# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| NATIONAL WILDLIFE REFUGE ASSOCIATION, DRIFTLESS AREA LAND CONSERVANCY, and WISCONSIN WILDLIFE FEDERATION | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. _____ |
| RURAL UTILITIES SERVICE, ANDY BERKE, Administrator, Rural Utilities Service, UNITED STATES FISH AND WILDLIFE SERVICE, WILL MEEKS, Midwest Regional Director, and SABRINA CHANDLER, Manager, Upper Mississippi River National Wildlife and Fish Refuge, UNITED STATES ARMY CORPS OF ENGINEERS, LIEUTENANT GENERAL SCOTT A. SPELLMON, Chief of Engineers and Commanding General, U.S. Army Corps of Engineers, COLONEL STEVEN SATTINGER, Commander and District Engineer, Rock Island District, U.S. Army Corps of Engineers, and COLONEL KARL JANSEN, Commander and District Engineer, St. Paul District, U.S. Army Corps of Engineers, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) ) ) ) | |

# COMPLAINT

Plaintiffs NATIONAL WILDLIFE REFUGE ASSOCIATION, DRIFTLESS AREA LAND CONSERVANCY, and WISCONSIN WILDLIFE FEDERATION, for their Complaint, allege and state as follows:

## I.    INTRODUCTION

1.    This is a civil action for declaratory and injunctive relief against three federal agencies for violations of the Administrative Procedure Act ("APA"), 5 U.S.C. § 701-706, the National Wildlife Refuge System Improvement Act of 1997 ("1997 Refuge System Improvement Act"), 16 U.S.C. § 668dd-668ee, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq.

2.    Plaintiffs contend that the federal agencies violated the 1997 Refuge System Improvement Act, NEPA and other applicable laws in granting permits and approvals, engaging in an unlawful land exchange and otherwise taking actions to allow three private developers to run a huge high-voltage transmission line with up to 200-feet high towers through the protected Upper Mississippi River National Wildlife and Fish Refuge, which was created by Congressional action in 1924, and by skewing the required NEPA review and purpose and need statements to avoid rigorously exploring and objectively evaluating all reasonable alternatives, among other NEPA issues.

3.    This lawsuit involves the controversial Cardinal-Hickory Creek ("CHC") high-voltage transmission line. The CHC transmission line with its wide

1

clear-cut right-of-way and up to 200-feet high towers is proposed to start in Dubuque County, Iowa, run through and across the protected Upper Mississippi River National Wildlife and Fish Refuge ("the Refuge"), and then run through southwest Wisconsin's scenic Driftless Area landscape, family farms, rural small-town communities, and vital natural resources and conservation areas to a substation in Middleton, Wisconsin.

4.     Plaintiffs previously sued the Rural Utilities Service of the U.S. Department of Agriculture ("RUS"), the U.S. Fish & Wildlife Service of the U.S. Department of Interior ("USFWS"), and the U.S. Army Corps of Engineers of the U.S. Department of Defense ("Corps"), and named agency officials (collectively, "Federal Defendants") in this Court challenging the Federal Defendants' approvals of the CHC transmission line. *Nat'l Wildlife Refuge Ass'n v. Rural Util. Serv.*, Nos. 21-cv-096-wmc & 21-cv-306, 580 F. Supp. 3d 588 (W.D. Wis. 2022) (attached hereto as "Exhibit A").

5.     American Transmission Co. ("ATC"), ITC Midwest ("ITC"), and Dairyland Power Cooperative, Inc. ("Dairyland") are the three developers (collectively, "Transmission Companies") of the CHC transmission line, and they intervened in the preceding related case.

6.     On January 14, 2022, this Court issued an Opinion and Order holding that the National Wildlife Refuge System Improvement Act of 1997, 18 U.S.C. §§

2

668dd-668ee, prohibited Defendant U.S. Fish & Wildlife Service from allowing the Transmission Companies, whether by easement or land exchange, to cross the protected Refuge because the huge high-voltage transmission line and its very high towers is not "compatible with" the Refuge's wildlife protection and conservation purposes. This Court concluded that the CHC transmission line was "preclude[d]…from crossing the Refuge by right of way or land transfer," and "a land exchange that is equally incompatible with the purposes of the Refuge as a right of way cannot be used as a method to evade Congress' mandate." *Nat'l Wildlife Refuge Ass'n v. Rural Utilities Serv.,* 580 F.Supp.3d 588, 610 (W.D. Wis. 2022).

7.     This Court further held in its Opinion and Order, that the three Federal Defendants' environmental impact statement ("EIS") and Record of Decision ("ROD") failed to comply with NEPA because, among other things, the EIS defined the "purpose and need" so narrowly that non-Refuge-crossing alternatives, including a combination of non-wires alternatives, were not rigorously explored and objectively evaluated. *Id*. at 613, 615.

8.     In its Opinion and Order, this Court warned the Transmission Companies about continuing construction up to the borders of the protected Upper Mississippi River National Wildlife and Fish Refuge, and described that approach

3

as an "orchestrated train wreck," which the Court was not likely to tolerate. *Id.* at 601.

9.     The Federal Defendants and the Transmission Companies appealed this Court's January 14, 2022 Opinion and Order to the U.S. Court of Appeals for the Seventh Circuit. On July 19, 2023, the Seventh Circuit issued its Opinion that did not reach the merits of the 1997 Refuge System Improvement Act and the NEPA violations, but instead vacated this Court's Order on the grounds that Defendants had not reached a "final agency decision" and, therefore, the case was not yet reviewable under the APA. *Driftless Area Land Conservancy v. Rural Util. Serv.*, 74 F.4th 489 (7th Cir. 2023) (attached hereto as "Exhibit B").

10.    In the face of this Court's warning about creating an "orchestrated trainwreck," the Transmission Companies have nonetheless built their high-voltage transmission line and very high towers right up to the borders of the protected Refuge. *See* Transmission Companies Fourth Quarter of 2023 Construction Progress Report to the Public Service Commission of Wisconsin (attached hereto as "Exhibit C").

11.    On February 23, 2024, Defendant USFWS issued three documents: (1) a Finding of No Significant Impact ("FONSI") under NEPA (attached hereto as "Exhibit D"); (2) an executed Land Exchange (attached hereto as "Exhibit E");

4

which is identical to the deal this Court previously invalidated; and (3) a "Net Benefits Analysis" (attached hereto as "Exhibit F") for the land exchange.

12.    Defendant USFWS did not issue a draft version of this FONSI document for public notice and did not provide a reasonable opportunity for public comments before issuing its final version of this FONSI document on February 23, 2024.

13.    Defendant USFWS did not issue a draft version of this land exchange document for public notice and did not provide a reasonable opportunity for public comments before issuing its final version of this land exchange document on February 23, 2024.

14.    Defendant USFWS did not issue a draft version of its Net Benefits Analysis for public notice and did not provide a reasonable opportunity for public comments before issuing its final version of this Net Benefits Analysis document on February 23, 2024.

15.    Defendant USFWS has made a "final agency decision."

16.     Defendant USFWS has approved a land exchange by which it will convey and transfer fee simple title to the Transmission Companies for their preferred corridor to bulldoze and run the transmission line and towers through the protected Refuge in exchange for a parcel of land downstream the Mississippi River on the Wisconsin side.

17.     On information and belief, the Transmission Companies are taking preparatory steps to run the CHC transmission line and high towers through and across what has long been the protected Upper Mississippi River National Wildlife and Fish Refuge.

18.     On information and belief, the Transmission Companies have cleared staging areas and assembled heavy equipment to begin construction through the Refuge, and they appear ready to proceed. One of Plaintiffs' members has witnessed activity near the Refuge in the past few weeks, including staging of laydown pallets on the Iowa side and unloading materials on the Wisconsin side. *See* Declaration of Dena Kurt (attached hereto as "Exhibit G").

19.     The Transmission Companies have publicly stated their intention to finish construction and operationalize the western half of the CHC project by the end of June 2024. Final Supplemental Environmental Assessment ("SEA") at 40 (attached hereto as "Exhibit H").

20.     This land exchange violates the 1997 National Wildlife Refuge System Improvement Act, as this Court previously held. 16 U.S.C. § 668dd; *Nat'l Wildlife Refuge Ass'n,* 580 F. Supp. 3d at 610.

21.     The Defendants have not conducted any further analyses of non-Refuge-crossing alternatives.

22.     Defendants, USFWS, RUS, and the Corps have made final agency decisions in issuing their Final EIS and ROD and their subsequent final Supplemental Environmental Assessment under NEPA, which were relied upon by USFWS in its February 23, 2024 decision documents.

23.     Defendants' NEPA documents, including the FONSI, the supplemental environmental assessment and the original environmental impact statement, all violate NEPA as this court previously held. 42 U.S.C. § 4321 *et. seq*; *Nat'l Wildlife Refuge Ass'n.*, 580 F. Supp. 3d at 612-13.

24.     Plaintiffs therefore seek a declaratory judgment "setting aside" the land exchange and land transfer, and preliminary and permanent injunctive relief against any construction of the CHC high-voltage transmission line and high towers through and across the historic, long-standing land and waters of the Upper Mississippi River National Wildlife and Fish Refuge, and against any approvals thereof by the Federal Defendants that would allow this to take place.

## II.     JURISDICTION AND VENUE

25.      This Court has federal question jurisdiction under 28 U.S.C. § 1331, and federal officer jurisdiction under 28 U.S.C. § 1346, and supplemental jurisdiction over any state claims under 28 U.S.C. § 1367.

26.     This Court has the authority to grant the requested relief under the APA, 5 U.S.C. § 706(2), under 28 U.S.C. §§ 2201 (declaratory relief) and 2202 (injunctive relief), and under Fed. R. Civ. P. 65.

27.     Venue in the United States District Court for the Western District of Wisconsin is appropriate under 28 U.S.C. § 1391. Plaintiffs Driftless Area Land Conservancy ("DALC") and Wisconsin Wildlife Federation ("WWF") are located in this district. Most of the CHC high-voltage transmission line is located in this district, and more than half of the challenged land exchange involves transferring land located in this district.

28.     "A substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of the property that is the subject of the action is situated" in the Western District of Wisconsin within the meaning of 28 U.S.C. § 1391.

29.     This U.S. District Court for the Western District of Wisconsin has conducted all previous federal litigation over this CHC transmission line. *See, e.g.*, *Nat'l Wildlife Refuge Ass'n,* 580 F. Supp. 3d at 588.

30.     This action is timely under Title 41 of the FAST Act, 42 U.S.C. § 4370m-6(a)(1)(A) and under 28 U.S.C. § 2401.

## III.   STANDING

31.     Plaintiff National Wildlife Refuge Association ("NWRA") is a not-for-profit organization focused exclusively on protecting and promoting the 850 million-acre National Wildlife Refuge System, which is the world's largest network of lands and waters set aside for wildlife conservation. Founded in 1975, NWRA's mission is to conserve America's wildlife heritage for future generations through strategic programs that enhance the National Wildlife Refuge System and the landscapes beyond its boundaries.

32.     NWRA's affiliates and supporters include Friends of Pool 9 and Friends of the Refuge—Mississippi River Pools 7 & 8, two of the volunteer organizations that support the Upper Mississippi River National Wildlife and Fish Refuge.

33.     NWRA has members who use and enjoy and plan to continue to use and enjoy the Upper Mississippi River National Wildlife and Fish Refuge and the extensive natural resources in the Driftless Area.

34.     Dena Kurt is an NWRA member who lives near and recreates in the Upper Mississippi River National Wildlife and Fish Refuge. Ms. Kurt frequently kayaks on the Mississippi River and enjoys observing wildlife and a practice of silent paddling through the Refuge. Ms. Kurt is disheartened by the impacts she already sees in the Refuge from the transmission line built up to the boundaries. If

the transmission line is completed through the Refuge, Ms. Kurt will visit that section of the River less often. As discussed in her declaration, Ms. Kurt has observed staging and other activity by the Companies in the last few weeks to prepare for construction near the Refuge. Ms. Kurt's Declaration is attached hereto as Exhibit G.

35.     Mark Mittelstadt is an NWRA member who lives, works and recreates in the Driftless Area and the Upper Mississippi River National Wildlife and Fish Refuge. Mr. Mittlestadt is a professional forester who has worked on properties near the Refuge. Mr. Mittelstadt visits the Refuge regularly, enjoying the scenic beauty of the Mississippi River and the steep bluffs rising up from the Mississippi River. Mr. Mittelstadt's Declaration is attached hereto as Exhibit I.

36.     This Court previously held that NWRA had standing in the prior, related lawsuit. *Nat'l Wildlife Refuge Ass'n*, 580 F. Supp. 3d at 603.

37.     Plaintiff Driftless Area Land Conservancy ("DALC") is a not-for-profit land trust and conservation organization, headquartered in Dodgeville, Wisconsin. DALC is dedicated to protecting sensitive lands, vital conservation areas, scenic landscapes, historic properties, and natural resources in Wisconsin's Driftless Area. DALC and its members maintain and enhance the health, diversity, and beauty of Wisconsin's natural and agricultural landscape through permanent land protection and restoration, and other conservation, natural resources

protection, and preservation actions. DALC is a nationally certified land trust that was recognized as the Wisconsin Land Conservancy of the Year in 2017 by Gathering Waters, which is Wisconsin's Alliance for Land Trusts.

38.   DALC has members who use and enjoy, and plan to continue to use and enjoy the Upper Mississippi River National Wildlife and Fish Refuge and the extensive natural resources in Wisconsin's Driftless Area.

39.   Mary Kritz is a DALC member who lives in Southwest Wisconsin who enjoys trail walking, hiking and taking in the beautiful scenery of the Refuge. Ms. Kritz's enjoyment of the Refuge will be diminished if the transmission line is allowed to run through the existing Refuge lands and waters. Ms. Kritz's declaration is attached hereto as Exhibit J.

40.   Kerry Beheler is a DALC member who has lived and worked near the Refuge for over 40 years. Ms. Beheler is an avid birder who enjoys observing the spring migration. Ms. Beheler's declaration is attached hereto as Exhibit K.

41.   Kristi Hart is a DALC member who lives in Southwest Wisconsin and visits the Refuge with her kids and grandkids. Ms. Hart enjoys taking in the scenery, bird watching and looking for interesting plants around the Refuge. Ms. Hart's declaration is attached hereto as Exhibit L.

42.    In addition to their membership in the National Wildlife Refuge Association, Ms. Kurt and Mr. Mittelstadt are also DALC members. *See* Exhibits G and I.

43.    This Court previously held that DALC had standing in the prior, related lawsuit. *Nat'l Wildlife Refuge Ass'n*, 580 F. Supp. 3d at 603.

44.    Plaintiff Wisconsin Wildlife Federation ("WWF") is a not-for-profit conservation organization dedicated to protecting wildlife habitat, conservation lands and waters, and natural resources throughout the State of Wisconsin on behalf of the hunters, anglers, trappers, and other individuals who are WWF members.

45.    WWF has members who use and enjoy, and plan to continue to use and enjoy the Upper Mississippi River National Wildlife and Fish Refuge and the extensive natural resources in Wisconsin's Driftless Area.

46.    Charles Horn is a WWF member who previously worked for the Wisconsin Department of Natural Resources in Southwest Wisconsin covering an area that includes the Upper Mississippi River National Wildlife and Fish Refuge. Mr. Horn is an avid fisherman who spends significant time navigating and recreating on the Mississippi River in the Refuge. Mr. Horn's declaration is attached hereto as Exhibit M.

47.    In addition to her membership in DALC, Ms. Kristi Hart is also a WWF member. *See* Exhibit L. Likewise, in addition to her membership in both DALC and NWRA, Ms. Dena Kurt is also a WWF member. *See* Exhibit G.

48.    This Court previously held that WWF had standing in the prior, related lawsuit. *Nat'l Wildlife Refuge Ass'n*, 580 F. Supp. 3d at 603.

49.    Construction of the CHC transmission line and very high towers and, in particular, bulldozing and running through and across the protected Upper Mississippi River National Wildlife and Fish Refuge would frustrate the mission of each of the Plaintiff organizations and their members to protect wildlife and wildlife habitat, conserve vital natural resources, use and enjoy these special areas and scenic landscapes, and engage in outdoor recreational activities.

## IV.    DEFENDANTS

50.     Defendant United States Fish & Wildlife Service ("USFWS") is a bureau of the U.S. Department of the Interior, and it manages the lands in the National Wildlife Refuge System in trust on behalf of the public.

51.    Defendant Will Meeks is the Regional Director for USFWS for its Midwest region, which includes the Upper Mississippi River National Wildlife and Fish Refuge. Defendant Meeks is sued in his official capacity.

52.    Defendant Sabrina Chandler is the Manager of the Upper Mississippi River National Wildlife and Fish Refuge, and she is sued in her official capacity.

53.     Defendant Rural Utilities Service ("RUS") is part of the U.S. Department of Agriculture ("USDA"). Its Electric Program provides loans and loan guarantees to finance the construction of electric distribution, transmission and generation facilities, including system improvements, as well as demand-side management, energy conservation programs, and on-grid and off-grid renewable energy systems.

54.     Defendant Andy Berke is the Administrator of the RUS, and he is sued in his official capacity.

55.     Defendant U.S. Army Corps of Engineers ("Corps") is part of the U.S. Department of the Army in the U.S. Department of Defense. The Corps' Civil Works Regulatory Program evaluates permit applications under section 10 of the Rivers and Harbors Act of 1899, and under section 404 of the Clean Water Act, for essentially all construction activities that occur in the "waters of the United States."

56.     Defendant Lieutenant General Scott Spellmon is the Chief of Engineers and Commanding General of the U.S. Army Corps of Engineers, and he is sued in his official capacity.

57.     Defendant Colonel Karl Jansenis the Commander and District Engineer for the St. Paul District of the Corps, which covers permit applications in Wisconsin, and he is sued in his official capacity.

58.     Defendant Colonel Steven Sattinger is the Commander and District Engineer for the Rock Island District of the Corps, which covers permit applications in Iowa, and he is sued in his official capacity.

59.     The Transmission Companies were intervenor-defendant parties in the previous related case. *Nat'l Wildlife Refuge Ass'n*, 580 F. Supp. 3d at 593.

60.     The three Transmission Companies are not named as Defendants in this Complaint at this time based on their representation to Plaintiffs' counsel that they will not begin construction through the Refuge unless and until the proposed land exchange is fully closed. Plaintiffs are serving courtesy copies of this Complaint on the Transmission Companies.

## V.     FACTS

### A.     The Upper Mississippi River National Wildlife and Fish Refuge and the Scenic Driftless Area Landscape and Communities

61.      The Upper Mississippi River National Wildlife and Fish Refuge was established by Congress in 1924 as a refuge and breeding place for migratory birds, and as a refuge for other birds, wildlife, fish, and plants. 16 U.S.C. § 723.

62.     The Refuge covers over 240,000 acres and extends 261 river miles from its north end at the confluence of the Chippewa and Mississippi Rivers and its south end near Rock Island, Illinois. *Upper Mississippi River National Wildlife and*

15

*Fish Refuge, About Us,* U.S Fish and Wildlife Service,

https://www.fws.gov/refuge/upper-mississippi-river.

63.     The Upper Mississippi River National Wildlife and Fish Refuge is one of the largest blocks of floodplain habitat in the lower 48 states. According to Defendant USFWS: "[b]ordered by steep wooded bluffs that rise 100 to 600 feet above the river valley, the Mississippi River corridor and refuge offer scenic beauty and productive fish and wildlife habitat unmatched in the heart of America." *Upper Mississippi River National Wildlife and Fish Refuge, About Us,* U.S Fish and Wildlife Service, https://www.fws.gov/refuge/upper-mississippi-river/about-us.

64.     The Upper Mississippi River National Wildlife and Fish Refuge is designated as a Wetland of International Importance pursuant to the treaty established at the Ramsar Convention on Wetlands of International Importance. *See Upper Mississippi River Floodplain Wetlands*, Ramsar, Sites Information Service, Ramsar (Jan. 5, 2020) https://rsis.ramsar.org/ris/1901.

65.     The designation of an area as a Ramsar site "embodies the government's commitment to take the steps necessary to ensure that its ecological character is maintained." *Wetlands of International Importance*, Ramsar: The Convention on Wetlands, https://www.ramsar.org/about-wetlands-of-international-importance-ramsar-sites. Ramsar sites "are recognized as being of significant value

16

not only for the country or the countries to which they are located, but for humanity as a whole." *Id.*

66.    The Upper Mississippi River National Wildlife and Fish Refuge is also designated as a Globally Important Bird Area. *Upper Mississippi River National Wildlife and Fish Refuge,* U.S. Fish & Wildlife Service, https://www.fws.gov/refuge/upper-mississippi-river.

67.    The Upper Mississippi River National Wildlife and Fish Refuge is located within the Mississippi Flyway, a major bird migration route used by more than 325 migratory bird species to travel from their breeding grounds in Canada and the northern United States to their wintering grounds along the Gulf of Mexico and in Central and South America.

68.    While birds migrate north and south along the Mississippi Flyway in the Refuge, the Transmission Companies plan to build their high-voltage transmission line and high towers east and west through and across the Refuge.

69.    That east-west horizontal transmission line through and across the Refuge will cause migratory bird kills, injuries and deaths.

70.    The federally endangered whooping crane, the tallest of North America's birds and one of the rarest, has been sighted at the Refuge near where the CHC transmission line is proposed to run through and across the Refuge. *See* Exhibit G at ¶19.

17

71.     Construction of the CHC transmission line in the protected Upper Mississippi River National Wildlife and Fish Refuge will also take place in or near an Essential Habitat Area for the federally endangered Higgins eye pearly mussel, the greatest native mussel density of all the essential habitat areas in the United States.

72.     The Upper Mississippi River National Wildlife and Fish Refuge is also part of the iconic Driftless Area of Wisconsin, Iowa, Minnesota, and Illinois.

73.     Unlike most of the Midwest's landscape, the Driftless Area was not flattened by glaciers. Instead, it includes hundreds of rolling hills with deep river valleys, and contains many rare and unique woodland, prairie, and riparian habitats.

74.     The Driftless Area has more than 1,200 streams, including world-class trout fishing streams, more than 4,000 river miles, and a network of 600 spring-fed creeks that flow through porous limestone bedrock.

**B.      The Cardinal-Hickory Creek High-Voltage Transmission Line Project**

75.      The CHC transmission line project begins at the Hickory Creek substation in Dubuque County, Iowa, would then run across and through the protected Upper Mississippi River National Wildlife and Fish Refuge, and then would cut a wide swath east through Wisconsin's scenic Driftless Area landscape,

18

vital natural resources, conservation areas, family farms and rural small town

communities to the Cardinal substation in Middleton, Wisconsin.



Exhibit H at 4.

76.    For most of its route, the CHC transmission line's right-of-way is 150-

feet wide. Within the protected Upper Mississippi River National Wildlife and Fish

Refuge, the proposed right-of-way will be 260-feet wide with towers nearly 200-

feet high at the Mississippi River crossing points.

77.    Almost all of the CHC transmission line cuts through the scenic

Driftless Area landscape in Southwest Wisconsin. Construction of the transmission

line is now having and will have significant adverse effects on conservation lands

and rivers, lakes and streams, ecological, economic, historic aesthetic resources, tourism opportunities and outdoor recreation enjoyment, small-town rural communities, and vital natural resources along its entire route both through the Upper Mississippi River National Wildlife and Fish Refuge and throughout the Driftless Area in Southwest Wisconsin.

78.     If it becomes operational, the CHC transmission line will be open access, and it will carry a significant amount of electricity generated from coal and other fossil fuel-powered generating plants, which emit greenhouse gases causing significant harmful climate change impacts.

79.      The CHC transmission line was first conceived in the early 2000's as part of a "multi-value portfolio" of about 20 new proposed high-voltage transmission lines by the Midcontinent Independent System Operator ("MISO"), a regional transmission planner that covers the Upper Midwest region.

80.     MISO did not analyze the incremental costs and benefits, or evaluate the route for the CHC transmission line itself.

81.     MISO's analysis was largely limited to an evaluation of the entire portfolio of about 20 proposed new transmission lines.

82.     As of December 31, 2023, the Transmission Companies state that they have spent $649 million on the CHC transmission line project. *See* Exhibit C.

83.     Under Federal Energy Regulatory Commission ("FERC") orders, the Transmission Companies are provided a rate of return of between 10 and 12% on their prudent and reasonable capital investment so they have a financial incentive to defer finding less expensive, less environmentally damaging alternative solutions to their huge costly proposed high-voltage transmission line.

### C.     Procedural History

84.     In 2006, USFWS released its Comprehensive Conservation Plan ("CCP") for the Upper Mississippi River National Wildlife and Fish Refuge, as required by the 1997 Refuge System Improvement Act. The CCP is attached hereto as "Exhibit N."

85.     The CCP outlines the Refuge Managers long-term plans for the Refuge.

86.     The CCP identifies the importance of land exchanges, with a particular focus on "explor[ing] land exchanges with the states to remove intermingled ownerships." *See e.g.*, CCP at 111.

87.     The CCP discusses "Land Acquisition" in several paragraphs without mentioning *disposition* of land for private infrastructure projects once. *Id.* at 13.

88.     Further, the CCP identifies land acquisition as a means to preserve flood plains. *Id.*

89.     According to the CCP, habitat fragmentation is a threat and harm to be avoided.

90.     In 2012, the Transmission Companies met with the Defendant USFWS's managers of the Upper Mississippi River National Wildlife and Fish Refuge to discuss whether their proposed CHC high-voltage transmission line could or should be allowed to run through and across the protected Refuge.

91.     The Defendant USFWS Refuge managers met with ATC to discuss the proposed CHC transmission line, and USFWS managers confirmed "the use of existing rights-of-way and or avoidance of the Refuge as the only compatible alternatives for crossing the Refuge." *See* Email from Timothy Yager, former Deputy Refuge Manager USFWS to Cheryl Laatsch, Wisconsin DNR, April 17, 2012. (attached hereto as "Exhibit O").

92.     At about that time, the Refuge managers also advised a different group of transmission developers (including Dairyland Power) that the Defendant USFWS would not allow their proposed high-voltage transmission line to run through and across the Refuge at the Black River Bottoms location farther north.

93.     The Defendant USFWS Refuge managers explained the reasons why a project like CHC high-voltage transmission could not meet the 1997 National Wildlife Refuge System Improvement Act's requirements. According to the USFWS Refuge managers, right-of-way projects "can cause habitat fragmentation,

reduce habitat quality, degrade habitat quality through introduction of contaminants; disrupt migration corridors; alter hydrology; facilitate introduction of alien, including invasive species; and disturb wildlife." *See* Refuge Managers Letter on Capx2020 at 21 (attached hereto as "Exhibit P").

94.    The Defendant USFWS Refuge managers also explained that transmission line crossings would: compromise the area's scenic qualities; encourage the establishment of invasive species like reed canary-grass, European buckthorn, Japanese knotweed, and others; compromise threatened and endangered and candidate species like the Higgins Eye pearlymussel, the Massasauga rattlesnake, and the sheepnose mussel; pose a significant hazard to bald eagles; and greatly increase the risk of harmful bird strikes generally. Exhibit P at 24.

95.    In 2017, the U.S. Environmental Protection Agency ("EPA") concurred with the USFWS Refuge managers, and specifically advised the Transmission Companies to find a non-Refuge-crossing alternative. *See* 2017 EPA Scoping Comments (attached hereto as "Exhibit Q").

96.    Nevertheless, the Transmission Companies pressed forward with their plan to build the huge CHC high-voltage transmission line that would run through and across the protected Refuge.

97.    Dairyland Power expressed interest in securing a loan from Defendant Rural Utilities Service ("RUS") for its share of the CHC transmission

line project, and that triggered the requirement for an environmental impact statement ("EIS") under NEPA and the U.S. Department of Agriculture's applicable NEPA rules and regulations.

98.    The Transmission Companies seeking to develop the CHC high-voltage transmission line needed permits from the Defendant U.S. Army Corps of Engineers for constructing in "waters of the United States."

99.    The Transmission Companies seeking to develop the CHC high-voltage transmission line needed an easement and special permit from the Defendant U.S. Fish and Wildlife Service in order to cross the protected Refuge.

100.    The Transmission Companies seeking to develop the CHC high-voltage transmission line also needed state permits from Wisconsin and Iowa.

101.    The Defendant Corps' and USFWS's actions and approvals required environmental reviews under NEPA.

102.    Defendant Corps and Defendant USFWS joined together with Defendant RUS in the NEPA EIS process as cooperating agencies.

103.    At all stages—scoping, draft EIS, and final EIS—Plaintiffs DALC and WWF submitted written comments. These comments are attached hereto as Exhibits R, S, and T respectively.

104.    At all stages—scoping, draft EIS, and final EIS—Plaintiffs DALC's and WWF's members participated in public meetings and hearings.

105.   Despite DALC and WWF's opposition and thousands of other public comments, the Federal Defendants' final EIS ("FEIS") and Record of Decision ("ROD") summarily rejected all non-Refuge-crossing alternatives, principally on the grounds that those alternatives would not meet the "purpose and need" of increasing electricity transfer capacity between Iowa and Wisconsin.

106.   Plaintiffs DALC and WWF, their members' and their allies' comments identified alternatives and the following problems with the Transmission Companies' proposed CHC high-voltage transmission line:

(A) The Defendants' EIS purpose and need statement required that any alternatives "increase transfer capacity of the electrical system between Iowa and Wisconsin." That precluded consideration of non-wires alternatives or grid enhancement technologies, and it precluded routes to carry electricity from west to east that would go north or south of the protected Refuge and most of the Driftless Area.

(B) The Defendants' environmental review documents did not take a hard look at all reasonable alternatives, particularly routes that did not cross the protected Refuge, but, instead, only seriously considered two alternatives, both of which were to be new high-voltage transmission lines and both of which crossed the protected Refuge near Cassville, WI. One was on a route across the Refuge where old low-voltage power lines run ("the Stoneman crossing"), and one was

25

farther north where an old coal-fired power plant had stood ("the Nelson Dewey crossing").

(C) The Defendants' EIS did not take a hard look assessing the climate change impacts even though the Federal Defendants and the Transmission Companies acknowledged that the CHC high-voltage transmission line would carry electricity from fossil fuel generating plants.

(D) The Defendants' EIS did not take a hard look at the cumulative impacts of the CHC high-voltage transmission line in combination with other high-voltage transmission lines and other environmentally harmful development projects recently built in the area, including the Badger-Coulee high-voltage transmission line running from near La Crosse, WI through the Driftless Area towards the Madison, Wisconsin area.

(E) The Defendants' environmental review documents assumed the lawfulness of any crossing through the Upper Mississippi River National Wildlife and Fish Refuge.

(F) The Defendants' EIS did not take a hard look at other adverse environmental impacts, including but not limited to impacts involving invasive species, increased deer population and damage, effects on tourism, recreation, and on public and private conservation and other lands.

(G) The Defendants' environmental review documents overly and impermissibly relied on reports and self-serving analyses from the Transmission Companies who are the CHC transmission line developers and proponents.

(H) The Defendants' EIS and ROD outcome was their predetermined approval of the Transmission Companies' CHC high-voltage transmission line along their preferred route running through and crossing the protected Refuge.

107.   On January 16, 2020, the three Federal Defendants issued a Record of Decision ("ROD 2020"), finding the EIS adequate under NEPA.

108.   The Defendant Corps would then grant permits for work in waterbodies and wetlands along the route and the Defendant RUS would consider the loan application.

109.   As part of the ROD, Defendants USFWS and Corps would grant right-of-way ("ROW") easements and special permits for the Transmission Companies' preferred "Nelson Dewey crossing."

110.   The ROD included a USFWS document, dated December 19, 2019, called a "Compatibility Determination," which it later rescinded. *Nat'l Wildlife Refuge Ass'n*, 580 F. Supp. 3d at 595.

111.   While the USFWS found the use to be compatible, this decision was later rescinded because it relied on inaccurate information.

27

112. Defendant USFWS determined that the CHC high-voltage transmission line could be grandfathered in, by deeming it as "maintenance" of the old, low-voltage lines that use "the Stoneman crossing," if the Transmission Companies were willing to take down the old lines and revegetate the area. *See Nat'l Wildlife Refuge Ass'n*, 580 F. Supp. 3d at 604.

113. Under the 1997 Refuge Act, "[m]aintenance of an existing right-of-way includes minor expansion or minor realignment to meet safety standards." 50 C.F.R. § 26.41(c).

114. Defendants USFWS and Corps formally granted the right-of-way easements in September 2020.

115. On February 10, 2021, and on May 4, 2021, Plaintiffs NWRA, DALC and WWF, along with Defenders of Wildlife, filed lawsuits in this Court to "set aside" the Federal Defendants' FEIS and Record of Decision and the accompanying decisions from all three agencies, and to enjoin further construction of the CHC high-voltage transmission line project unless and until the Federal Defendants fully comply with all applicable federal laws.

116. On March 1, 2021, Dairyland and ITC submitted an application for a revised crossing of the Defendant USFWS's fee title land in the Upper Mississippi River National Wildlife and Fish Refuge, stating a need to reduce the impact on cultural resources.

28

117.   The Federal Defendants prepared a new draft environmental assessment ("EA") for the route modification, which was made available to the public on June 24, 2021, with a 30-day comment period.

118.   On July 29, 2021, five days after the EA comment period expired, the Transmission Companies made a proposal to Defendant USFWS for an expedited land exchange as an alternative to the pending proposal to grant an easement and special permit, which the Transmission Companies said would "take too long." *Nat'l Wildlife Refuge Ass'n*, 580 F. Supp. 3d at 594.

119.   Under the Transmission Companies' proposal, the Defendant USFWS would deed the right-of-way for the project using the Nelson Dewey crossing, and the Transmission Companies would convey a parcel of land in Wisconsin that they were going to transfer anyway as compensatory mitigation for the damage caused by the CHC high-voltage transmission line.

120.   Defendant USFWS's own rules expressly prohibit using "compensatory mitigation," like receiving other land in return, to meet the compatibility requirements in the 1997 National Wildlife Refuge System Improvement Act. 50 C.F.R. § 26.41(b).

121.   Defendant USFWS may not "initiate or permit a new use of a national wildlife refuge or expand, renew, or extend an existing use of a national wildlife

29

refuge, unless [USFWS] has determined that the use is a compatible use." 16

U.S.C. § 668dd(d)(3)(A)(i).

122.   Under the 1997 Refuge Act, a "compatible use" is "a wildlife

dependent recreational use, or any other use on a refuge that . . . will not materially

interfere with or detract from the fulfillment of the mission of the System or the

purposes of the refuge." 16 U.S.C. § 668ee(1).

123.   In a letter dated August 3, 2021, Defendant Sabrina Chandler on

behalf of Defendant USFWS advised the Transmission Companies that USFWS

favored the land exchange proposal (attached hereto as "Exhibit U").

124.   The parties completed surveying before August 25, 2021. Doc. 67 at

5, 21-cv-00096.

125.   On August 27, 2021, less than a month after the Transmission

Companies first proposed the land exchange, and one week before summary

judgment briefs were due in the lawsuit before this Court, the Defendant USFWS

withdrew its "Compatibility Determination" which grandfathered in the CHC high-

voltage transmission line project by having characterized it as "maintenance,"

again citing a title or property description problem with one of the existing

easements. *See* FWS August 27, 2021 Letter to Companies (attached hereto as

"Exhibit V"); *see also Nat'l Wildlife Refuge Ass'n*, 580 F. Supp. 3d at 594.

126.   On or about October 25, 2021, the Transmission Companies commenced construction of the CHC high-voltage transmission line and very high towers in both Iowa and Wisconsin.

127.   On October 29, 2021, two days after this Court conducted a hearing on Plaintiffs' motion for a preliminary injunction, Defendant USFWS and Intervenor-Defendants Dairyland and ITC Midwest formally executed a Statement of Proposed Land Exchange/Purchase that identified the parcels of land that would be exchanged and setting the terms and conditions.

128.   On November 1, 2021, this Court enjoined the Transmission Companies from any activities under their Corps issued permits in jurisdictional waters. *See Nat'l Wildlife Refuge Ass'n v. Rural Utilities Serv.*, Nos. 21-cv-096-wmc, 21-cv-306, 2021 WL 5050073 at *7 (W.D. Wis. Nov. 1, 2021).

129.   This Court found that the Plaintiffs will suffer irreparable harm if the Cardinal Hickory Creek high-voltage transmission line is completed. *Id.* at *7 ("All of the above represent real and irreparable impacts that will occur from clearing alone; actual groundbreaking will lead to even more severe consequences.").

130.   This Court also found that the balance of hardships tipped toward the Plaintiffs. *Id.* at *8.

131.   The Federal Defendants' and Transmission Companies' fully executed Statement of Proposed Land Exchange/Purchase, dated October 29, 2021,

was not disclosed to the Plaintiffs. The Statement of Proposed Land Exchange/Purpose is attached hereto as "Exhibit W."

132.   The Federal Defendants' and Transmission Companies' fully executed Statement of Proposed Land Exchange/Purchase, dated October 29, 2021, was not disclosed to this Court or to the U.S. Court of Appeals for the Seventh Circuit.

133.   On January 14, 2022, this Court entered an Opinion and Order granting partial summary judgment to the Plaintiffs. *Nat'l Wildlife Refuge Ass'n*, 580 F. Supp. 3d at 615. The Court made several key conclusions related to the 1997 National Wildlife Refuge System Improvement Act and its applicability to the case.

134.   The Court recognized that, under the National Wildlife Refuge System Improvement Act of 1997: (1) the USFWS may not "initiate or permit a new use of a national wildlife refuge or expand, renew, or extend an existing use of a national wildlife refuge, unless [USFWS] has determined that the use is a compatible use," 16 U.S.C. § 668dd(d)(3)(A)(i); (2) a "compatible use" is one that "will not materially interfere with or detract from the fulfillment of the mission of the System or the purposes of the Refuge;" 16 U.S.C. § 668ee(1); and (3) the Refuge Act expressly subjects "powerlines, telephone lines, canals, ditches,

pipelines, and roads" to the compatibility requirement. 16 U.S.C. §

668dd(d)(1)(B). *Nat'l Wildlife Refuge Ass'n*, 580 F. Supp. 3d at 606.

135.   The Court agreed with Plaintiffs that the CHC transmission line and

right-of-way did not meet that standard. *Id.* at 608.

136.   The Court noted that USFWS rules allow an exception for

"maintenance of an existing right-of-way, including minor expansion or minor

realignment to meet safety standards." 50 C.F.R. § 26.41(c).

137.   The Court, however, concluded that the proposed CHC transmission

line crossing—with its 260-foot-wide right-of-way and up to 200-feet high

towers—could not lawfully be considered "maintenance" because it was neither

"minor" nor being built to "meet safety standards." 580 F. Supp. 3d at 604.

138.   The Court rejected Defendant USFWS's initial decision to grandfather

in the CHC transmission line. *Id.*

139.   The Court explained that the 1997 Refuge System Improvement Act

requires every Refuge to complete and to comply with a "Comprehensive

Conservation Plan (CCP)." 16 U.S.C. 668dd(e)(1).

140.   The Court held that allowing the proposed CHC high-voltage

transmission line to cross the Refuge would violate the Refuge's Comprehensive

Conservation Plan, which prioritizes restoring habitat connectivity and expressly

recognizes habitat fragmentation as a threat, because it would create additional habitat gaps and forest fragmentation. 580 F.Supp.3d at 607.

141.   The Court held that Defendant USFWS could not avoid the compatibility requirements in the 1997 Refuge System Improvement Act through a land exchange under 16 U.S.C. § 668dd(b)(3), which allows Refuge managers to exchange away land that is "suitable for disposition."

142.   The Court held that the general land exchange authority could not overcome the specific requirements and procedures in the 1997 Refuge System Improvement Act for linear projects like the CHC high-voltage transmission line. 580 F. Supp. 3d at 609.

143.   The Court held that the land to be exchanged away could not be "suitable for disposition" because "deeding a long strip of land to private utility companies that cuts through the *middle of the Refuge* for construction of a major power line would not comport with the goals of consolidating jurisdiction and reducing fragmentation." *Id.* at 610.

144.   The Court stated that Defendant USFWS's own rules expressly prohibited using "compensatory mitigation," like receiving other land in return, to meet the compatibility requirements in the statute. 50 C.F.R. § 26.41(b). 580 F. Supp. 3d at 608.

145.   The Court's January 14, 2022 Opinion and Order concluded that the FEIS that all three Federal Defendants relied up on to support their decisions, and the ROD that they all signed, did not comply with NEPA's statutory requirements and applicable regulations.

146.   The Federal Defendants' FEIS "defined the purpose and need of the CHC project so narrowly as to define away reasonable alternatives." *Nat'l Wildlife Refuge Ass'n,* 580 F. Supp. 3d at 610. The requirement that the transfer capacity between Iowa and Wisconsin be increased, coupled with the other sub-purposes, left "the EIS to only consider alternatives so substantially similar to the CHC project that any distinction would be meaningless." *Id*. at 612.

147.   The Federal Defendants' FEIS improperly adopted the "convoluted" purpose statement provided by the project proponents, contrary to "the duty under NEPA to exercise a degree of skepticism in dealing with self-serving statements from a prime beneficiary of the project." *Nat'l Wildlife Refuge Ass'n*, 580 F. Supp. 3d at 613 (quoting *Simmons v. U.S. Army Corps of Eng'rs*, 120 F.3d 664, 669 (7th Cir. 1987)).

148.   The Court's Opinion stated that the Transmission Companies apparently intended to complete construction of the CHC high-voltage transmission line up to the borders of the protected Upper Mississippi River

National Wildlife and Fish Refuge despite having no lawful way to cross. *Nat'l Wildlife Refuge Ass'n,* 580 F. Supp. 3d at 599.

149.   The Court described the Transmission Companies' strategy and approach as an "orchestrated trainwreck." *Id.* at 600–01.

150.   The Court stated that "the Utilities are pushing forward with construction on either side of the Refuge, even without an approved path through the Refuge, in order to make any subsequent challenge to a Refuge crossing extremely prejudicial to their sunk investment, which will fall on ratepayers regardless of completion of the CHC project, along with a guaranteed return on the Utilities' investment in the project." *Id*. at 599.

151.   The Court concluded: "both the government defendants and Utilities appear to be playing a shell game, cavalierly revoking applications for and grants of permits, all as a Refuge crossing becomes a near certainty, while telling this court that *nothing* is yet reviewable." *Id*. at 600.

152.   The Federal Defendants and the Transmission Companies appealed this Court's Opinion and Order to the U.S. Court of Appeals for the Seventh Circuit.

153.   The Federal Defendants argued that the Defendant USFWS's decision was not final and there was a lack of a "final agency action" under the APA.

36

154.   The Federal Defendants did not argue the merits or legality of the land exchange, other than to assert that USFWS's power to exchange land was plenary so long as it determined the Refuge land was "suitable for disposition," per 16 U.S.C. § 668dd(b)(3).

155.   Neither the Federal Defendants nor the Transmission Companies disclosed to the U.S. Court of Appeals for the Seventh Circuit that they had previously fully executed the Statement of Proposed Land Exchange/Purchase setting the terms of the land exchange on October 29, 2021.

156.   On July 19, 2023, without the benefit of the Statement of Proposed Land Exchange/Purpose, the Seventh Circuit accepted the Federal Defendants' "final agency action" argument, and vacated this Court's decision on those grounds. *Driftless Area Land Conservancy v. Rural Utilities Serv.*, 74 F.4th 489 (7th Cir. 2023). The Court concluded that "the Fish and Wildlife Service has not issued a final decision that could harm plaintiffs. The agency has not permitted a land transfer and perhaps never will." *Id*. at 494.

157.   The Seventh Circuit stated in its decision that it was making no decision on the merits of either the Plaintiffs' 1997 National Wildlife Refuge System Improvement Act of 1997 or NEPA claims. *Id.* at 496.

158.   Defendant USFWS has now approved and executed the identical land exchange addressed in the previous litigation before this Court.

37

159.    Defendant RUS provided public notice and provided an opportunity for comments on a draft supplemental environmental assessment ("Draft SEA") on or about September 7, 2023.

160.    Defendant RUS, however, only provided 14 days for Plaintiffs and other members of the public to comment.

161.    Plaintiffs requested that Defendant RUS provide a reasonable amount of additional time to submit public comments, but Defendant RUS refused to do so.

162.    Defendant RUS's newspaper notice published at the beginning of the 14-day period was defective because the hyperlink to the Draft SEA went to an error page.

163.    Defendant RUS provided a hard copy of the Draft SEA at the Dodgeville, WI public library, but members of the public were not allowed to copy or scan it.

164.    Defendant RUS did not provide an opportunity for a public hearing at which Plaintiffs and many interested members of the public could provide oral comments to their public officials, the Federal Defendants.

165.    Plaintiff NWRA, DALC and WWF nevertheless submitted written comments on the Draft SEA on September 22, 2023, (attached hereto as Exhibit X). Plaintiffs' comments explained:

38

(A)    The Defendants' unduly truncated 14-day comment period and the defective notice denied the public a reasonable opportunity to review the 150-page Draft SEA and be heard through their comments.

(B)    The Defendants' Draft SEA incorporated the former Final EIS, but did not address the problems with the Final EIS, including those previously found by this Court in *Nat'l Wildlife Refuge Ass'n*, 580 F. Supp. 3d at 610, 613.

(C)    The Defendants' Draft SEA incorporates: the same purpose and need statement; the same unreasonably limited range of alternatives; the same, now even more outdated assessment of the need for the project; and the same inadequate assessment of other significant adverse environmental impacts.

(D)    The Defendants' preferred alternative in the Draft SEA—the proposed land exchange—would violate the 1997 National Wildlife System Refuge Improvement Act, and therefore was not a "reasonable" alternative for Federal Defendants to consider and assess.

(E)    The Defendants' Draft SEA deferred analysis of the costs and benefits to wildlife from the proposed land exchange to a later process.

(F)    Despite Council of Environmental Quality ("CEQ") regulations and guidance issued on January 9, 2023, which are applicable to the Federal Defendants and all executive agencies, for considering and assessing climate change impacts in the environmental review process, the Defendants' Draft SEA

39

did not analyze climate change impacts, even to forecast how much of the electrical power to be carried by the open access CHC line would be from fossil-fuel generated electricity sources. *See* CEQ National Environmental Policy Act Guidance on Consideration of Greenhouse Gas Emissions and Climate Change, 88 Fed. Reg. 1196 (Jan. 9, 2023).

(G)     The Defendants did not take a "hard look" at climate change impacts in either their Draft SEA or final supplemental environmental assessment ("Final SEA").

166.   On October 6, 2023, Defendant RUS noticed the availability of its Final SEA.

167.   Defendant RUS stated that the proposed land exchange would have no significant environmental impact.

168.   The Defendants' Final SEA made no material changes from the Draft SEA issued a month earlier.

169.   On February 23, 2024, the Defendant USFWS made available three decision documents: (1) the formal land exchange as originally proposed; (2) a finding of no significant environmental impact ("FONSI") under NEPA; and (3) a new "Net Benefits Analysis." Attached as Exhibits D-F (collectively, the "February 23, 2024 Documents").

40

170.   Defendant USFWS did not provide public notice about the February 23, 2024 land exchange, the FONSI, or the Net Benefits Analysis.

171.   Defendant USFWS did not and has not afforded the public any reasonable opportunity to comment either in writing or orally at a public hearing on the Net Benefits Analysis, which was not included in the draft SEA.

172.   Defendant USFWS did not and has not afforded the public any reasonable opportunity to comment either in writing or orally at a public hearing on the land exchange.

173.   Defendant USFWS did not and has not afforded the public any reasonable opportunity to comment either in writing or orally at a public hearing on the FONSI.

174.   On information and belief, the land exchange has not yet closed.

175.   On information and belief, the USFWS has made its final decision and plans to close the land exchange as early as the week of March 11, 2024 and, in any event, plans to do so by no later than March 22, 2024.

176.   On information and belief, the Transmission Companies have assembled heavy equipment at the edge of the protected Refuge and are prepared to imminently commence construction of the CHC high-voltage transmission line and up to 200-feet high towers through and across what has long been the protected Upper Mississippi River National Wildlife and Fish Refuge lands and

waters. A member of Plaintiff organizations observed the Companies assembling a workforce, materials, and equipment near the Refuge. *See* Exhibit G.

177.    Counsel for the Transmission Companies has advised counsel for the Plaintiffs that they will not commence construction unless and until the land exchange closes.

178.    The Transmission Companies stated to the Public Service Commission of Wisconsin their intention to complete construction through the Refuge and operationalize the CHC transmission line by the end of June 2024. *See* Exhibit C at 5.

179.    Any such construction of the huge CHC high-voltage transmission line through lands and waters that have long been part of the Upper Mississippi River National Wildlife and Fish Refuge would and will cause immediate and irreparable harm to the Plaintiffs and their members.

## COUNT ONE
### VIOLATION OF THE NATIONAL WILDLIFE REFUGE SYSTEM IMPROVEMENT ACT OF 1997, 16 U.S.C. §§ 668dd-668ee – COMPATIBILITY REQUIREMENT

180.    Plaintiffs reallege the allegations in paragraphs 1 through 179 above.

181.    The Upper Mississippi River National Wildlife and Fish Refuge is part of the National Wildlife Refuge System administered by Defendant USFWS and is governed by the National Wildlife Refuge System Improvement Act of

42

1997, 16 U.S.C. §§ 668dd-668ee, and corresponding USFWS regulations and policies.

182.   The National Refuge System Improvement Act of 1997 clarified for the first time that the sole mission of the National Wildlife Refuge System is "to administer a national network of lands and waters for the conservation, management, and where appropriate, restoration of the fish, wildlife, and plant resources and their habitats within the United States for the benefit of present and future generations of Americans." 16 U.S.C. § 668dd(a)(2).

183.   Consistent with that mission, the 1997 Refuge System Improvement Act provides that USFWS "shall not initiate or permit a new use of a refuge or expand, renew, or extend an existing use of a refuge, unless [USFWS] has determined that the use is a compatible use." 16 U.S.C. § 668dd(d)(3)(a)(i).

184.   The 1997 Refuge System Improvement Act contemplates the possible grant of easements for purposes of right-of-way projects such as powerlines, telephone lines, canals, ditches, pipelines, and roads," but only if USFWS has first "determine[d] that such uses are compatible with the purposes for which these areas are established." 16 U.S.C. § 668dd(d)(1)(B).

185.   The 1997 Refuge System Improvement Act defines "compatible use" as "a wildlife-dependent recreational use or any other use of a refuge that, in the sound professional judgment of [USFWS] will not materially interfere with or

detract from the fulfillment of the mission of the System or purposes of the Refuge." 16 U.S.C. § 668ee(1).

186.   "Sound professional judgment," in turn, must be science-based and "consistent with principles of sound fish and wildlife management and administration, available science and resources, and adherence to the requirements of the Act and other applicable laws." 16 U.S.C. § 668ee(3).

187.   Defendant USFWS's National Wildlife Refuge System rules further provide that proposed "economic" uses, which provide an economic benefit to an applicant, must meet a higher standard than uses that support wildlife-dependent recreation or wildlife conservation: "We may only authorize public or private economic use of the natural resources of any natural wildlife refuge . . . where we determine that the use *contributes to* the achievement of the national wildlife refuge purposes or the National Wildlife Refuge System mission." 50 C.F.R. § 29.1.

188.   Defendant USFWS's policy manual states that "[i]t is the policy of the Service to discourage the types of uses embodied in right-of-way requests. On areas in the National Wildlife Refuge System (System) if a right-of-way cannot be certified as compatible with the purposes for which a unit was established, it cannot be granted without authorization by Congress." 340 FW § 3.3.

189.    The Defendant USFWS's manual flatly prohibits using "compensatory mitigation to make a proposed refuge use compatible." 603 FW § 2.11(C).

190.    The Transmission Companies' proposed "Nelson Dewey crossing" for the CHC high-voltage transmission line is a "type of use embodied in a right-of-way request" and therefore may not be permitted unless it were found to be "compatible." 16 U.S.C. § 668dd(d)(1)(B).

191.    The "Nelson Dewey crossing" for the huge CHC high-voltage transmission line with very high towers is not a "compatible use" under the National Wildlife Refuge System Improvement Act of 1997.

192.    Defendant USFWS may not use a land exchange to avoid the compatibility requirement imposed by the National Wildlife Refuge System Improvement Act of 1997 on right-of-way projects like the CHC high-voltage transmission line.

193.    Defendant USFWS may not use a land exchange to avoid the policies and requirements in its own manual.

194.    The 1997 Refuge System Improvement Act authorizes easements and permits only, not transfer of fee simple ownership, and then only following favorable compatibility findings for the right-of-way project based on sound scientific standards.

195.   Land for a right-of-way project like the CHC high-voltage transmission line is not "suitable for disposition" under the 1997 Refuge System Improvement Act.

196.   Allowing the Transmission Companies' proposed huge CHC high-voltage transmission line and very high towers to run through and across the Refuge is not compatible with Congress' purpose in creating the Upper Mississippi River National Wildlife and Fish Refuge, and violates the goals, purposes and compatibility requirement of the National Wildlife Refuge System Improvement Act of 1997.

197.   Accordingly, the Defendant USFWS's February 23, 2024 Decision Documents are contrary to law, not supported by substantial evidence, arbitrary and capricious, and an abuse of discretion, and, therefore, must be set aside under the Administrative Procedure Act, 5 U.S.C. § 706(2).

198.   Because the proposed land exchange is unlawful and must be set aside, USFWS's imminent planned closure of the land exchange would violate 16 U.S.C. § 668dd(b)(3) and should be enjoined under Fed. R. Civ. P. 65.

199.   Because the proposed land exchange is unlawful and must be set aside, the Transmission Companies' planned imminent construction to bulldoze through land and waterways that are currently part of the Upper Mississippi River National Wildlife and Fish Refuge at the "Nelson Dewey crossing" to construct the

CHC high-voltage transmission line and towers once the land exchange closes

would violate 16 U.S.C. §§ 668dd(b)(3) and should be enjoined under Fed. R. Civ.

P. 65.

## COUNT TWO
## VIOLATIONS OF THE NATIONAL WILDLIFE REFUGE SYSTEM IMPROVEMENT ACT OF 1997 AND THE ADMINISTRATIVE PROCEDURE ACT –THE COMPREHENSIVE CONSERVATION PLAN FOR THE UPPER MISSISSIPPI RIVER NATIONAL WILDLIFE AND FISH REFUGE AND OTHER REGULATORY REQUIREMENTS

200.   Plaintiffs reallege the allegations in paragraphs 1 through 199 above.

201.   Even if a land exchange were a legally viable option—which it is

not—the proposed land exchange is inconsistent with the Defendant USFWS's

own Comprehensive Conservation Plan for Upper Mississippi River National

Wildlife and Fish Refuge because it will increase, not decrease, habitat

fragmentation and create, not eliminate, inholdings and noncompatible uses within

the Refuge. *Nat'l Wildlife Refuge Association,* 580 F.Supp.3d at 606. The

Comprehensive Conservation Plan is attached hereto as Exhibit N.

202.   The land exchange is also inconsistent with the Comprehensive

Conservation Plan because it gives away valuable floodplain land, which the CCP

identifies as critical for habitat protection. Exhibit N at 12-13.

203.   The proposed land exchange also violates the Council on

Environmental Quality's ("CEQ") *Guidance for Federal Departments and

Agencies on Ecological Connectivity and Wildlife Corridors*, dated March 21,

47

2023, which directs federal agencies to develop policies "to conserve, enhance, protect and restore [wildlife] corridors and [ecological] connectivity during planning and decision-making."

204.   The proposed land exchange similarly does not comply with Defendant USFWS policy expressed through the agency's proposed new "BIDEH" rule on biological integrity, diversity and environmental health, 50 C.F.R. § 29.3 (new). U.S. Fish & Wildlife Service, Proposed Rule: Biological Integrity, Diversity, and Environmental Health ("BIDEH"), 89 Fed. Reg. 7345, 7351 (February 2, 2024).  Defendant USFWS's proposed BIDEH rule states: "We allow for and defer to natural processes on habitats within the Refuge System and promote conservation, restoration, and connectivity to meet refuge habitat objectives and landscape planning goals. We will avoid and minimize habitat fragmentation to sustain biological integrity and diversity."

205.   Even if the proposed land exchange were a legally viable option and could be reconciled with the Comprehensive Conservation Plan or CEQ guidance on ecological connectivity and wildlife corridors, Defendant USFWS's finding that the costs and risks to wildlife from a right-of-way project like this do not exceed any compensatory benefits of the parcel being offered in exchange is not based on substantial evidence and is arbitrary and capricious.

206.   The property being transferred to the Transmission Companies is floodplain land, which the Defendant USFWS's Comprehensive Conservation Plan identifies as valuable land that the Defendant USFWS's Refuge managers would like to acquire more of. *See* Comprehensive Conservation Plan at 12-13 (attached hereto as "Exhibit N").

207.   Bulldozing and running a huge new high-voltage transmission line with very high towers through and across the Upper Mississippi National Wildlife and Fish Refuge on lands and waters proposed to be transferred away will result in significant adverse environmental impacts and harms previously documented by Defendant USFWS for these types of right-of-way projects: compromise the aesthetic values; wildlife habitat fragmentation; stormwater runoff from clear-cut area; proliferation of invasive species; damages to wetlands; increased bird strikes; possible increased risk to endangered and threatened species; and other environmental and natural resources damages.

208.   Defendant USFWS's Net Benefits Analysis (attached hereto as "Exhibit F") either ignores or arbitrarily dismisses the concerns identified above.

209.   The land that Defendant USFWS exchanges out of the Refuge is not "suitable for disposition."

210.   All of the Defendant USFWS's February 23, 2024 Decision Documents rely on compensatory mitigation to make the transaction lawful, but

that is contrary to Defendant USFWS's own rules. 50 C.F.R. § 26.41(b); *see also* 603 FW § 2.11(H)(3).

211.   Defendant USFWS's proposed land exchange, embodied in the February 23, 2024 Decision Documents, is contrary to law, is not supported by substantial evidence, is arbitrary and capricious, and an abuse of discretion, and must be set aside under the Administrative Procedure Act, 5 U.S.C. § 706(2).

212.   Allowing the Transmission Companies' proposed huge CHC high-voltage transmission line and very high towers to run through and across the Refuge is contrary to the Defendant USFWS's applicable Comprehensive Conservation Plan for the Upper Mississippi River National Wildlife and Fish Refuge and does not comply with the Defendant USFWS's regulations limiting compensatory mitigation and CEQ's regulations.

213.   Accordingly, the Defendant USFWS's February 23, 2024 Decision Documents are contrary to law, not supported by substantial evidence, arbitrary and capricious, and an abuse of discretion, and, therefore, must be set aside under the Administrative Procedure Act, 5 U.S.C. § 706(2).

214.   By approving the land exchange and finding a net benefit despite the CCP's clear goal of promoting habitat connectivity, Defendant USFWS has violated 16 U.S.C. § 668dd(e)(1)(E) by failing to manage the refuge in a manner consistent with the CCP.

215.   Because the land the Defendant USFWS seeks to dispose of is not "suitable for disposition," the land exchange violates 16 U.S.C. §668dd(b)(3).

216.   Because the proposed land exchange is unlawful and must be set aside, the Defendant USFWS's planned imminent closure of the land exchange would violate 16 U.S.C. §668dd(c) and should be enjoined under Fed. R. Civ. P. 65.

217.   Because the proposed land exchange is unlawful and must be set aside, the Transmission Companies' imminent construction to bulldoze through land and waterways that are currently part of the Upper Mississippi River National Wildlife and Fish Refuge at the "Nelson Dewey crossing" to construct the CHC high-voltage transmission line and towers once the land exchange closes would violate the Refuge Act's general prohibition against "disturb[ing], injur[ing], cut[ting], burn[ing], remov[ing], destroy[ing], or possess[ing]," or "us[ing], or otherwise occupy[ing]," Refuge land, 16 U.S.C. § 668dd(c), and should be enjoined under Fed. R. Civ. P. 65.

**COUNT THREE**
**DEFENDANTS' FAILURE TO PROVIDE FOR PUBLIC NOTICE AND PUBLIC COMMENTS ON THE NET BENEFITS ANALYSIS, FINDING OF NO SIGNIFICANT ENVIRONMENTAL IMPACTS, AND LAND EXCHANGE**

218.   Plaintiffs reallege the allegations in paragraphs 1 through 217 above.

219.   RUS, USFWS, and the Corps, the three Federal Defendants noticed the availability of a draft supplemental environmental assessment ("draft SEA") on September 7, 2023, and a final supplemental environmental assessment on October 6, 2023 ("final SEA"). Those documents, in turn, incorporated the October 2019 final environmental impact statement for the entire CHC transmission line, which this Court previously held to violate the requirements of NEPA. *Nat'l Wildlife Refuge Ass'n,* 580 F.Supp.3d at 613.

220.   The Federal Defendants did not provide sufficient public notice of the draft SEA and only provided less than 14 days for the public to submit written comments. The Federal Defendants did not provide for a public hearing for members of the public to submit oral comments.

221.   The Defendant USFWS's Net Benefits Analysis (Exhibit F) and the land exchange it supports is also invalid and contrary to law because USFWS did not provide public notice or a reasonable opportunity to comment.

222.   The Federal Defendants did not include Defendant USFWS's "Net Benefits Analysis" which compared the ecological damage likely to be caused by granting the right-of-way through the Refuge sought by the Transmission Companies with the likely ecological benefits of the parcel the Companies were willing to provide in exchange as compensatory mitigation, in either the draft SEA or final SEA for the land exchange.

223.    As a result, the public was not afforded a reasonable opportunity to comment in writing or orally as required by NEPA and its regulations.

224.    The CEQ's NEPA regulations require that the lead agency on an EA "involve the public . . . to the extent practicable in preparing environmental assessments." 40 C.F.R. § 1501.5(e); *see also* 40 C.F.R. § 1506.6(a). That duty includes the requirement that agencies "[p]rovide public notice of . . . the availability of environmental documents so as to inform those persons and agencies who may be interested or affected by their proposed actions" (*id.* § 1506.6(b)), and "[s]olicit appropriate information from the public." *Id.* § 1506.6(d).

225.    The requirement to provide the public with a meaningful opportunity to comment is "to insure that environmental information is available to public officials and citizens *before decisions are made and before actions are taken."* 40 C.F.R. § 1500.1(b)(emphasis added).

226.    The U.S. Supreme Court has recognized that "the broad dissemination of information mandated by NEPA" is to "permit[] the public and other government agencies to react to the effects of a proposed action at a meaningful time," not "after it is too late to correct." *Marsh v. Or. Natural Res. Council,* 490 U.S. 360, 371 (1989).

227.   By denying the public access to its "Net Benefits Analysis" until after its final decision was made, Defendant USFWS has violated the public participation requirements of NEPA.

228.   Defendant USFWS has not offered, and the administrative record does not contain, any justification for not providing the public with a reasonable opportunity to submit comments on the "Net Benefits Analysis."

229.   Accordingly, the Defendant USFWS's February 23, 2024 Decision Documents are contrary to law, not supported by substantial evidence, arbitrary and capricious, and an abuse of discretion, and, therefore, must be set aside under the Administrative Procedure Act, 5 U.S.C. § 706(2).

230.   Because the Defendant USFWS's proposed land exchange, FONSI, and Net Benefits Analysis are unlawful in these respects, as well, the Defendant's USFWS's imminent planned closure of the land exchange is unlawful and should be enjoined under Fed. R. Civ. P. 65.

231.   Because the proposed land exchange is unlawful and must be set aside, the Transmission Companies' planned imminent construction to bulldoze through land and waterways that are currently part of the Upper Mississippi River National Wildlife and Fish Refuge at the "Nelson Dewey crossing" to construct the CHC high-voltage transmission line and towers once the land exchange closes

would violate 16 U.S.C. §§ 668dd(b)(3) and should be enjoined under Fed. R. Civ. P. 65.

## COUNT FOUR
## VIOLATIONS OF THE NATIONAL ENVIRONMENTAL POLICY ACT, 42 U.S.C § 4321 et seq.

232.    Plaintiffs reallege the allegations in paragraphs 1 to 231 above.

233.    The National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq. is "the basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). NEPA's purpose is to protect the environment by ensuring that federal agencies "make decisions that are based on an understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." 40 C.F.R. § 1500.1(c).

234.    NEPA requires agencies to take a "hard look" at the environmental consequences of their actions. For major federal actions with the potential for significant adverse environmental impacts, NEPA requires that the agencies first prepare an environmental impact statement ("EIS").

235.    NEPA requires that an EIS must include a detailed discussion of "(i) the environmental impact of the proposed action; (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented; (iii) alternatives to the proposed action; (iv) the relationship between the local short-term uses of man's environment and the maintenance and enhancement of long-

55

term productivity; and (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." 42 U.S.C. § 4332(2)(C).

236.   The CEQ rules governing environmental review emphasize that the alternatives analysis is the "heart of the environmental impact statement." 40 C.F.R. § 1502.14. The CEQ rules require agencies to "[r]igorously explore and objectively evaluate reasonable alternatives to the proposed action," 40 C.F.R. § 1502.14(a), including the "no action alternative." 40 C.F.R. § 1502.14(c).

237.   Both an EIS and an environmental assessment ("EA") must contain a "purpose and need" statement, specifying "the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action." 40 C.F.R. §§ 1502.13; 1501.5(c)(2). The purpose and need statement determines the reasonable range of alternatives to be considered.

238.   "The evaluation of 'alternatives' mandated by NEPA is to be an evaluation of alternative means to accomplish the general goal of an action; it is not an evaluation of the alternative means by which a particular applicant can reach his goals." *Simmons v. U.S. Army Corps of Eng'rs,* 120 F.3d 664, 666 (7th Cir. 1997) (*quoting Van Abbema v. Fornell,* 807 F.2d 633, 638 (7th Cir. 1986)).

239.   As CEQ has recognized, "[i]t is contrary to NEPA for agencies to 'contrive a purpose so slender as to define competing 'reasonable alternatives' out

of consideration (and even out of existence)." CEQ, *National Environmental Policy Act Implementing Regulations Revisions,* 87 Fed. Reg. 23453, 23459 (April 20, 2022), *quoting Simmons,* 120 F.3d at 669. Consequently, federal agencies have "the duty under NEPA to exercise a degree of skepticism in dealing with self-serving statements from a prime beneficiary of the project" about purpose and need and the reasonable range of alternatives. *Simmons,* 120 F.3d at 669.

240.   The Transmission Companies proposed a "purpose and need" statement for the original EIS that required an "increase [in] the transfer capability of the electrical system between Iowa and Wisconsin." That statement unduly restricted the range of alternatives to only high-voltage transmission lines running between Iowa and Wisconsin. *Nat'l Wildlife Refuge Association,* 580 F.Supp.3d at 612-613.

241.   The three Federal Defendants subsequently adopted the Transmission Companies' purpose and need statement verbatim for their October 2019 Final EIS, and adopted the same thing again, in September 2023 Draft SEA and October 2023 Final SEA for the proposed land exchange.

242.   This Court previously concluded that this purpose and need statement improperly restricted the range of alternatives and therefore violated NEPA. *Nat'l Wildlife Refuge Ass'n,* 580 F. Supp. 3d at 612-613.

243.   The Federal Defendants' October 2019 Final EIS did not rigorously explore or objectively evaluate all reasonable alternatives that would meet the general objectives of the CHC transmission line.

244.   The Federal Defendants' October 2019 Final EIS did not take the required "hard look" at all reasonable alternatives that would meet the general objectives of the CHC transmission line.

245.   The Federal Defendants' October 2019 Final EIS did not rigorously explore or objectively evaluate whether a package of non-wires alternatives would meet the general objectives of the CHC transmission line.

246.   The Federal Defendants' October 2019 Final EIS did not rigorously explore or objectively evaluate alternative routes either north or south of the Upper Mississippi River National Wildlife and Fish Refuge, or that would otherwise avoid running through and across the Refuge.

247.   The Federal Defendants' – RUS, USWFS, and the Corps – October 2023 final SEA, incorporates the October 2019 FEIS.

248.   The Federal Defendants' – RUS, USWFS, and the Corps – October 2023 Final SEA, by incorporating the October 2019 FEIS, does nothing to remedy the lack of the Federal Defendants' "hard look" and adequate analysis of alternatives.

249.   The Federal Defendants' October 2019 Final EIS did not adequately analyze the additional greenhouse gas emissions and potential climate impacts attributable to the CHC transmission line and the fossil-fuel generated electricity it would carry.

250.   The Federal Defendants' – RUS, USWFS, and the Corps – October 2023 Final SEA adds nothing to the insufficient analysis of climate impacts.

251.   The Federal Defendants' – RUS, USWFS, and the Corps – October 2023 Final SEA does not assess the lawfulness of the proposed land exchange.

252.   An unlawful alternative is not a "reasonable" alternative under NEPA.

253.   To the extent that each of Defendant RUS's and Defendant USFWS's Findings of No Significant Environmental Impact depend on mitigation, there is no adequate description of monitoring or enforcement and no compliance plan required by CEQ rules, 40 C.F.R. § 1501.6(c), and CEQ guidance. CEQ, *Final Guidance for Federal Departments and Agencies on the Appropriate Use of Mitigation and Monitoring and Clarifying the Appropriate Use of Mitigated Findings of No Significant Impact,* 76 Fed. Reg. 3843 (Jan. 21, 2011).

254.   The Defendant USFWS's February 23, 2024 Finding of No Significant Environmental Impact relied on the RUS Supplemental Environmental Assessment and from October 2023, the October 2019 Final Environmental Impact Statement, and the Record of the Decision which was signed by all three Federal

Defendants, RUS, USFWS, and the Corps. All three of these documents violate NEPA, as discussed above.

255.   The Defendant USFWS's February 23, 2024 Finding of No Significant Environmental Impact and the Defendant RUS's October 2023 final SEA are invalid because the public was not given adequate notice and a reasonable opportunity to submit written and oral comments.

256.   Accordingly, the Federal Defendants' October 2023 Final SEA, and RUS's and USFWS's respective Findings of No Significant Environmental Impact are contrary to law, not supported by substantial evidence, arbitrary and capricious, and an abuse of discretion, and, therefore, must be set aside under the Administrative Procedure Act, 5 U.S.C. § 706(2).

257.   Accordingly, the Defendant USFWS's February 23, 2024 Decision Documents are contrary to law, not supported by substantial evidence, arbitrary and capricious, and an abuse of discretion, and, therefore, must be set aside under the Administrative Procedure Act, 5 U.S.C. § 706(2).

258.   Because the Federal Defendants' did not provide adequate notice and a reasonable opportunity to comment on their NEPA documents the Defendant USFWS's imminent planned closure of the land exchange is unlawful and should be enjoined under Fed. R. Civ. P. 65.

259.   Because the proposed land exchange is unlawful and must be set aside, the Transmission Companies' planned imminent construction to bulldoze through land and waterways that are currently part of the Upper Mississippi River National Wildlife and Fish Refuge at the "Nelson Dewey crossing" to construct the CHC high-voltage transmission line and towers once the land exchange closes would violate 16 U.S.C. §§ 668dd(b)(3) and should be enjoined under Fed. R. Civ. P. 65.

## VI.   REQUESTED RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court issue an Order granting the following relief:

1.   Declare that Defendant USFWS's final decision approving the land exchange (Exhibit E), issued on February 23, 2024, violates the compatibility requirement of the National Wildlife Refuge System Improvement Act, 16 U.S.C. §§ 668dd-668ee, and the Comprehensive Conservation Plan for the Upper Mississippi River National Wildlife and Fish Refuge, and is contrary to the requirement in the National Wildlife Refuge System Improvement Act, 16 U.S.C. § 668dd that powerline projects not be permitted unless they are compatible with the wildlife protection purposes of the Upper Mississippi River National Wildlife and Fish Refuge, and, therefore, must be set aside under the Administrative Procedures Act, 5 U.S.C. § 706(2).

61

2.      Declare that Defendant USFWS's Finding of No Significant Environmental Impact (Exhibit D), issued on February 23, 2024, that would result from the huge CHC high-voltage transmission line and high towers running through and across the Upper Mississippi River National Wildlife and Fish Refuge violates the National Wildlife Refuge System Improvement Act, 16 U.S.C. §§ 668dd-668ee, because it is inconsistent with the Comprehensive Conservation Plan for the Upper Mississippi River National Wildlife and Fish Refuge, is arbitrary and capricious, is not supported by substantial evidence, and is an abuse of discretion and, therefore, must be set aside under the Administrative Procedures Act, 5 U.S.C. § 706(2).

3.      Declare that the Defendant USFWS's Net Benefits Analysis (Exhibit F), issued on February 23, 2024, to support the proposed land exchange is arbitrary and capricious, is not supported by substantial evidence, is an abuse of discretion and is contrary to law because it is inconsistent with the Comprehensive Conservation Plan for the Upper Mississippi River National Wildlife and Fish Refuge, and thereby violates the National Wildlife Refuge System Improvement Act, and, therefore, must be set aside under the Administrative Procedures Act, 5 U.S.C. § 706(2).

4.      Declare that the Defendant USFWS's Net Benefits Analysis (Exhibit F), issued on February 23, 2024, is invalid and contrary to law because the public

was not provided notice and was not provided a reasonable opportunity to submit public written or oral comments, and, therefore, must be set aside under the Administrative Procedures Act, 5 U.S.C. § 706(2).

5.      Declare that the Federal Defendants' – RUS's, USFW's, and the Corps' – approvals of the February 23, 2024 Finding of No Significant Impact (Exhibit D), the October 9, 2023 Final Supplementary Environmental Assessment and Finding of No Significant Impact (attached hereto as Exhibit Y), and the October 19, 2019 Final Environmental Impact Statement do not comply with the requirements of the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.,* were contrary to law, and arbitrary and capricious, and, therefore, must be set aside under the Administrative Procedures Act, 5 U.S.C. §706(2).

6.      Declare that the Cardinal Hickory Creek transmission line is not compatible with the Refuge and that Transmission Companies cannot cross the Refuge by right of way or land exchange.

7.      Preliminarily and permanently enjoin Defendant USFWS from closing or otherwise implementing the February 23, 2024 land exchange.

8.      Preliminarily and permanently enjoin the Defendant USFWS from permitting or granting a land exchange, an easement, a permit, or any other authority to allow the proposed CHC transmission line to run through and cross the

lands and waters of the Upper Mississippi River National Wildlife and Fish Refuge, as defined before the proposed land exchange.

9.     Preliminarily and permanently enjoin the Defendant USFWS from permitting or granting a land exchange, an easement, a permit, or any other authority to allow the proposed CHC transmission line to run through and cross the lands and waters of the Upper Mississippi River National Wildlife and Fish Refuge, as defined before the proposed land exchange, unless and until the USFWS provides public notice and a reasonable opportunity and time for Plaintiffs and other members of the public to submit written and oral comments on the Net Benefits Analysis, Finding of No Significant Environmental Impact and Land Exchange documents, issued on February 23, 2024, fully and fairly considered by the Defendant USFWS.

10.     Preliminarily and permanently enjoin the Defendant RUS from providing financial assistance to Dairyland Power for the CHC transmission line project unless and until the Defendants fully comply with all requirements of NEPA and the National Wildlife Refuge System Improvement Act of 1997, and the Administrative Procedure Act.

11.     Preliminarily and permanently enjoin the Transmission Companies from taking any action to construct the proposed CHC high-voltage transmission line through and across the lands and waters of the Upper Mississippi River

National Wildlife and Fish Refuge as defined before the proposed land exchange, or otherwise taking any action to disturb the Refuge unless and until the Federal Defendants' approvals, permits, other actions are found to not violate federal law.

12.     Vacate and set aside any and all federal permits and approvals, for the CHC transmission line based on the unlawful October 2019 environmental impact statement and Record of Decision.

13.     Reverse and remand the EIS and ROD to the Federal Defendants to complete an environmental impact statement that identifies and fully considers and compares the likely environmental impacts of non-Refuge-crossing alternatives including alternative routes and a package of non-wires alternatives, and that fully assesses direct, indirect, and cumulative climate impacts, if the Transmission Companies apply for permits or financial assistance.

14.     Award Plaintiffs attorney fees and costs under the Equal Access to Justice Act, 28 U.S.C. § 2412, or other applicable laws;

15.     Grant such further relief as may be appropriate.

Dated March 6, 2024

Respectfully Submitted,

/s/ Howard A. Learner
Howard A. Learner
Daniel Abrams
Environmental Law & Policy Center
35 East Wacker Drive, Suite 1600
Chicago, IL 60601
T: (312) 673-6500
F: (312) 795-3730
HLearner@elpc.org
DAbrams@elpc.org
*Counsel for Plaintiffs National Wildlife Refuge Association, Driftless Area Land Conservancy, and Wisconsin Wildlife Federation*

/s/ Robert M. Morgan
Robert M. Morgan
*Admitted Pro Hac Vice*
National Wildlife Refuge Association
415 E. Cape Shores Dr.
Lewes, DE 19958-3109
T: (301) 466-8915
RMorgan@RefugeAssocation.org
*Counsel for Plaintiff National Wildlife Refuge Association*

## VERIFICATION

I, Howard Learner, of the Environmental Law & Policy Center, 35 E Wacker Street, Suite 1600,

Chicago, Cook County, Illinois, attorney for the plaintiffs in this action, being duly sworn,

depose and say that I am authorized to file the pleading alleging violations of the National

Wildlife Refuge System Improvement Act and the National Environmental Policy Act on behalf

of the National Wildlife Refuge Association, Driftless Area Land Conservancy, Wisconsin

Wildlife Federation, that I have read the facts and allegations in the Complaint and know its

contents, that the statements contained in it are true and correct to the best of my knowledge,

information, and belief, and that the Complaint is not interposed for delay or other improper

purpose.

I declare under penalty of perjury under the laws of the United States of American that the

foregoing is true and correct.

Executed on ___March 6___, 2024.

_HOWARD LEARNER_
Howard A. Learner
Environmental Law & Policy Center
35 East Wacker Drive, Suite 1600
Chicago, IL 60601
T: (312) 673-6500
HLearner@elpc.org
*Counsel for Plaintiffs National Wildlife*
*Refuge Association, Driftless Area Land*
*Conservancy, and Wisconsin Wildlife*
*Federation*