IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

NATIONAL WILDLIFE REFUGE ASSOCIATION,
DRIFTLESS AREA LAND CONSERVANCY, and
WISCONSIN WILDLIFE FEDERATION,

                  Plaintiffs,                         OPINION AND ORDER

     v.

                                           24-139-wmc

RURAL UTITLITIES SERVICE,
ANDY BERKE, Administrator, Rural Utilities Service,
UNITED STATES FISH AND WILDLIFE SERVICE,
WILL MEEKS, Midwest Regional Director, and
SABRINA CHANDLER, Manager, Upper Mississippi River
National Wildlife and Fish Refuge,
UNITED STATES ARMY CORPS OF ENGINEERS,
LIEUTENANT GENERAL SCOTT A. SPELLMON, Chief of
Engineers and Commanding General, U.S. Army Corps of
Engineers, COLONEL JESSE T. CURRY, Commander
and District Engineer, Rock Island District, U.S. Army Corps of
Engineers, and COLONEL ERIC SWENSON, Commander and
District Engineer, St. Paul District, U.S. Army Corps of Engineers,

                  Defendants,

                  and

DAIRYLAND POWER COOPERATIVE and
ITC MIDWEST LLC,

                  Intervenor-Defendants.

This lawsuit is a continuation of efforts by several environmental groups to disrupt completion of the 101-mile high-voltage Cardinal-Hickory Creek Transmission Line Project running from Dubuque, Iowa to Madison, Wisconsin, across the Mississippi River, and crucially for purposes of this latest federal lawsuit, through the Upper Mississippi River National Wildlife and Fish Refuge.  On March 21, 2024, this court preliminarily enjoined defendants United States Fish and Wildlife Service ("FWS") and the intervening, utility

defendants -- Dairyland Power Cooperative and ITC Midwest LLC -- from closing on a land contract that would result in an exchange of parcels adjacent to the Refuge would proceed, with part of the Refuge, as well as immediate construction of the remaining towers on what is now part of the Refuge.

The court then held a hearing on plaintiffs National Wildlife Refuge Association, Driftless Area Land Conservancy and Wisconsin Wildlife Federation's pending motion for a preliminary injunction (dkt. #60) on March 22, and on March 25, entered an order granting that motion, at least until the court could review the full administrative record considered by the federal defendants in approving the land exchange agreement.  The court's preliminary injunction order prohibits the federal and utility defendants from taking any action to close on the land exchange agreement or begin construction on the stretch of the Cardinal-Hickory project running through the Upper Mississippi River National Wildlife and Fish Refuge.  (Dkt. #62 and Dkt. #63.)

The utility defendants filed an appeal with the Seventh Circuit, followed by a motion in this court under Rule 62(d) of the Federal Rules of Civil Procedure to stay the preliminary injunction order pending resolution of the appeal (dkt. #71), arguing they should be permitted to consummate a land exchange with FWS and build the final portion of the Cardinal-Hickory transmission line while the parties brief summary judgment and any further appeals.  The utility defendants later filed a similar stay motion in the court of appeals, without waiting for a ruling from this court,  although the Seventh Circuit issued an order deferring its ruling on the motion to stay until this court could timely address it.

Because the utility defendants have not shown that their likelihood of success on the merits of their appeal outweighs the near certainty of irreparable harm to the Refuge,

and because the balance of equities weighs in favor of judicial review (albeit expedited) with a complete administrative record and against staying the preliminary injunction order, the court will deny the utility defendants' motion to stay pending appeal.

OPINION

In deciding whether to stay an injunction pending appeal, the court considers four factors: "(1) the likelihood the applicant will succeed on the merits of the appeal; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure other parties; and (4) the public interest." *Common Cause Indiana v. Lawson*, 978 F.3d 1036, 1039 (7th Cir. 2020). "The standard calls for equitable balancing, much like that required in deciding whether to grant a preliminary injunction" in the first place, but the "first two factors are most critical." (*Id.* (quoting *Venckiene v. United States*, 929 F.3d 843, 853 (7th Cir. 2019)).

The utility defendants contend that they are likely to succeed on the merits of their appeal because the court's March 21 text order and its March 25 preliminary injunction decision do not comply with Rule 65(d)(1)(A)'s requirement to "state the reasons why [the injunction] issued or Rule 52(a)(2)'s requirement to state the "findings and conclusions" supporting a preliminary injunction. *See In re Jimmy John's Overtime Litig.*, 877 F.3d 756, 770 (7th Cir. 2017) ("Before issuing an injunction, a judge must identify the appropriate legal standard and make the findings of law and fact required by that standard.") (citations

omitted).[1]  The utility defendants further contend that the court issued the two preliminary injunction orders without providing any justification in law or fact.

Neither argument is particularly persuasive.  As the Supreme Court has explained, the purpose of a preliminary injunction is "to balance the equities as the litigation moves forward." *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579 (2017).  Thus, "[c]rafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Id.*  The court's preliminary injunction rulings in this case to date have each been tailored in time and scope to the specific circumstances before it, balancing the equities between the parties as this litigation proceeds.

Turning first to the March 21 text order, the court's purpose in issuing that order was to ensure both sides, and defendants in particular, would have the opportunity to present evidence and argument (in writing and at an evidentiary hearing) before the court addressed plaintiffs' request for emergency injunctive relief.  Moreover, in its initial response to plaintiffs' motion for a TRO, defendants conceded that construction on the transmission line in the Refuge would begin as soon as the land exchange agreement closed. (Dkt. #15, at 4.)  Given the exigent circumstances, the court felt compelled to act to preserve the status quo, even though the court strongly prefers to hear from both sides of

---

[1] The parties spend a significant amount of time arguing whether this court retains jurisdiction to amend its preliminary injunction orders or "cure deficiencies" while an appeal is pending.  However, the court does not intend to amend or modify its preliminary injunction order at this time. Regardless, it is entirely appropriate for this court to address the arguments raised by the defendants' motion to stay, particularly since the Seventh Circuit has directed this court to do so. Accordingly, the court will deny both sides' request to file additional briefs on this issue.  (Dkt. #81 and Dkt. #86.)

a dispute before providing any emergency relief.  Here, in particular, the court found that there was sufficient time to convert plaintiffs' TRO motion to a motion for a preliminary injunction so that both sides of the dispute could be heard.  (3/11/24 Trans. (dkt. #37) 4.)  Thus, the court denied plaintiffs' motion for a TRO, converted the motion to one for a preliminary injunction, and set briefing and a hearing date, with the understanding that defendants would not proceed with closing the land exchange or beginning construction until plaintiffs' motion was resolved.

After reviewing the transcript from the telephonic hearing, the court next decided to put its understanding in clear and binding terms, as defendants had agreed to refrain from closing the land exchange only until March 22 -- the date on which the preliminary injunction hearing was scheduled.  Specifically, the March 21 text order clarified that defendants were prohibited from taking action to close the land exchange until after the March 22 hearing and the court's ruling on plaintiffs' motion for a preliminary injunction.  While both the reasons for the March 21 order and its terms appeared to this court to be sufficient to satisfy Rules 65(d)(1)(A) and 52(a)(2), as well as within this court's discretion given the equities and exigent circumstances of that time, defendants' request to lift any stay of that order appears moot.

As for its March 25 preliminary injunction decision and order, this court again attempted to provide adequate reasoning and justification under the circumstances at that time.  As the court explained at the March 22 hearing itself, there have been only a few, factual developments since this court last reviewed the parties' dispute in 2022.  In particular, the boundaries of the Refuge and the proposed location of transmission project through the Refuge remain the same, the risks to wildlife and habitat on the Refuge remain

5

the same, and the federal defendants relied largely on the same, flawed 2019 Final Environmental Impact Statement in approving the land exchange that the court reviewed previously, albeit supplemented by an environmental assessment finalized late last year.[2] (Dkt. #1-21.)

The primary difference is that the federal defendants are now proceeding under the land exchange provisions of the Refuge Act, 16 U.S.C. § 668dd(b)(3), instead of the statutory provisions applying to "uses" and right-of-way projects, 16 U.S.C. § 668dd(d)(1)(B). As the court and the parties discussed at length at the March 22 hearing, plaintiffs had already succeeded in their previous case in showing that the land exchange would violate the Refuge Act if the "right-of-way" provisions applied. *See National Wildlife Refuge I*, 580 F. Supp. 3d at 608 (holding the proposed CHC project could not meet the "compatibility" requirement for right-of-way projects in the Refuge Act because it would result in habitat fragmentation in Refuge land dedicated to protecting wildlife and wildlife habitat).

As the Seventh Circuit stated in vacating this court's decision in *National Wildlife I*, the "inquiry into whether a land exchange is 'suitable' under 16 U.S.C. § 668dd(b)(3) *may differ* from the compatibility analysis for a right-of-way permit under 16 U.S.C. § 668ee(1)."

---

[2] The utility defendants criticize this court's reference to the prior, vacated summary judgment opinion in *National Wildlife Refuge Ass'n v. Rural Utilities Serv.*, 580 F. Supp. 3d 588 (W.D. Wis. 2022) ("*National Wildlife I*"). However, the court did not base any of its rulings in the present case on legal conclusions that were vacated by the Seventh Circuit. That being said, the present case is obviously a a continuation from the parties' earlier dispute, so it would be absurd not to acknowledge the factual and legal history documented in this court's decisions. Moreover, the court referred to its past findings not as binding legal precedent or law of the case, but as a reflection of the court's familiarity with the history and underlying facts. Nothing in the Seventh Circuit's decision appears to preclude that as a matter of efficiency, it nothing more.

*Driftless Area Land Conservancy v. Rural Utilities Serv.*, 74 F.4th 489, 495 (7th Cir. 2023) (emphasis added). Not surprisingly, the parties disagree about the implications of the *Driftless* decision and its comments on the applicable legal standards, but the Seventh Circuit provided no further, specific instructions. Nor has the court found any binding, legal precedent resolving these questions. Thus, one question the court must now resolve is whether and how the standards of "compatibility" and "suitability" differ, and for purposes of plaintiffs' preliminary injunction motion, whether they are likely to succeed in showing that the land exchange does not meet the "suitability" requirements of the Act. As also discussed at the hearing, there is a question whether the Refuge Act still requires a compatibility analysis for a land exchange that will be used for a transmission project.

The utility defendants make no real effort to dispute that under their interpretation, a land exchange permits a transmission line on a parcel previously included in and protected by the Refuge Act to work an end-around of the Act's compatibility provisions. As plaintiffs argue persuasively here, considering the land exchange at issue to be independent of any other provision in the Refuge Act would permit defendants to evade Congress's express concerns regarding powerlines constructed through federal lands otherwise expressly protected, so long as the federal defendants can articulate some "net benefit" in the exchange itself. Regardless, in light of the uncertain legal standards, defendants' prior, erroneous compatibility analysis and flawed FEIS, as well as plaintiffs' legitimate concerns regarding the harm provided by a contiguous Refuge and the lack of the administrative record underlying the Refuge's six-page "Land Exchange Net Benefit Analysis" (dkt. #55-3) and Supplemental Environment Assessment (dkt. #1-21), the court

concluded that plaintiffs had a likelihood of success in showing defendants' "suitability" analysis is also flawed.

Moreover, in deciding whether to grant the preliminary injunction, and now whether to stay that injunction, the court must weigh this likelihood of success with irreparable harm and other relevant equities.  As discussed at both the March 22 hearing and in this court's March 25 decision, plaintiffs would suffer irreparable harm if the court stayed its preliminary injunction order and permitted construction to begin immediately. Defendants have conceded that a result of lifting the court's stay would be the anchoring of massive foundations in the Mississippi River and construction of high-voltage towers and transmission lines through the Refuge *before* this court could conduct any meaningful judicial review of the merits of plaintiffs' substantive claims.  While the utility defendants continue to maintain that this court has all the information needed to complete its review, the court is *still* awaiting the basic, underlying documents considered by the governmental defendants in reaching their suitability decision.  In addition, the court has found that the construction work itself would result in irreparable environmental harm to plaintiffs and the public, as well as violate Congress's purpose in passing the Refuge Act, based on findings in the 2019 FEIS.  (Trans. Mot. Hear. (dkt. #66) 6 ([The court] already found substantial harm by stripping out part of the refuge.").

In contrast, the court is not persuaded that defendants will suffer irreparable harm absent a stay of that preliminary injunction order.  Defendants argue that the delay in completing the Cardinal-Hickory Creek transmission project will cost them several million dollars.  In particular, defendants argue that this court failed to consider the requirements of the FAST Act.  42 U.S.C. § 4370m-6(b)(1)–(2).  However, the FAST Act simply requires

courts to consider public interest factors (including potential effects on "the environment"), which were accounted for the in the preliminary injunction standard that the court addressed in finding the risk of substantial damage to the Refuge. (Dkt. #62, at 3.)  Regardless, as this court and the Seventh Circuit both recognized, "[t]he cost of construction is one the utility companies have opted to incur and bear the risk of." *Driftless*, 74 F.4th at 495.  In particular, any ongoing current costs are very much the government and utility defendants own making by the issuance of the analysis giving plaintiff's standing to proceed in federal court just days before construction would begin.  Finally, the preliminary injunction will be in place only until this court can address the merits of plaintiffs' objections with the benefit of an administrative record.  If plaintiffs' claims fail on the merits, defendants can close their land exchange deal and begin construction absent a further stay on appeal.

The utility defendants also contend that the court failed to recognize that permitting completion of the transmission line will benefit the public because the land exchange will:  reduce fragmentation of the Refuge; exchange lower quality habitat for higher quality habitat; and increase the total protected acreage in the Refuge.  They also point out that the project will provide significant economic and environmental benefits to the region, including the ability to transfer low-cost, renewable electricity from states west of the Mississippi River into Wisconsin and beyond, thereby bringing a host of benefits to consumers.  Still, as previously discussed, if defendants succeed in showing that the land exchange *is* lawful under the Refuge Act and NEPA, the public should enjoy those same benefits without significant, additional delay caused by a preliminary injunction to allow for meaningful judicial review.  Indeed, this court has no desire to prolong these

proceedings if it can assure the requirements of the law have been met, which is why it already set an expedited briefing schedule as soon as the administrative record is assembled.[3]

Finally, there is no evidence that any delay in closing the land exchange agreement while the preliminary injunction is pending will result in significant change to the status quo of the relevant parcels.  In particular, although defendants argue that the Refuge and public will benefit from its acquisition of the Wagner parcel, there is no evidence that delay in acquisition will somehow diminish the quality of the Wagner parcel as a result of development or otherwise.  Nor is there evidence, despite defendants' suggestion to the contrary, that defendants are likely to pursue completion of the project via existing easements that would entail more and taller transmission line structures while waiting for this case to be resolved.  On the contrary, given the mangling of that option leading to this court's 2022 decision and withdrawal of permits, it is disingenuous of the utility defendants to suggest otherwise.  Thus, the court is persuaded that the public interest is benefited by both its limited, interim preliminary injunction and denial of a stay.

In sum, "[t]he purpose of [ ] interim equitable relief is not to conclusively determine the rights of the parties, but to balance the equities as the litigation moves forward." *International Refugee Assistance Project*, 582 U.S. at 580.  Here, the balance of equities weighs in favor of plaintiffs and the public, and in favor of informed judicial review of the land exchange decision, particularly since this court is already committed to expedited review on the merits.  Accordingly, intervenor-defendants' motion for stay will be denied.

---

[3] Frankly, why there is a continued hold up in producing the record is vexing.  Yet here we are more than a month after the March 25 hearing with nothing produced.

ORDER

IT IS ORDERED that:

1. The intervenor-defendants motion to stay preliminary injunction (dkt. #71) is

   DENIED.

2. The motions to file reply briefs by both plaintiffs and intervenor-defendants

   (dkt. #81 and dkt. #86) are DENIED.

Entered this 26th day of April, 2024.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge

11