# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| NATIONAL WILDLIFE REFUGE ASSOCIATION, DRIFTLESS AREA LAND CONSERVANCY, and WISCONSIN WILDLIFE FEDERATION<br><br>Plaintiffs,<br><br>v.<br><br>RURAL UTILITIES SERVICE, ANDY BERKE, Administrator, Rural Utilities Service, UNITED STATES FISH AND WILDLIFE SERVICE, WILL MEEKS, Midwest Regional Director, and SABRINA CHANDLER, Manager, Upper Mississippi River National Wildlife and Fish Refuge, UNITED STATES ARMY CORPS OF ENGINEERS, LIEUTENANT GENERAL SCOTT A. SPELLMON, Chief of Engineers and Commanding General, U.S. Army Corps of Engineers, COLONEL JESSE T. CURRY, Commander and District Engineer, Rock Island District, U.S. Army Corps of Engineers, and COLONEL ERIC SWENSON, Commander and District Engineer, St. Paul District, U.S. Army Corps of Engineers,<br><br>Federal Defendants,<br><br>and<br><br>ITC MIDWEST, LLC, and DAIRYLAND POWER COOPERATIVE,<br><br>Intervenor-Defendants. | Case No. 24-cv-139-wmc |

# PLAINTIFFS' AMENDED COMPLAINT

Plaintiffs NATIONAL WILDLIFE REFUGE ASSOCIATION, DRIFTLESS AREA LAND CONSERVANCY, and WISCONSIN WILDLIFE FEDERATION, for their Amended Complaint, allege and state as follows:

## I.     INTRODUCTION

1.     This is a civil action for declaratory and injunctive relief against three federal agencies for violations of the Administrative Procedure Act ("APA"), 5 U.S.C. § 701-706, the National Wildlife Refuge System Improvement Act of 1997 ("1997 National Wildlife Refuge System Improvement Act"), 16 U.S.C. §§ 668dd-668ee, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq., and for related relief against Intervenor-Defendants, which are the transmission line developers.

2.     Plaintiffs contend that the Federal Defendants U.S. Army Corps of Engineers ("Corps"), U.S. Fish and Wildlife Service ("FWS") and Rural Utilities Service ("RUS") violated the 1997 National Wildlife Refuge System Improvement Act, NEPA, and other applicable laws by (1) granting permits and approvals, engaging in an unlawful land exchange and otherwise taking actions to allow the two Intervenor-Defendants, which are private developers, to run a huge high-voltage transmission line with up to 200-feet high towers through the protected Upper Mississippi River National Wildlife and Fish Refuge, which was created by Congressional action in 1924, and (2) impermissibly skewing the required NEPA

1

review process and the purpose and need statement to avoid rigorously exploring and objectively evaluating all reasonable alternatives, among other NEPA issues.

3.     This lawsuit involves the controversial Cardinal-Hickory Creek ("CHC") high-voltage transmission line. The CHC powerline with its wide clear-cut right-of-way and up to 200-feet high towers starts in Dubuque County, Iowa, would run through and across the protected Upper Mississippi River National Wildlife and Fish Refuge ("the Refuge") and then run through southwest Wisconsin's scenic Driftless Area landscape, family farms, rural small-town communities, and vital natural resources and conservation areas to a substation in Middleton, Wisconsin.

4.     Plaintiffs previously sued the RUS, FWS and Army Corps and named agency officials (collectively, "Federal Defendants") in this Court challenging the Federal Defendants' approvals of the CHC transmission line and other related actions. *Nat'l Wildlife Refuge Ass'n v. Rural Utils. Serv.*, Nos. 21-cv-096-wmc & 21-cv-306, 580 F. Supp. 3d 588 (W.D. Wis. 2022) (attached to Plaintiffs' original Complaint as "Exhibit A", Doc. 1-14).[1]

5.     Intervenor-Defendants ITC Midwest LLC ("ITC") and Dairyland Power Cooperative, Inc. ("Dairyland") are two of the three private developers

---

[1] Plaintiffs filed Exhibits A through Y with their original complaint. They can be found in the docket at Doc. 1-14-1-38. Plaintiffs' exhibit to this Amended Complaint will be Exhibit 1.

(collectively, "Transmission Companies") of the CHC transmission line, and they intervened in the preceding related case, along with a third private developer, American Transmission Company. ("ATC"), who did not intervene in this case.

6.     On January 14, 2022, this Court issued an Opinion and Order holding that the National Wildlife Refuge System Improvement Act of 1997, 16 U.S.C. §§ 668dd-668ee, prohibited Defendant U.S. Fish & Wildlife Service from allowing the Transmission Companies, whether by easement or land exchange, to cross the protected Refuge because the huge CHC high-voltage transmission line and its very high towers are not "compatible with" the Refuge's wildlife protection and conservation purposes. This Court concluded that the CHC transmission line was "preclude[d]…from crossing the Refuge by right of way or land transfer," and "a land exchange that is equally incompatible with the purposes of the Refuge as a right of way cannot be used as a method to evade Congress' mandate." *Nat'l Wildlife Refuge Ass'n v. Rural Utils. Serv.*, 580 F.Supp.3d 588, 610 (W.D. Wis. 2022).

7.     This Court further held in its Opinion and Order, that the three Federal Defendants' environmental impact statement ("EIS") and Record of Decision ("ROD") failed to comply with NEPA because, among other things, the EIS defined the "purpose and need" so narrowly that non-Refuge-crossing route alternatives and other alternatives including a combination of non-wires

3

alternatives and solutions were not rigorously explored and objectively evaluated. *Id*. at 613, 615.

8.     In its Opinion and Order, this Court warned the Transmission Companies about continuing construction up to the borders of the protected Upper Mississippi River National Wildlife and Fish Refuge, and described that approach as an "orchestrated trainwreck," which the Court was not likely to tolerate. *Id.* at 601.

9.     The Federal Defendants and the Transmission Companies, including ATC at that time, appealed this Court's January 14, 2022 Opinion and Order to the U.S. Court of Appeals for the Seventh Circuit. On July 19, 2023, the Seventh Circuit issued its Opinion that did not reach the merits of the 1997 Refuge System Improvement Act and the NEPA violations, but instead vacated this Court's Order on the grounds that the Federal Defendants had not reached a "final agency decision" and, therefore, the case was not yet reviewable under the APA. *Driftless Area Land Conservancy v. Rural Utils. Serv.*, 74 F.4th 489 (7th Cir. 2023) (attached to Plaintiffs' original Complaint as "Exhibit B", Doc. 1-15).

10.     The Seventh Circuit's Opinion stated: "The cost of construction is one the utility companies have opted to incur and bear the risk of, not one imposed by the agency." *Driftless Area Land Conservancy v. Rural Utils. Serv.*, 74 F.4th 489, 495 (7th Cir. 2023).

11.     Although the Seventh Circuit's Opinion vacated this Court's January 14, 2022 Opinion and Order, Plaintiffs quote from it herein for procedural context and because this Court's prior reasoning is equally applicable to this present action in which there is now final agency action, as described below.

12.     The Transmission Companies have nonetheless built their high-voltage transmission line and very high towers right up to the borders of the protected Refuge notwithstanding this Court's warnings about their creating an "orchestrated trainwreck."

13.     Defendant FWS and the Transmission Companies have now closed on their land exchange as of May 9, 2024. Doc. 104.

14.     The Transmission Companies have begun construction within the Refuge as of May 13, 2024. Docs. 103 and 104; *see also* Transmission Companies' First Quarter 2024 Progress Report to Public Service Commission of Wisconsin (attached hereto as Exhibit 1) and Transmission Companies' Fourth Quarter of 2023 Construction Progress Report to the Public Service Commission of Wisconsin (attached to Plaintiffs' original Complaint as "Exhibit C," Doc. 1-16).

15.     Federal Defendants RUS, FWS and Corps noticed the availability of a draft supplemental environmental assessment ("Draft SEA") on September 7, 2023, which examined the environmental impact of the proposed land exchange between FWS and ITC Midwest. Doc. 42-1.

16.    The public notice of the availability of the Draft SEA was delayed for at least one day.

17.    Federal Defendants provided only a 14-day period for the public to submit written comments.

18.    Federal Defendants did not provide for a public hearing and did not otherwise provide for members of the public to submit oral comments.

19.    Plaintiffs submitted comments on the Draft SEA. (Attached to Plaintiffs' original Complaint as "Exhibit X", Doc. 1-37).

20.    On October 6, 2023, the Federal Defendants published the Final Supplemental Environmental Assessment ("Final SEA"), which selected the land exchange as the approved alternative. (Attached to Plaintiffs' original Complaint as "Exhibit H", Doc. 1-21).

21.    On February 23, 2024, Defendant FWS issued three documents: (1) a Finding of No Significant Impact ("FONSI") under NEPA (attached to Plaintiffs' original Complaint as "Exhibit D", Doc. 1-17); (2) an executed Land Exchange Agreement (attached to Plaintiffs' original Complaint as "Exhibit E", Doc. 1-18); which is identical to the deal this Court previously invalidated; and (3) a "Net Benefits Analysis" (attached to Plaintiffs' original Complaint as "Exhibit F", Doc 1-19) for the land exchange.

22.    Defendant FWS did not issue a draft version of this FONSI document for public notice.

23.    Defendant FWS did not provide any opportunity at all for public comments in writing before issuing its final version of this FONSI document on February 23, 2024.

24.    Defendant FWS did not provide any opportunity at all for members of the public to submit oral comments before issuing its final version of this FONSI document on February 23, 2024.

25.    Defendant FWS did not provide for a public hearing before issuing its final version of this FONSI document on February 23, 2024.

26.    Defendant FWS did not separately issue a draft version of the land exchange document for public notice and did not provide any reasonable opportunity for public comments and did not provide for a public hearing before issuing its final version of this land exchange document on February 23, 2024.

27.    Defendant FWS did not issue a draft version of its Net Benefits Analysis for public notice.

28.    Defendant FWS did not provide any opportunity at all for public comments in writing before issuing its final version of this Net Benefits Analysis document on February 23, 2024.

29.     Defendant FWS did not provide any opportunity at all for members of the public to submit oral comments before issuing its final version of this Net Benefits Analysis document on February 23, 2024.

30.     Defendant FWS did not provide for a public hearing before issuing its final version of this Net Benefits Analysis document on February 23, 2024.

31.     Defendant FWS has made a "final agency decision."

32.     Defendant FWS approved a land exchange by which it conveyed and transferred fee simple title of longstanding public lands and waters in the Refuge to the Transmission Companies for their preferred corridor to clear-cut, bulldoze, build, and run their powerline and transmission towers through the "Turkey River Bottoms" area of the Refuge in exchange for a parcel of land downstream on the Wisconsin side of the Mississippi River.

33.     Plaintiffs filed their original Complaint in this action on March 6, 2024 in which Plaintiffs brought suit against the Federal Defendants. Doc. 1.

34.     ITC Midwest and Dairyland Power moved to intervene on March 7, 2024, Doc. 25, and this Court granted their unopposed motion on March 8, 2024. Doc. 32.

35.     This Court granted preliminary injunctions in favor of Plaintiffs and issued Orders on March 21 and March 25, 2024. Doc. 60, 62, 63.

36.     Defendant FWS nonetheless conveyed the Turkey River Bottoms – Oak Road parcel to the Transmission Companies via a quitclaim deed signed by Defendant William A. Meeks on March 26, 2024. Doc. 105-1.

37.     On April 8, 2024, ITC Midwest and Dairyland filed a motion requesting that the U.S. Court of Appeals for the Seventh Circuit stay the preliminary injunctions pending appeal.

38.     On April 11, 2024, the Seventh Circuit entered an Order stating that: "This court will defer action on these motions until the district court has acted (within a reasonable time) on the pending motion for stay." Doc. 80.

39.     On April 22, 2024, this District Court issued an Opinion and Order (Doc. 88) denying the Intervenor-Defendant Transmission Companies' motion for stay and continuing the interim preliminary injunction.

40.     On May 2, 2024, the Seventh Circuit entered on Order "stay[ing] the effectiveness of the preliminary injunction" and stating "[t]he district court remains free to consider whether a permanent injunction is appropriate." Doc. 93-1.

41.     Plaintiffs have a renewed preliminary injunction motion pending before this Court filed on May 8, 2024. 3/21/24 Order, Doc. 60; 3/25/24 Order, Doc. 63; May 2 Seventh Circuit Order, Doc. 95; Renewed Prelim. Inj. Mot., Doc. 101.

42.     Defendant FWS and ITC Midwest closed the land exchange on May 9, 2024. Notice of Closing, Doc. 103.

43.     The Transmission Companies have commenced construction and are taking preparatory steps to run the CHC powerline and high towers through and across what has long been the protected Upper Mississippi River National Wildlife and Fish Refuge with stated intent to begin foundation work the week of May 27, 2024. Doc. 104; Doc. 112 at 34.

44.     Even prior to the closing of the land exchange agreement, the Transmission Companies cleared staging areas and assembled heavy equipment to begin construction through the Refuge.

45.     One of Plaintiffs' members witnessed activity near the Refuge prior to the filing of this lawsuit, including staging of laydown pallets on the Iowa side and unloading materials on the Wisconsin side. Doc. 1-20, Declaration of Dena Kurt (attached to Plaintiffs' original Complaint as "Exhibit G").

46.     The Transmission Companies publicly stated their intention to finish construction and operationalize the western half of the CHC project by the end of June 2024. Final Supplemental Environmental Assessment ("Final SEA") at 40 (attached to Plaintiffs' original complaint as "Exhibit H", Doc. 1-21).

47.     This land exchange violates the 1997 National Wildlife Refuge System Improvement Act. 16 U.S.C. § 668dd.

48.     The Defendants have not conducted any further analyses of alternative routes by which their transmission line would avoid running through and crossing the Upper Mississippi River National Wildlife and Fish Refuge.

49.     Each of the Federal Defendants, the FWS, RUS, and the Corps, have made final agency decisions in issuing their Final EIS and ROD and their subsequent Final SEA under NEPA, which were relied upon by FWS in its February 23, 2024 decisional documents.

50.     Federal Defendants' NEPA documents, including the FONSI, the Final SEA and the original Final Environmental Impact Statement, all violate NEPA. 42 U.S.C. § 4321 *et. seq.*

51.     Plaintiffs, therefore, seek a declaratory judgment "setting aside" and vacating the land exchange and land transfer, and granting preliminary and permanent injunctive relief against any and all construction of the CHC high-voltage transmission line and high towers through and across the historic, longstanding lands and waters of the Upper Mississippi River National Wildlife and Fish Refuge, and against any approvals, thereof, by the Federal Defendants that would allow this to take place, such that any construction that has or will occur must be undone and remediated, and any and all contracts entered into between Federal Defendants and the Intervenor-Defendant Transmission Companies are declared null and void.

11

## II.     JURISDICTION AND VENUE

52.     This Court has federal question jurisdiction under 28 U.S.C. § 1331, and federal officer jurisdiction under 28 U.S.C. § 1346, and supplemental jurisdiction over any state claims under 28 U.S.C. § 1367.

53.     This Court has the authority to grant the requested relief under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2), under 28 U.S.C. §§ 2201 (declaratory relief), and 2202 (injunctive relief), and under Fed. R. Civ. P. 65.

54.     Venue in the United States District Court for the Western District of Wisconsin is appropriate under 28 U.S.C. § 1391. Plaintiffs Driftless Area Land Conservancy ("DALC") and Wisconsin Wildlife Federation ("WWF") are located in this district. Most of the CHC high-voltage transmission line is located in this district, and some of the challenged land exchange involves transferring land located in this district.

55.     "A substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of the property that is the subject of the action is situated" in the Western District of Wisconsin within the meaning of 28 U.S.C. § 1391.

56.     This U.S. District Court for the Western District of Wisconsin has conducted all previous federal litigation over this CHC transmission line.

57.     This action is timely under Title 41 of the FAST Act, 42 U.S.C. § 4370m-6(a)(1)(A), and under 28 U.S.C. § 2401.

## III.   STANDING

58.     Plaintiff National Wildlife Refuge Association ("NWRA") is a not-for-profit organization focused on protecting and promoting the 850 million-acre National Wildlife Refuge System, which is the world's largest network of lands and waters set aside for wildlife conservation. Founded in 1975, NWRA's mission is to conserve America's wildlife heritage for future generations through strategic programs that enhance the National Wildlife Refuge System and the landscapes beyond its boundaries.

59.     NWRA's affiliates and supporters include Friends of Pool 9 and Friends of the Refuge—Mississippi River Pools 7 & 8, which are two of the volunteer organizations that support the Upper Mississippi River National Wildlife and Fish Refuge.

60.     NWRA has members who use and enjoy and who plan to continue to use and enjoy the Upper Mississippi River National Wildlife and Fish Refuge and the extensive natural resources in the Driftless Area.

61.     Dena Kurt is an NWRA member who lives near and recreates in the Upper Mississippi River National Wildlife and Fish Refuge. Ms. Kurt frequently kayaks on the Mississippi River and enjoys observing wildlife and a practice of

13

silent paddling through the Refuge. Ms. Kurt is disheartened by the impacts she already sees in the Refuge from the transmission line and towers built up to the boundaries. If the CHC transmission line is completed through the Refuge, Ms. Kurt will visit that section of the River less often. As discussed in her declaration, Ms. Kurt has observed staging and other activity by the Transmission Companies preparing for construction near the Refuge. Ms. Kurt's Declaration is attached to Plaintiffs' original Complaint as Exhibit G, Doc. 1-20.

62.　　Mark Mittelstadt is an NWRA member who lives, works and recreates in the Driftless Area and the Upper Mississippi River National Wildlife and Fish Refuge. Mr. Mittelstadt is a professional forester who has worked on properties near the Refuge. Mr. Mittelstadt visits the Refuge regularly, enjoying the scenic beauty of the Mississippi River and the steep bluffs rising up from the Mississippi River. Mr. Mittelstadt's Declaration is attached to Plaintiffs' original Complaint as Exhibit I, Doc. 1-22.

63.　　Plaintiff Driftless Area Land Conservancy ("DALC") is a not-for-profit land trust and conservation organization, headquartered in Dodgeville, Wisconsin. DALC is dedicated to protecting sensitive lands, vital conservation areas, scenic landscapes, historic properties, and natural resources in Wisconsin's Driftless Area. DALC and its members maintain and enhance the health, diversity, and beauty of Wisconsin's natural and agricultural landscape through permanent

land protection and restoration, and other conservation, natural resources protection, and preservation actions. DALC is a nationally certified land trust that was recognized as the Wisconsin Land Conservancy of the Year in 2017 by Gathering Waters, which is Wisconsin's Alliance for Land Trusts.

64.    DALC has members who use and enjoy, and who plan to continue to use and enjoy the Upper Mississippi River National Wildlife and Fish Refuge and the extensive natural resources in Wisconsin's Driftless Area.

65.    Mary Kritz is a DALC member who lives in Southwest Wisconsin who enjoys trail walking, hiking, and taking in the beautiful scenery of the Refuge. Ms. Kritz's enjoyment of the Refuge will be diminished if the CHC transmission line is allowed to run through the longstanding Refuge lands and waters. Ms. Kritz's declaration is attached to Plaintiffs' original Complaint as Exhibit J, Doc. 1-23.

66.    Kerry Beheler is a DALC member who has lived and worked near the Refuge for over 40 years. Ms. Beheler is an avid birder who enjoys observing the spring bird migration. Ms. Beheler's declaration is attached to Plaintiffs' original Complaint as Exhibit K, Doc. 1-24.

67.    Kristi Hart is a DALC member who lives in Southwest Wisconsin and visits the Refuge with her kids and grandkids. Ms. Hart enjoys taking in the scenery, bird watching and looking for interesting plants around the Refuge. Ms.

15

Hart's declaration is attached to Plaintiffs' original Complaint as Exhibit L, Doc. 1-25.

68.     In addition to their membership in the National Wildlife Refuge Association, Ms. Kurt and Mr. Mittelstadt are also members of DALC. Exhibits G and I to Plaintiffs' original Complaint, Doc. 1-20 and Doc. 1-22.

69.     Plaintiff Wisconsin Wildlife Federation ("WWF") is a not-for-profit conservation organization dedicated to protecting wildlife habitat, conservation lands and waters, and natural resources throughout the State of Wisconsin on behalf of the hunters, anglers, trappers, and other individuals who are WWF members.

70.     WWF has members who use and enjoy and who plan to continue to use and enjoy the Upper Mississippi River National Wildlife and Fish Refuge and the extensive natural resources in Wisconsin's Driftless Area.

71.     Charles Horn is a WWF member who previously worked for the Wisconsin Department of Natural Resources in Southwest Wisconsin covering an area that includes the Upper Mississippi River National Wildlife and Fish Refuge. Mr. Horn is an avid fisherman who spends significant time navigating and recreating on the Mississippi River in the Refuge. Mr. Horn's declaration is attached to Plaintiffs' original Complaint as Exhibit M, Doc. 1-26.

72.    In addition to her membership in DALC, Ms. Kristi Hart is also a member of WWF. Exhibit L to Plaintiffs' original Complaint, Doc. 1-25. Likewise, in addition to her membership in both DALC and NWRA, Ms. Dena Kurt is also a member of WWF. Exhibit G to Plaintiffs' original Complaint, Doc. 1-20.

73.    Construction of the CHC transmission line and very high towers and, in particular, bulldozing and running through and across the protected Upper Mississippi River National Wildlife and Fish Refuge would frustrate the mission of each of the Plaintiff organizations and their members to protect wildlife and wildlife habitat, conserve vital natural resources, use and enjoy these special areas and scenic landscapes, and engage in outdoor recreational activities.

## IV.    DEFENDANTS

74.    Defendant United States Fish & Wildlife Service ("FWS") is a bureau of the U.S. Department of the Interior, and manages the lands in the National Wildlife Refuge System in trust on behalf of the public.

75.    Defendant Will Meeks is the Regional Director for FWS for its Midwest region, which includes the Upper Mississippi River National Wildlife and Fish Refuge, and he is sued in his official capacity.

76.    Defendant Sabrina Chandler is the Manager of the Upper Mississippi River National Wildlife and Fish Refuge, and she is sued in her official capacity.

77.     Defendant Rural Utilities Service ("RUS") is part of the U.S.
Department of Agriculture ("USDA"). Its Electric Program provides loans and
loan guarantees to finance the construction of electric distribution, transmission,
and generation facilities, including system improvements, as well as demand-side
management, energy conservation programs, and on-grid and off-grid renewable
energy systems.

78.     Defendant Andy Berke is the Administrator of the RUS, and he is
sued in his official capacity.

79.     Defendant U.S. Army Corps of Engineers ("Corps") is part of the U.S.
Department of the Army in the U.S. Department of Defense. The Corps' Civil
Works Regulatory Program evaluates permit applications under section 10 of the
Rivers and Harbors Act of 1899 and under section 404 of the Clean Water Act for
essentially all construction activities that occur in the "waters of the United States."

80.     Defendant Lieutenant General Scott Spellmon is the Chief of
Engineers and Commanding General of the U.S. Army Corps of Engineers, and he
is sued in his official capacity.

81.     Defendant Colonel Eric Swenson is the Commander and District
Engineer for the St. Paul District of the Corps, which covers permit applications in
Wisconsin, and he is sued in his official capacity.

82.     Defendant Colonel Jesse Curry is the Commander and District Engineer for the Rock Island District of the Corps, which covers permit applications in Iowa, and he is sued in his official capacity.

83.     The Transmission Companies were Intervenor-Defendant parties in the previous related case.

84.     Transmission Companies ITC Midwest and Dairyland Power were not named as Defendants in Plaintiffs' original Complaint based on their representation to Plaintiffs' counsel that they would not begin construction through the Refuge unless and until the proposed land exchange was fully closed. However, now that the Transmission Companies ITC Midwest and Dairyland Power voluntarily moved to intervene in this case and land exchange is closed, Plaintiffs are adding ITC Midwest and Dairyland Power as Defendants in this Amended Complaint.

## V.    FACTS
### A.    The Upper Mississippi River National Wildlife and Fish Refuge and the Scenic Driftless Area Landscape and Communities

85.      The Upper Mississippi River National Wildlife and Fish Refuge was established by Congress in 1924 as a refuge and breeding place for migratory birds, and as a refuge for other birds, wildlife, fish, and plants. 16 U.S.C. § 723.

86.     Congress has not changed the borders of the Refuge since the Court's

last ruling. 16 U.S.C. § 723; U.S. Fish & Wildlife Service ("FWS") *Upper*

*Mississippi River National Wildlife and Fish Refuge*,

https://www.fws.gov/refuge/upper-mississippi-river/about-us.

87.     Defendant FWS explains that: "[t]he mission of the National Wildlife

Refuge System is to administer a national network of lands and waters for the

conservation, management and, where appropriate, restoration of the fish, wildlife

and plant resources and their habitats within the United States for the benefit of

present and future generations of Americans. Every national wildlife refuge was

created for a special purpose. Some were created to protect migratory birds, others

to protect threatened or endangered species or unique habitats, while others fulfill

another special purpose. All activities allowed on refuges must be evaluated to

make sure each activity will not conflict with the reason the refuge was founded."

*Id*.

88.     Defendant FWS states that the: "Upper Mississippi River National

Wildlife and Fish Refuge has been a haven for migratory birds, fish, wildlife and

people since 1924. The refuge stretches 261 river miles from Wabasha, Minnesota

to Rock Island, Illinois, and protects more than 240,000 acres of Mississippi River

floodplain. The refuge hosts more than 3.7 million annual visits for hunting,

fishing, wildlife observations, and other recreation. The refuge is a Wetland of

International Importance and a Globally Important Bird Area." *Upper Mississippi River National Wildlife and Fish Refuge*, U.S Fish and Wildlife Service, https://www.fws.gov/refuge/upper-mississippi-river

89.     The Upper Mississippi River National Wildlife and Fish Refuge is one of the largest blocks of floodplain habitat in the lower 48 states. According to Defendant FWS: "[b]ordered by steep wooded bluffs that rise 100 to 600 feet above the river valley, the Mississippi River corridor and refuge offer scenic beauty and productive fish and wildlife habitat unmatched in the heart of America." *Upper Mississippi River National Wildlife and Fish Refuge, About Us*, U.S Fish and Wildlife Service, https://www.fws.gov/refuge/upper-mississippi-river/about-us

90.     The Upper Mississippi River National Wildlife and Fish Refuge is designated as a Wetland of International Importance pursuant to the treaty established at the Ramsar Convention on Wetlands of International Importance. *Upper Mississippi River Floodplain Wetlands*, Ramsar, Sites Information Service, Ramsar (Jan. 5, 2020) https://rsis.ramsar.org/ris/1901.

91.     The designation of an area as a Ramsar site "embodies the government's commitment to take the steps necessary to ensure that its ecological character is maintained." *Wetlands of International Importance*, Ramsar: The

Convention on Wetlands, https://www.ramsar.org/about/our-mission/wetlands-international-importance.

92.     Ramsar sites "are recognized as being of significant value not only for the country or the countries to which they are located, but for humanity as a whole." *Id.*

93.     The Upper Mississippi River National Wildlife and Fish Refuge is also designated as a Globally Important Bird Area. *Upper Mississippi River National Wildlife and Fish Refuge*, U.S. Fish & Wildlife Service, https://www.fws.gov/refuge/upper-mississippi-river.

94.     The Upper Mississippi River National Wildlife and Fish Refuge is located within the Mississippi Flyway, a Globally Important Bird Area, where, "[m]ore than 290 species of birds migrate throughout the refuge every year. About 40% of the waterfowl in the nation use the Mississippi River as a travel corridor in the fall migration and the refuge is particularly known to host large flocks of tundra swans and large rafts of canvasback ducks between mid-October and the winter freeze-up. In addition, Upper Mississippi River National Wildlife and Fish Refuge hosts more than 300 pairs of bald eagles in part due to having one of the largest blocks of floodplain forest habitat in the lower 48 states." *Upper Mississippi River National Wildlife and Fish Refuge*, U.S. Fish & Wildlife Service, https://www.fws.gov/refuge/upper-mississippi-river/about-us.

95.     While birds migrate north and south, which is vertically, along the Mississippi Flyway in the Refuge, the Transmission Companies plan to build their CHC high-voltage transmission line and high towers east and west, which is horizontally, through and across the Refuge.

96.     That east-west horizontal transmission line through and across the Refuge will cause migratory bird kills, injuries, and deaths. ROD005184, ROD005186, ROD005196, ROD005474.

97.     The federally endangered whooping crane, the tallest of North America's birds and one of the rarest, has been sighted at the Refuge near where the CHC transmission line is proposed to run through and across the Refuge. Exhibit G at ¶19, attached to Plaintiffs' original Complaint, Doc. 1-20.

98.     Construction of the CHC transmission line in the protected Upper Mississippi River National Wildlife and Fish Refuge in the Turkey River Bottoms – Oak Road parcel would also take place in or near an Essential Habitat Area for the federally endangered Higgins eye pearly mussel. The Refuge contains the greatest native mussel density of all the essential habitat areas in the United States.

99.     Defendant FWS published and maintains a kiosk on the Iowa side of the Mississippi River just across from the new, very high dark brown transmission towers on the Cassville, Wisconsin side. The FWS kiosk contains a sign titled "River Refuge." Doc. 109 at ¶ 7.

100.   The "River Refuge" sign on the FWS kiosk states:

The refuge is perhaps the most important corridor of fish and wildlife habitat in the central United States, an importance which has increased over time as habitat losses or degradation have occurred elsewhere. This special habitat was almost lost . . . . The seemingly endless panorama of river, backwaters, marshes, islands, and forest, framed by steep bluffs, makes the refuge a national scenic treasure; a place for wildlife to feed, rest, breed, and rear young. Doc. 109 at ¶ 8.

101.   The FWS kiosk also contains a sign titled "Freshwater Mussel or Clam?" which states: "the Cassville Channel before you is famous among malacologists (mussel experts) because of its hidden secret. This is one of several locations on the Mississippi River where mussels still blanket the river bottom in what is known as a mussel 'bed.' Over 25 species of mussels can be found here, including the Federally endangered Higgin's eye pearlymussel." Doc. 109 at ¶ 9.

102.   The FWS kiosk also contains a sign titled "Mussels of the Mississippi, which states:

No other group of animals in North America is in such grave danger of disappearing. Mussels native to the Upper Mississippi River are losing ground to pollution, sedimentation, habitat alteration, and smothering from non-native zebra mussels.

Native mussels are critical to water quality as they anchor themselves to the river bed and silently purify the water . . . [and that the mussels] are food for refuge wildlife including otter, raccoon, muskrat, heron, egret and some fish.

Doc. 109 at ¶ 9.

103.   The Upper Mississippi River National Wildlife and Fish Refuge is also part of the iconic Driftless Area of Wisconsin, Iowa, Minnesota and Illinois.

104.   Unlike most of the Midwest's landscape, the Driftless Area was not flattened by glaciers. Instead, it includes hundreds of rolling hills with deep river valleys and contains many rare and unique woodland, prairie, and riparian habitats.

105.   The Driftless Area has more than 1,200 streams, including world-class trout fishing streams, more than 4,000 river miles, and a network of 600 spring-fed creeks that flow through porous limestone bedrock.

**B.**     **The Cardinal-Hickory Creek High-Voltage Transmission Line**

106.   The CHC transmission line begins at the Hickory Creek substation in Dubuque County, Iowa, and would then run across and through the protected Upper Mississippi River National Wildlife and Fish Refuge, and then would cut a wide swath east through Wisconsin's scenic Driftless Area landscape, vital natural resources, conservation areas, family farms, and rural small town communities to the Cardinal substation in Middleton, Wisconsin.



Exhibit H at 4, attached to Plaintiffs' original Complaint, Doc. 1-21.

107.   For most of its route, the CHC transmission line's right-of-way is 150-feet wide. Within the Upper Mississippi River National Wildlife and Fish Refuge, the proposed right-of-way would be 260-feet wide with towers nearly 200-feet high at the Mississippi River crossing points around the Turkey River Bottoms – Oak Road parcel.

108.   Almost all of the CHC transmission line cuts through the scenic Driftless Area landscape in Southwest Wisconsin. Construction of the transmission line is now having, and will continue to have, significant adverse effects on conservation lands and rivers, lakes and streams, ecological, economic, historic

26

aesthetic resources, tourism opportunities and outdoor recreation enjoyment, small-town rural communities, and vital natural resources along its entire route both throughout the Driftless Area in Southwest Wisconsin and through the Upper Mississippi River National Wildlife and Fish Refuge.

109.   If it becomes operational, the CHC transmission line will be open access, and it will carry a significant amount of electricity generated from coal, natural gas and other fossil fuel-powered generating plants, which emit greenhouse gases causing significant harmful climate change impacts.

110.   The CHC transmission line was first conceived in the early 2000's as part of a "multi-value portfolio" of about 20 new proposed high-voltage transmission lines by the Midcontinent Independent System Operator ("MISO"), a regional transmission organization that covers the Upper Midwest region.

111.   MISO did not analyze the incremental costs and benefits of or evaluate the route for the CHC transmission line itself.

112.   MISO's analysis was largely limited to an evaluation of the entire portfolio of about 20 proposed new transmission lines.

113.   As of March 31, 2024, the Transmission Companies state that they have spent $554 million on the CHC transmission line.

114.   The Transmission Companies now estimate that the CHC transmission line will cost $707 million. Exhibit 1.

27

115.   Under Federal Energy Regulatory Commission ("FERC") orders, the Transmission Companies are provided a rate of return of between 10% and 12% on their prudent and reasonable capital investment, so they have a financial incentive to defer finding less expensive, less environmentally damaging and more cost-effective non-wires alternative solutions to building their huge costly proposed high-voltage transmission line.

### C.     Procedural History

116.   In 2006, FWS issued its Comprehensive Conservation Plan ("CCP") for the Upper Mississippi River National Wildlife and Fish Refuge as required by the 1997 National Wildlife Refuge System Improvement Act. The CCP is attached to Plaintiffs' original Complaint as "Exhibit N", Doc. 1-27.

117.   The CCP outlines the Refuge Manager's long-term plans for the Refuge.

118.   With regard to land exchanges, the CCP focuses on "explor[ing] land exchanges with the states to remove intermingled ownerships." *See e.g.*, Doc. 1-27 at 111.

119.   The CCP discusses "Land Acquisition" in several paragraphs without mentioning *disposition* of land for private transmission line projects at all. *Id.* at 13.

28

120.    The CCP specifically identifies land acquisition as a means to preserve flood plains. *Id.*

121.    According to the CCP, habitat fragmentation is a threat and harm to be avoided.

122.    The CCP highlights the Turkey River Bottoms – Oak Road parcel as a strategic target for land acquisition. Doc. 1-27 at 204.

123.    In 2012, the Transmission Companies met with the Defendant FWS's managers of the Upper Mississippi River National Wildlife and Fish Refuge to discuss whether their proposed CHC high-voltage transmission line could or should be allowed to run through and across the protected Refuge.

124.    The Defendant FWS Refuge managers met with ATC to discuss the proposed CHC transmission line, and FWS managers confirmed "the use of existing rights-of-way and or avoidance of the Refuge as the only compatible alternatives for crossing the Refuge." Email from Timothy Yager, former Deputy Refuge Manager FWS to Cheryl Laatsch, Wisconsin DNR, April 17, 2012. Exhibit O to Plaintiffs' original Complaint, Doc. 1-28.

125.    At about that time, the Refuge managers also advised a different group of transmission developers (including Dairyland Power) that the Defendant FWS would not allow their proposed high-voltage transmission line to run through

and across the Refuge at the Black River Bottoms location farther north along the Mississippi River in the Refuge.

126.   The Defendant FWS Refuge managers explained the reasons why a project like the CHC high-voltage transmission line could not meet the 1997 National Wildlife Refuge System Improvement Act's requirements. According to the FWS Refuge managers, right-of-way projects "can cause habitat fragmentation, reduce habitat quality, degrade habitat quality through introduction of contaminants; disrupt migration corridors; alter hydrology; facilitate introduction of alien, including invasive species; and disturb wildlife." Refuge Managers Letter on Capx2020 at 21, Exhibit P to Plaintiffs' original Complaint, Doc. 1-29.

127.   The Defendant FWS Refuge managers also explained that transmission line crossings would compromise the area's scenic qualities encourage the establishment of invasive species like reed canary-grass, European buckthorn, Japanese knotweed, and others; compromise threatened and endangered and candidate species like the Higgins Eye pearlymussel, the Massasauga rattlesnake, and the sheepnose mussel; pose a significant hazard to bald eagles; and greatly increase the risk of harmful bird strikes generally. Exhibit P to Plaintiffs' original Complaint at 24, Doc. 1-29.

128.   In 2017, the U.S. Environmental Protection Agency ("EPA") specifically advised the Cardinal-Hickory Creek transmission line developers to

avoid crossing the National Wildlife Refuge and, instead, identify and use an alternative route that would not run through and cross the Refuge. 2017 EPA Scoping Comments, Exhibit Q to Plaintiffs' original Complaint, Doc. 1-30.

129.   Nevertheless, the Transmission Companies pressed forward with their plan to build the huge CHC high-voltage transmission line that would run through and across the protected National Wildlife and Fish Refuge.

130.   Dairyland Power expressed interest in securing a loan from Defendant Rural Utilities Service ("RUS") for its share of the CHC transmission line project, and that triggered the requirement for an environmental impact statement ("EIS") under NEPA and the U.S. Department of Agriculture's applicable NEPA rules and regulations.

131.   The Transmission Companies seeking to develop the CHC high-voltage transmission line needed to obtain approvals of permits from the Defendant Corps in order to construct in "waters of the United States."

132.   The Transmission Companies seeking to develop the CHC high-voltage transmission line needed to obtain approval of an easement and special permit from the Defendant FWS in order to cross the protected Refuge.

133.   The Transmission Companies seeking to develop the CHC high-voltage transmission line also needed state permits from Wisconsin and Iowa.

31

134.   The Defendant Corps' and FWS's actions and approvals required environmental reviews under NEPA.

135.   Defendant Corps and Defendant FWS joined together with Defendant RUS in the NEPA EIS process as cooperating agencies.

136.   At all stages of the NEPA environmental review process—scoping, draft EIS, and final EIS—Plaintiffs DALC and WWF submitted written comments. These comments were attached as Exhibits R, S, and T, respectively, to Plaintiffs' original Complaint, Docs. 1-31, 1-32, 1-33.

137.   Also, at all stages—scoping, draft EIS, and final EIS—Plaintiffs DALC's and WWF's members participated in public meetings and public hearings.

138.   Despite DALC's and WWF's opposition and thousands of other public comments in opposition, the Federal Defendants' final EIS ("FEIS") and Record of Decision ("ROD") summarily rejected all non-Refuge-crossing alternatives, principally on the ground that those alternatives would not meet the "purpose and need" of increasing electricity transfer capacity between Iowa and Wisconsin.

139.   Plaintiffs DALC's and WWF's, their members', and their allies' comments identified alternatives and the following problems with the Transmission Companies' proposed CHC high-voltage transmission line:

(A) The Defendants' EIS purpose and need statement required that any alternatives "increase transfer capacity of the electrical system between Iowa and Wisconsin." That precluded consideration of non-wires alternative solutions and grid enhancement technologies.

(B) The Defendants' environmental review documents did not take a hard look at all reasonable alternatives, especially including alternative routes that would have avoided crossing the protected Upper Mississippi River National Wildlife and Fish Refuge. Instead, the Federal Defendants only seriously considered two alternatives, both of which were to be new high-voltage transmission lines and both of which crossed the protected Refuge near Cassville, WI. One was on a route across the Refuge where old low-voltage power lines had run ("the Stoneman crossing"), and one was farther north where an old coal-fired power plant had been shut down. ("the Nelson Dewey crossing").

(C) The Defendants' EIS did not take a hard look at the climate change impacts of the CHC high-voltage transmission line even though the Federal Defendants and the Transmission Companies acknowledged that the CHC high-voltage transmission line would carry electricity from fossil-fuel generating plants using coal and natural gas, not just wind power and solar energy.

(D) The Defendants' EIS did not take a hard look at the cumulative impacts of the CHC high-voltage transmission line in combination with other high-voltage

transmission lines and other environmentally harmful development projects recently built in the area, including the Badger-Coulee high-voltage transmission line running from near La Crosse, WI through the Driftless Area towards the Madison, Wisconsin area.

(E) The Defendants' environmental review documents assumed the lawfulness of crossing through the Upper Mississippi River National Wildlife and Fish Refuge.

(F) The Defendants' EIS did not take a hard look at other adverse environmental impacts, including, but not limited to, impacts involving invasive species, increased deer population and damage, effects on tourism and recreation, and effects on public and private conservation and other lands.

(G) The Defendants' environmental review documents overly and impermissibly relied on reports and self-serving analyses from the Transmission Companies that are the CHC transmission line developers and proponents.

(H) The Defendants' FEIS and ROD outcomes was their predetermined approval of the Transmission Companies' CHC high-voltage transmission line along their preferred route running through and crossing the protected Refuge.

140.   On January 16, 2020, the three Federal Defendants issued their ROD finding the FEIS adequate under NEPA.

141. The Defendant Corps would then grant permits for work in waterbodies and wetlands along the route, and the Defendant RUS would consider the loan application.

142. As part of the ROD, Defendants Corps and FWS would grant right-of-way ("ROW") easements and special permits for the Transmission Companies' preferred "Nelson Dewey crossing."

143. The ROD included an FWS document, dated December 19, 2019, called a "Compatibility Determination."

144. The FWS began a process to grant a right-of-way, using the statutory "compatibility determination" standard, for the proposed CHC high-voltage powerline and towers that would run through and cross the Refuge at the Turkey River Bottom – Oak Road parcel. FWS000092.

145. While the FWS found the powerline use to be compatible, the Defendants later rescinded this determination because it relied on inaccurate information.

146. On December 19, 2019, in its "Final Compatibility Determination," Defendant FWS stated that if the Transmission Companies were willing to tear down some old low-voltage powerlines about a mile south of the proposed CHC crossing, the CHC powerline could be deemed a "minor realignment of an existing

right-of-way to meet safety standards" and, therefore, only "maintenance" of the old lines, which predated the 1997 Refuge Act. ROD007584.

147.   Under the 1997 Refuge Act, "[m]aintenance of an existing right-of-way includes minor expansion or minor realignment to meet safety standards." 50 C.F.R. § 26.41(c).

148.   The new CHC high-voltage powerline and high towers are not a minor realignment of an existing right-of-way and are not designed to "meet safety standards."

149.   The FWS's "Final Compatibility Determination" which adopted the "maintenance" theory stated the proposed right-of-way for the CHC high-voltage powerline would "result[] in habitat gaps and forest fragmentation" and that "[c]learing and maintenance suppression of woody vegetation by the [Companies] within the right-of-way footprint would alter the forest succession patterns permanently." ROD007579.

150.   Defendants FWS and Corps formally granted the right-of-way easements in September 2020.

151.   On February 10, 2021 and on May 4, 2021, Plaintiffs NWRA, DALC, and WWF, along with Defenders of Wildlife, filed lawsuits in this Court to declare unlawful, "set aside" and vacate the Federal Defendants' FEIS and Record of Decision and the accompanying decisions from all three agencies, and to enjoin

further construction of the CHC high-voltage transmission line project unless and until the Federal Defendants fully comply with all applicable federal laws.

152.   On March 1, 2021, Dairyland and ITC applied for a revised crossing of the Defendant FWS's fee title land in the Upper Mississippi River National Wildlife and Fish Refuge, stating a need to reduce the impact on cultural resources.

153.   The Federal Defendants prepared a new draft environmental assessment ("EA") for the route modification, which was made available to the public on June 24, 2021, with a 30-day comment period.

154.   On July 29, 2021, five days after the EA comment period expired, the Transmission Companies made a proposal to Defendant FWS for an expedited land exchange as an alternative to the pending proposal to grant an easement and special permit, which the Transmission Companies said would take too long. FWS-AR-0002858.[2]

155.   Under the Transmission Companies' proposal, the Defendant FWS would deed the right-of-way for the project using the Turkey River Bottoms – Oak Road parcel, and, in return, the Transmission Companies would convey a parcel of land in Wisconsin that they were going to transfer anyway as compensatory mitigation for the damage caused by the CHC high-voltage transmission line.

---

[2] Citations to "RUS-AR…" and "FWS-AR…" are from the recently-lodged Administrative Record in the instant lawsuit. See Doc. 90; 91.

156.   Defendant FWS's own rules expressly prohibit using "compensatory mitigation," like receiving other land in return, to meet the compatibility requirements in the 1997 Refuge Act. 50 C.F.R. § 26.41(b).

157.   Defendant FWS may not "initiate or permit a new use of a national wildlife refuge or expand, renew, or extend an existing use of a national wildlife refuge, unless [FWS] has determined that the use is a compatible use." 16 U.S.C. § 668dd(d)(3)(A)(i).

158.   Under the 1997 Refuge Act, a "compatible use" is "a wildlife dependent recreational use, or any other use on a refuge that . . . will not materially interfere with or detract from the fulfillment of the mission of the System or the purposes of the refuge." 16 U.S.C. § 668ee(1).

159.   In a letter dated August 3, 2021, Defendant Sabrina Chandler on behalf of Defendant FWS advised the Transmission Companies that FWS favored the land exchange proposal. Exhibit U to Plaintiffs' original Complaint, Doc. 1-34).

160.   The Transmission Companies and FWS completed surveying before August 25, 2021. Doc. 67 at 5, 21-cv-00096.

161.   On August 27, 2021, less than a month after the Transmission Companies first proposed the land exchange, and one week before summary judgment briefs were due in the lawsuit before this Court, the Defendant FWS

withdrew its "Compatibility Determination" which grandfathered in the CHC high-voltage transmission line project by characterizing it as "maintenance," again citing a title or property description problem with one of the existing easements. FWS August 27, 2021 Letter to Companies, Exhibit V to Plaintiffs' original Complaint, Doc. 1-35).

162.   On or about October 25, 2021, the Transmission Companies commenced construction of the CHC high-voltage transmission line and very high towers in both Iowa and Wisconsin.

163.   On October 29, 2021, two days after this Court conducted a hearing on Plaintiffs' motion for a preliminary injunction, Defendant FWS and Intervenor-Defendants Dairyland Power and ITC Midwest formally executed a Statement of Proposed Land Exchange/Purchase that identified the parcels of land that would be exchanged and setting the terms and conditions.

164.   The Federal Defendants' and Transmission Companies' fully executed Statement of Proposed Land Exchange/Purchase, dated October 29, 2021, was not disclosed to the Plaintiffs or to the general public at that time. The Statement of Proposed Land Exchange/Purpose is Exhibit W to Plaintiffs' original Complaint, Doc. 1-36.

165.   The Federal Defendants' and Transmission Companies' fully executed Statement of Proposed Land Exchange/Purchase, dated October 29, 2021,

was not disclosed to this Court or to the U.S. Court of Appeals for the Seventh

Circuit while the courts were conducting judicial reviews.

166.   The Defendants did not disclose that Statement of Proposed Land

Exchange/Purchase to Plaintiffs or to the general public until about two years later

in September 2023. Exhibit H to Plaintiffs' original Complaint, Doc. 1-21,

Appendix A.

167.   On November 1, 2021, this Court enjoined the Transmission

Companies from any activities under the permits issued by the Corps in

jurisdictional waters. *Nat'l Wildlife Refuge Ass'n v. Rural Utilities Serv.*, Nos. 21-

cv-096-wmc, 21-cv-306, 2021 WL 5050073 at *7 (W.D. Wis. Nov. 1, 2021).

168.   On January 14, 2022, this Court entered an Opinion and Order

granting partial summary judgment to the Plaintiffs. *Nat'l Wildlife Refuge Ass'n*,

580 F. Supp. 3d at 615. Although this ruling was vacated by the Seventh Circuit,

several key conclusions related to the 1997 National Wildlife Refuge System

Improvement Act are equally applicable to adjudicating this new lawsuit and the

Court should reach the same conclusions in this case based on the record rather

than by citing to the now vacated order.

169.   Under the National Wildlife Refuge System Improvement Act of

1997: (1) the FWS may not "initiate or permit a new use of a national wildlife

refuge or expand, renew, or extend an existing use of a national wildlife refuge,

unless [FWS] has determined that the use is a compatible use," 16 U.S.C. §

668dd(d)(3)(A)(i); and (2) a "compatible use" is one that "will not materially

interfere with or detract from the fulfillment of the mission of the System or the

purposes of the Refuge;" 16 U.S.C. § 668ee(1),

170.   The National Wildlife Refuge System Improvement Act of 1997

expressly specifies that "powerlines, telephone lines, canals, ditches, pipelines, and

roads" are subject to the statute's required compatibility determination by FWS. 16

U.S.C. § 668dd(d)(1)(B).

171.   The huge CHC high-voltage transmission line with very high towers

is a powerline and does not meet the statutory standard for compatibility with the

mission of the National Wildlife and Fish Refuge System and with the purposes of

this National Wildlife Refuge.

172.   The Court noted that FWS rules allow an exception for "maintenance

of an existing right-of-way, including minor expansion or minor realignment to

meet safety standards." 50 C.F.R. § 26.41(c).

173.   The proposed CHC transmission line crossing—with its 260-foot-

wide right-of-way and up to 200-feet high towers—cannot lawfully be considered

"maintenance" because it is neither "minor" nor being built to "meet safety

standards."

41

174.   The Court rejected Defendant FWS's initial decision to grandfather in the CHC transmission line. *Id.*

175.   The 1997 National Wildlife Refuge System Improvement Act requires every Refuge to complete and to comply with a "Comprehensive Conservation Plan (CCP)." 16 U.S.C. 668dd(e)(1).

176.   Allowing the proposed CHC high-voltage powerline to run through and cross the Refuge would violate the Refuge's Comprehensive Conservation Plan, which prioritizes restoring habitat connectivity and expressly recognizes habitat fragmentation as a threat because it would create additional habitat gaps and forest fragmentation.

177.   Defendant FWS cannot lawfully end-run, evade, and avoid the compatibility requirements in the 1997 National Wildlife Refuge System Improvement Act through a land exchange under 16 U.S.C. § 668dd(b)(3).

178.   The general land exchange authority cannot overcome the specific requirements and procedures in the 1997 National Wildlife Refuge System Improvement Act for linear projects like the CHC high-voltage powerline.

179.   The Turkey River Bottoms – Oak Road parcel land exchanged away cannot be "suitable for disposition" because "deeding a long strip of land to private utility companies that cuts through the *middle of the Refuge* for construction of a major power line would not comport with the goals of consolidating jurisdiction

and reducing fragmentation." *Nat'l Wildlife Refuge Ass'n*, 580 F. Supp. 3d at. at 610.

180.   Defendant FWS's own rules expressly prohibited using "compensatory mitigation," like receiving other land in return, to meet the compatibility requirements in the statute. 50 C.F.R. § 26.41(b).

181.   In addition, the Court's January 14, 2022 Opinion and Order concluded that the FEIS that all three Federal Defendants relied up on to support their decisions, and the ROD that they all signed, did not comply with NEPA's statutory requirements and applicable regulations.

182.   The Federal Defendants' FEIS "defined the purpose and need of the CHC project so narrowly as to define away reasonable alternatives." *Nat'l Wildlife Refuge Ass'n,* 580 F. Supp. 3d at 610. The requirement that the transfer capacity between Iowa and Wisconsin be increased, coupled with the other sub-purposes, left "the EIS to only consider alternatives so substantially similar to the CHC project that any distinction would be meaningless." *Id*. at 612.

183.   The Federal Defendants' FEIS improperly adopted the "convoluted" purpose statement provided by the project proponents, contrary to "the duty under NEPA to exercise a degree of skepticism in dealing with self-serving statements from a prime beneficiary of the project." *Id*. at 613 (quoting *Simmons v. U.S. Army Corps of Eng'rs*, 120 F.3d 664, 669 (7th Cir. 1987)).

184.   The Court's Opinion stated that the Transmission Companies apparently intended to complete construction of the CHC high-voltage transmission line up to the borders of the protected Upper Mississippi River National Wildlife and Fish Refuge despite having no lawful way to cross. *Id*. at 599.

185.   The Court stated that "the Utilities are pushing forward with construction on either side of the Refuge, even without an approved path through the Refuge, in order to make any subsequent challenge to a Refuge crossing extremely prejudicial to their sunk investment, which will fall on ratepayers regardless of completion of the CHC project, along with a guaranteed return on the Utilities' investment in the project." *Id*. at 599.

186.   The Court concluded "both the government defendants and Utilities appear to be playing a shell game, cavalierly revoking applications for and grants of permits, all as a Refuge crossing becomes a near certainty, while telling this court that *nothing* is yet reviewable." *Id*. at 600.

187.   The Federal Defendants and the Transmission Companies appealed this Court's Opinion and Order to the U.S. Court of Appeals for the Seventh Circuit.

188.   The Federal Defendants argued that the Defendant FWS's decision was not final, and there was a lack of a "final agency action" under the APA.

189.   The Federal Defendants did not argue the merits or legality of the land exchange other than to assert that FWS's power to exchange land was plenary so long as it determined the Refuge land was "suitable for disposition" per 16 U.S.C. § 668dd(b)(3).

190.   Neither the Federal Defendants nor the Transmission Companies disclosed to the U.S. Court of Appeals for the Seventh Circuit that, on October 29, 2021, they had previously fully executed the Statement of Proposed Land Exchange/Purchase setting the terms of the land exchange.

191.   On July 19, 2023, without the benefit of the Statement of Proposed Land Exchange/Purpose, the Seventh Circuit accepted the Federal Defendants' "final agency action" argument, and vacated this Court's decision on those grounds. *Driftless Area Land Conservancy v. Rural Utilities Serv.*, 74 F.4th 489 (7th Cir. 2023). The Court concluded that "the Fish and Wildlife Service has not issued a final decision that could harm plaintiffs. The agency has not permitted a land transfer and perhaps never will." *Id*. at 494.

192.   The Seventh Circuit stated in its decision that it was making no decision on the merits of either the Plaintiffs' National Wildlife Refuge System Improvement Act of 1997 or NEPA claims, respectively. *Id.* at 496.

193.   Defendant FWS has now approved and executed the identical land exchange addressed in the previous litigation before this Court.

45

194.   Defendant RUS provided public notice of its new draft supplemental environmental assessment ("Draft SEA") on or about September 7, 2023.

195.   Defendant RUS, however, only provided 14 days for Plaintiffs and other members of the public to submit written comments.

196.   Plaintiffs requested that Defendant RUS provide a reasonable amount of additional time to submit public comments, but Defendant RUS refused to do so.

197.   Defendant RUS's newspaper notice published at the beginning of the 14-day period was defective because the hyperlink to the Draft SEA went to an error page.

198.   Defendant RUS provided a hard copy of the Draft SEA at the Dodgeville, WI public library, but members of the public were not allowed to copy or scan it.

199.   Defendant RUS did not provide an opportunity for a public hearing at which Plaintiffs and many interested members of the public could provide oral comments to their public officials or the Federal Defendants.

200.   Plaintiff NWRA, DALC and WWF nevertheless submitted written comments on the Draft SEA on September 22, 2023. Exhibit X to Plaintiffs' original Complaint, Doc. 1-37. Plaintiffs' comments explained:

(A)     The Defendants' unduly truncated 14-day comment period and the defective notice denied the public a reasonable opportunity to review the 150-page Draft SEA and be heard through their comments.

(B)     The Defendants' Draft SEA incorporated the former FEIS, but did not address the problems with the FEIS, including those previously found by this Court in *Nat'l Wildlife Refuge Ass'n*, 580 F. Supp. 3d at 610, 613.

(C)     The Defendants' Draft SEA incorporates: (1) the same purpose and need statement; (2) the same unreasonably limited range of alternatives; the same, now even more outdated assessment of the need for the project; and (3) the same inadequate assessment of other significant adverse environmental impacts.

(D)     The Defendants' preferred alternative in the Draft SEA—the proposed land exchange—violates the 1997 National Wildlife System Refuge Improvement Act, and, therefore, was not a "reasonable" alternative for the Federal Defendants to consider and assess.

(E)     The Defendants' Draft SEA deferred analysis of the costs and benefits to wildlife from the proposed land exchange to a later process. The Defendants' "Net Benefits Analysis" was not provided at that time to Plaintiffs or to the general public.

(F)     Despite Council of Environmental Quality ("CEQ") regulations and guidance issued on January 9, 2023, which are applicable to the Federal

Defendants and all executive agencies, for considering and assessing climate change impacts in the environmental review process, the Defendants' Draft SEA did not analyze climate change impacts, even to forecast how much of the electrical power to be carried by the open access CHC transmission line would be from fossil-fuel generated electricity sources. CEQ National Environmental Policy Act Guidance on Consideration of Greenhouse Gas Emissions and Climate Change, 88 Fed. Reg. 1196 (Jan. 9, 2023).

(G)    The Defendants did not take a "hard look" at climate change impacts in either their Draft SEA or final supplemental environmental assessment ("Final SEA").

201.   Emails from counsels for the Transmission Companies sent to Federal Defendants show that leading up to the September 2023 Draft SEA, the Transmission Companies were pressuring Federal Defendants to quickly finalize the Environmental Assessment ("EA").

202.   On July 31, 2023, Edward Boling, one of the counsels for Intervenor-Defendant Transmission Companies, emailed Defendant Andrew Berke and Sean Babington of the United States Department of Agriculture ("USDA"), copying other USDA officials, and stated:

> The only obstacle to completion of the Project on time by the end of the year is the federal government. We understand from comments made by RUS staff last week that the agency intends to wait for the litigation

> to be dismissed by the district court before completing its environmental review — which could mean a delay of two months or more. There is no doubt that the case will be dismissed. RUS risks appearing to be unduly dragging its feet waiting for an administrative formality.
>
> FWS and RUS need to finish their work now.
>
> . . .
>
> If the agencies reach their decisions by late August, the Project can be completed on time. If not, the Project will be delayed. The length of delay will depend on how long it takes the agencies to finish their work.

RUS-AR-001591–1592.

203.   On August 1, 2023, Boling sent an email "[f]ollowing up" with Berke and Babington on his previous email, requesting to "consult on the schedule for completing the environmental assessment and associated decisions." RUS-AR-001593–1596.

204.   Boling's August 1, 2023 email copied an "Illustrative Schedule for Completion of C-HC NEPA Compliance," with proposed comment periods of about 15 days. *Id.*

205.   On August 22, 2023, Boling sent another email to Federal Defendants in which he states:

> The only impediment to completion by the scheduled In-Service Date at the end of this year is the authorization work that the remains to be done by the Rural Utilities Service and Fish and Wildlife Service. Every day counts.

49

It has been almost five weeks since the Seventh Circuit Court of Appeals issued its decision overturning the lower court and ordering the project opponents' case dismissed. In that time, the Administration has not been able to produce a schedule for completing its decision-making on the project, let alone do the work needed to allow the project to enter service by the December 31, 2023 date expected. . .

. . . If the agencies can complete the supplemental environmental assessment (SEA) by October 6th, a portion of C-HC's Wisconsin segment can be completed by December 2023. It is critical that co-owners be consulted on a schedule for the completion of the SEA and related authorizations as soon as possible.

Once business decisions are made, the Co-owners have obligations to announce any required changes to the in-service date to stakeholders and regulators. The Administration's role in any delay will be evident.

RUS-AR-001598–1599.

206.   On September 22, 2023, in a cover email to the Transmission Companies

comments on the DSEA, Thomas Jensen, another counsel for Intervenor-

Defendant Transmission Companies, stated:

If the environmental review process is to be completed by the October 6th deadline — i.e., the latest date that would allow completion of the eastern segment of the C-HC project by year-end — it appears that the actual deadline will need to be September 30th. We believe that it is realistic to aim to complete the environmental review process by September 30th based on the demonstrated skills of agency personnel and the consultant engaged to support this work, and our successful experience in similar situations. We urge you to set and meet that accelerated deadline.

RUS-AR-001827.

207.   On October 6, 2023, which is the date that counsel Jensen referred to as a "deadline," Defendant RUS noticed the availability of its Final SEA. RUS-AR-002824.

208.   Defendant RUS concluded that the proposed land exchange would have no significant environmental impacts. *Id.*

209.   The Defendants' Final SEA made no material changes from the Draft SEA issued a month earlier.

210.   On February 23, 2024, the Defendant FWS made available three decision documents: (1) the formal land exchange as originally proposed; (2) a Finding of No Significant Environmental Impact ("FONSI") under NEPA; and (3) a new "Net Benefits Analysis." Exhibits D - F to Plaintiffs' original Complaint, Docs 1-17, 1-18, 1-19 (collectively, the "February 23, 2024 Documents").

211.   Defendant FWS did not provide public notice about the February 23, 2024 Documents including the land exchange, this FONSI, or the Net Benefits Analysis.

212.   Defendant FWS did not and has not afforded Plaintiffs or the general public any reasonable opportunity at all to submit written comments or oral comments at a public hearing on the land exchange following release of the February 23, 2024 Documents.

213.   Defendant FWS did not and has not afforded Plaintiffs or the general public any reasonable opportunity at all to submit written comments or oral comments at a public hearing on the FONSI.

214.   Defendant FWS did not and has not afforded Plaintiffs or the general public any reasonable opportunity at all to submit written comments or oral comments at a public hearing on the Net Benefits Analysis, which was not included in the Draft SEA.

215.   The Transmission Companies began construction in the Refuge on or about Monday, May 13, 2024. Doc. 104.

216.   The Transmission Companies, which have now begun construction within the Refuge, stated to the Public Service Commission of Wisconsin their intention to complete construction through the Refuge and operationalize the CHC transmission line by the end of June 2024. Exhibit C to Plaintiffs' original Complaint at 5, Doc. 1-16.

217.   Any further such construction of the huge CHC high-voltage transmission line through public lands and waters that have long been part of the Upper Mississippi River National Wildlife and Fish Refuge would and will cause irreparable harm to the Plaintiffs and their members.

**The Wagner Parcel**

218.   On May 9, 2024, Defendant FWS exchanged the Turkey River

Bottoms – Oak Road parcel for the Wagner Parcel. Doc. 103.

219.   Defendant FWS's Net Benefits Analysis argues that "the proposed

land exchange fulfills the Refuge's purposes by exchanging lower quality habitat

for higher quality habitat," referring to the Wagner tract as "higher quality habitat."

Exhibit F to Plaintiffs' original Complaint, Doc. 1-19 at 2.

220.   Defendant FWS in the Net Benefits Analysis argues that

"[a]cquisition of the Wagner tract will also provide value for wildlife-dependent

recreation on the Refuge, such as hunting, fishing and wildlife observation." *Id*.

221.   Defendant FWS states in the Net Benefits Analysis that the Wagner

Parcel "has never been offered to the Refuge for acquisition and the Refuge would

likely be unable to acquire the tract outside of this proposed exchange due to limits

of how much the Service can pay per acre based on fair market value." *Id*. at 5.

222.   On June 14, 2023, Cook Appraisal Commercial Valuation Research

Group performed an appraisal of the two parts of Wagner Parcel in Grant County,

Wisconsin. FWS-AR-0005963.

223.   The two Wagner parcels combine to equal 35.69 acres. FWS-AR-

0005964.

224.   The appraisal estimated the combined market value of the Wagner Parcels at $79,000. *Id.*

225.   According to the appraisal, "[t]he property is bordered by the BNSF Railroad on the north, a campground on the west, and federally owned land (and the Mississippi River) to the south and east." FWS-AR-0005964.

226.   According to the appraisal, "[t]here is a historic sand pit adjacent to the property . . . there is a quarry operation north of the railroad. There are numerous quarry sites in the area." FWS-AR-0005987.

227.   "A campground is located west of the [property] along Jack Oak Road and the Cassville Municipal Airport is located just west of the campground." FWS-AR-0005988.

228.   According to the appraisal, the Wagner Parcel is undeveloped, has limited value beyond recreational uses, and is currently "utilized in conjunction with the adjacent campground for recreational uses including hiking and camping." FWS-AR-0005967.

229.   There is questionable, limited access for recreational use of the Wagner Parcel, however, due to an uncertain easement across the railroad, according to an FWS document. FWS-AR-0006104.

230.   The BNSF high-speed freight railroad that borders the Wagner Parcel has a double set of tracks. Doc. 109 at ¶ 12 and Exhibit G, Doc. 109-7.

231.   When professional videographer and photographer William Ward visited the site, he witnessed "many loud freight trains go through Cassville at different points in time, and heard their horns blaring." Doc. 109 (William Ward Declaration) at ¶ 12.

232.   Adjacent to the Wagner Parcel, there is an RV and trailer park-type campground. Doc. 109 at ¶ 13 and Exhibit H, Doc. 109-8.

233.   This facility has "a man-made water area with a tiki bar and palm tree ornament." Doc. 109 at ¶ 13 and Exhibit H, Doc. 109-8.

234.   According to a FWS document, the difference in appraised value of the Wagner Parcel and the Turkey River Bottoms – Oak Road parcel is only $21,000. FWS-AR-0006105.

235.   The Wagner Parcel, appraised at $79,000 for 35.69 acres is worth $2,213.50 per acre.

236.   When Defendant FWS created the statement of work for the appraisal of the proposed divested Refuge land in the Turkey River Bottoms – Oak Road area, which it called the "Oak Road parcel," FWS only requested appraisal of that 19.69 acres alone, independent of the larger 335 acres of Refuge land in the Turkey River Bottoms – Oak Road parcel. FWS-AR-0004571; FWS-AR-0004549.

237.   Defendant FWS did not request appraisal of the larger surrounding Turkey River Bottoms – Oak Road parcel, which will have diminished property

and conservation value because of the presence of the new huge CHC high-voltage transmission line and high towers.

238.   It is typical practice in appraisal work when reviewing the impact of a partial divestment of land for a linear project to look at both the value of the divested land, and also the impact of the proposed use, which can diminish the value of the remaining surrounding land. Declaration of Scott McWilliams (filed concurrently with this amended complaint).

## COUNT ONE:

### FEDERAL DEFENDANTS' VIOLATIONS OF THE NATIONAL WILDLIFE REFUGE SYSTEM IMPROVEMENT ACT OF 1997, 16 U.S.C. §§ 668dd-668ee – COMPATIBILITY REQUIREMENT

239.   Plaintiffs reallege the allegations in paragraphs 1 through 238 above.

240.   The Upper Mississippi River National Wildlife and Fish Refuge is part of the National Wildlife Refuge System administered by Defendant FWS and is governed by the National Wildlife Refuge System Improvement Act of 1997, 16 U.S.C. §§ 668dd-668ee, and corresponding FWS regulations and policies.

241.   In the National Wildlife Refuge System Improvement Act of 1997, Congress clarified for the first time that the sole mission of the National Wildlife Refuge System is "to administer a national network of lands and waters for the conservation, management, and where appropriate, restoration of the fish, wildlife,

and plant resources and their habitats within the United States for the benefit of present and future generations of Americans." 16 U.S.C. § 668dd(a)(2).

242.   Consistent with that mission, the 1997 National Wildlife Refuge System Improvement Act provides that FWS "shall not initiate or permit a new use of a refuge or expand, renew, or extend an existing use of a refuge, unless [FWS] has determined that the use is a compatible use." 16 U.S.C. § 668dd(d)(3)(a)(i).

243.   The 1997 National Wildlife Refuge System Improvement Act specifically states that proposed grants of easements for purposes of right-of-way projects such as "powerlines, telephone lines, canals, ditches, pipelines, and roads" require that FWS must first "determine[] that such uses are compatible with the purposes for which these areas are established." 16 U.S.C. § 668dd(d)(1)(B).

244.   The 1997 National Wildlife Refuge System Improvement Act defines "compatible use" as "a wildlife-dependent recreational use or any other use of a refuge that, in the sound professional judgment of [FWS] will not materially interfere with or detract from the fulfillment of the mission of the System or purposes of the Refuge." 16 U.S.C. § 668ee(1).

245.   "Sound professional judgment," in turn, must be science-based and "consistent with principles of sound fish and wildlife management and administration, available science and resources, and adherence to the requirements of the Act and other applicable laws." 16 U.S.C. § 668ee(3).

246.   Defendant FWS's National Wildlife Refuge System rules further provide that proposed "economic" uses, which provide an economic benefit to an applicant, must meet a higher standard than uses that support wildlife-dependent recreation or wildlife conservation: "We may only authorize public or private economic use of the natural resources of any natural wildlife refuge . . . where we determine that the use *contributes to* the achievement of the national wildlife refuge purposes or the National Wildlife Refuge System mission." 50 C.F.R. § 29.1 (emphasis added).

247.   Defendant FWS's policy manual states: "It is the policy of the Service to discourage the types of uses embodied in right-of-way requests. On areas in the National Wildlife Refuge System (System), if a right-of-way cannot be certified as compatible with the purposes for which a unit was established, it cannot be granted without authorization by Congress." 340 FW § 3.3.

248.   Defendant FWS's manual flatly prohibits using "compensatory mitigation to make a proposed refuge use compatible." 603 FW § 2.11(C); *see also* 50 C.F.R. § 26.41(b).

249.   The Transmission Companies' proposed "Nelson Dewey crossing" for the CHC high-voltage transmission line is a "type of use embodied in a right-of-way request" and, therefore, shall not be permitted unless it were found to be

"compatible" under the applicable statutory requirements. 16 U.S.C. §

668dd(d)(1)(B).

250.   The "Nelson Dewey crossing" for the huge CHC high-voltage

transmission line with very high towers is not a "compatible use" under the

standards of the National Wildlife Refuge System Improvement Act of 1997.

251.   Defendant FWS may not use a land exchange to avoid, end-run or

evade the compatibility requirement imposed by the National Wildlife Refuge

System Improvement Act of 1997 on right-of-way projects like the CHC high-

voltage transmission line.

252.   Defendant FWS may not use a land exchange to avoid the policies and

requirements in its own regulations and manual.

253.   The 1997 National Wildlife Refuge System Improvement Act

authorizes easements and permits only, not transfer of fee simple ownership, and

then only following favorable compatibility findings for the right-of-way project

based on sound scientific standards.

254.   Allowing the Transmission Companies' proposed huge CHC high-

voltage transmission line and very high towers to run through and across the

Refuge is not compatible with Congress' purpose in creating the Upper Mississippi

River National Wildlife and Fish Refuge, and violates the goals, purposes and

compatibility requirement of the National Wildlife Refuge System Improvement Act of 1997.

255.   Accordingly, the Defendant FWS's February 23, 2024 decision documents are contrary to law, not supported by substantial evidence, arbitrary and capricious, and an abuse of discretion, and, therefore, must be set aside and declared invalid under the Administrative Procedure Act, 5 U.S.C. § 706(2).

256.   Because the FWS's proposed land exchange violates 16 U.S.C. § 668dd(d)(1)(B), it is unlawful and must be set aside, should be declared invalid, and should be enjoined under Fed. R. Civ. P. 65.

257.   Because the proposed land exchange is unlawful and must be set aside and invalidated, the Transmission Companies' continued construction to clear-cut, bulldoze and build through land and waterways that were a longstanding part of the Upper Mississippi River National Wildlife and Fish Refuge at the "Nelson Dewey crossing" to construct the CHC high-voltage transmission line and towers violates 16 U.S.C. §§ 668dd(d)(1)(B), should be declared unlawful and should be enjoined under Fed. R. Civ. P. 65.

## COUNT TWO:

## FEDERAL DEFENDANTS' VIOLATIONS OF THE NATIONAL WILDLIFE REFUGE SYSTEM IMPROVEMENT ACT OF 1997, 16 U.S.C. §§ 668dd-668ee – SUITABLE FOR DISPOSITION REQUIREMENT

258.   Plaintiffs reallege the allegations in paragraphs 1 through 257 above.

259.   The National Wildlife Refuge System Improvement Act of 1997

states in 16 U.S.C. § 668dd(b)(3) that the Secretary may:

> [a]cquire lands or interests therein by exchange (A) for acquired lands or public lands, or for interests in acquired or public lands, under his jurisdiction which he finds to be suitable for disposition . . . . The values of the properties so exchanged either shall be approximately equal, or if they are not approximately equal the values shall be equalized by the payment of cash to the grantor or to the Secretary as the circumstances require.

260.   By approving this land exchange, Defendant FWS implicitly

determined that the divested Turkey River Bottoms – Oak Road parcel was

"suitable for disposition."

261.   The Turkey River Bottoms – Oak Road parcel in the Upper

Mississippi River National Wildlife and Fish Refuge is not "suitable for

disposition" under the National Wildlife Refuge System Improvement Act of 1997.

262.   The Turkey River Bottoms – Oak Road parcel is not "suitable for

disposition" based on the statute and factual information from the Administrative

Record, the applicable Comprehensive Conservation Plan ("CCP") for the Upper

Mississippi River National Wildlife and Fish Refuge, and photographic images presented and described in the Declaration of William Ward. Doc. 91; CCP, attached as Exhibit N to Plaintiffs' original Complaint, Doc. 1-27; Doc. 109 and Ward Decl. Exhibits D & E, Docs. 109-4, 109-5. Evidence in the Administrative Record and the Ward Declaration indicate that the FWS systematically undervalued the conservation value of the Turkey River Bottoms – Oak Road parcel in the Net Benefits Analysis.

263.   Defendant FWS therefore violated 16 U.S.C. § 668dd(b)(3) by approving and closing on a land exchange involving Refuge property that is not "suitable for disposition".

## COUNT THREE:

### FEDERAL DEFENDANTS' VIOLATIONS OF THE NATIONAL WILDLIFE REFUGE SYSTEM IMPROVEMENT ACT OF 1997 AND THE ADMINISTRATIVE PROCEDURE ACT – THE COMPREHENSIVE CONSERVATION PLAN FOR THE UPPER MISSISSIPPI RIVER NATIONAL WILDLIFE AND FISH REFUGE AND OTHER REGULATORY REQUIREMENTS

264.   Plaintiffs reallege the allegations in paragraphs 1 through 263 above.

265.   Even if a land exchange were a legally viable option—which it is not—the proposed land exchange is inconsistent with the Defendant FWS's own Comprehensive Conservation Plan ("CCP") for the Upper Mississippi River National Wildlife and Fish Refuge because it will increase, not decrease, habitat

fragmentation, and it will create, not eliminate, inholdings and noncompatible uses within the Refuge. *Nat'l Wildlife Refuge Association*, 580 F.Supp.3d at 606. The Comprehensive Conservation Plan is attached to Plaintiffs' original Complaint as Exhibit N, Doc. 1-27.

266.   The land exchange is also inconsistent with the CCP because it divests and trades away valuable floodplain land, which the CCP identifies as vital for habitat protection. Doc. 1-27 at 12-13.

267.   The proposed land exchange also violates the Council on Environmental Quality's ("CEQ") *Guidance for Federal Departments and Agencies on Ecological Connectivity and Wildlife Corridors*, dated March 21, 2023, which directs federal agencies to develop policies "to conserve, enhance, protect and restore [wildlife] corridors and [ecological] connectivity during planning and decision-making."

268.   The proposed land exchange similarly does not comply with FWS's policy expressed through the agency's own proposed new "BIDEH" rule on biological integrity, diversity and environmental health, 50 C.F.R. § 29.3 (new). U.S. Fish & Wildlife Service, Proposed Rule: Biological Integrity, Diversity, and Environmental Health ("BIDEH"), 89 Fed. Reg. 7345, 7351 (February 2, 2024).

269.   Defendant FWS's proposed BIDEH rule states: "We allow for and defer to natural processes on habitats within the Refuge System and promote

conservation, restoration, and connectivity to meet refuge habitat objectives and landscape planning goals. We will avoid and minimize habitat fragmentation to sustain biological integrity and diversity." *Id.*

270.   The property transferred to the Transmission Companies is floodplain land, which the FWS's CCP identifies as valuable land that the FWS's Refuge managers would like to acquire more of. Exhibit N to Plaintiffs' original complaint, Doc. 1-27 at 12-13.

271.   Clearcutting, plowing, constructing, and running a huge new high-voltage powerline with very high towers through and across the Upper Mississippi National Wildlife and Fish Refuge on lands and waters exchanged and transferred away will result in significant adverse environmental impacts and harms that have been previously documented by Defendant FWS for these types of right-of-way projects: compromised aesthetic values; wildlife habitat fragmentation; stormwater runoff from clear-cut area; proliferation of invasive species; damages to wetlands; increased bird strikes; possible increased risk to endangered and threatened species; and other environmental and natural resources damages. Doc. 1-29, Ex. P at 22 of 28; FWS00530-531.

272.   Defendant FWS's Net Benefits Analysis (Exhibit F to Plaintiffs' original Complaint, Doc. 1-19) either ignores or arbitrarily dismisses the concerns identified above.

273.   The land that Defendant FWS exchanged out of the Refuge is not "suitable for disposition" because it is floodplain land that is especially valued in the CCP.

274.   The land that Defendant FWS exchanged out of the Refuge is not "suitable for disposition" because the intended use for a huge powerline with high towers and transmission wires will increase habitat fragmentation instead of better achieving habitat connectivity.

275.   The land that Defendant FWS exchanged out of the Refuge is not "suitable for disposition" because it is part of an ongoing flood plain restoration project managed by the FWS and Corps. ROD005473.

276.   Allowing construction of the powerline along the Turkey River Bottoms – Oak Road parcel will fragment and disrupt this restoration project. ROD005473.

277.   Defendant FWS's proposed land exchange, embodied in the February 23, 2024 decision documents, is contrary to law, is not supported by substantial evidence, is arbitrary and capricious, and is an abuse of discretion, and must be set aside and invalidated under the Administrative Procedure Act, 5 U.S.C. § 706(2).

278.   Allowing the Transmission Companies' proposed huge CHC high-voltage powerline and very high towers to run through and across the Refuge is contrary to the Defendant FWS's applicable CCP for the Upper Mississippi River

65

National Wildlife and Fish Refuge and does not comply with the Defendant FWS's regulations limiting compensatory mitigation and CEQ's regulations.

279.   By approving the land exchange and finding a net benefit despite the CCP's clear goal of promoting habitat connectivity, Defendant FWS has violated 16 U.S.C. § 668dd(e)(1)(E) by failing to manage the Refuge in a manner consistent with the CCP.

280.   Accordingly, the Defendant FWS's February 23, 2024 decision documents are contrary to law, not supported by substantial evidence, arbitrary and capricious, and an abuse of discretion, and, therefore, must be set aside and invalidated under the Administrative Procedure Act, 5 U.S.C. § 706(2).

281.   Because the land exchange is unlawful and must be set aside, the Defendant FWS's closure of the land exchange violated 16 U.S.C. §668dd(c) and should be declared invalid and should be enjoined under Fed. R. Civ. P. 65.

282.   Because the land exchange is unlawful and must be set aside and invalidated, the Transmission Companies' construction through land and waterways that were part of the Upper Mississippi River National Wildlife and Fish Refuge at the "Nelson Dewey crossing" and the Turkey River Bottoms – Oak Road parcel violates the Refuge Act's general prohibition against "disturb[ing], injur[ing], cut[ting], burn[ing], remov[ing], destroy[ing], or possess[ing]," or

"us[ing], or otherwise occupy[ing]," Refuge land, 16 U.S.C. § 668dd(c), and

should be declared invalid, and should be enjoined under Fed. R. Civ. P. 65.

### COUNT FOUR:

### FEDERAL DEFENDANT FWS's NET BENEFIT ANALYSIS SUPPORTING THE LAND EXCHANGE WAS ARBITRARY AND CAPRICIOUS AND CONTRARY TO LAW

283.   Plaintiffs reallege the allegations in paragraphs 1 through 282 above.

284.   Defendant FWS's "Net Benefit Analysis" ignores and omits key

pieces of evidence from the Administrative Record calling into question the habitat

and conservation value of the Wagner Parcel in comparison with the Turkey River

Bottoms – Oak Road parcel.

285.   For example, Defendant FWS identifies that there is a railroad near

the Turkey River Bottoms – Oak Road parcel, but omits that there is a larger, more

heavily used, louder, double-tracked BNSF freight railroad bordering the Wagner

Parcel. Doc. 1-19 at 4; Doc. 109 at ¶ 12.

286.   The Net Benefit Analysis does not recognize the adverse impacts of

the BNSF freight railroad traffic which is very active with passing long freight

trains blaring their horns along the border of the Wagner Parcel. Doc. 109 at ¶ 12.

287.   The Net Benefit Analysis omits that the Wagner Parcel is nearby the

Cassville Municipal Airport, which is regularly used by private planes. FWS-AR-

0005988; Doc. 109 at ¶ 12 and Doc. 109-8.

288.   The New Benefit Analysis does not recognize the impacts of the RV and trailer park-type "campground" adjacent to the Wagner Parcel.

289.   The New Benefit Analysis is silent on the "man-made water area with a tiki bar and palm tree ornament" by the RV and trailer park-type campground adjacent to the Wagner Parcel. Doc. 109 at ¶ 13 and Exhibit H, Doc. 109-9.

290.   The Net Benefit Analysis says nothing regarding the "historic sand pit adjacent to the property . . . there is [also] a quarry operation north of the railroad . . . [and] numerous quarry sites in the area." FWS-AR-0005987.

291.   In the Net Benefit Analysis, FWS asserts that "the Refuge would likely be unable to acquire the [Wagner Parcel] outside of this proposed exchange due to limits of how much the Service can pay per acre based on fair market value." Doc. 1-19 at 5.

292.   An appraisal performed in anticipation of the land exchange, however, appraised the Wagner Parcel at only $79,000. FWS-AR-0005964.

293.   The appraisal noted that the Transmission Companies paid $287,200 for the parcel and described the Companies as "atypically motivated buyer[s]." FWS-AR-0005967.

294.   Further, the appraisal of the Turkey River Bottoms parcel limited the scope to only the divested tract of 19.84 acres, instead of assessing the impacts of

the CHC powerline and towers on the 335 acres of Refuge land surrounding the divested parcel. FWS-AR-0004571; FWS-AR-0004549.

295.   Therefore, FWS received an incomplete picture of the impact of the powerline because it limited the scope of review to not include the larger area of Refuge land along the Turkey River Bottoms – Oak Road parcel.

296.   Accordingly, the Defendant FWS's Net Benefit Analysis is contrary to law, not supported by substantial evidence, arbitrary and capricious, and an abuse of discretion, and, therefore, must be set aside and invalidated under the Administrative Procedure Act, 5 U.S.C. § 706(2).

## COUNT FIVE:

### FEDERAL DEFENDANTS' FAILURE TO PROVIDE FOR PUBLIC NOTICE AND PUBLIC COMMENTS ON THE ENVIRONMENTAL ASSESSMENT, NET BENEFIT ANALYSIS, FINDING OF NO SIGNIFICANT ENVIRONMENTAL IMPACTS, AND LAND EXCHANGE VIOLATES NEPA's PUBLIC PARTICIPATION REQUIREMENTS

297.   Plaintiffs reallege the allegations in paragraphs 1 through 296 above.

298.   "Informed public participation in reviewing environmental impacts is essential to the proper functioning of NEPA." *League of Wilderness Defenders v. Connaughton*, 752 F.3d 755, 761 (9th Cir. 2014).

299.   As the U.S. Supreme Court has held, "the broad dissemination of information mandated by NEPA permits the public and other government agencies

to react to the effects of a proposed action at a meaningful time." *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 371 (1989) citing *Robertson v. Methow Valley Citizens*, 490 U.S. 332, 349-350 (1989).

300.   Federal Defendants RUS, FWS and Corps noticed the availability of a draft supplemental environmental assessment ("Draft SEA") on September 7, 2023.

301.   Federal Defendants did not provide sufficient or adequate public notice of the Draft SEA because the link they provided to the electronic version of the Draft SEA did not work for at least 24 hours, and when Plaintiffs' members went to review the hard-copy at the Dodgeville, Wisconsin library they were not permitted to copy or scan the document, or remove it from the library.

302.   The Federal Defendants provided less than 14 days for Plaintiffs and the public to submit written comments, which was unduly constricted and deprived Plaintiffs and the public of a reasonable opportunity to comment.

303.   The Federal Defendants did not provide for a public hearing at all for Plaintiffs and members of the public to submit oral comments.

304.   Federal Defendants RUS, FWS and Corps issued their final supplemental environmental assessment ("Final SEA") on October 6, 2023, and made a Finding of No Significant Environmental Impact ("FONSI"). Those documents, in turn, incorporated the October 2019 final environmental impact

statement for the entire CHC transmission line, which violates the requirements of NEPA.

305.   NEPA requires agencies to "[m]ake diligent efforts to involve the public in preparing and implementing their NEPA procedures." 40 C.F.R. § 1506.6(a).

306.   NEPA requires agencies to provide more wide-ranging public notice when there are highly controversial local issues. 40 C.F.R. § 1506.6(b)(3).

307.   The CEQ's NEPA regulations require that the lead agency on an EA "involve the public . . . to the extent practicable in preparing environmental assessments." 40 C.F.R. §§ 1501.5(e); 1506.6(a). That duty includes the requirement that agencies "[p]rovide public notice of . . . the availability of environmental documents so as to inform those persons and agencies who may be interested or affected by their proposed actions" (*id.* § 1506.6(b)), and "[s]olicit appropriate information from the public." *Id.* § 1506.6(d).

308.   The requirement to provide the public with a meaningful opportunity to comment is helps "ensure that relevant environmental information is identified and considered early in the process in order to ensure informed decision making by Federal agencies." 40 C.F.R. § 1500.1(b) (emphasis added); *see also* 43 C.F.R. § 46.305(c).

309.   Federal Defendants' October 2023 Final SEA and FONSI are invalid because the public was not given adequate notice and a reasonable opportunity to submit written and oral comments.

310.   Federal Defendants' October 2023 Final SEA and FONSI are invalid because the agency did not hold a public hearing for the members of the public to submit written and oral comments.

311.   Accordingly, the Federal Defendants' October 2023 Final SEA, and RUS's Findings of No Significant Environmental Impact are contrary to law, not supported by substantial evidence, arbitrary and capricious, and an abuse of discretion, and, therefore, must be set aside under the Administrative Procedure Act, 5 U.S.C. § 706(2).

312.   The Federal Defendants did not include Defendant FWS's "Net Benefit Analysis" which compared the ecological damage likely to be caused by granting the right-of-way for the huge powerline through the Refuge sought by the Transmission Companies with the Wagner Parcel that the Transmission Companies were willing to provide in exchange as compensatory mitigation, in either the Draft SEA or the Final SEA for the land exchange.

313.   Defendant FWS's Net Benefit Analysis (Exhibit F to Plaintiffs' original Complaint) was issued on February 23, 2024.

314.   The New Benefit Analysis and the land exchange it supports is invalid and contrary to law because Defendant FWS did not provide public notice at all or any reasonable opportunity for Plaintiffs and other members of the public to comment in writing or orally as required by NEPA and its regulations.

315.   Defendant FWS's Net Benefit Analysis document is invalid because the agency did not hold a public hearing for the members of the public to submit written and oral comments on the Net Benefit Analysis.

316.   By denying the public access to its Net Benefit Analysis until after its final decision was made, Defendant FWS has violated the public participation requirements of NEPA.

317.   Defendant FWS has not offered, and the administrative record does not contain, any justification for not providing the public with a reasonable opportunity to submit comments on the "Net Benefit Analysis."

318.   Defendant FWS's February 23, 2024 Finding of No Significant Environmental Impact is invalid because the agency provided no public notice and no reasonable opportunity at all for the public to submit written and oral comments as required by NEPA and its regulations.

319.   The Defendant FWS's February 23, 2024 Finding of No Significant Environmental Impact is invalid because the agency did not hold a public hearing

for the members of the public to submit written and oral comments as required by NEPA and its regulations.

320.   Accordingly, the Defendant FWS's February 23, 2024 decisional documents are contrary to law, not supported by substantial evidence, arbitrary and capricious, and an abuse of discretion, and, therefore, must be set aside and invalidated under the Administrative Procedure Act, 5 U.S.C. § 706(2).

321.   Because the Federal Defendants' did not provide adequate notice and a reasonable opportunity to comment on these February 23, 2024 decisional documents, the Defendant FWS's closure of the land exchange is unlawful, and should be declared invalid and should be enjoined under Fed. R. Civ. P. 65.

322.   Because the proposed land exchange is unlawful and must be set aside, the Transmission Companies' clearcutting, bulldozing and construction of their CHC high-voltage powerline and towers through land and waters that have long been part of the Upper Mississippi River National Wildlife and Fish Refuge in the Turkey Rivers Bottom – Oak Road parcel violates 16 U.S.C. §§ 668dd(b)(3), should be declared invalid, and should be enjoined under Fed. R. Civ. P. 65.

## COUNT SIX:

### FEDERAL DEFENDANTS' VIOLATIONS OF THE NATIONAL ENVIRONMENTAL POLICY ACT, 42 U.S.C § 4321 et seq.

323.   Plaintiffs reallege the allegations in paragraphs 1 to 322 above.

324.   The National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq. is "the basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). NEPA's purpose is to protect the environment by ensuring that federal agencies "make decisions that are based on an understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." 40 C.F.R. § 1500.1(c).

325.   NEPA requires agencies to take a "hard look" at the environmental consequences of their actions. For major federal actions with the potential for significant adverse environmental impacts, NEPA requires that the agencies first prepare an environmental impact statement ("EIS").

326.   NEPA requires that an EIS must include a detailed discussion of "(i) the environmental impact of the proposed action; (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented; (iii) alternatives to the proposed action; (iv) the relationship between the local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." 42 U.S.C. § 4332(2)(C).

327.   The Council on Environmental Quality ("CEQ") rules apply to all federal agencies, including Defendants Corps, FWS and RUS.

328.   The CEQ rules governing environmental review emphasize that the alternatives analysis is the "heart of the environmental impact statement." 40 C.F.R. § 1502.14. The CEQ rules in effect at the time of the Federal Defendants' FEIS and ROD require agencies to "[r]igorously explore and objectively evaluate reasonable alternatives to the proposed action," 40 C.F.R. § 1502.14(a), including the "no action alternative." 40 C.F.R. § 1502.14(c).

329.   Both an EIS and an environmental assessment ("EA") must contain a "purpose and need" statement, specifying "the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action." 40 C.F.R. §§ 1502.13; 1501.5(c)(2). The purpose and need statement determines the reasonable range of alternatives to be considered.

330.   "The evaluation of 'alternatives' mandated by NEPA is to be an evaluation of alternative means to accomplish the general goal of an action; it is not an evaluation of the alternative means by which a particular applicant can reach his goals." *Simmons v. U.S. Army Corps of Eng'rs*, 120 F.3d 664, 666 (7th Cir. 1997) (*quoting Van Abbema v. Fornell*, 807 F.2d 633, 638 (7th Cir. 1986)).

331.   CEQ recently relied on *Simmons* in recognizing that, "[i]t is contrary to NEPA for agencies to 'contrive a purpose so slender as to define competing 'reasonable alternatives' out of consideration (and even out of existence)." CEQ,

*National Environmental Policy Act Implementing Regulations Revisions*, 87 Fed.

Reg. 23453, 23459 (April 20, 2022), *quoting Simmons*, 120 F.3d at 669.

332.   Consequently, federal agencies have "the duty under NEPA to

exercise a degree of skepticism in dealing with self-serving statements from a

prime beneficiary of the project" about purpose and need and the reasonable range

of alternatives. *Simmons*, 120 F.3d at 669.

333.   The Transmission Companies proposed a "purpose and need"

statement for the original EIS that required an "increase [in] the transfer capability

of the electrical system between Iowa and Wisconsin." That statement unduly

restricted the range of alternatives to only high-voltage transmission lines running

between Iowa and Wisconsin. ROD004984.

334.   The three Federal Defendants subsequently adopted the Transmission

Companies' purpose and need statement verbatim for their October 2019 Final

EIS, and adopted the same purpose and need statement, again, in their September

2023 Draft SEA and October 2023 Final SEA for the proposed land exchange.

335.   This Court previously concluded that this purpose and need statement

improperly restricted the range of alternatives and therefore violated NEPA. *Nat'l*

*Wildlife Refuge Ass'n*, 580 F. Supp. 3d at 612-613.

336.   The Federal Defendants' October 2019 Final EIS did not rigorously explore or objectively evaluate all reasonable alternatives that would meet the general objectives of the CHC transmission line.

337.   The Federal Defendants' October 2019 Final EIS did not take the required "hard look" at all reasonable alternatives that would meet the general objectives of the CHC transmission line.

338.   The Federal Defendants' October 2019 Final EIS did not rigorously explore or objectively evaluate whether a package of non-wires alternatives would meet the general objectives of the CHC transmission line.

339.   The Federal Defendants' October 2019 FEIS did not rigorously explore or objectively evaluate whether a package of grid-enhancing technologies would meet the general objectives of the CHC transmission line.

340.   The Federal Defendants' October 2019 Final EIS did not rigorously explore or objectively evaluate alternative routes either north or south of the Upper Mississippi River National Wildlife and Fish Refuge, or that would otherwise avoid running through and across the Refuge.

341.   The Federal Defendants'—RUS, FWS, and the Corps—October 2023 Final SEA incorporates and relies upon the October 2019 FEIS.

342.   The Federal Defendants'—RUS, FWS, and the Corps—October 2023 Final SEA by directly incorporating and relying upon the October 2019 FEIS does

78

nothing to remedy the lack of the Federal Defendants' "hard look" and adequate analysis of alternatives.

343.   The Federal Defendants' October 2019 Final EIS did not sufficiently analyze the additional greenhouse gas emissions and potential climate impacts attributable to the CHC transmission line and the fossil-fuel generated electricity it would carry.

344.   The Federal Defendants'—RUS, WFS, and the Corps—October 2023 Final SEA adds nothing to the insufficient analysis of climate impacts.

345.   The Federal Defendants'—RUS, WFS, and the Corps—October 2023 Final SEA does not assess the lawfulness of the proposed land exchange.

346.   An unlawful alternative is not a "reasonable" alternative under NEPA.

347.   To the extent that each of Defendant RUS's and Defendant FWS's Findings of No Significant Environmental Impact depend on mitigation, there is no adequate description of monitoring or enforcement and no compliance plan as is required by CEQ rules, 40 C.F.R. § 1501.6(c), and CEQ, *Final Guidance for Federal Departments and Agencies on the Appropriate Use of Mitigation and Monitoring and Clarifying the Appropriate Use of Mitigated Findings of No Significant Impact*, 76 Fed. Reg. 3843 (Jan. 21, 2011).

348.   The Defendant FWS's February 23, 2024 Finding of No Significant Environmental Impact relied on the RUS's October 2023 Supplemental

Environmental Assessment, the October 2019 Final Environmental Impact Statement, and the 2020 Record of the Decision which was signed by all three Federal Defendants, RUS, FWS, and the Corps. All three of these documents fail to comply with NEPA's requirements.

349.   Accordingly, the Defendant FWS's February 23, 2024 decision documents—the Finding of No Significant Environmental Impact, Net Benefit Analysis and Land Exchange Agreement—are contrary to law, not supported by substantial evidence, arbitrary and capricious, and an abuse of discretion, and, therefore, must be set aside and invalidated under the Administrative Procedure Act, 5 U.S.C. § 706(2).

350.   The proposed land exchange is unlawful and must be set aside, therefore the Transmission Companies' planned construction to clear-cut, bulldoze and build through land and waterways that have long been part of the Upper Mississippi River National Wildlife and Fish Refuge at the "Nelson Dewey crossing" for the CHC high-voltage transmission line and towers would violate 16 U.S.C. §§ 668dd(b)(3), should be declared unlawful, and should be enjoined under Fed. R. Civ. P. 65.

## COUNT SEVEN:

## THE TRANSMISSION COMPANIES' CONTINUED CONSTRUCTION

351.   Plaintiffs reallege the allegations in paragraphs 1 to 350 above.

352.   The Transmission Companies have voluntarily submitted to this Court's jurisdiction under Rule 65 by intervening as defendant parties in this case.

353.   The Transmission Companies moved to intervene in this lawsuit on March 7, 2024. Doc. 25. This Court granted the Transmission Companies' motion on March 8, 2024. Doc. 32

354.   This Court has equitable powers to stop the Transmission Companies' from building the CHC powerline and transmission towers through the Upper Mississippi River National Wildlife and Fish Refuge. The U.S. Supreme Court has long recognized that Article III courts have broad equitable discretion to shape the contours of a remedy to address the facts of the case and serve the purposes of the underlying statutes. *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944) ("The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case.").

355.   Under both federal common law and applicable state law, a public nuisance is "an unreasonable interference with a right common to the general public." Restatement (2d) of Torts § 821B; *Freeman v. Grain Processing Corp.*, 848 N.W.2d 58 (Iowa 2014).

356.   The right to have, use and enjoy public lands and waters dedicated to public purposes like the Upper Mississippi River National Wildlife and Fish Refuge is "a right common to the general public." *Id.*

357.   By constructing the CHC transmission line through the protected Upper Mississippi River National Wildlife and Fish Refuge without lawful authorization, the Transmission Companies would be "unreasonably interfering" with "a right common to the general public."

358.   "[I]njunctive relief is typically an available remedy against someone found liable in tort for nuisance, assuming that a plaintiff demonstrates the likelihood of irreparable harm." *Bad River Band of Lake Superior Tribe v. Enbridge Energy Co.*, *Inc.,* 626 F.Supp. 3d 1030, 1062 (W.D. Wis. 2022). Indeed, "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e. irreparable . . . . [T]herefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Id.* (quoting *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987)).

359.   Under state and federal common law and state law, an action for unjust enrichment occurs when a defendant "obtained a benefit at [plaintiffs'] expense, or in violation of [plaintiffs'] legally protected rights." *Bad River Band of Lake Superior Tribe of Chippewa Indians*, 626 F. Supp. 3d 1030, 1049-50 (citing Restatement (Third) Restitution and Unjust Enrichment § 1 (Restatement of Restitution)).

360.   Under Wisconsin state law, in "an action for unjust enrichment, '. . . [r]ecovery is based upon the universally recognized moral principal that one who has received a benefit has a duty to make restitution when to retain such benefit would be unjust." *Puttkammer v. Minth*, 266 N.W.2d 361, 363 (Wis. 1978) (alternation in original) (citations omitted).

361.   Under Iowa state law, an unjust enrichment claim requires a showing that "(1) defendant was enriched by the receipt of a benefit; (2) the enrichment was at the expense of the plaintiff; and (3) it is unjust to allow the defendant to retain the benefit under the circumstances." *State of Iowa, Dep't of Human Servs. v. Unisys Corp.*, 637 N.W.2d 142, 154-55 (Iowa 2001) (footnotes omitted).

362.   The Seventh Circuit warned the Transmission Companies that they are building at their own risk. *Driftless Area Land Conservancy v. Rural Utils. Serv.*, 74 F.4th 489, 495 (7th Cir. 2023).

363.   The Transmission Companies' construction activities are harming the aesthetic, recreational, environmental and economic interests of the Plaintiffs and their members who use and enjoy, and who live, work, and play in and near the Upper Mississippi River National Wildlife and Fish Refuge.

364.   The Transmission Companies are unjustly enriched as a result of the unlawful land exchange entered into with Defendant FWS to run their CHC high-

voltage powerline and transmission towers through the Upper Mississippi River National Wildlife and Fish Refuge and generate revenue.

365.   The Transmission Companies' unjust enrichment is at the expense of Plaintiffs' use and enjoyment of the Refuge given the environmental damage construction and the existence of the CHC high-voltage powerline and transmission towers will cause to the ecosystem, wildlife and marine life and visual quality of the Refuge.

366.   If the Court invalidates the land exchange as an impermissible evasion of the statutory compatibility requirement, and as contrary to the CCP, and as divesting land that is not suitable for disposition, and finds NEPA violations, then the Federal Defendants' actions should be vacated and set aside. The Transmission Companies would lack permits and other necessary approvals to continue building in the Refuge, and the Turkey River Bottoms – Oak Road parcel will be included as it should be in the Upper Mississippi River National Wildlife and Fish Refuge.

## VI.   REQUESTED RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court issue an Order granting the following relief:

1.   Declare that Defendant FWS's final agency actions issuing its decisional documents, including the Net Benefit Analysis and Finding of No Significant Impacts, issued on February 23, 2024, underlying its signing and

closing the land exchange violate the compatibility requirement of the National

Wildlife Refuge System Improvement Act of 1997, 16 U.S.C. §§ 668dd-668ee,

and FWS's own Comprehensive Conservation Plan for the Upper Mississippi

River National Wildlife and Fish Refuge, and violate to the requirement in the

National Wildlife Refuge System Improvement Act, 16 U.S.C. § 668dd(d)(1)(B)

that "powerline" projects, including the CHC transmission line, cannot be

permitted and allowed to run through the Upper Mississippi River National

Wildlife and Fish Refuge unless they are compatible with the wildlife protection

purposes of the Refuge, and, therefore, they are contrary to law, invalid and must

be vacated and set aside under the Administrative Procedure Act, 5 U.S.C. §

706(2).

2.      Declare that Defendant FWS's Finding of No Significant

Environmental Impact (Exhibit D to Plaintiffs' original Complaint), issued on

February 23, 2024, that would result from the huge CHC high-voltage powerline

and high towers running through and across the Upper Mississippi River National

Wildlife and Fish Refuge violates the National Wildlife Refuge System

Improvement Act of 1997, 16 U.S.C. §§ 668dd-668ee, because it is inconsistent

with the Comprehensive Conservation Plan, is contrary to law, is arbitrary and

capricious, is not supported by substantial evidence, and is an abuse of discretion

and, therefore, must be vacated and set aside under the Administrative Procedure Act, 5 U.S.C. § 706(2).

3.       Declare that the Defendant FWS's Net Benefits Analysis (Exhibit F to Plaintiffs' original Complaint), issued on February 23, 2024, to support its land exchange is arbitrary and capricious, is not supported by substantial evidence, is an abuse of discretion, and is contrary to law because it is inconsistent with the Comprehensive Conservation Plan for the Upper Mississippi River National Wildlife and Fish Refuge, and thereby violates the National Wildlife Refuge System Improvement Act of 1997, and, therefore, must be vacated and set aside under the Administrative Procedure Act, 5 U.S.C. § 706(2).

4.       Declare that the Defendant FWS's Net Benefit Analysis (Exhibit F), issued on February 23, 2024, is invalid and contrary to law because the public was not provided notice, the public was not provided a reasonable opportunity to submit public written or oral comments, and there was no public hearing held by the FWS, and, therefore, the Net Benefit Analysis must be vacated and set aside under the Administrative Procedure Act, 5 U.S.C. § 706(2).

5.       Declare that the Federal Defendants'—RUS's, FWS's, and the Corps'—approvals of (a) the February 23, 2024 decision documents, (b) the October 9, 2023 Final Supplementary Environmental Assessment and Finding of No Significant Impact (attached hereto as Exhibit Y), and (c) the October 19, 2019

Final Environmental Impact Statement and subsequent Record of Decision do not comply with the requirements of the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*, were contrary to law, and arbitrary and capricious, and, therefore, must be reversed and remanded, and vacated and set aside under the Administrative Procedure Act, 5 U.S.C. §706(2).

6.     Declare that the Cardinal-Hickory Creek high-voltage powerline is not compatible with the Upper Mississippi National Wildlife and Fish Refuge's purpose and goals as a matter of law and facts, and that this powerline cannot be permitted to run through and cross the Refuge by right of way or land exchange.

7.     Declare that Defendants FWS's closure or other steps to implement the February 23, 2024 land exchange was unlawful and must be declared invalid and null and void, and vacated and set aside under the Administrative Procedure Act, 5 U.S.C. § 706(2).

8.     Preliminarily and permanently enjoin Defendant FWS from taking any other action to implement the February 23, 2024 land exchange, and require the Defendant FWS to take all necessary actions to undo its prior signing and closure of the land exchange.

9.     Preliminarily and permanently enjoin the Defendant FWS from permitting or granting a land exchange, an easement, a permit, or any other authority to allow any additional actions by the CHC high-voltage powerline

developers to run through and cross the lands and waters of the Upper Mississippi River National Wildlife and Fish Refuge, as defined before the land exchange.

10.     Preliminarily and permanently enjoin the Defendant FWS from permitting or granting a land exchange, an easement, a permit, or any other authority to allow any additional actions by the CHC high-voltage powerline developers to run through and cross the lands and waters of the Upper Mississippi River National Wildlife and Fish Refuge, as defined before the land exchange, unless and until the FWS provides public notice and a reasonable opportunity and time for Plaintiffs and other members of the public to submit written and oral comments on a draft version of Defendant FWS's Net Benefit Analysis, Finding of No Significant Environmental Impact, and Land Exchange documents, issued on February 23, 2024, and those comments are then fully and fairly considered by the Defendant FWS before issuing any new final decisional documents.

11.     Preliminarily and permanently enjoin the Defendant RUS from providing financial assistance to Dairyland Power for the CHC high-voltage transmission line project unless and until all of the Defendants fully comply with all requirements of NEPA and the National Wildlife Refuge System Improvement Act of 1997, and the Administrative Procedure Act.

12.     Preliminarily and permanently enjoin the Intervenor-Defendants Transmission Companies to immediately stop all construction and construction-

related actions and not take any further actions to construct the proposed CHC high-voltage powerline and transmission towers through and across the lands and waters of the Upper Mississippi River National Wildlife and Fish Refuge as defined before the proposed land exchange, or otherwise take any action to disturb the Refuge unless and until each and all of the Federal Defendants' required approvals, permits, other actions are found to be in full compliance with federal and state laws.

13.     Preliminarily and permanently enjoin the Defendants FWS and Corps, and the Intervenor-Defendants Transmission Companies to restore any harms that have occurred to the lands and waters of the Upper Mississippi River National Wildlife and Fish Refuge in the Turkey River Bottoms – Oak Road parcel area as a result of construction and construction-related actions for the CHC powerline and towers. The Federal Defendants and the Intervenor-Defendants Transmission Companies be required to return and restore the Turkey River Bottoms – Oak Road parcel to its condition prior to the land exchange and remediate any damage to ecology and wildlife and fish.

14.     Vacate and set aside any and all federal permits and approvals for the CHC high-voltage powerline based on the Federal Defendants' unlawful October 2019 Final Environmental Impact Statement and Record of Decision.

15.     Reverse and remand the Final Environmental Impact Statement and Record of Decision to the Federal Defendants to complete an environmental impact statement that identifies and fully considers and compares the likely environmental impacts of non-Refuge-crossing alternatives including alternative routes and a package of non-wires alternatives and solutions, and that fully assesses direct, indirect, and cumulative impacts, and climate change impacts.

16.     Award Plaintiffs attorney fees and costs under the Equal Access to Justice Act, 28 U.S.C. § 2412, or other applicable laws;

17.     Grant such further relief as may be appropriate.


Dated May 22, 2024

                              Respectfully Submitted,

                              */s/ Howard A. Learner*
                              Howard A. Learner
                              Daniel Abrams
                              Environmental Law & Policy Center
                              35 East Wacker Drive, Suite 1600
                              Chicago, IL 60601
                              T: (312) 673-6500
                              F: (312) 795-3730
                              HLearner@elpc.org
                              DAbrams@elpc.org
                              *Counsel for Plaintiffs National Wildlife Refuge Association, Driftless Area Land Conservancy, and Wisconsin Wildlife Federation*