**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WISCONSIN**

| | | |
|---|---|---|
| NATIONAL WILDLIFE REFUGE ASSOCIATION, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| RURAL UTILITIES SERVICE, et al., | ) | |
| | ) | Case No. 24-cv-139-wmc |
| Federal Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| ITC MIDWEST LLC, and DAIRYLAND POWER COOPERATIVE, | ) | |
| | ) | |
| Intervenor-Defendants. | ) | |
| | ) | |
| | ) | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**

**Table of Contents**

INTRODUCTION AND SUMMARY ................................................................................ 1

STATEMENT OF FACTS AND PROCEDURAL HISTORY .................................... 11

ARGUMENT ................................................................................................................ 27

I.      Standard Of Review .......................................................................................... 27

II.     Defendant FWS Violated Several Specific Statutory Requirements in the National Wildlife Refuge System Improvement Act By Impermissibly Permitting the CHC Powerline to Run Through the Congressionally-Designated Upper Mississippi River National Wildlife and Fish Refuge ................................................................................................ 31

        A.   Defendant FWS Violated the Refuge Act by Permitting the CHC Powerline to Run Through the National Wildlife Refuge Without Making the Statutorily-Required "Compatibility" And This Huge Powerline Is Obviously Not Compatible ................... 37

        B.   The Turkey River Bottoms – Oak Road Parcel Has High Ecological Value and Divesting It Would Increase Habitat Fragmentation So It Is Not "Suitable for Disposition" ................................................................................................................. 46

        C.   The Land Exchange Agreement Does Not Comply with the Refuge's Comprehensive Conservation Plan and Therefore Violates the Refuge Act ............................................. 56

        D.   FWS's Land Exchange Agreement and Net Benefit Analysis Is Unduly Skewed and Imbalanced, Arbitrary and Capricious, and Contrary to Law ........................................ 56

III.    The Federal Defendants' 2019 EIS and ROD, and Their 2023 and 2024 SEA and FONSIs Violates NEPA ............................................................................................ 62

IV.     The Federal Defendants Violated NEPA and the Refuge Act's Public Participation Requirements ...................................................................................................... 67

V.      The Transmission Companies' Construction Should Be Declared to Be Unlawful and Remedied. ........................................................................................................... 70

VI.     Plaintiffs Have Standing ................................................................................... 73

VII.    The Court Should Address Effective Remedies After Granting Summary Judgment to Plaintiffs on the Merits of Their Claims. ............................................................. 76

CONCLUSION .............................................................................................................. 79

i

# TABLE OF AUTHORITIES

## Cases

*Am. Bottom Conservancy v. U.S. Army Corps of Eng'rs*, 650 F.3d 652 (7th Cir. 2011)............. 74

*American Hospital Ass'n v. Becerra*, 596 U.S. 724 (2022)...................................................... 6, 40

*American Rivers v. Fed. Energy Reg. Comm'n*, 895 F.3d 32 (D.C. Cir 2018)............................ 74

*American Wild Horse Preservation Campaign v. Perdue*, 873 F.3d 914 (D.C. Cir 2017) .......... 66

*Bad River Band of Lake Superior Tribe v. Enbrdge Energy*, 626 F.Supp. 3d 1030 (W.D. Wis. 2022) ................................................................................................................................ 71, 72

*Block v. Community Nutrition Inst.*, 467 U.S. 340 (1984)............................................................ 54

*Brown v. Gardner*, 513 U.S. 115 (1994)...................................................................................... 38

*Ctr. for Food Safety v. Vilsack*, 2010 WL 11484449 (N.D. Cal. Nov. 30, 2010).................... 9, 71

*Cty. of Maui v. Hawaii Wildlife Fund*, 590 U.S. 165 (2020) ....................................................... 40

*Cty. of Suffolk v. Sec'y of Interior*, 562 F.2d 1368 (2d Cir. 1977)................................................ 28

*Davis v. Michigan Dept. of Treasury*, 489 U.S. 803 (1989)........................................................ 38

*Dep't of Workforce Dev.-Div. of Vocation Rehab. v. Dep't of Educ.*, 980 F.3d 558 (7th Cir. 2020) ................................................................................................................................................ 28

*Driftless Area Land Conservancy v. Rural Utils. Serv.*, 74 F.4th 489 (7th Cir. 2022).......... passim

*Environmental Defense v. U.S. Army Corps of Engineers,* 515 F. Supp. 2d 69 (D.D.C. 2007)4, 77

*Food and Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000)......... 38, 39

*Freeman v. Grain Processing Corp.*, 848 N.W.2d 58 (Iowa 2014) ............................................. 71

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167 (2000) ........... 73, 74

*Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050 (D.C. Cir. 1986) ...................................... 28

*Greater Yellowstone Coal. v. Bosworth*, 209 F. Supp. 2d 156 (D.D.C. 2002) ....................... 8, 71

*Gunpowder Riverkeeper v. FERC*, 807 F.3d 267 (D.C. Cir 2015) .............................................. 75

*Habitat Educ. Ctr., Inc. v. Bosworth*, 363 F. Supp. 2d 1090 (E.D. Wis. 2005).......................... 66

*Heckler v. Chaney*, 470 U.S. 821 (1985) .................................................................................... 54

*Humane Soc. Of the U.S. v. Hodel*, 840 F.2d 45 (D.C. Cir 1988) .............................................. 75

*Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333 (1977) .............................. 73, 75

*Indiana Forest All., Inc. v. U.S. Forest Serv.*, 325 F.3d 851 (7th Cir. 2003).............................. 73

*Kisor v. Wilkie*, 588 U.S. 558 (2019)........................................................................................... 27

*League of Wilderness Defenders v. Connaughton*, 752 F.3d 755 (9th Cir. 2014)...................... 68

*Lujan v. Defenders of Wildlife,* 504 U.S. 555 (1992) .................................................................. 74

*Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360 (1989) ......................................................... 68

*Massachusetts v. Watt*, 716 F.2d 946 (1st Cir. 1983) ................................................................ 76

*Michigan v. U.S. Army Corps of Eng'rs*, 758 F.3d 892 (7th Cir. 2014).................................... 71

*Motor Vehicle Mfrs. Ass'n. v. State Farm*, 463 U.S. 29 (1983).................................................. 28

*N.L.R.B. v. SW General, Inc.*, 580 U.S. 288 (2017)..................................................................... 41

*Nat'l Wildlife Refuge Ass'n v. Rural Utils Serv.*, 2021 WL 5050073 (W.D. Wis. Nov. 1, 2021) 17

*Nat'l Wildlife Refuge Ass'n v. Rural Utils. Serv.*, 580 F. Supp. 3d 588 (W.D. Wis. 2022)... 17, 63, 64, 76

*Nat'l Parks Conservation Ass'n v. Semonite,* 916 F.3d 1075 (D.C. Cir. 2019) .................. 4, 8, 77

*Nat'l Parks Conservation Ass'n v. Semonite,* 925 F.3d 500 (D.C. Cir. 2019) ........................ 4, 77

*Northern Alaska Env't Ctr. v. Hodel*, 803 F.2d 466 (9th Cir. 1986) ........................................ 8, 71

*Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846 (9th Cir. 2005) .................... 5, 77

*Ocean Advocates*, 2005 WL 2035053 (W.D. Wash 2005) ...................................................... 4, 77

*Oneida Tribe of Indians of Wisconsin v. State of Wis.*, 951 F.2d 757 (7th Cir. 1991) ............... 47

*Orchard Hill Bldg. Co. v. U.S. Army Corps of Eng'rs*, 893 F.3d 1017 (7th Cir. 2018) .............. 28

*Puttkammer v. Minth*, 266 N.W.2d 361 (Wis. 1978) ................................................................... 72

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 556 U.S. 639 (2012)............................... 41

*Ramsey v. Ellis,* 484 N.W.2d 331 (Wis. 1992) ........................................................................... 72

*Richland/Wilkin Joint Powrs Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030 (8th Cir. 2016) .................................................................................................................................................. 76

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989)................................... 62, 68

*Rocky Mountain Wild v. Dallas*, 2017 WL 6350384 (D. Colo. May 19, 2017) ......................... 68

*S.E.C. v. Sloan*, 436 U.S. 103 (1978)........................................................................... 28, 35, 46

*Save Greers Ferry Lake, Inc v. Dep't of Def.,* 255 F.3d 498 (8th Cir. 2001) ........................... 8, 71

*Sierra Club v. Fed. Energy Reg. Comm'n*, 867 F.3d 1357 (D.C. Cir. 2017)............................... 63

*Sierra Club v. Marsh*, 872 F.2d 497 (1st Cir. 1989)................................................................... 76

*Sierra Club v. Morton*, 405 U.S. 727 (1972) ............................................................................. 73

*Sierra Club v. U.S. Army Corps of Eng'rs*, 645 F.3d 978 (8th Cir. 2011)................................. 76

*Simmons v. U.S. Army Corps of Engineers,* 120 F.3d 664 (7th Cir. 1997)......................... passim

*State of Iowa, Dep't of Human Servs. v. Unisys Corp.*, 637 N.W.2d 142 (Iowa 2001)............... 72

*Toys "R" US, Inc. v. F.T.C.*, 221 F.3d 928 (7th Cir. 2000)............................................ 28, 35, 44

*Turner v. U.S. Parole Comm'n,* 810 F.2d 612 (7th Cir. 1987)................................................... 35

*U.S. v. 105.40 Acres of Land, More or Less, in Porter County, State of Ind.*, 471 F.2d 207 (7th Cir. 1972) ............................................................................................................................... 51

*Uebelacker v. Rock Energy Coop.*, 54 F.4th 1008 (7th Cir. 2022)............................................ 29

*United States v. Coal. for Buzzards Bay*, 644 F.3d 26 (1st Cir. 2011) ...................................... 76

*Uzuegbunam v. Preczewski*, 141 S. Ct. 792 (2021) ................................................................... 73

*Vahora v. Holder*, 626 F.3d 907 (7th Cir. 2010) .............................................................. 34, 54

*Van Abbema v. Fornell*, 807 F.2d 633 (7th Cir. 1986) ............................................................. 67

*Varity Corp v. Howe*, 516 U.S. 489 (1996) .............................................................................. 41

*Warth v. Seldin*, 422 U.S. 490 (1975) ....................................................................................... 75

*West Virginia v. EPA*, 597 U.S. 697 (2022)............................................................................... 38

*Wis. Cent. Ltd. v. Surface Transp. Bd.*, 112 F.3d 881 (7th Cir. 1997)......................................... 27

iii

**Statutes**

16 U.S.C. § 668dd...............................................................................2, 13, 31
16 U.S.C. § 668dd(a) ......................................................................37, 49, 55
16 U.S.C. § 668dd(b) ............................................................................passim
16 U.S.C. § 668dd(d) ............................................................................passim
16 U.S.C. § 668dd(e) ............................................................................passim
16 U.S.C. § 668ee ...................................................................13, 31, 33, 37
16 U.S.C. § 723 ....................................................................................11, 45
42 U.S.C. § 4321 ...........................................................................1, 3, 30, 63
42 U.S.C. § 4332 ...................................................................................1, 62
5 U.S.C. § 701 ...........................................................................................54
5 U.S.C. § 706 ...........................................................................7, 27, 28, 39
Wis. Stat. 32.09 ..........................................................................................51

**Regulations**

40 C.F.R. § 1500.1 .....................................................................................69
40 C.F.R. § 1501.5 .....................................................................................68
40 C.F.R. § 1506.6 .....................................................................................68
43 C.F.R. § 46.305 ................................................................................68, 69
50 C.F.R. § 26.41(b) .............................................................................16, 43
50 C.F.R. § 29.21-3 ..............................................................................33, 42
50 C.F.R. § 29.3(new) ................................................................................50
CEQ, National Environmental Policy Act Guidance on Consideration of Greenhouse Gas Emissions and Climate Change, 88 Fed. Reg. 1196 (Jan. 9, 2023)...........................................66
CEQ, *National Environmental Policy Act Implementing Regulations Revisions,* 87 Fed. Reg. 23453 (April 20, 2022) .........................................................63

**Rules**

340 FW 3.5...............................................................................................42
340 FW 3.6...............................................................................................42
603 FW 2.11.............................................................................................69
603 FW 2.12.............................................................................................69
Fed. R. Civ. P. 56 ................................................................................27, 29

**Other Authorities**

Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 63 (2012) .... 39
Cam Tredennick, *The National Wildlife System Improvement Act of 1997: Defining the National Wildlife Refuge System for the Twenty-First Century,* 12 Fordham Envtl. L.J. 41 (2000). 31, 41
CEQ, *Guidance for Federal Departments and Agencies on Ecological Connectivity and Wildlife Corridors* (Mar. 21, 2023) ...........................................................50

H.R. Rep 105-106 (1997)............................................................................ 33, 41

Iowa Department of Natural Resources, *Real Estate Appraisal Report Guidelines* (Jan. 1, 2022)
............................................................................................................................... 51

OXFORD ENGLISH DICTIONARY........................................................................ 47

Restatement (2d) of Torts § 821B...................................................................... 71

Restatement (Third) Restitution and Unjust Enrichment § 1 (Restatement of Restitution) ......... 72

Robert L. Fischman, *The National Refuge System and the Hallmarks of Modern Organic Legislation*, 29 ECOLOGY L.Q. 457 (2002) ............................................................ 69

## INTRODUCTION AND SUMMARY

Congress established the Upper Mississippi River National Wildlife and Fish Refuge, which, overall, has more statutory protections than do most National Parks. Congress strengthened those protections in the National Wildlife Refuge System Improvement Act of 1997 because of the death by a thousand cuts as some unduly complacent or politically pressured Refuge managers allowed powerlines, pipelines and other large linear right-of-way projects to plow through the National Wildlife Refuges. Congress has spoken. Congress enacted specific requirements that "powerlines" must be determined "compatible" in order to run through and use a Refuge's public lands and waters, 16 U.S.C. § 668dd(d)(1)(B), and that the public lands must be "suitable for disposition" in order to be divested. 16 U.S.C. § 668dd(b)(3). Congress enacted the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq., as the nation's foundational environmental law and required agencies' full and fair analysis of alternatives as the heart of the NEPA process. *Simmons v. U.S. Army Corps of Engineers*, 120 F.3d 664, 666 (7th Cir. 1997) ("The federal courts cannot condone an agency's frustration of Congressional will. If the agency constricts the definition of the project's purpose and thereby excludes what truly are reasonable alternatives, the EIS cannot fulfill its role. Nor can the agency satisfy the Act. 42 U.S.C. § 4332(2)(E)."). These statutory protections and legal requirements are plainly and blatantly being subverted in this case. This Court should grant summary judgment in Plaintiffs' favor on their claims.

The Transmission Companies, ITC Midwest and Dairyland Power, and the Federal Defendants Rural Utilities Service ("RUS"), U.S. Fish & Wildlife Service ("FWS") and U.S. Army Corps of Engineers ("Corps"), along with the corresponding named officials (collectively, "Federal Defendants") have created exactly the "orchestrated trainwreck" that this Court strongly

1

warned against. They have plowed through all of the red warning flags posted by the Seventh Circuit and this Court.

The Transmission Companies and the Federal Defendants are continuing to attempt to "evade" and "end-run" Congress' substantive requirements in the Refuge Act, Doc. 88 at 7; Doc. 113 at 9, and in NEPA. Doc. 77 at 2; Doc. 120 at 24. They have withheld key evidence and information, including their draft Statement of Proposed Land Exchange/Proposal, which they signed in October 2021, SPF at ¶¶ 65-67. They belatedly disclosed the only $79,000 appraised value of the vaunted Wagner Parcel. SPF at ¶ 209. They continually attempt to preclude effective judicial review of Plaintiffs' claims on the merits even though the Seventh Circuit and this Court made clear that Plaintiffs were entitled to their day in court on the merits. *Driftless Area Land Conservancy v. Rural Utils. Serv.*, 74 F.4th 489, 495 (7th Cir. 2022); Doc. 62 at 3.

The Seventh Circuit explicitly warned the Transmission Companies that they continued to build without an approved Refuge crossing "at their own risk." *Driftless Area Land Conservancy*, 74 F.4th at 495. As did this Court. Doc. 88 at 9. This Court must not now reward the Transmission Companies' "shell game" stratagem to force Plaintiffs and the Court into an impossible position, where the CHC transmission line becomes a *fait accompli* and there is not effective judicial review providing a just determination of the merits of Plaintiffs' claims. The Federal Defendants and Transmission Companies violated the legal requirements of: (1) the National Wildlife Refuge System Improvement Act of 1997, 16 U.S.C. § 668dd, by – (a) evading and failing to comply with the required compatibility determination for the Cardinal-Hickory Creek ("CHC") huge high-voltage powerline, 16 U.S.C. § 668dd(d)(1)(B); (b) evading and failing to comply with the requirement that, in order to be divested and traded, the Turkey River Bottoms – Oak Road Parcel must itself be "suitable for disposition", 16 U.S.C. § 668dd(b)(3); and (c) evading and failing to

2

comply with the requirement these Refuge management actions involving this CHC powerline and the public lands disposition must "be consistent with the" Comprehensive Conservation Plan ("CCP") for the Refuge, which they are not, 16 U.S.C. § 668dd(e)(1)(E); and (2) they continue to evade and fail to comply with NEPA in multiple respects. 42 U.S.C. § 4321 et seq.

Unless the Court acts to block this unlawful conduct by granting Plaintiffs' summary judgment motion, future project developers will likely follow the same build-first, judicial review-later playbook, thereby prejudicing effective judicial review when plaintiffs bring claims raising serious statutory violations and lack of compliance with federal environmental laws. The rule of law should be followed instead of rewarding this Wild West maneuvering to subvert judicial review and shield unlawful actions. The Transmission Companies' build-first, judicial review-later stratagem to evade complying with Congress' statutory requirements should not be countenanced, blessed and rewarded by the judiciary.

In light of the Transmission Companies' current construction, Plaintiffs and the judiciary should not just throw up their hands and walk away. This Court should follow the same path as it did in its two rulings in early 2022: *first*, rule on the merits of Plaintiffs' legal claims and grant summary judgment in Plaintiffs' favor where it is warranted on the merits, just as the Court did in its January 14, 2022 Opinion and Order, PA 94;[1] and *second*, direct the parties to file additional briefs on the scope of the remedies as the Court previously did, and then issue a remedial ruling, which is what the Court then did in its March 1, 2022 Order. PA 139.

---

[1] Documents attached to the Appendix to the Plaintiffs' original Preliminary Injunction Motion (Doc. 38-1) are cited to as "PA" including the page numbers at the bottom of each page labelled "Plaintiffs' App'x XX" corresponding with Plaintiffs' Appendix Table of Contents.

The remedies can include a range of alternatives including, but not limited to: unwinding the *ultra vires* land exchange transaction; requiring the Transmission Companies take down their transmission towers and restore the Turkey River Bottoms – Oak Road Parcel to its prior state; and/or directing the parties to negotiate an equivalent alternative remedy that provides sufficient relief to the Plaintiff Conservation Groups in this case and disincentivizes the Transmission Companies' orchestrated trainwreck approach for the future so that building "at their own risk" has sufficient meaning and impacts; and, potentially, appoint a mediator to assist the parties and the Court in achieving such a meaningful and effective equivalent alternative remedy. *See Nat'l Parks Conservation Ass'n v. Semonite*, 925 F.3d 500, 502 (D.C. Cir. 2019) (in case involving a transmission line already built, "[the district] court is best positioned to order additional briefing, gather evidence, make factual findings, and determine the remedies necessary to protect the purpose and integrity of the EIS process . . . noting that district courts possess 'the ability to fashion an appropriate sanction for conduct which abuses the judicial process'") (citations omitted); *Nat'l Parks Conservation Ass'n v. Semonite*, 916 F.3d 1075, 1083-1089 (D.C. Cir. 2019).

This Court retains significant discretion in fashioning an appropriate remedial order, and it can issue an order that requires Defendants to come into legal compliance by a date certain. *See, e.g.*, *Environmental Defense v. U.S. Army Corps of Engineers*, 515 F. Supp. 2d 69, 88 (D.D.C. 2007) ("The agency acted arbitrarily and capriciously in violation of the APA, the CWA, and NEPA . . . . Plaintiffs' motion for summary judgment will accordingly be granted, and defendant's 2002 RSEIS, 2006 RSEIS, and 2006 ROD will be set aside. The Corps will be enjoined from proceeding with the project, and it will be ordered to deconstruct that portion of the project which it has already built."); *Ocean Advocates*, 2005 WL 2035053, at *2 (W.D. Wash 2005) (ordering

4

the Corps to "revoke the permit or . . . [otherwise take steps] necessary to ensure compliance with the law"); *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 871 (9th Cir. 2005).

*First,* in turning to the merits, Plaintiffs have demonstrated time and again that the Refuge Act cannot legitimately be read to allow the "evasion" and "end-run" around the clear "compatibility" determination statutory requirement. Doc. 88 at 7; Doc 113 at 9. That is exactly, however, what the Transmission Companies are attempting to do here in cahoots with the Federal Defendants. *Id.*; *see also* Doc. 38 at 25–29; Doc. 120 at 8–13. Congress specifically designated compatibility as a mandatory prerequisite for approving "powerlines" in Refuges. 16 U.S.C. § 668dd(d)(1)(B); Doc. 88 at 7. The compatibility determination is statutorily required, not optional or discretionary for the agency. 16 U.S.C. § 668dd(d)(1); Doc. 88 at 7.

There is no factual dispute that the Defendant FWS failed to make the required compatibility determination. Why? Because FWS could not reasonably determine that the huge high-voltage CHC transmission line and very high towers running through the middle of the Upper Mississippi River National Wildlife and Fish Refuge would somehow be consistent with the applicable wildlife protection and conservation goals for the Refuge. SPF at ¶¶ 53–55.[2]

*Second*, the FWS did not determine that the Turkey River Bottoms – Oak Road Parcel is "suitable for disposition," and the divestment of these public lands through the land exchange is contrary to law, and arbitrary and capricious. 16 U.S.C. § 668dd(b)(3). That statutory requirement, again, is mandatory, not optional. There is no factual dispute on this point: Defendant FWS did not find that the 20-acre Turkey River Bottoms – Oak Road Parcel is "suitable for disposition"

---

[2] By contrast, there might be a smaller powerline running along a corner or edge of a Refuge that could reasonably be found compatible by FWS based on those particular circumstances, but that is certainly not the factual situation with the huge CHC high-voltage powerline crossing through the middle of the Refuge in the present case.

because it is not. The usual reasons for disposition involve property that has very limited wildlife protection and conservation value. That is not the situation here for several reasons. First, the Turkey River Bottoms – Oak Road Parcel is exceptionally rare habitat and has important conservation value. SPF at ¶ 252 (this parcel "represents an exceptionally rare alluvial deltaic environmental whose dynamic processes sustain the refuge's biodiversity and federal/state-listed species, particularly the freshwater mussel beds of utmost conservation significance"). Second, FWS is now creating a new private inholding—a hole in the middle of the Refuge where private parties own the property. Third, the huge high-voltage CHC transmission line and its very high towers will increase habitat fragmentation, not reduce it. Fourth, FWS concedes in its Net Benefits Agreement as it must: "Construction and maintenance of the CHC Project will impact the entire divested parcel and visual quality and aesthetics in the vicinity and will contribute to habitat fragmentation." SPF at ¶ 141. Fifth, the Turkey River Bottoms – Oak Road Parcel is high conservation value bottomlands for which the FWS's Comprehensive Conservation Plan for the Refuge emphasizes the importance of preserving and restoring, not disposing. SPF at ¶ 155.

Unlike Plaintiffs' reasonable reading of the entire Refuge Act, the Federal Defendants and Transmission Companies espouse an extreme and implausible reading of the general "suitability" provision that would effectively obliterate the explicit protections that Congress provided in the much more specific requirement in the 1997 Refuge Act that compatibility determinations be made for "powerlines, telephone lines, canals, ditches, pipelines, and roads." 16 U.S.C. §§ 668dd(d)(1)(B), 668dd(d)(3)(A)(i). The Supreme Court has instructed lower courts to "hesitate to adopt an interpretation that would eviscerate such significant aspects of the statutory text." *American Hospital Ass'n v. Becerra*, 596 U.S. 724, 737 (2022).

6

If land exchanges are truly unreviewable acts, committed completely to agency discretion as Defendants argue, then the significant protections Congress created around compatibility are facilely evaded and could become meaningless statutory surplusage. How can it be that in divesting a *greater* property right (fee simple as compared to easement), Defendant FWS must undergo less process, with less public participation, and no judicial review?

*Third*, FWS's decision to authorize the land exchange violates its own Comprehensive Conservation Plan ("CCP") for the Upper Mississippi River National Wildlife and Fish Refuge, which therefore violates the Refuge Act. 16 U.S.C. § 668dd(e)(1)(E). The Refuge's CCP identifies the Turkey River Bottoms as a location for strategic land acquisition *not* divestment. SPF at ¶ 155. Moreover, the CCP highlights the Refuge's role in protecting habitat against development pressures and habitat fragmentation. SPF at ¶ 157. This land exchange and the CHC powerline will exacerbate habitat fragmentation and allow development running through the heart of the Refuge. SPF at ¶ 141.

*Fourth*, FWS's decision to enter into the Land Exchange Agreement and issue the Net Benefit Analysis is arbitrary and capricious, and unsupported by substantial evidence, and therefore should be vacated, reversed and remanded under the Administrative Procedure Act ("APA"). 5 U.S.C. § 706. The Land Exchange Agreement and Net Benefit Analysis systematically diminish the value of the Turkey River Bottoms – Oak Road Parcel, while accentuating the positives of the Wagner Parcel without recognizing the significant development around it, SPF at ¶¶ 115–154, which includes a loud and busy double-tracked BNSF high-speed freight railroad line, the Cassville municipal airport, gravel mining pits, and an RV and trailer recreational camp with a tiki bar. SPF at ¶¶ 208–235.

*Fifth*, the Federal Defendants and Transmission Companies continue to rely on the same flawed NEPA 2019 Final Environmental Impact Statement ("FEIS") analysis as before. Even if this Court's opinion in Plaintiffs' prior lawsuit is not precedential, the Seventh Circuit's reversal of the decision *on different grounds* does not change the underlying facts, which should now be recognized by this Court in a fresh finding that the Federal Defendants violated NEPA. The Federal Defendant agencies failed to properly consider alternative routes that would avoid the CHC powerline running through the Refuge, and non-wires alternatives. They skewed the required NEPA analysis and pre-determined the outcome to conclude that *this* powerline must be built in *this* location, contrary to NEPA's requirements. *Simmons*, 120 F.3d 664; *see Nat'l Parks Conservation Ass'n*, 916 F.3d at 1083-1089. The Federal Defendants' October 2023 Supplemental Environmental Assessment ("SEA") "incorporates" and "tiers" off of Federal Defendants' flawed analysis without even attempting to correct the significant errors that this Court identified in the 2019 FEIS. SPF at ¶ 95. "This SEA incorporates those materials, including the FEIS, by reference." *Id.* Likewise and in turn, FWS's February 23, 2024 FONSI is based on that October 2023 SEA that incorporated the 2019 FEIS, thereby repeating the same legal flaw. SPF at ¶ 108.

*Sixth*, injunctions against private and non-federal entities to which agency permits were issued in violation of NEPA are commonplace, and remedial actions against the Transmission Companies are especially warranted as they voluntarily intervened as parties subject to the Court's jurisdiction in this case. *See, e.g.*, *Save Greers Ferry Lake, Inc v. Dep't of Def.*, 255 F.3d 498, 501 (8th Cir. 2001) (enjoining private use of docks where Corps permits were illegal; ordering removal within one year if Corps does not come into compliance); *Northern Alaska Env't Ctr. v. Hodel*, 803 F.2d 466, 471 (9th Cir. 1986) (injunction against private mining operations); *Greater Yellowstone Coal. v. Bosworth*, 209 F. Supp. 2d 156, 163 (D.D.C. 2002) ("prohibiting any

8

livestock grazing on the Horse Butte allotment until the NEPA process is completed"); *Ctr. for Food Safety v. Vilsack*, 2010 WL 11484449, at *8 (N.D. Cal. Nov. 30, 2010) (enjoining private farmers to remove genetically modified seeds that had already been planted).

The story of this case is the Transmission Companies' and Federal Defendants': (1) flagrant evasions of the Refuge Act's compatibility requirement applicable to powerlines; (2) avoidance of the Refuge Act's "suitable for disposition" requirement, which applies directly to public land in a Refuge for which disposition (or divestment) is contemplated; (3) failure to comply with the FWS's own applicable CCP for this Refuge; (4) impermissible avoidance of NEPA's specific requirements—skewing the purpose and need statement to predetermine the outcome and thereby precluding rigorous exploration and objective evaluation of reasonable alternatives, and arbitrarily avoiding considering other projects that would cause adverse cumulative impacts; (5) first unduly truncating and then altogether avoidance of NEPA's public notice and comment responsibilities and requirements; and (6) subversions of effective judicial review by the judiciary.

The Transmission Companies and Federal Defendants worked backwards from the outcome they desired: running the huge, high-voltage CHC transmission line and high towers through the heart of the Upper Mississippi River National Wildlife and Fish Refuge, even though they clearly knew of the Refuge Act's requirements and were specifically urged to avoid the Refuge crossing by the U.S. EPA in its 2017 comments on the EIS scoping document and by FWS Refuge managers starting in 2012. SPF at ¶¶ 34-42.

The key components of the 2019 FEIS, which is part of the Administrative Record here, SPF at ¶ 96, were drafted by the Transmission Companies and largely adopted verbatim by RUS. SPF at ¶ 99. Federal Defendants, with the Transmission Companies aiding and abetting, presented a moving target, withdrawing their first final action—the compatibility determination and

9

associated permits—on the eve of summary judgment motions in Plaintiffs' prior lawsuit, and arguing in Plaintiffs' prior lawsuit that Plaintiffs were both too early and too late. SPF at ¶ 61. They agreed to a Statement of Proposed Land Exchange/Proposal in October 2021, SPF at ¶ 65, but did not disclose it until almost two years later in September 2023, SPF at ¶¶ 66–67, after the critical issue pending before the Seventh Circuit in Plaintiffs' prior lawsuit was the question of final agency action. Doc. 62 at 2 ("Although unknown to either court at the time of their respective ruling, those actions were already underway as U.S. Fish and Wildlife Service and one of the Intervenor-Defendants, Dairyland Power, had already entered into a non-binding understanding for a land exchange/purchase in a private writing dated October 29, 2021").

Federal Defendants, in close coordination with the Transmission Companies, subverted public comments on the land exchange and environmental review by providing a truncated timeframe—just 14 days—for comment on what became the October 2023 SEA, and providing for no opportunity at all for public comments, written or oral, on FWS's critical February 23, 2024 decisional documents, including the Net Benefits Analysis and FONSI. Doc. 62 at 2–3; *see also* SPF at ¶¶ 82–94, 113–114. They then rushed the land exchange process to set this litigation on an unduly compressed track. Doc. 62 at 2–3. Indeed, Federal Defendants and the Transmission Companies have taken every opportunity to prejudice Plaintiffs' pursuit of effective judicial review on the merits of their claims and effective relief.

This Court has both jurisdiction and proper grounds to end this shell game and the destruction of a critical ecologically unique portion of the Refuge. Plaintiffs are entitled to summary judgment based on the governing law in the Refuge Act, NEPA, and the APA, as well as the facts in the Administrative Record. In addition, Plaintiffs have filed documents to

supplement the Administrative Record[3] which further highlight the arbitrary and capriciousness of the Federal Defendants' land exchange. These additional documents are an essential component of the full record for this Court to judicially review, particularly given Plaintiffs' extremely limited opportunity for input into the record; however, should this Court disagree, Plaintiffs are still entitled to summary judgment for the reasons discussed below.

Once this Court decides in Plaintiffs' favor on the merits and grants summary judgment, the Court should direct the parties to brief remedy issues. The Court should then issue an order granting just and equitable relief as explained above.

**STATEMENT OF FACTS AND PROCEDURAL HISTORY**

**The Upper Mississippi River National Wildlife and Fish Refuge**

Congress established the Upper Mississippi River National Wildlife and Fish Refuge in 1924 as a refuge and breeding place for migratory birds, as well as for other birds, wildlife, fish, and plants. 16 U.S.C. § 723; SPF at ¶ 1. This Refuge is one of the largest blocks of floodplain habitat in the lower 48 states. SPF at ¶¶ 4, 8. According to Defendant FWS: "Bordered by steep wooded bluffs that rise 100 to 600 feet above the river valley, the Mississippi River corridor and refuge offer scenic beauty and productive fish and wildlife habitat unmatched in the heart of America." SPF at ¶ 5.

This Refuge "is designated as a Wetland of International Importance by the Ramsar Convention and a Globally Important Bird Area." SPF at ¶ 6. The Ramsar designation "embodies the government's commitment to take the steps necessary to ensure that its ecological character is

---

[3] Plaintiffs responded to the Transmission Companies' motion to strike some of these supplemental documents on June 17. Doc. 141. Plaintiffs have also separately moved to supplement the Administrative Record. That motion will be filed today, June 20.

maintained." *Id.* Ramsar sites "are recognized as being of significant value not only for the country or the countries in which they are located, but for humanity as a whole." SPF at ¶ 7.

This Refuge is designated as a Globally Important Bird Area because it is located within the Mississippi Flyway. SPF at ¶ 8. "More than 290 species of birds migrate throughout the refuge every year. About 40% of the waterfowl in the nation use the Mississippi River as a travel corridor in the fall migration and the refuge is particularly known to host large flocks of tundra swans and large rafts of canvasback ducks between mid-October and the winter freeze-up. In addition, Upper Mississippi River National Wildlife and Fish Refuge hosts more than 300 pairs of bald eagles in part due to having one of the largest blocks of floodplain forest habitat in the lower 48 states." *Id.*

The Refuge is managed according to the Refuge Act, FWS rules and the Refuge-specific Comprehensive Conservation Plan, which makes enhancing ecological connectivity and avoiding habitat fragmentation a clear goal of the Refuge. SPF at ¶¶ 11, 147-157. The Refuge covers over 240,000 acres and extends 261 river miles from its north end at the confluence of the Chippewa and Mississippi Rivers to its south end near Rock Island, Illinois. SPF at ¶ 3. Because the Refuge is linear, following the Mississippi River, one of the Refuge's values is its ability to allow uninterrupted movement of birds and other wildlife north and south along the River. SPF at ¶ 12.

**The National Wildlife Refuge System Improvement Act of 1997 and the
Cardinal-Hickory Creek High-Voltage Powerline's Proposed Crossing of the Refuge**

The Transmission Companies' huge Cardinal-Hickory Creek ("CHC") high-voltage transmission line begins at the Hickory Creek substation in Dubuque County, Iowa, and then would run with a wide clear-cut right-of-way through and across the middle of the protected Upper Mississippi River National Wildlife and Fish Refuge, and thereafter cut a wide swath east through Southwest Wisconsin's scenic Driftless Area landscape, vital natural resources, conservation areas, family farms and rural small town communities going to the Cardinal substation in

Middleton, Wisconsin. SPF at ¶ 15. While migratory birds fly north and south along the Mississippi Flyway, the Transmission Companies are building the CHC high-voltage transmission line and high towers mostly east and west across the Refuge. SPF at ¶ 10. FWS recognizes that the CHC transmission line will cause migratory bird kills, injuries and deaths. SPF at ¶ 10.

The National Wildlife Refuge System Improvement Act of 1997, 16 U.S.C. §§ 668dd-668ee, prohibits private economic use—and, specifically, "powerlines"—on Refuge lands and waters unless the use is determined to be "compatible" with the wildlife-dependent and conservation purposes of this Refuge and the overall Refuge System. 16 U.S.C. §§ 668dd(d)(1)(B); 668dd(d)(3)(A)(i). Defendant FWS has long acknowledged that the CHC line cannot pass that statutory test. SPF at ¶ 53. FWS did not make a scientific determination that the proposed CHC high-voltage transmission line: (1) would "not materially interfere with or detract from" the purposes of the Upper Mississippi River National Wildlife and Fish Refuge or the National Wildlife Refuge System; or (2) would somehow "contribute to" the achievement of the purposes of the Refuge or the mission of the National Wildlife Refuge System. SPF at ¶¶ 54-55. Even in its Net Benefits Analysis which supports this land exchange, FWS concedes that "[c]onstruction and maintenance of the CHC project will impact the entire divested parcel and visual quality and aesthetics in the vicinity and will contribute to habitat fragmentation." SPF at ¶ 141.

In 2012, the Transmission Companies met with FWS's Refuge managers to discuss whether their proposed CHC transmission line could be allowed to run through and across the protected Refuge. SPF at ¶¶ 34, 35. The FWS Refuge managers advised the Transmission Companies to find a non-Refuge-crossing alternative because the proposed CHC transmission line could not meet the 1997 Refuge Act's requirement that it be "compatible" with the Refuge's wildlife protection and wildlife habitat management purposes. SPF at ¶¶ 36, 37. At about that time,

the Refuge managers also advised a different group of transmission developers (including Dairyland Power) that the FWS would not allow their proposed high-voltage transmission line to run across the Refuge at the Black River Bottoms area further north. SPF at ¶¶ 38-41.

The FWS Refuge managers explained the reasons why a project like the CHC high-voltage transmission line cannot meet the Refuge Act's requirements: because right-of-way projects "can cause habitat fragmentation, reduce habitat quality, degrade habitat quality through introduction of contaminants; disrupt migration corridors; alter hydrology; facilitate introduction of alien, including invasive species; and disturb wildlife." SPF at ¶ 39. They also explained that transmission line crossings would: (i) compromise the Refuge's scenic qualities; encourage establishment of invasive species like reed canary-grass, European buckthorn, Japanese knotweed, and others; (ii) compromise threatened and endangered and candidate species like the Higgins Eye pearlymussel, Massasauga rattlesnake, and sheepnose mussel; pose a significant hazard to bald eagles; and (iii) greatly increase the risk of harmful bird strikes. SPF at ¶ 41.

In 2017, the U.S. Environmental Protection Agency ("U.S. EPA") concurred with the FWS Refuge managers' concerns and specifically advised the Transmission Companies to find a non-Refuge-crossing alternative. SPF at ¶ 42. The U.S. EPA explained in great detail in its formal NEPA scoping comments the reasons why the proposed Refuge crossing was contrary to law, sound policies and ecological values. *Id.* The Transmission Companies, however, nonetheless pressed forward with their plan for the CHC high-voltage transmission line to run through the protected Upper Mississippi River National Wildlife and Fish Refuge.

FWS and the Transmission Companies then attempted to avoid the "compatibility" requirement enacted by Congress in the Refuge Act. First, FWS decided that because the Transmission Companies were willing to tear down some old low-voltage powerlines about a mile

south of the proposed CHC high-voltage powerline crossing, the much larger new CHC powerline could be grandfathered in by deeming it to be "maintenance" of the old lines, which predated the Refuge Act and never needed to pass the compatibility test. SPF at ¶ 44. On that basis, FWS granted the Transmission Companies an easement and a special use permit. SPF at ¶ 52.

**Plaintiff Conservation Groups' Lawsuit before the District Court, this Court's Decisions and the Seventh Circuit's Decision**

On February 10, 2021, Plaintiffs filed a lawsuit challenging Defendant FWS's "maintenance" theory, and contending that the proposed CHC transmission line right-of-way project violated the Refuge Act's compatibility requirement. SPF at ¶¶ 56, 57. Plaintiffs further claimed the Federal Defendants' approvals and permits were invalid because their jointly signed October 23, 2019 Final Environmental Impact Statement ("FEIS") and January 16, 2020 Record of Decision ("ROD") violated NEPA's requirements for multiple reasons, including, but not limited to: (1) unduly constricting the "purpose and need" statement; (2) failing to rigorously explore and objectively evaluate all reasonable alternatives especially routes that would avoid running through the protected Refuge, and reasonable non-wires alternatives; (3) failing to fully and fairly analyze climate change impacts; and (4) failing to fully and fairly analyze cumulative impacts. SPF at ¶¶ 75-77.

Then, on August 27, 2021, "less than a week before summary judgment motions were due," FWS "withdrew" its "maintenance exception." SPF at ¶ 62. FWS decided that rather than grant a right-of-way easement and special use permit subject to the compatibility requirement, it would instead entertain the idea of a land exchange. SPF at ¶ 64. This sudden change in legal theory underlying the original case meant that Plaintiffs were challenging the legality of the absence of the required compatibility determination, and the proposed land exchange. Meanwhile, the Transmission Companies continued construction on non-federal lands.

15

Under this land exchange proposal: (1) the Transmission Companies would get fee simple title to their preferred right-of-way through the Refuge for about 20 acres along the Turkey River Bottoms near Oak Road (the "Turkey River Bottoms – Oak Road Parcel"), which is where the proposed CHC transmission line would cross the Mississippi River; (2) FWS would get the 35.6-acre "Wagner Parcel" of land in Wisconsin that the Transmission Companies purchased in 2021, and has a recently appraised value of $79,000, SPF at ¶¶ 68, 209, and had already been proposed by the Transmission Companies as compensatory mitigation for FWS granting the now-withdrawn easement, SPF at ¶ 51; and (3) the Refuge Act's compatibility requirements would thereby be evaded in their view. FWS found this transaction "favorable" even though the Refuge Act requires compatibility and the FWS's own regulation "specifically prohibits the use of compensatory mitigation to make a use compatible." SPF at ¶ 64; 50 C.F.R. § 26.41(b).

So, the proposed land exchange essentially amounts to the Transmission Companies buying longstanding Refuge public lands for conversion to their powerline right-of-way corridor in exchange for providing FWS a non-contiguous parcel valued at $79,000 and taking down an old, low-power powerline that the Transmission Companies had already offered to do. SPF at ¶ 68.

On October 29, 2021, FWS and the Transmission Companies formally executed and signed a "Statement of Proposed Land Exchange/Purpose," which detailed the terms. SPF at ¶ 65. They did not disclose that document, however, to Plaintiffs and the public, to this Court, or to the Seventh Circuit.[4] SPF at ¶¶ 66, 67. The land exchange proposed to swap the 35.6-acre non-contiguous Wagner Parcel purchased by ITC Midwest for the 19.84-acre Turkey River Bottoms –

---

[4] The agreement between the Federal Defendants and the Transmission Companies was first revealed on September 7, 2023 in Federal Defendants' appendix to the Draft Supplemental Environmental Assessment. SPF at ¶ 66.

Oak Road Parcel that would be divested from the National Wildlife Refuge's public lands. SPF at ¶ 68.

On November 1 and November 3, 2021, this Court entered a preliminary injunction. *Nat'l Wildlife Refuge Ass'n v. Rural Utils. Serv.*, 2021 WL 5050073 (W.D. Wis. Nov. 1, 2021). On January 14, 2022, this Court granted partial summary judgement in favor of Plaintiffs' substantive claims on Federal Defendants' violations of the 1997 Refuge Act and NEPA. *Nat'l Wildlife Refuge Ass'n v. Rural Utils. Serv.*, 580 F. Supp. 3d 588 (W.D. Wis. 2022). This Court rejected the Federal Defendants' "maintenance" theory and their attempted evasion of the 1997 Refuge Act's "compatibility" requirement through a land exchange, and criticized the "shell game" that the Transmission Companies and Federal Defendants were playing. *Id*. at 600, 610–15. This Court declared that allowing the CHC transmission line to cross what was protected Refuge public lands would violate the 1997 Refuge Act. *Id.* at 604–10. This Court further held that the Federal Defendants' failure to fully and fairly evaluate alternative routes that avoided crossing the Refuge, and non-wires alternatives, invalidated the FEIS prepared for the entire project. *Id.* at 610–13.

The Court directed the parties to submit briefs on "additional relief" and potential remedies for the final judgment order. *Id*. at 615. On March 1, 2022, this Court entered final judgment for the Plaintiffs. PA at 139–40.

The Federal Defendants and Transmission Companies appealed. SPF at ¶ 79. They requested that this Court's decision be stayed, but the Seventh Circuit denied their stay motion. SPF at ¶ 80. The Federal Defendants and Transmission Companies still did not disclose their "Statement of Land Exchange/Purpose," signed on October 29, 2021. SPF at ¶ 67. Without the benefit of this document, the Seventh Circuit concluded: "Fish and Wildlife Service has not issued a final decision that could harm plaintiffs. The agency has not permitted a land transfer and perhaps

17

never will." *Driftless Area Land Conservancy,* 74 F.4th at 494. The Seventh Circuit did not rule on the merits, stating: "[w]e do not express any opinion on the merits of the question . . .," but instead concluded that FWS had not completed a "final agency action." *Id.* at 495. The Seventh Circuit's decision cautioned that "[t]he cost of construction is one the utility companies have opted to incur and bear the risk of." *Id.* Meanwhile, the Transmission Companies continued building the CHC powerline up to the Refuge's edged in the face of this Court's and the Seventh Circuit's warnings and without any assurance that a Refuge crossing would be found lawful in light of the 1997 Refuge Act and NEPA requirements.[5] SPF at ¶ 16.

**Final Agency Actions Following the Seventh Circuit Decision**

On September 7, 2023, Federal Defendants issued a new draft Supplemental Environmental Assessment ("DSEA"), specifically incorporating and re-adopting their previous October 23, 2019 FEIS signed by all three Federal Defendant agencies. "This SEA incorporates those materials, including the FEIS, by reference." SPF at ¶ 95.

The Federal Defendants' public notice of the DSEA was defective, and the Federal Defendants provided only 14 days for public comments in writing. SPF at ¶¶ 90–92. They did not provide for a public hearing that would have allowed the public to be heard orally. SPF at ¶ 90. Plaintiffs and others submitted written comments on the truncated schedule,[6] SPF ¶¶ 92–93, but the Federal Defendants finalized the Supplemental Environmental Assessment ("FSEA") and their

---

[5] The Transmission Companies informed the Public Service Commission of Wisconsin that they have spent $654 million on the CHC transmission line thus far, which exceeds the $492 million cost they previously asserted in gaining approval. SPF at ¶ 16. Those cost overruns, if taken into account earlier, would have changed the economic analysis of reasonable alternatives. SPF at ¶ 17. The Transmission Companies should not be allowed to charge costs that are not "prudent," under utility laws, to ratepayers.

[6] FWS provided only newspaper notice, offering a 14-day comment period, with a copy of the DSEA only available at a public library, which would not allow photocopying. After a day or two, the document finally appeared on the Defendant Rural Utilities Service's website. SPF at ¶ 91.

finding of no significant environmental impact ("FONSI") on October 6, 2023, only two weeks after the close of the comment period. SPF ¶ 94. The Federal Defendants' DSEA and FSEA said that Defendant FWS would complete a "net benefit analysis" to justify the land exchange at some unspecified future date. SPF at ¶ 105.

The Administrative Record ultimately produced by the Federal Defendants revealed the extent of the Transmission Companies' influence on the timing and substance of the forthcoming environmental review and agency action. For example, in advance of the draft SEA, the Transmission Companies redlined the documents and dictated a schedule to the Defendant RUS. SPF at ¶¶ 82–88; 94. In a series of emails sent prior to the draft SEA, the Transmission Companies urged the Federal Defendants to not "unduly drag[ their] feet," SPF at ¶ 83, consulted on the truncated schedule, SPF at ¶ 86, and demanded that the final SEA be released by October 6 (the date it was ultimately published). SPF at ¶ 94.

On February 23, 2024, Defendant FWS issued three documents: (1) an executed Land Exchange; (2) a Finding of No Significant Environmental Impact ("FONSI") under NEPA; and (3) for the first time, a "Net Benefit Analysis" for the land exchange. SPF at ¶ 106. These decisional documents formally execute the land exchange which FWS and the Transmission Companies signed and agreed to in principle back on October 29, 2021.

Defendant FWS did not issue a draft version of its Net Benefit Analysis or its new FONSI document for public notice. SPF at ¶ 113. FWS did not provide an opportunity for public comments, either in writing or orally. SPF at ¶ 113. FWS did not hold a public hearing on its Net Benefit Analysis or its new FONSI document. SPF at ¶ 114.

In the Net Benefit Analysis, FWS asserts that the land exchange supports the Refuge's purpose "[s]ince the Wagner Tract has more acreage of higher quality, unfragmented habitat, it

provides more conservation value than the divested tract and has greater potential for achieving habitat protection objectives." SPF at ¶ 129. FWS states: "The Wagner tract is nearly twice as large as the divested tract (35.69 acres vs 19.84 acres) and is substantially larger than the combined acreage of the USFWS divested tract plus the 9.22-acre Corps right-of-way within the Refuge (35.69 acres vs. 29.06 acres)." SPF at ¶ 130. In the Net Benefit Analysis, FWS asserts that the wildlife value of the Wagner Parcel compensates for the lost wildlife value of the land within the transmission right-of-way corridor. SPF at ¶ 115. It does not assess, however, the loss of wildlife value in the area surrounding the Turkey River Bottoms – Oak Road Parcel where the CHC powerline right-of-way goes. SPF at ¶ 126. It also discounts the risk of habitat fragmentation, SPF at ¶ 118, contrary to what Defendant FWS Refuge managers had previously told the Transmission Companies and despite the policies expressed in the FWS's Comprehensive Conservation Plan ("CCP") for the Refuge and in general federal policies directing agencies to enhance ecological connectivity and avoid habitat fragmentation. SPF at ¶ 152. FWS states: "The divested parcel [Turkey River Bottoms – Oak Road] will be used to construct and maintain the CHC Project. Impacts of the CHC Project on the Refuge are detailed in FEIS Section 3.14 and SEA Section 3.14. Construction and maintenance of the CHC Project will impact the entire divested parcel and visual quality and aesthetics in the vicinity and will contribute to habitat fragmentation." SPF at ¶¶ 140, 141.

The Net Benefit Analysis states that the Wagner Parcel was too expensive for the FWS to acquire and not on the market. SPF at ¶ 59. FWS does not mention that the assessed value of the Wagner Parcel was only $79,000. SPF at ¶ 133. Nor does it mention that the "atypically motivated" Transmission Companies then purchased the Wagner Parcel for $287,200. SPF at ¶¶ 58-60.

The FWS Net Benefits Analysis also does not mention the large, double-track, heavily-used loud BNSF freight railroad that borders the Wagner Parcel. SPF at ¶¶ 216, 217. Nor does it mention the impact on wildlife of planes using the Cassville Municipal Airport close to the Wagner Parcel. SPF at ¶¶ 222. While the Net Benefit Analysis mentions wetland areas on the Wagner Parcel and on the to-be-restored Stoneman crossing, it entirely fails to mention that 18 acres of wetlands will be divested as part of the land exchange. SPF at ¶ 122. The Net Benefit Analysis describes the "tremendous conservation value" associated with acquiring the Wagner Parcel, but provides no facts showing that absent acquisition by the FWS, this land would be developed to the detriment of the National Wildlife Refuge System. SPF at ¶ 131, 213.

In its Net Benefits Analysis, FWS states its concern about "the risk that the Utilities would build through the Refuge on the Stoneman route, absent this land exchange, is high. Assuming the utilities can construct and maintain the CHC Project pursuant to the rights granted by their existing easements, there would be no compatibility determination, in accordance with 603 FW 2.10.B." SPF at ¶ 137. Defendant FWS's Net Benefits Analysis, however, does not address Congress' 1997 Refuge Act provision which states that FWS: "shall not initiate or permit a new use of a refuge or *expand, renew, or extend an existing use* of a refuge, unless the Secretary has *determined that the use is a compatible use* and that the use is not inconsistent with public safety." 16 U.S.C. § 668dd(d)(3)(A)(i) (emphasis added).

FWS issued its CCP for the Upper Mississippi River National Wildlife and Fish Refuge in 2006. SPF at ¶ 147. The CCP outlines the Refuge Manager's long-term plans for the Refuge. In outlining the strategic goals for the Refuge, the CCP discusses the Refuge's role in defending against developmental pressures and habitat fragmentation. SPF at ¶ 157. The CCP discusses land exchanges and acquisitions, but in the context of "remov[ing] intermingled ownership" and

"restoring habitat connectivity." SPF at ¶¶ 151, 152. The CCP specifically identifies the Turkey River Bottoms area as a strategic target *for* land acquisition. SPF at ¶ 155.

Defendant FWS's February 23, 2024 documents constituted final agency action. FWS approved the same land exchange, which it had signed on October 29, 2021, transferring the same 19.84 acres of Refuge public lands in the Turkey River Bottoms area by fee simple title to the Transmission Companies where they will clearcut and run their high-voltage powerline and up to 200-foot high towers through the protected Refuge in exchange for the same Wagner Parcel of land on the Wisconsin side of the River. SPF at ¶¶ 65–68.

**This New Lawsuit and Subsequent Events**

On March 7, 2024, Plaintiffs timely filed their Complaint commencing this lawsuit, along with a motion for a temporary restraining order ("TRO") and their memorandum supporting the TRO motion. Doc. 1-3. The Court held an emergency status hearing at which the parties presented oral argument and responded to the Court's questions. Doc. 37. The Court converted Plaintiffs' TRO into a preliminary injunction motion, and set an expedited briefing schedule, followed by a hearing to rule on the preliminary injunction on March 22, 2024, which is when the Federal Defendants and Transmission Companies stated they that planned to close their land exchange. *Id.* at 4. On March 21, 2024, this Court granted a very short, standstill order to stop the Federal Defendants and Transmission Companies from closing their proposed land exchange until the Court held a full hearing the next morning. Doc. 60. On Friday, March 22, 2024, following oral argument by the parties, the Court issued a preliminary injunction ruling from the bench. Doc. 66 at 62. On the following Monday, March 25, 2024, the Court issued a written Opinion and Order aligned with its ruling from the bench that prevented the Federal Defendants and Transmission Companies from closing their land exchange, which would have otherwise allowed powerline

construction to begin in the Refuge. Docs. 62, 63. The Transmission Companies appealed, Doc. 67, and moved for a stay before the Seventh Circuit. Plaintiffs filed a motion to dismiss the stay motion, and, on April 11, 2024, the Seventh Circuit issued an order stating: "This court will defer action on these motions until the district court has acted (within a reasonable time) on the pending motion for stay." Doc. 80.

This Court then issued a prompt Opinion and Order on April 26, 2024, denying the Transmission Companies' motion for stay and addressing the injunction issues involving the parties' likelihood of success on the merits, irreparable injury, balance of harms and the public interest, respectively. Doc. 88. The Seventh Circuit stayed the effect of the Court's preliminary injunction on May 2, 2024. Doc. 93-1. On May 3, 2024, this Court promptly held a hearing where it set an expedited schedule for deciding the merits of this case. That schedule provided for Plaintiffs to file an amended complaint, motions to supplement the Administrative Record, and cross-motions for summary judgment. Doc. 99 at 4–5. The FWS and the Transmission Companies then closed their land exchange deal on May 9, 2024. Doc. 103.

On May 7, 2024, based on new evidence as explained below, Plaintiffs filed a motion for reconsideration and renewed motion for preliminary injunction. Doc. 101. Plaintiffs' subsequently supported that motion with an updated set of proposed findings of fact and a memorandum of law. Docs. 120, 121. On May 13, 2024, the Transmission Companies began construction along the divested Turkey River Bottoms – Oak Road Parcel. Doc. 104. On May 14, 2024, the Court held a hearing on Plaintiffs' renewed motion for a preliminary injunction, which is still pending. The Transmission Companies indicated their intention to "begin foundation work" during the week of May 27, 2024. Doc. 113 at 39–40.

**The Administrative Record and New Evidence**

At the March 7, 2024 hearing, the Federal Defendants informed this Court it would take "many months" to produce the Administrative Record. Doc. 31 at 7. The Court asked the agencies to expedite this process. *Id.* at 7–8. At the March 22, 2024 hearing, the Federal Defendants then told the Court it would take a "few more weeks," to produce the Administrative Record. Doc. 66 at 5. In its April 26, 2024 Opinion and Order, the Court expressed frustration about the Federal Defendants' failure to promptly produce the Administrative Record. Doc. 88 at 10, n. 3. The Federal Defendants finally produced the new portion of the Administrative Record on April 29, 2024. Docs. 90, 91.

The Administrative Record revealed, among other things, a June 2023 independent appraisal concluding that the 35.69-acre Wagner Parcel is worth about $79,000. SPF at ¶ 209. The appraisal also concluded that the 19.84-acre Turkey River Bottoms – Oak Road Parcel is worth $58,000. SPF at ¶ 238. On a per acre basis, the Turkey River Bottoms – Oak Road Parcel is more valuable according to this appraisal. SPF at ¶¶ 236, 238.

While the FWS's Net Benefit Analysis pays particular attention to the narrow gravel Oak Road along the to-be-divested Turkey River Bottoms – Oak Road Parcel, the appraisal noted the busy high-speed freight railroad, quarries and gravel pits, and RV campground and trailer park, as well as the nearby Cassville Municipal Airport, that are next to the Wagner Parcel. SPF at ¶¶ 208–235. "There is a historic sand pit adjacent to the property . . . there is a quarry operation north of the railroad . . . . There are numerous quarry sites in the area." SPF at ¶ 211. Another document in the record highlights that there is questionable, limited access to the Wagner Parcel, due to an uncertain easement across the railroad. SPF at ¶ 215.

The Administrative Record does not contain any new rigorous scientific analysis about the divested National Wildlife Refuge public land parcel. It does include almost a hundred

photographs taken by the Transmission Companies of locations in the Refuge without any identifying information. SPF at ¶ 185.

Plaintiffs moved to supplement the Administrative Record with declarations from: (1) forensic photographer and videographer, William Ward, who visited the two exchanged parcels and the overall area, SPF at ¶¶ 189, 198, 208, 217–235; (2) appraisal expert Scott McWilliams, SPF at ¶¶ 241–246; and (3) an internationally recognized ecologist Steven Apfelbaum, who also visited the two exchanged parcels and knows the overall area well. SPF at ¶¶ 247-261.

William Ward's still images and video clips with sound capture, and his initial and supplemental declarations describe, the double-track freight railroad bordering the Wagner Parcel as having "many loud freight trains going through Cassville at different points in time." SPF at ¶¶ 216, 231. He further describes the recreational vehicle and trailer park-type campground with a "man-made water area with a tiki bar and palm tree" near the Wagner Parcel. SPF at ¶¶ 220–221, 231–233. He describes the Cassville Municipal Airport that is also across from the Wagner Parcel. SPF at ¶ 222.

Mr. Ward's photographs and video clips with sound also capture the "scenic and bucolic" nature of the Turkey River Bottoms – Oak Road Parcel. SPF at ¶¶ 189, 224, 227, 228. His photographs show FWS's own public education sign boards for visitors at the Turkey River Bottoms site on the Mississippi River that highlight the site's importance for protected mussels species and the Refuge's significance as "perhaps the most important corridor of fish and wildlife habitat in the central United States." SPF at ¶ 196. According to FWS, this importance "has increased over time as habitat losses or degradation have occurred elsewhere . . . ." *Id.* In addition, Ward captured images of the very high, solid brown-colored transmission towers the Transmission Companies installed at the river's edge in Wisconsin, which they aim to connect up with similar

towers in the Refuge on the Iowa side (so tall they have blinking lights to warn aircraft) and which are quite different than the older, silver-colored towers, as well as construction occurring in Iowa just outside the Refuge. SPF at ¶¶ 198, 200, 225, 226, 229, 230.

Appraisal expert Scott McWilliams explains, backed up by Wisconsin statute and federal and Iowa policy, that the appraisals and examination of Net Benefit Analysis performed by FWS reflected an overly narrow scope. Mr. McWilliams explains that the FWS only reviewed the 19.84 acres of the Turkey River Bottoms – Oak Road Parcel, and should have also, but did not consider the impacts of the massive CHC high-voltage transmission line and high towers on the surrounding 315 acres of Refuge land in Clayton County, Iowa. SPF at ¶¶ 241–246. Importantly, the area just outside the divested parcel includes important habitat for northern long-eared bats, bald eagles, and protected Higgins-eye mussel. SPF at ¶¶ 146, 201, 207.

Certified Senior Ecologist Steven Apfelbaum, with input from his colleague Jason Carlson, performed a comprehensive science-based ecological survey of the two parcels. SPF at ¶ 247. Mr. Apfelbaum determined that FWS misidentified the Turkey River Bottoms – Oak Road Parcel as land with "little or no conservation" value. SPF at ¶¶ 254–255. Instead, Mr. Apfelbaum explains that the Turkey River Bottoms – Oak Road Parcel "represents an exceptionally rare alluvial deltaic environment whose dynamic processes directly sustain the refuge's biodiversity and federal/state-listed species, particularly the freshwater mussel beds of utmost conservation significance." SPF at ¶ 252. Likewise, Mr. Apfelbaum also explains that the Wagner Parcel "typif[ies] a very common disturbed upper floodplain/floodway margin habitat" that requires extensive restoration efforts to meet refuge standards. SPF at ¶ 253.

In comparing the two parcels, Apfelbaum concludes: "The Turkey River Bottoms – Oak Road Parcel is an irreplaceable ecological resource of exceptional rarity, containing a rich diversity

of conservation priorities utterly distinct from the commonplace non-contiguous parcels that comprise the Wagner Parcel." SPF at ¶ 257. He states that the "disparity between the parcels renders any comparison not just fundamentally flawed but patently indefensible." SPF at ¶ 260. Apfelbaum recommends that the "Turkey River Bottoms – Oak Road Parcel must be retained under federal ownership to support the need for coherent restoration across the various Upper Mississippi River National Wildlife and Fish Refuge parcels that abut and include the Turkey River Bottoms – Oak Road Parcel." SPF at ¶ 261.

**ARGUMENT**

## I.     <u>Standard Of Review</u>

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Judicial review of federal agency actions under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, can be resolved as a matter of law. Summary judgment is the procedure by which the courts evaluate challenges, such as Plaintiffs' here, to the unlawfulness of the agencies' actions and whether those actions should be set aside and vacated.

Under the APA standard of review, questions of law are for courts to decide. *See, e.g.*, *Wis. Cent. Ltd. v. Surface Transp. Bd.*, 112 F.3d 881, 887 (7th Cir. 1997). Reviewing courts owe no deference to agency interpretations of the law, except under limited circumstances that do not apply to this case. *See generally Kisor v. Wilkie*, 588 U.S. 558 (2019). The APA itself dictates that "[t]o the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, [and] interpret constitutional and statutory provisions . . . ." 5 U.S.C. § 706. Courts are "the final authorities on issues of statutory construction, and are not obliged to stand aside and rubber-stamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying the

statute." *S.E.C. v. Sloan*, 436 U.S. 103, 118 (1978) (citations omitted); *see also Toys "R" US, Inc. v. F.T.C.*, 221 F.3d 928, 934 (7th Cir. 2000).

"Under the APA, a court must set aside an agency determination if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' or if it is 'unsupported by substantial evidence.' 5 U.S.C. §§ 706(2)(A), (E)." *Orchard Hill Bldg. Co. v. U.S. Army Corps of Eng'rs*, 893 F.3d 1017, 1024 (7th Cir. 2018). "That does not mean the review is toothless . . . . The Supreme Court has instructed that the 'APA requires meaningful review,'" and the court "should not attempt itself to make up for . . . deficiencies in an agency's reasoning, nor supply a reasoned basis for the agency's action that the agency itself has not given." *Id.* (internal quotations and citations omitted); *see also Dep't of Workforce Dev. Div. of Vocation Rehab. v. Dep't of Educ.*, 980 F.3d 558, 566 (7th Cir. 2020).

For example, an action is arbitrary and capricious if it fails to analyze important aspects of the problem. *Motor Vehicle Mfrs. Ass'n. v. State Farm*, 463 U.S. 29, 43 (1983). "Stating that a factor was considered . . . is not a substitute for considering it." *Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986). As the court explained in *County of Suffolk v. Secretary of Interior*: "Nor was the court obligated to restrict its review to the administrative record . . . in NEPA cases, by contrast, a primary function of the court is to insure that the information available to the decision-maker includes an adequate discussion of environmental effects and alternatives, which can sometimes be determined only by looking outside the administrative record to see what the agency may have ignored." 562 F.2d 1368, 1384 (2d Cir. 1977) (citations omitted).

In short, deference cannot save federal agency decision-making that violates numerous federal environmental laws.[7]

For the reasons explained in the following Parts of the brief, this Court should grant Plaintiffs' summary judgment motion because Plaintiffs have demonstrated "that there is no genuine dispute as to any material fact and the [Plaintiffs are] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The uncontested facts in the record establish that:

1.      FWS acted contrary to law by failing to make the "compatibility" determination required by the Refuge Act in allowing the Transmission Companies to construct and run their huge CHC high-voltage powerline through this National Wildlife Refuge. 16 U.S.C. § 668dd(d)(1)(B). *See* Part II.A below.

2.      FWS acted contrary to law by divesting the Turkey River Bottoms – Oak Road Parcel and failing to comply with the Refuge Act's "suitable for disposition" requirement, 16 U.S.C. § 668dd(b)(3), making no such finding, and creating a new private inholding and hole in the center of an ecologically important area that will contribute to wildlife habitat fragmentation in this Refuge. *See* Part II.B below.

3.      FWS acted contrary to law because the land exchange that FWS approved is contradictory to the FWS's own Comprehensive Conservation Plan in effect for the Upper Mississippi River National Wildlife and Fish Refuge. 16 U.S.C. § 668dd(e)(1)(E). *See* Part II.C below.

---

[7] Plaintiffs also move for summary judgment on their nuisance and unjust enrichment claims in Count VII against the Transmission Companies. In adjudicating a summary judgment motion, courts "view the facts and all reasonable inferences in the light most favorable to the nonmoving party." *Uebelacker v. Rock Energy Coop.*, 54 F.4th 1008, 1010 (7th Cir. 2022). "Summary judgment is appropriate," however, "if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.*

4.      FWS's Land Exchange Agreement and Net Benefit Analysis are arbitrary and capricious and not supported by substantial evidence, and, accordingly, should be reversed and remanded to the agency. *See* Part II.D below.

5.      The Federal Defendants violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq., because they: First, impermissibly constrained the purpose and need statement in their 2019 Final Environmental Impact Statement ("FEIS") and 2020 Record of Decision ("ROD"), thereby predetermining the outcome and precluding the agency's required rigorous exploration and objective evaluation of all reasonable alternatives. Second, they failed to reasonably and sufficiently analyze climate change impacts in the 2019 FEIS. Third, they failed to reasonably and sufficiently analyze cumulative impacts in the 2019 FEIS. Their 2023 Final Supplemental Environmental Assessment ("SEA"), the RUS's 2023 Finding Of No Significant Impact ("FONSI"), and the FWS's FONSI all "incorporated," relied upon and "tiered" off of that legally flawed 2019 FEIS and are, therefore, contrary to law, and arbitrary and capricious. *See* Part III below.

6.      The Federal Defendants acted contrary to law by failing to provide a reasonable and sufficient opportunity for Plaintiffs and the public to comment and be heard in writing and orally at a public hearing on the 2023 SEA and FONSI, and no opportunity at all for Plaintiffs and the public to comment and be heard in writing and orally at a public hearing on the FWS's February 23, 2024 decisional documents. Those federal agency actions violated NEPA, the Refuge Act, and the APA, and, taken as a whole, violated Plaintiffs' constitutional due process rights to a reasonable opportunity to be heard. *See* Part IV below.

7.      The Transmission Companies' continued construction on land received through an unlawful land exchange is a public nuisance, which should be undone and permanently enjoined.

The Transmission Companies' profits from construction based on the unlawful land exchange would constitute unjust enrichment which should be disgorged. *See* Part V below.

## II. Defendant FWS Violated Several Specific Statutory Requirements in the National Wildlife Refuge System Improvement Act By Impermissibly Permitting the CHC Powerline to Run Through the Congressionally-Designated Upper Mississippi River National Wildlife and Fish Refuge

The National Wildlife Refuge System Improvement Act of 1997, 16 U.S.C. §§ 668dd-ee, was passed by Congress to create a unified system and set of regulations for the Refuge System. That legislation specifically included a definition for compatibility and the specific compatibility requirements to curtail the problem of powerlines, pipelines and other large destructive linear projects damaging our nation's National Wildlife Refuges. The statutory compatibility determination requirements, 16 U.S.C. § 668dd(d)(1)(B), 16 U.S.C. § 668dd(d)(3)(A)(i), 16 U.S.C. § 668ee(1), and the statutory provision allowing divestment of public lands and waters only when they are determined to be "suitable for disposition," 16 U.S.C. § 668dd(b)(3), and the statutory requirement that FWS "shall manage the refuge or planning unit in a manner consistent with the [Comprehensive Conservation] Plan," 16 U.S.C. § 668dd(e)(1)(E), are all designed to ensure that the wildlife protection and conservation goals and values are achieved. *See* Cam Tredennick, *The National Wildlife System Improvement Act of 1997: Defining the National Wildlife Refuge System for the Twenty-First Century*, 12 Fordham Envtl. L.J. 41, 78 (2000) ("The mission statement included in the 1997 Amendments confirmed that the 'conservation needs of wildlife are paramount' on all refuges").

There is little existing case law under the Refuge Act because Defendant FWS typically follows the law by *not* allowing developers to run powerlines through protected National Wildlife Refuges, as the FWS's own Refuge managers and the U.S. EPA pointed out early in the environmental review and administrative processes. SPF at ¶¶ 34–42. Nonetheless, in this case,

31

the Federal Defendants chose instead to evade and end-run Congress's statutory requirements in the Refuge Act, and their actions and approvals should be vacated and reversed as contrary to law.

Plaintiffs offer a coherent, unified interpretation of the Refuge Act's governing regime involving both the compatibility determination requirement that Congress specifically applied to "powerlines" and the more general "suitable for disposition" requirement. The Federal Defendants' and Transmission Companies' interpretations fail to comply with basic principles of statutory construction and improperly assert an overbroad interpretation of "suitability" and the land exchange provision that would trump the rest of the statutory provisions enacted by Congress in the 1997 Refuge Act and thereby effectively nullify the much more specific compatibility determination requirements in the statute, impermissibly transforming compatibility protections into mere surplusage. While they cherry pick text in the Seventh Circuit's July 2023 decision, when all is said and done, the Seventh Circuit clearly stated: "We do not express any opinion on the merits of the question." *Driftless Area Land Conservancy*, 74 F.4th at 495. The Seventh Circuit made clear that it did not resolve the statutory construction issues. Now, with final agency action, the Court can address the merits and find compatibility and suitability are not met.

Plaintiffs' argument is straightforward and consistent with rules of statutory construction. Congress specifically and directly created a process by which "powerlines, telephone lines, canals, ditches, pipelines, and roads," could only be permitted to use the Refuge *if* FWS determined that "such uses are compatible with the purposes for which these areas are established"—namely, wildlife-dependent recreation, wildlife protection (which is what a "Refuge" is) and conservation. 16 U.S.C. § 668dd(d)(1)(B). Congress explained that:

> (1) The term "compatible use" means a wildlife-dependent recreational use or any other use of a refuge that, in the sound professional judgment of the Director, will not materially interfere with or detract from the fulfillment of the mission of the System or the purposes of the refuge.

> (2) The terms "wildlife-dependent recreation" and "wildlife-dependent recreational use" mean a use of a refuge involving hunting, fishing, wildlife observation and photography, or environmental education and interpretation.

16 U.S.C. §§ 668ee(1), (2). That does not mean that *all* land exchanges must comply with the "compatibility" provision. Instead, for the types of projects that Congress specifically identified in the compatibility provision—"powerlines, telephone lines, canals, ditches, pipelines, and roads" 16 U.S.C. § 668dd(d)(1)(B)—the compatibility determination is required. Congress was explicit in enacting this statutory requirement; there is no exception. The FWS made no compatibility determination for the powerline in this case. That fact is not in dispute.

As this Court recently explained:

> The utility defendants make no real effort to dispute that under their interpretation, a land exchange permits a transmission line on a parcel previously included in and protected by the Refuge Act to work an end-around of the Act's compatibility provisions. As plaintiffs argue persuasively here, considering the land exchange at issue to be independent of any other provision in the Refuge Act would permit defendants to evade Congress's express concerns regarding powerlines constructed through federal lands otherwise expressly protected, so long as the federal defendants can articulate some "net benefit" in the exchange itself.

Doc. 88 at 7. This Court recognized the "defendants' prior, erroneous compatibility analysis and flawed FEIS . . . [and] that plaintiffs had a likelihood of success in showing defendants' 'suitability' analysis is also flawed." *Id*. at 7–8.

If a Refuge manager wants to complete a land exchange in authorizing one of those named projects, they *also* must comply with the "suitability" provision, in addition to compatibility. Land exchanges not involving those specifically identified projects may not require a compatibility determination, but FWS still must make a finding that the land is "suitable for disposition." 16 U.S.C. § 668dd(b)(3). As explained below in Section II.A, this natural reading of the Refuge Act conforms to several canons of statutory interpretation, aligns with FWS's rules, 50 C.F.R. § 29.21-3(v), and the legislative history. H.R. Rep 105–106 at 3 (1997).

33

Unlike Plaintiffs, the Federal Defendants and the Transmission Companies argue that since the land exchange provision of the Refuge Act, which is in subsection (b)(3) of 16 U.S.C. § 668dd, instead of in subsection (d), does not mention compatibility, it cannot possibly apply. Doc. 129 at 18–19; Doc. 49 at 14. First, that interpretation ignores and writes out of the statute the very specific provision and language that Congress enacted to expressly apply the compatibility requirement to "powerlines, telephone lines, canals, ditches, pipelines, and roads" 16 U.S.C. § 668dd(d)(1)(B). Second, by the Defendants' logic, while a grant of an easement or a special permit for a right-of-way project *is* subject to the compatibility requirement, the grant of fee simple title, which conveys away even more property rights for the identical purpose, somehow *is not* subject to the required compatibility determination. That defies common sense and would treat the land exchange subsection as an isolated provision without construing the language in the context of the overall statutory scheme. This Court has variously labelled the Defendants' view of the Refuge Act as an "eva[sion]" or "end-run" around the compatibility determination requirement. Doc. 88 at 7; Doc. 113 at 9.

Recently, the Federal Defendants and Transmission Companies have argued that FWS's "suitable for disposition" finding and the supporting Net Benefit Analysis are committed to agency discretion, and thus unreviewable by courts. Doc. 129 at 39–40; Doc. 130 at 17–20. This dangerous argument, coupled with the government's position that land exchanges are categorically excluded from environmental review, and that Net Benefit Analyses are not subject to any public participation requirements, Doc. 82 at 14–20, if accepted, could completely remove the public and the courts from the agency's decision-making process. Quite simply, Federal Defendants and the Transmission Companies are wrong as a matter of law about the applicability of the committed to agency discretion doctrine. *See Vahora v. Holder*, 626 F.3d 907, 915–16 (7th Cir. 2010)

34

(discussing the Supreme Court's application of the *Heckler* "committed to agency discretion" doctrine narrowly to cases of enforcement discretion, an agency's allocation of lump-sum appropriations, issues of national security, and areas where there is no law to apply). The opposing parties' misapplication of this principle contradicts the established Seventh Circuit guidance which dictates that "judicial review will still be presumed unless the statutory scheme provides no meaningful guideline by which to define the limits of the agency's discretion." *Turner v. U.S. Parole Comm'n*, 810 F.2d 612, 614 (7th Cir. 1987); *see also* Section II.B below. Under this pernicious view of the law, FWS can trade away public land without any public participation, or oversight from the judiciary whatsoever.

On this issue, the Court reviews FWS's view of the statute de novo. *Toys "R" Us*, 221 F.3d at 934. The Court can conclude that as a matter of law, FWS misconstrued and misapplied the Refuge Act by circumventing and evading the required "compatibility" determination for powerlines. 16 U.S.C. § 668dd(d)(1)(B). "Courts are the final authorities on issues of statutory construction," and therefore, the Court owes no deference to FWS's view of the interaction between the compatibility and suitability provisions." *Sloan*, 436 U.S. at 118.

Even beyond the parties' competing views of the Refuge Act, Plaintiffs are entitled to judgment based on the Federal Defendants' arbitrary and capricious application of the law and guidance to the facts of this case. The Federal Defendants wrongfully concluded that the Turkey River Bottoms – Oak Road Parcel is "suitable for disposition," which is contrary to law, as well as arbitrary and capricious. 16 U.S.C. § 668dd(b)(3); *see* Section II.B below. Plaintiffs' expert ecologist Steven Apfelbaum explains that the Turkey River Bottoms land is unique alluvial deltaic habitat, which "is an irreplaceable ecological resource of exceptional rarity," which is not suitable

for disposition. SPF at ¶ 257. The Federal Defendants misidentified, and disregarded the unique characteristics of this land in determining it was suitable for disposition. SPF at ¶¶ 255–256.

Defendant FWS's disposition of the Turkey River Bottoms – Oak Road Parcel also contradicts the Refuge's Comprehensive Conservation Plan, which in turn violates the Refuge Act. 16 U.S.C. § 668dd(e)(1)(e). The CCP commits FWS to defend the Refuge against development pressures and habitat fragmentation, while identifying the Turkey River Bottoms as a target for strategic land acquisition. SPF at ¶¶ 155–157. This exchange and subsequent construction will permanently alter the Refuge, fragmenting habitat, and divesting a parcel along the same area where the CCP states that the Refuge managers would like to acquire land. SPF at ¶¶ 141, 155.

Additionally, the Land Exchange Agreement and Net Benefit Analysis are arbitrary and capricious actions by the Federal Defendants, which are not supported by substantial evidence. *See* Section II.D below. The Wagner Parcel simply does not have the conservation value of the divested Turkey River Bottoms – Oak Road Parcel, SPF at ¶ 260, and the Net Benefit Analysis, which purportedly supports the Land Exchange Agreement, systematically downplays the value of the Turkey River Bottoms – Oak Road Parcel while emphasizing the positives and ignoring the negative attributes of the Wagner Parcel.

Plaintiffs' statutory reading harmonizes the "compatibility" and "suitability" provisions of the Refuge Act. The Federal Defendants, on the other hand, argue that FWS possesses limitless discretion to trade away Refuge lands so long as the transaction is styled as a "land exchange" instead of a grant of an easement and right-of-way permit. Such a result would eviscerate the significant substantive protections in the Refuge Act and put public lands in jeopardy. Accordingly, the Court should find that FWS violated the Refuge Act by permitting a powerline

through means other than the Congressionally-mandated compatibility determination and, also, violated the statutory "suitable for disposition" requirement.

    **A.**    **Defendant FWS Violated the Refuge Act by Permitting the CHC Powerline to Run Through the National Wildlife Refuge Without Making the Statutorily-Required "Compatibility" And This Huge Powerline Is Obviously Not Compatible**

In the National Wildlife Refuge System Improvement Act of 1997, Congress created a comprehensive, unified scheme for managing the National Wildlife Refuge System. 16 U.S.C. § 668dd(a)(1). A key statutory goal was defining "compatible use" as the core determination that the Defendant FWS must make in authorizing secondary uses through the Refuge System. "[C]ompatible use means a wildlife-dependent recreational use or any other use of a refuge that, in the sound professional judgment of the Director will not materially interfere with or detract from the fulfillment of the mission of the System or the purposes of the refuge." 16 U.S.C. § 668ee(1). FWS's "sound professional judgment" consists of "principles of sound fish and wildlife management and administration, available science and resources, and adherence to the requirements of this Act and other applicable laws." 16 U.S.C. § 668ee(3). In order to permit a "use" of the Refuge System, FWS must find that the use is "compatible with the major purposes for which such areas are established . . . ." 16 U.S.C. § 668dd(d)(1)(A).

Congress emphasized this point by repeating it in the negative. A separate provision states that "the Secretary *shall not initiate or permit a new use of a refuge* or expand, renew, or extend an existing use of a refuge, *unless the Secretary has determined that the use is a compatible use .  . . .*" 16 U.S.C. § 668dd(d)(3)(A)(i) (emphasis added).

Next, Congress defined a specific set of projects for which a compatibility determination must be made in order to be permitted "such as but not necessarily limited to, powerlines, telephone lines, canals ditches, pipelines, and roads . . . ." 16 U.S.C. § 668dd(d)(1)(B). For "powerlines,"

"pipelines," and the other specifically identified linear development projects, the compatibility requirement clearly applies. For other projects that fall in the "such as but not necessarily limited to" category, there is room to argue whether FWS must make the compatibility determination.

Compatibility is a mandatory prerequisite for FWS to approve "powerlines" through National Wildlife Refuges. That conclusion is supported by the plain language of the statutory text with its specific callout of "powerlines," by several canons of statutory interpretation recognized by the Supreme Court, by the legislative history and background and purposes of the 1997 Refuge Act, and by FWS's own rules. The Federal Defendants understood that compatibility is a mandatory prerequisite to approve a powerline, and they have repeatedly attempted to evade this statutory requirement. FWS has not made the required compatibility determination in this case, and, accordingly, their Land Exchange Agreement is contrary to law.

**First**, the land exchange provision, 16 U.S.C. § 668dd(b)(3), cannot be read in isolation. Instead, it must be read to harmonize with the "compatibility" provisions, 16 U.S.C. §§ 668dd(d)(1)(B), 668dd(d)(3)(A)(i), in order to give effect to the comprehensive management system that Congress created in the 1997 Refuge Act. The U.S. Supreme Court has long cautioned that "[i]n determining whether Congress has specifically addressed the question at issue, a reviewing court should not confine itself to examining a particular statutory provision in isolation. The meaning—or ambiguity—of certain words or phrases may only become evident when placed in context." *Food and Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000), citing *Brown v. Gardner*, 513 U.S. 115, 118 (1994). In *West Virginia v. EPA*, the Supreme Court reaffirmed: "[i]t is a "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view for their place in the overall statutory scheme." 597 U.S. 697, 721 (2022) (*quoting Davis v. Michigan Dept. of Treasury*, 489 U.S. 803, 809 (1989)). A

court must therefore interpret the statute "as a symmetrical and coherent regulatory scheme," and "fit, if possible, all parts into an [sic] harmonious whole." *Brown & Williamson*, 529 U.S. at 133 (citations omitted).

Consequently, the land exchange provision, 16 U.S.C. § 668dd(b)(3), must be read in the context of the entire statute. By contrast, the Federal Defendants and Transmission Companies argue that through the land exchange provision, FWS possess limitless, unreviewable discretion. Doc. 129 at 39–40; Doc. 130 at 17–20. They argue that this sole provision authorizes FWS to override the overall statutory scheme by exchanging land FWS deems "suitable for disposition," and that once exchanged, that land is no longer in the Refuge. Under that theory, the statutory text by which Congress specifically required compatibility findings for enumerated private uses, including powerlines, pipelines, etc., would be effectively erased and nullified through the land transfer evasion. That contradicts the fundamental canon of construction that "a textually permissible interpretation that furthers rather than obstructs the document's purpose should be favored." Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 63 (2012). Congress could not have possibly intended, on one hand, to restrict and limit FWS's discretion in permitting powerlines and other secondary, non-wildlife uses through refuges, and then, on the other hand, allowed a bottomless loophole through the land exchange provision. Accordingly, the Federal Defendants' and Transmission Companies' view of the Refuge Act is plainly contrary to law. 5 U.S.C. § 706.

Likewise, contrary to the whole text canon, the Federal Defendants and Transmission Companies urge this Court to interpret the "land exchange" provision as if it stood alone, rather than surrounded by a comprehensive statutory framework that specifically requires compatibility for "powerlines," 16 U.S.C. § 668dd(d)(1)(B), and, also, specifically provides that FWS "shall not

initiate or permit a new use of a refuge or expand, renew, or extend an existing use of a refuge, unless the Secretary has determined that the use is a compatible use." 16 U.S.C. § 668dd(d)(3)(A)(i). In *County of Maui v. Hawaii Wildlife Fund*, the Supreme Court rejected a similar overreaching argument, concluding that "[w]e do not see how Congress could have intended to create such a large and obvious loophole in one of the key regulatory innovations of the Clean Water Act." 590 U.S. 165, 178–79 (2020). That same conclusion rings true for this case.

Plaintiffs' theory of the statute coherently blends "compatibility" and "suitability" to "further" the statute, unlike the Federal Defendants' theory of limitless discretion, which "obstructs" the purpose of the 1997 Refuge Act. The Supreme Court has instructed that courts "must hesitate to adopt an interpretation that would eviscerate such significant aspects of the statutory text." *American Hospital Ass'n*, 596 U.S. at 737. In *American Hospital Ass'n*, a statute allowed the Department of Health and Human Services ("HHS") to adjust hospital groups' reimbursement rates only if HHS first performed surveys of individual hospital acquisition costs. HHS, however, decided to reduce reimbursement rates for a hospital group without the required survey, relying on another provision allowing it to "adjust" average rates "as necessary." *Id.* at 728–30. The Supreme Court rejected that approach. If the agency would never have to do the surveys Congress required because it could always "adjust" rates, "why, then, would Congress have constructed this elaborate statute premised on HHS's surveys of hospitals' acquisition costs, including specifying when HHS could vary reimbursement rates by hospital group? HHS has no good answer to that question." *Id.* at 737. The same reasoning applies here. Why would Congress establish the Refuge Act's elaborate system of specific compatibility determinations and define "compatible use," if FWS could avoid those requirements by using the land exchange section?

40

Why would Congress so clearly limit FWS's discretion on one hand, then somehow expand it on the other? Defendants have no good answer.

**Second**, this Court should pay special attention to the explicit reference to "for purposes such as but not necessarily limited to powerlines, telephone lines, canals, ditches and roads" within 16 U.S.C. § 668dd(d)(1)(B). It is a well-established canon of statutory construction that the "specific governs the general." *See N.L.R.B. v. SW General, Inc.*, 580 U.S. 288, 305 (2017) (quoting *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 556 U.S. 639, 645 (2012). This is "particularly true where . . . 'Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions.'" *RadLAX Gateway Hotel*, 556 U.S. at 645 (quoting *Varity Corp v. Howe*, 516 U.S. 489, 519 (1996) (Thomas, J. dissenting)). The specific Refuge Act compatibility provisions regarding "powerlines" cannot be ignored on grounds of more general land exchange provision.

**Third**, the legislative history and context surrounding the passage of the 1997 Refuge Act supports Plaintiffs' reading of the statute, which limits rather than enlarges Refuge managers' discretion to permit "powerlines" through National Wildlife Refuges. As a rationale for imposing the tight restrictions in the 1997 Refuge Act's text, the legislative history noted "the lack of an overall mission and management procedures [that] had allowed numerous incompatible uses to be tolerated on wildlife refuges." H.R. Rep 105–106 at 3 (1997). Before the 1997 law, a GAO report determined that 90% of Refuges had at least one secondary (non-wildlife use), 70% had at least seven secondary uses, and over 30% had fourteen. SPF at ¶ 28; Tredennick, *supra,* at 77, 86. Congress enacted the 1997 Refuge Act to limit Refuge managers' discretion in an attempt to limit the proliferation of non-compatible uses. Thus, to allow FWS to subvert and evade the explicit

"compatibility" requirement for powerlines, through a land exchange, would produce the opposite result of what Congress clearly intended.

**Fourth**, Defendant FWS's own rules set forth specific separate processes for consideration of right-of-way applications such as powerlines. These rules only contemplate granting "easements" for right-of-way projects; they do not provide for giving Transmission Companies' fee simple ownership of rights-of-way through land exchanges or outright sales. 50 C.F.R. §§ 29.21-1; 29.21-3(a). Similarly, the FWS Policy Manual ("FW"), like the rules, contains a separate section for "rights-of-way," which it defines as "uses that will encumber real property by granting a right to use and alter the landscape through construction of a facility such as a road, *powerline*, pipeline or building." 340 FW 3.5A (emphasis added). The Manual only contemplates two options for granting rights-of-way: either by permit or easement. 340 FW 3.6.

When the CHC powerline project was first proposed, and for nearly the next decade, FWS recognized that it would have to make a compatibility finding; however, when forced to defend that decision, FWS withdrew its decision in 2021, and the Transmission Companies proposed other evasive means to accomplish their goals. SPF at ¶¶ 61–64. In 2012, the Refuge managers warned the Transmission Companies of the "challenge" associated with a Refuge crossing and urged the Transmission Companies that avoiding the Refuge would be a "compatible alternative." SPF at ¶ 37. In 2012, the same Refuge managers also described the parade of horribles associated with a similar transmission line across the Refuge, including "caus[ing] habitat fragmentation, reduc[ing] habitat quality, degrad[ing] habitat quality through introduction of contaminants, disrupt[ing] migration corridors, alter[ing] hydrology, facilitat[ing] introduction of invasive species and disturb[ing] wildlife." SPF at ¶ 39. Likewise, in 2017, the U.S. EPA warned in its scoping comments, at the beginning of the environmental review process, that the Federal Defendants and

Transmission Companies should avoid running through the protected Upper Mississippi River National Wildlife and Fish Refuge and turn to other alternative routes. SPF at ¶ 42.

When it finally became time to approve the CHC powerline, Defendant FWS initially proceeded under the compatibility provision; however, it utilized the "maintenance" exception in an attempt to receive the Wagner Parcel as compensatory mitigation, which is otherwise forbidden. 50 C.F.R. § 26.41(b); SPF at ¶¶ 50, 51. When the first round of this litigation neared summary judgment, FWS withdrew its compatibility determination and permit, ostensibly because of incorrect easement assessments. SPF at ¶ 62. FWS could not credibly claim, though, that either: (1) the new huge CHC powerline was "maintenance" of the smaller low-power transmission lines a mile south, or (2) that the huge new CHC powerline with its very high towers was somehow compatible with the Refuge. So, in the summer of 2021, the Transmission Companies switched gears to first propose the land exchange as an impermissible end-around the statutorily required compatibility determination. SPF at ¶¶ 53–55.

Even as FWS shifted away from "compatibility" in attempting to find another way to somehow approve this CHC powerline, the fundamental details of the transaction's prior iteration as a right-of-way still remain. The Net Benefit Analysis and Land Exchange treat the land exchange agreement like a right-of-way agreement, SPF at ¶ 116, without going through compatibility. Specifically, the Net Benefits Analysis touts the land use limits in the Land Exchange Agreement which are "similar to those regularly found in right-of-way permits." *Id.*

Likewise, the key characteristics of the transaction remain the same—it is the same Turkey River Bottoms – Oak Road Parcel, the same Wagner Parcel now as an exchange property instead of compensatory mitigation, and even the same vegetation management plan. SPF at ¶¶ 68, 118. FWS is attempting to complete a right-of-way transaction for a "powerline," as specifically

43

identified by Congress in the 1997 Refuge Act, without finding "compatibility." In the process, FWS is impermissibly permitting a huge non-compatible powerline through the heart of Refuge and giving fee simple title to Refuge land to a private, for-profit, utility company.

At the end of the day, this is the same transaction—the same parties, the same powerline, the same parcels, the same plan to manage the divested property. All that has changed is the title at the top of the paper.

The stakes are high. All of Defendant FWS's and Transmission Companies' maneuvering is designed to avoid Congress' plain statutory language and clear legislative purpose in enacting the compatibility requirement in the National Wildlife Refuge System Improvement Act of 1997, which was enacted to prevent incompatible huge powerlines and pipelines running through, carving up and further fragmenting wildlife habitat in National Wildlife Refuges.[8] That is exactly what the Federal Defendants and Transmission Companies are attempting to do here even after Congress enacted the 1997 Refuge Act to bring an end to this very practice. This Court can conclude as a matter of law that the Defendants' flawed statutory construction violates the Refuge Act. The Court owes FWS no deference in its (mis-)interpretation of the Refuge Act. *Toys "R" Us*, 221 F.3d at 934.

If FWS's approach here is upheld, land exchanges could become a preferred end-run to sell off public lands and evade Congress's protective statutes including the compatibility determination requirements for specified uses in the 1997 Refuge Act and National Wildlife Refuge designations. Congress understood that allowing protected public lands to be used for powerlines and pipelines

---

[8] Defendant FWS's own Net Benefits Analysis recognizes, as it must, that: "Construction and maintenance of the CHC Project will impact the entire divested parcel and visual quality and aesthetics in the vicinity and *will contribute to habitat fragmentation.*" SPF at ¶ 141 (emphasis added).

would always be attractive, at least in the short term. For the developers, it means avoiding having to negotiate and pay private landowners, or having to use the eminent domain process. For individual Refuge (or other federal lands) managers, it means avoiding conflict and being able to obtain financial remuneration from motivated developer buyers.

When the details of the transaction here are laid bare, a clear picture comes through: the Upper Mississippi River National Wildlife and Fish Refuge's public lands are being put up for sale in the form of "let's make a deal" or a "swap-o-rama," which is exactly what Congress' "compatibility" requirement text, especially applied to "powerlines," in the 1997 Refuge Act, and the overall statutory purpose was designed to stop. 16 U.S.C. § 668dd(d)(1)(B); 16 U.S.C. § 668dd(d)(3)(A)(i).

The Upper Mississippi River National Wildlife and Fish Refuge was created by Congressional statute in 1924, 16 U.S.C. § 723, not administrative action. SPF at ¶ 1–2. For exchanged land appraised at only $79,000, FWS, a federal agency, is allowing private developers to purchase part of the land that Congress designated for this National Wildlife and Fish Refuge without Congressional approval. SPF at ¶ 209. The Transmission Companies expediently bought the Wagner Parcel a few years ago so the parties could call it a land exchange instead of a sale of Refuge land. SFP at ¶ 60.

This scheme effectively puts Refuge lands up for sale, just as before the Refuge Act was adopted in 1997. For the nation's National Wildlife Refuge system, Congress chose to lean against this temptation to barter away protected public lands by prohibiting the use of Refuge lands for "powerline" right-of-way projects unless the developers could prove that their projects would somehow *not* materially interfere with the Refuge system's wildlife, conservation protection and recreational purposes. The Defendant FWS and the Transmission Companies have violated that

statutory requirement in this case, and the Federal Defendants' actions in that regard should be vacated, reversed and remanded as contrary to law.

> **B.      The Turkey River Bottoms – Oak Road Parcel Has High Ecological Value and Divesting It Would Increase Habitat Fragmentation So It Is Not "Suitable for Disposition"**

In order for Defendant FWS to complete this land exchange, the 1997 Refuge Act specifically requires that FWS must first find that the "public land[s]" currently in the Refuge are "suitable for disposition." 16 U.S.C. § 668dd(b)(3)(A).[9] This Court can conclude as a matter of law that disposition of the Turkey River Bottoms – Oak Road Parcel violates the Refuge Act. Such a conclusion is *de novo*, without deference to the FWS's legal conclusions. *Sloan*, 436 U.S. at 118. Further, the key evidence in the Administrative Record, along with Plaintiffs' supplemental materials, demonstrate that the Turkey River Bottoms – Oak Road Parcel is *not* suitable for disposition as a prerequisite for any further action.

The Court has several resources to aid in its analysis of both the meaning of the statutory term "suitable for disposition" and whether this specific Turkey River Bottoms – Oak Road Parcel *is* "suitable for disposition." These resources include the statute itself, FWS's own Comprehensive Conservation Plan and Net Benefit Analysis, and the Federal Defendants' statements in their own NEPA environmental review documents.

**First,** although the term "suitable for disposition" is not defined in the Refuge Act, the clear focus of this statutory provision is on the Refuge land to be divested and given away, not

---

[9] The full text of the land exchange provisions is: "(b) In administering the System, the Secretary is authorized to take the following actions (3) Acquire lands or interests therein by exchange (A) for acquired lands or public lands, or for interests in acquired or public lands, under his jurisdiction which he finds to be suitable for disposition or (B) for the right to remove, in accordance with such terms and conditions as he may prescribe, products from the acquired or public lands within the System. The values of the properties so exchanged either shall be approximately equal, or if they are not approximately equal the values shall be equalized by the payment of cash to the grantor or to the Secretary as the circumstances require." 16 U.S.C. § 668dd(b)(3).

on the land to be received, or the relative merits of the two parcels. This reading is supported by the plain meaning of the word "suitable" which means "appropriate or fit for . . . a purpose."[10] Therefore, before FWS reaches the non-statutory "Net Benefit Analysis" described below, it must determine that the Turkey River Bottoms – Oak Road Parcel is in fact appropriate or fit for disposition under the statute. Defendant FWS has not done so because it cannot reasonably and legally do so.

**Second**, disposing of the Turkey River Bottoms – Oak Road Parcel in the proposed land exchange contradicts vital aspects of the Upper Mississippi River Wildlife and Fish Refuge's Comprehensive Conservation Plan or "CCP." In the 1997 Refuge Act, Congress directed Refuge Managers to develop CCPs. 16 U.S.C. § 668dd(e)(1)(A). Once finalized, each Refuge must be managed "in a manner consistent with the plan." 16 U.S.C. § 668dd(e)(1)(E). The operative CCP for this Refuge presents a strategic plan where the Refuge serves the critical role of "protecting, restoring, and enhancing wetland and associated habitat." SPF at ¶ 156.

Similarly, the CCP frames this National Wildlife and Fish Refuge as the last line of defense for the fragile ecosystem: to be standing in the way of development pressures that threaten habitat and wildlife along the Mississippi River bottoms. SPF at ¶ 157. Contrary to the CCP's commitment to habitat protection and defense against development, divesting the Turkey River Bottoms – Oak Road Parcel would allow a massive new powerline—a linear infrastructure project through the heart of Pool 11 of the Refuge. This Turkey River Bottoms area is a rare alluvial deltaic environment. SPF at ¶ 252. Rather than protect and restore wetlands, divesting this public land

---

[10] *Suitable*, OXFORD ENGLISH DICTIONARY, https://www.oed.com/search/dictionary/?scope=Entries&q=suitable (last visited June 19, 2024); *see also Oneida Tribe of Indians of Wisconsin v. State of Wis.*, 951 F.2d 757, 761 (7th Cir. 1991) ("Federal courts regularly turn to general and technical dictionaries to determine the plain meaning of a word or phrase").

would harm and damage wetlands within the Turkey River floodplain and the fragile river bottom where mussels are located in order to make room for the CHC transmission line and its large towers. SPF at ¶¶ 118, 201–206, 252.

Even more importantly, the CCP specifically identifies the Turkey River area as a strategic target for land acquisition. SPF at ¶ 155. However, here, without acknowledging that goal in its own CCP, FWS proposed to divest land along the Turkey River Bottoms. FWS fails to explain the dissonance between its long-term strategic planning document and this proposed land exchange because it cannot reasonably do so. FWS does not and cannot justify divestment of land in the vicinity of its stated strategic acquisition target; nor can FWS justify divestment of 18 acres of wetlands specifically *for development*, when the CCP holds out the Refuge as the bastion for defense of habitat *against development* pressures. SPF at ¶ 155.

The Court should also look to the absence of evidence in the record beyond conclusory statements that support FWS's result. This Court rightly wanted to review the Administrative Record to effectively determine whether FWS supported its legal conclusion with necessary evidence in the record, and FWS has not met its burden. Doc. 66 at 6–7. While FWS asserts the Turkey River Bottoms – Oak Road Parcel is "lower quality habitat" in the Net Benefit Analysis, photographs by William Ward, the forensic photographer retained by Plaintiffs, shows the Turkey River Bottoms – Oak Road Parcel's scenic and bucolic nature. SPF at ¶ 189.

**Third,** the FWS's own Net Benefit Analysis concedes, as it must, that "[t]he divested parcel will be used to construct and maintain the CHC Project. Impacts of the CHC Project on the Refuge are detailed in FEIS Section 3.14 and SEA Section 3.14. Construction and maintenance of *the CHC Project will impact the entire divested parcel and visual quality and aesthetics in the vicinity and will contribute to habitat fragmentation*." SPF at ¶¶ 140–141 (emphasis added).

Regardless of whether the land exchange itself is fair and balanced, or not, the Turkey River Bottoms – Oak Road Parcel to be divested here is not "suitable for disposition" in light of the FWS's own CCP and its own statement in the Net Benefit Analysis.

**Fourth,** the Turkey River Bottoms – Oak Road Parcel is not "suitable for disposition" because, as recognized in the Federal Defendants' 2019 FEIS: (1) the huge CHC transmission line would result in "future fragmentation impacts of 27 acres of mature forested wetland along the edges of the Turkey River restoration area," SPF at ¶¶ 191–193; and (2) divestment will interfere with ongoing restoration efforts in the area. *Id.* In the mid-2010s, FWS began a restoration project along the Turkey River Bottoms. SPF at ¶ 191. Federal Defendants stated in the FEIS that they intended to "manage this restoration area so the natural forest regeneration and succession results in much of the Turkey River floodplains' growing into bottomland forest within 100 years." SPF at ¶ 144. Despite the aspirational, hundred-year timeline highlighted in the FEIS, only four years later, Defendant FWS, without any further evidentiary support in the Administrative Record, claims in the Net Benefit Analysis that the restoration project is a failure as a supposed justification for the divestment. SPF at ¶ 193.

**Fifth**, as FWS has conceded, the proposed transmission line construction—both in the Turkey River Bottoms – Oak Road Parcel to be divested and along the U.S. Army Corps easement by the River's edge on the Iowa side—"would dominate the landscape and detract from current user activities." SPF at ¶ 197. This Court has noted that the Turkey River Bottoms – Oak Road Parcel already hosts the ferry landing. Doc. 113 at 19. However, part of the purpose of the Refuge system is for recreation, 16 U.S.C. § 668dd(a)(3)(B), and the ferry enables visitors from the Wisconsin side to access the Refuge. The impacts of the massive CHC powerline at this access point to the Refuge area should not be discounted. SPF at ¶ 224. Those visiting the Refuge will be

greeted by the massive towering powerline and the very high dark-brown colored towers along the River and going west leading away from the River. SPF at ¶¶ 224–226, 230; Doc. 113 at 39–40. This land is not suitable for disposition because the intended use will allow the massive powerline to "dominate the landscape" and interrupt recreation. That is inappropriate, inconsistent with the CCP, contrary to the Federal Defendants' own statements in the FEIS, and, ultimately, unlawful.

**Sixth**, divesting the Turkey River Bottoms – Oak Road Parcel will have a detrimental effect on the remaining Refuge land on the Iowa side of the River along the scenic, biodiversity-rich floodplain area. Habitat fragmentation is not only about the disrupted land, but about the effect on the surrounding land. Doc. 38 at 18. FWS acknowledged this scientific fact in its own 2024 "BIDEH" proposed rule on biological integrity, diversity, and environmental health, 50 C.F.R. § 29.3 (new), which states: "We allow for and defer to natural processes on habitats within the Refuge System and promote conservation, restoration, and connectivity to meet refuge habitat objectives and landscaping planning goals. *We will avoid and minimize habitat fragmentation to sustain biological integrity and diversity.*" *Id.* (emphasis added).

In March 2023, the Council of Environmental Quality ("CEQ") implemented a similar policy which instructs federal agencies to "advance the objectives of this guidance by developing policies, through regulations, guidance, or other means, to consider how to conserve, enhance, protect, and restore [wildlife] corridors and [ecological] connectivity during planning and decision-making. CEQ, *Guidance for Federal Departments and Agencies on Ecological Connectivity and Wildlife Corridors* (Mar. 21, 2023).

The Administrative Record largely fails to consider the impact of the massive CHC powerline on the surrounding Refuge land, and where it does, the evidence contradicts the approval of a powerline because of the environmental and wildlife impacts of construction. Also missing

from the Administrative Record is any additional appraisal or conservation assessment of the impact on the Refuge area surrounding the parcel. SPF at ¶ 241. For example, the powerline construction and operation could impact the federally endangered northern-long eared bat because its habitat is nearby the divested Turkey River Bottoms – Oak Road Parcel. SPF at ¶ 146. Even though the Transmission Companies previously committed to do their construction in the November 15 to March 31 window recommended by their own consultant to avoid risks to species at key times, *id.*, they now are building in May, June, and July. While the identified northern-long eared bat habitat is outside the divested Turkey River Bottoms – Oak Road Parcel, it demonstrates the impacts that construction within the Refuge, upon which FWS can require mitigation measures, will also impact habitat that surrounds the right-of-way.

In assessing the impact on the Refuge of the huge powerline and towers, FWS should have ordered an appraisal of the acreage surrounding the divested parcel to determine the diminution of the conservation value in allowing a massive new powerline to bisect the Turkey River Bottoms area. McWilliams Declaration, SPF at ¶ 245. Appraisal of the surrounding land with and without the transmission line is standard practice in both Wisconsin and Iowa in condemnation proceedings.[11] *Id.* Severance damages are also standard practice in takings case at the federal level. *See, e.g.*, *U.S. v. 105.40 Acres of Land, More or Less, in Porter County, State of Ind.*, 471 F.2d 207, 211 (7th Cir. 1972) ("The essence of severance damages is the loss in value to the 'remainder tract' by reason of a partial taking of land"). While this case involves a voluntary sale, it does not

---

[11] *See* Wis. Stat. 32.09(8)(h) ("A commission in condemnation or a court may in their respective discretion require that both condemnor and owner submit to the commission or court at a specified time in advance of the commission hearing or court trial a statement covering the respective contentions of the parties on the following points . . . (h) separation opinion as to fair market value, including before and after value where applicable by not to exceed 3 appraisers."); *see also* Iowa Department of Natural Resources, *Real Estate Appraisal Report Guidelines* (Jan. 1, 2022) ("If there is a partial acquisition involved, it may be necessary to perform a "Before & After" method within the Appraisal Report.").

change the relevant comparison, which should have included the larger area of land along the Turkey River Bottoms, rather than just the divested parcel.

Here, FWS improperly narrowed the scope of review related to the divested Turkey River Bottoms – Oak Road Parcel. Whether the Turkey River Bottoms – Oak Road Parcel is suitable for disposition cannot be ascertained by examining only the divested parcel itself, but must also include the diminution of value on the surrounding 315 acres of Refuge land around the Turkey River Bottoms. SPF at ¶¶ 241, 245. In fact, based on the appraisal, it would seem FWS intended to limit the scope just to the divested parcel. The appraiser states that "[t]he subject totals 19.84 acres and *only this area can be considered in the larger parcel determination* subject to the Statement of Work provided by the client." SPF at ¶ 239 (emphasis added).

In many cases, the value of the land given away is less than the diminution in the remaining land, and the compensation for this loss is referred to as "severance damages." SPF at ¶ 244. To fairly account for the full scale of permitting this massive transmission line through the heart of the Refuge in determining benefits and costs, FWS should have properly examined the impacts of construction on the remaining Refuge acreage along the Turkey River Bottoms. SPF at ¶ 245. It is impossible to properly assess the suitability of the parcel for disposition without this information.

Even if FWS's characterization of the limited value of the Turkey River Bottoms – Oak Road parcel itself were accurate, FWS incorrectly failed to examine the impact of the transmission line on the surrounding Refuge land. This in itself is arbitrary and capricious, and is an additional reason why Plaintiffs should prevail on their claim that the Turkey River Bottoms – Oak Road Parcel is not "suitable for disposition." 16 U.S.C. § 668dd(b)(3).

**Seventh**, along with their motion to supplement the record, Plaintiffs' included an expert declaration from ecologist Steven Apfelbaum, which attaches a detailed evaluation report and

which highlights important, critical flaws in FWS's characterization and treatment of the Turkey River Bottoms – Oak Road Parcel. SPF at ¶¶ 247–249. Based upon his in-depth review of 17 different ecological features of the parcel, his field visit to the parcel, his over 40 years of experience contributing to studies, publications, and work on projects involving rivers, wetlands, lakes, and overall watershed sciences (including as retired found of Applied Ecological Services a firm of 380 employees with 19 offices and now as founder of Applied Ecological Institute and StartifyX, Inc.), and his consideration of data, detailed maps and record documents, Mr. Apfelbaum determined that FWS misidentified the Turkey River Bottoms – Oak Road Parcel as land with "little or no wildlife or habitat value." SPF at ¶¶ 150, 249, 254–255 (the "ecological significance" of the Turkey River Bottoms – Oak Road Parcel "has been inappropriately undervalued"). Rather than being "scrub-shrub" land, SPF at ¶ 150, the parcel "represents an exceptionally rare alluvial deltaic environment whose dynamic processes directly sustain the refuge's biodiversity and federal/state-listed species, particularly the freshwater mussel beds of utmost conservation significance." SPF at ¶ 252. Mr. Apfelbaum described this unique habitat as "an irreplaceable ecological resource of exceptional rarity, containing a rich diversity of conservation priorities . . . ." SPF at ¶ 257. Thus, in pursuit of approving the Transmission Companies' powerline in their desired location, FWS misidentified the Turkey River Bottoms – Oak Road Parcel, and divested itself of "irreplaceable" habitat, that Mr. Apfelbaum determined "must be retained under federal ownership." SPF at ¶ 261. This determination, that such land would ever be "suitable for disposition," is contrary to law and arbitrary and capricious. Mr. Apfelbaum ultimately concluded, that "[g]iven the special significance of the [parcel], it is not a suitable piece of property to remove from the refuge ownership portfolio nor is installation of transmission lines on this property compatible with the purposes of the refuge." SPF at ¶ 258.

In the recent round of preliminary injunction briefing, the Federal Defendants and Transmission Companies argued that Defendant FWS's determination that the Turkey River Bottoms – Oak Road Parcel is "suitable for disposition" is unreviewable action, committed to agency discretion. Doc. 129 at 39–40; Doc. 130 at 17–20. The Court must reject this dangerous argument as plainly inconsistent with the Refuge Act and the caselaw regarding this doctrine.

They are wrong as a matter of law regarding their view of "suitability" as unreviewable. Section 701(a) of the APA creates an exception to judicial review of agency action "to the extent that – (1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(1)–(2). The cases cited by the opposing parties generally deal with enforcement discretion, a concern not present here. *See Vahora*, 626 F.3d at 915–16 (discussing the Supreme Court's application of the *Heckler* "committed to agency discretion" doctrine narrowly to cases of enforcement discretion, an agency's allocation of lump-sum appropriations, issues of national security, and areas where there is no law to apply). The opposing parties' misapplication of the principle contradicts the established Seventh Circuit guidance which dictates that "judicial review will still be presumed unless the statutory scheme provides no meaningful guideline by which to define the limits of the agency's discretion, leaving [the agency's] decision 'committed to agency discretion by law' under section 701(a)(2)." *Turner*, 810 F.2d at 614; *see also Heckler v. Chaney*, 470 U.S. 821, 833 (1985). The Seventh Circuit went on to emphasize that "*Chaney* itself firmly establishes that § 701(a)(2) is only applicable if no statutory intent can be discerned under § 701(a)(1)." *Turner*, 810 F.2d at 614. In order to determine congressional intent regarding judicial review requires a court "to look to 'inferences of intent drawn from the statutory scheme as a whole.'" *Id.* (quoting *Block v. Community Nutrition Inst.*, 467 U.S. 340, 349 (1984).

The Refuge Act dictates the system should be administered as "a national network of lands and waters for the conservation, management, and where appropriate restoration of the fish, wildlife, and plant resources and their habitats within the United States for the benefit of present and future generations." 16 U.S.C. § 668dd(a)(2). Yet again, the Federal Defendants wish to read 16 U.S.C. § 668dd(b)(3) as an isolated provision rather than a part of the whole. At the most basic level, this is not an enforcement decision or a case of agency inaction, instead it is the affirmative decision of the FWS to divest public land in the National Wildlife and Fish Refuge for the benefit of private utility companies that will admittedly damage and fragment wildlife habitat. Quite simply, Courts are in the business of applying the law to these decisions and determining their legality every day. Under Defendants' dangerous, overreaching view of the law, FWS can trade away public land without any public participation oversight from the judiciary at all.

FWS's implicit finding that this parcel is "suitable for disposition," as well as its failure to make an express finding as to whether or not the parcel is "suitable for disposition," is contrary to law and arbitrary and capricious because that: (1) contradicts FWS's own Comprehensive Conservation Plan and FEIS, and will exacerbate habitat fragmentation in the Refuge, while creating a new private inholding; (2) divests the Refuge of rare alluvial deltaic habitat which FWS must protect, SPF at ¶ 251; (3) disrupts a long-term restoration effort for the Turkey River portion of the Refuge by the Corps and FWS; (4) allows construction on the parcel that would severely diminish the scenic quality of the area; and (5) divests the Turkey River Bottoms – Oak Road parcel which has a detrimental effect on the remaining Refuge land in and around the Turkey River Bottoms area.

The FWS never really determined the Turkey River Bottoms – Oak Road Parcel is "suitable for disposition," which is a necessary predicate under the Refuge Act, and failed to properly

analyze the impact of a massive CHC powerline on the larger tract of Refuge land in the Turkey River Bottoms Area. This was both contrary to law and arbitrary and capricious.

### C.    The Land Exchange Agreement Does Not Comply with the Refuge's Comprehensive Conservation Plan and Therefore Violates the Refuge Act

As part of the 1997 Refuge Act, Congress ordered Refuge Managers to create Comprehensive Conservation Plans ("CCP"). 16 U.S.C. § 668dd(e)(1)(A). Congress directed that each Refuge must then be managed "in a manner consistent with the plan." 16 U.S.C. § 668dd(e)(1)(E). As Plaintiffs explained in Section II.B above, the land exchange contradicts several commitments, goals and planning objectives that are established in the operative CCP for the Upper Mississippi River National Wildlife and Fish Refuge. For example, the CCP identifies the Turkey River Bottoms as a target for strategic land acquisition, but, here FWS proposes to trade away Turkey River Bottoms land. SPF at ¶ 155. Similarly, throughout the CCP, FWS highlights the importance of the Refuge in "protecting, restoring, and enhancing wetland and associated habitat," as well as its role in staving off development pressures. SPF at ¶¶ 156–157. With this land exchange, FWS is facilitating development and destruction of wetlands and further fragmenting wildlife habitat for an area—the Turkey River Bottoms—that the CCP identifies as a priority for wildlife protection and conservation. This represents an independent statutory violation for which this Court should vacate, reverse and remand the FWS's decision and actions as contrary to law.

### D.    FWS's Land Exchange Agreement and Net Benefit Analysis Is Unduly Skewed and Imbalanced, Arbitrary and Capricious, and Contrary to Law

*Even if* the Court finds that FWS properly determined that the Turkey River Bottoms – Oak Road Parcel is somehow "suitable for disposition," and it should not, the Land Exchange Agreement and Net Benefit Analysis are skewed, arbitrary, and capricious and contrary to law. The Federal Defendants repeatedly paint the transaction in the most favorable, glowing light in

their Net Benefit Analysis by ignoring and omitting key pieces of evidence, some of which have only recently been made available to Plaintiffs through the belated Administrative Record filing. The Plaintiffs are entitled to summary judgment on the record alone, but the Court can and should consider Plaintiffs' supplemental materials that further demonstrate FWS's arbitrary and capricious decision to enter into this land exchange. As discussed below, Plaintiffs' supplemental materials include images that paint a vastly different picture of the value of the two parcels, an affidavit from an appraisal instructor who critiqued the limited scope of the appraisal in this case, and the biological opinion of an esteemed ecologist who identified the Turkey River Bottoms – Oak Road Parcel as a unique gem to be preserved rather than disposed of.

**First**, the Refuge's own CCP contemplates a far different use of land exchanges than what is proposed here. The CCP discusses land exchanges and acquisitions in the context of "remov[ing] intermingled ownership" and "restoring habitat connectivity." SPF at ¶¶ 151–152. This land exchange, by contrast, would create "intermingled" ownership, not remove it, by allowing the Transmission Companies to own a newly-created private inholding parcel smack within the middle of the Refuge. Divesting the Turkey River Bottoms – Oak Road Parcel will impede habitat connectivity and create more habitat fragmentation in this part of the Refuge, not restore connectivity. This land exchange does not reduce and minimize inholdings that disrupt habitat connectivity. Instead, it does the opposite: creating a new inholding that adds to habitat fragmentation.

**Second,** the Net Benefit Analysis states that the Wagner Parcel was too expensive for the FWS to acquire and not on the market. SPF at ¶ 59. The Administrative Record reveals that the appraised value was only $79,000. SPF at ¶ 209. The "atypically motivated" Transmission Company was able to purchase it for more, SPF at ¶ 60, but surely the U.S. Fish and Wildlife

Service could find sufficient funds to acquire the Wagner Parcel at the $79,000 appraised value, or even at the over-market purchase price that was well below $300,000. That is not so expensive to be beyond FWS's price range if the agency was sufficiently motivated. The Net Benefit Analysis implies a multi-million-dollar Wagner Parcel valuation.

**Third,** the Net Benefit Analysis states "[s]ince the Wagner tract has more acreage of higher quality, unfragmented habitat, it provides more conservation value than the divested tract and has greater potential for achieving habitat protection objectives." SPF at ¶ 129. However, FWS's one-sided analysis in its Net Benefit Analysis is undermined by newly-produced evidence in the Administrative Record. On the one hand, FWS points to a nearby railroad to diminish the conservation value of the Turkey River Bottoms – Oak Road Parcel. SPF at ¶ 128. On the other hand, FWS's Net Benefit Analysis ignores the larger, louder, double-tracked heavily-used BNSF freight railroad that borders the Wagner Parcel. SPF at ¶¶ 216, 217. Likewise, on the one hand, FWS's Net Benefit Analysis mentions wetlands areas on Wagner Parcel and on the to-be-restored Stoneman crossing. On the other hand, FWS's Net Benefit Analysis entirely fails to mention that 18 acres of wetlands will be divested at the Turkey River Bottoms Parcel. SPF at ¶ 122.

**Fourth**, the vaunted Wagner Parcel is hardly pristine: "The property is bordered by the BNSF Railroad on the north, a campground on the west, and federally owned land (and the Mississippi River) to the south and east." SPF at ¶¶ 210, 231–234. The campground is a lively RV and trailer park adjacent to the Wagner Parcel with "a man-made water area with a tiki bar and palm tree ornament." SPF at ¶¶ 221, 234. The Cassville Municipal Airport is across the road from the Wagner Parcel. SPF at ¶ 222. The BNSF freight railroad bordering the site has two sets of tracks, is very active and the long freight trains passing by often blare their horns. SPF at ¶¶ 216, 231. Also, nearby the Wagner Parcel, "[t]here is a historic sand pit adjacent to the property . . .

there is a quarry operation north of the railroad . . . [and] numerous quarry sites in the area." SPF at ¶¶ 211, 232–235.

**Fifth**, the Net Benefit Analysis speaks of the "tremendous conservation value" associated with acquiring the Wagner Parcel, but there is no evidence in the Administrative Record to indicate that absent acquisition by the FWS, this land would be developed to the detriment of the National Wildlife Refuge System. SPF at ¶ 213. The property is currently "utilized in conjunction with the adjacent campground for recreational uses including hiking and camping." *Id*. An appraisal performed on the property concluded that the highest and best use of the Wagner Parcel was for "recreation," not development. SPF at ¶ 214.

**Sixth,** Defendant FWS's Net Benefit Analysis is also arbitrary and capricious because the relative value of the properties does not warrant a land exchange. The 35.69-acre Wagner Parcel, including the two non-contiguous parcels, is appraised at $79,000 for a value of $2,213.50 per acre. SPF at ¶ 236. The 19.84-acre Turkey River Bottoms – Oak Road Parcel was appraised at $58,000 for a higher value of $2,923.39 per acre. SPF at ¶ 238. In its Net Benefit Analysis, FWS claimed that "the Refuge would likely be unable to acquire the tract outside of this proposed exchange due to limits of how much the Service can pay per acre based on fair market value." SPF at ¶ 59. FWS is sacrificing the ecological, wildlife habitat and scenic quality of the divested Refuge land for a parcel appraised at $79,000. SPF at ¶ 209. The Administrative Record does not include any facts showing that FWS attempted to acquire the Wagner Parcel itself. SPF at ¶ 132.

**Seventh,** the Net Benefit Analysis does not comply with the Department of Interior's M-Opinion. The M-Opinion requires "heightened" analysis of these transactions to ensure "land exchanges fulfill the Refuge System's conservation mission and the individual Refuge's purpose." Doc. 42-3 at 12. This land exchange does not. Rather, the purpose of the Net Benefit Analysis was

59

to concoct a way for this massive powerline to run through the protected Refuge. FWS claims a net benefit despite receiving a subpar non-contiguous parcel in return. There was no scientific consideration in the Administrative Record of the "habitat and broader conservation value of the portion of the refuge to be divested and in deciding whether it is suitable." *Id.* at 10.

**Finally**, in addition to the evidence in the Administrative Record, Plaintiffs have also moved for the inclusion of a declaration and expert report by expert ecologist Steven Apfelbaum which also demonstrates that FWS acted arbitrarily in closing the land exchange. As noted above, Mr. Apfelbaum concluded that the FWS misidentified and undervalued the Turkey River Bottoms – Oak Road Parcel, which "represents an exceptionally rare alluvial deltaic environment." SPF at ¶¶ 251, 254–255. On the other hand, the Wagner Parcel "typif[ies] a common disturbed upper floodplain/floodway margin habitat . . . ." SPF at ¶ 253. Mr. Apfelbaum concluded that the land exchange "would constitute an unacceptable compromise of one of the refuge's rarest and most ecologically important resource areas." SPF at ¶ 256. In comparing the two parcels, Mr. Apfelbaum determined that "[the Turkey River Bottoms – Oak Road Parcel is an irreplaceable ecological resource of exceptional rarity, containing rich diversity of conservation priorities that is utterly distinct from the commonplace non-contiguous parcels that compromise" the Wagner Parcel. SPF at ¶ 251. In even stronger terms, Mr. Apfelbaum determined that "divestment of the [Turkey River Bottoms – Oak Road Parcel] from the refuge in the proposed land exchange *would appear to be antithetical* to ensuring the preservation of the refuge's most ecologically valuable resources and should not be allowed to proceed based on the findings herein. Given the special significance of [the parcel] it is not a suitable piece of property to remove from refuge ownership portfolio . . . ." SPF at ¶ 258 (emphasis added). Therefore, "any comparison [between the two parcels is] not just fundamentally flawed but patently indefensible." SPF at ¶ 260.

Defendant FWS and the Transmission Companies argue that FWS's determination is owed deference, but the federal agencies' conduct over the course of litigation dictates otherwise. For almost a decade, the Transmission Companies and the Federal Defendants have attempted to ram the huge CHC powerline through the Upper Mississippi River National Wildlife and Fish Refuge, and they have persistently and consistently resisted and failed to look at alternative routes that would avoid running through the Refuge. The record from this and the earlier case show their shifting tactics, their maneuvering, and their "shell games" to achieve their predetermined result resulting in a final agency decision that is not supported by the record, common sense, good science, or Congress' duly-enacted statutory requirements.

Plaintiffs' review of the recently filed Administrative Record shows multiple examples of the "hand-in-glove" relationship that this Court has described between the Transmission Companies and the Federal Defendants. The Transmission Companies urged the Federal Defendant agencies to complete the NEPA review, and to not be "unduly dragging [their] feet." SPF at ¶ 83. The Transmission Companies consulted on the RUS's Environmental Assessment ("EA") and proposed a schedule for the process. SPF at ¶ 84. In late August 2023, the Transmission Companies again urged RUS to complete its EA and approvals, and they warned that "the administration's role in any delay will be evident." SPF at ¶ 88. The Transmission Companies subsequently requested that the SEA be completed by October 6—the very day the SEA ended up being finalized. SPF at ¶ 94.

In these circumstances, this Court in conducting judicial review should be more skeptical of affording deference to the Defendant FWS. The FWS's February 23, 2024 decisional documents are arbitrary and capricious because they trade away valuable Refuge land and fragment the habitat, and create a huge scenic and visual impairment, all for a parcel only appraised at $79,000.

SPF at ¶ 209. All this arbitrary and capricious action is designed to allow private utilities to bulldoze and damage the protected Refuge, right at the heart of Pool 11 of the protected Refuge, at the exact spot where visitors arrive from Wisconsin at the ferry landing to take in the educational kiosk constructed by FWS that describes the pristine nature of the Refuge and its high ecological and habitat value.

Finally, as many of Plaintiffs' members' declarations make clear, the CHC high-voltage transmission line and high towers in the Refuge will diminish birding, kayaking, fishing, and boating and other wildlife-related and outdoor recreation in the area. Even Defendant FWS concedes that the huge powerline will impact the viewsheds in the area, stating in the Final SEA that the line "would dominate the landscape and detract from current user activities." SPF at ¶ 197. That does not conform to the purpose of the 1997 Refuge Act, the purposes of the National Wildlife Refuge System, the goals of the Upper Mississippi River Wildlife and Fish Refuge as expressed in its Comprehensive Conservation Plan, and, accordingly, is therefore arbitrary and capricious and contrary to law.

## III.     The Federal Defendants' 2019 EIS and ROD, and Their 2023 and 2024 SEA and FONSIs Violates NEPA

The National Environmental Policy Act ("NEPA") is our nation's foundational environmental law through which Congress established a "broad national commitment to protecting and promoting the environment." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989). NEPA requires agencies to include in "every recommendation or report on . . . major Federal actions significantly affecting the quality of the human environment, a detailed" description of the proposed action's environmental impact. 42 U.S.C. § 4332(C). The EIS must thoroughly analyze the project's "reasonably foreseeable environmental effects," adverse impacts, and a "reasonable range of alternatives to the proposed action." *Id.* The EIS "has two purposes. It

forces the agency to take a 'hard look' at the environmental consequences of its actions, including alternatives to its proposed course. It also ensures that these environmental consequences, and the agency's consideration of them, are disclosed to the public." *Sierra Club v. Fed. Energy Reg. Comm'n*, 867 F.3d 1357, 1367 (D.C. Cir. 2017).

The Federal Defendants' "new" October 2023 Final Supplemental Environmental Assessment ("FSEA") and Defendant FWS's FONSI "incorporate," rely upon and are based upon their 2019 FEIS and the 2020 ROD, all signed by the Federal Defendants. SPF at ¶ 95. That is the *very same* FEIS that this Court already reversed as violating NEPA's statutory requirements and applicable regulations. *National Wildlife Refuge Association,* 580 F. Supp. 3d at 610–13. This Court relied on the Seventh Circuit's controlling decision in *Simmons v. U.S. Army Corps of Engineers*, 120 F.3d 664 (7th Cir. 1997), which CEQ subsequently adopted in its new NEPA guidance regulations applicable to the Federal Defendants and *all* federal agencies: "It is contrary to NEPA for agencies to 'contrive a purpose so slender as to define competing "reasonable alternatives" out of consideration (and even out of existence)." CEQ, *National Environmental Policy Act Implementing Regulations Revisions*, 87 Fed. Reg. 23453, 23459 (April 20, 2022) (quoting *Simmons*, 120 F.3d at 669).

The Federal Defendants recognize that "[t]ogether, the decision whether to approve the proposed route modifications and the associated administrative action necessary to facilitate the C-HC Project to cross the Refuge *is a major Federal action requiring compliance with NEPA* (42 United States Code [USC] 4321)." SPF at ¶ 109 (emphasis added). Even though the Seventh Circuit vacated and remanded this Court's January 14, 2022 Opinion and Order, the Federal Defendants have made no attempt to revise or address the flaws this Court identified in the first round of litigation. The same narrow purpose and need statement, the same inadequate evaluation

63

of alternatives, the same failure to address climate impacts of the action, and the same failure to address cumulative impacts are fatal flaws still present in the 2023 SEA and the new FONSIs.

In fact, the Transmission Companies drafted many of the key documents underlying the 2019 FEIS, which the Federal Defendants adopted verbatim. SPF at ¶¶ 99, 102. The Federal Defendants here have abrogated their "duty under NEPA to exercise a degree of skepticism in dealing with self-serving statements from a prime beneficiary of the project" about purpose and need and the reasonable range of alternatives. *Simmons*, 120 F.3d at 669.

The Federal Defendants' October 2023 FSEA for the land exchange simply "incorporate[s] by reference" and "tiers" to the 2019 FEIS and the 2020 ROD, with no meaningful changes. SPF at ¶ 95. Similarly, the FONSIs issued by both RUS and FWS relate back to the original 2019 FEIS without any modification. SPF at ¶¶ 98, 108. All three documents, the October 2023 FSEA, the RUS FONSI and the FWS FONSI, utilize the same flawed purpose and need statement as the 2019 FEIS. SPF at ¶¶ 97, 98, 108. In fact, the RUS's FONSI continues to tout the 2019 FEIS's supposed study of non-Refuge alternative routes, even though this Court held that analysis to be wholly inadequate. SPF at ¶ 101; *Nat'l Wildlife Refuge Ass'n*, 580 F. Supp. 3d at 597. There has been *no* attempt by any of the Federal Defendants to address the fundamental problems with the underlying 2019 FEIS. SPF at ¶¶ 103, 108. Therefore, due to this incorporation by reference of flawed documents, the October 2023 FSEA, the RUS FONSI and the FWS FONSI are likewise wholly inadequate.

Plaintiffs are asking the Court to order Defendant FWS to unwind the land exchange, and, hold that the Federal Defendants' final actions were contrary to law. Plaintiffs are suing all three agencies because they all participated in the 2019 FEIS and FSEA, and, particularly, Defendant FWS, which is relying on the 2019 FEIS and FSEA for its FONSI. SPF at ¶ 108.

64

The 2019 FEIS and now the 2023 FSEA still do not comply with NEPA's requirements and *Simmons*, 120 F.3d at 666, for the following reasons:

**First**, the Federal Defendants adopted the Transmission Companies' "purpose and need" statement verbatim for their 2019 Final EIS, and adopted the same thing again in the October 2023 Draft SEA and Final SEA for the proposed land exchange. SPF at ¶¶ 97, 98, 108. That "purpose and need" statement for the 2019 FEIS required an "increase [in] the transfer capability of the electrical system between Iowa and Wisconsin." SPF at ¶ 100. That statement unduly restricted the range of alternatives to only high-voltage transmission lines running between Iowa and Wisconsin, and, thus, violated NEPA. *Simmons*, 120 F.3d at 666–670.

**Second**, the Defendants' 2019 FEIS did not rigorously explore and objectively evaluate all reasonable alternatives that would meet the general objectives of the CHC transmission lines. An unlawful alternative is not a "reasonable" alternative under NEPA. The Federal Defendants focused their NEPA review only on Refuge crossings for the CHC transmission line, which as discussed above, would violate the Refuge Act. The Federal Defendants 2019 FEIS did not take a "hard look" at alternative routes either north or south of the Upper Mississippi River National Wildlife and Fish Refuge, or that would otherwise avoid running through and across the Refuge. SPF at ¶¶ 77, 103. The Federal Defendants did not rigorously explore and objectively evaluate whether a combination of non-wires alternatives would meet the general objectives of the CHC transmission line. The Defendant RUS's October 2023 Final SEA, which incorporates the 2019 FEIS, does nothing to remedy the Federal Defendants' impermissible lack of a "hard look" and failure to analyze of reasonable alternatives. They only looked at minor route modifications. SPF at ¶ 103.

**Third**, the Federal Defendants' 2019 FEIS, and the 2023 FSEA and 2024 FONSI likewise do not fully and fairly analyze climate impacts of the CHC transmission line, which will carry a significant amount of electricity generated from coal and other fossil fuel-power generating plants. SPF at ¶ 104. The January 2023 CEQ regulations require all executive agencies to consider and assess climate impacts in the environmental review process. *See* CEQ, National Environmental Policy Act Guidance on Consideration of Greenhouse Gas Emissions and Climate Change, 88 Fed. Reg. 1196 (Jan. 9, 2023), PA 54–71.

**Fourth**, the Federal Defendants' 2019 FEIS did not adequately analyze the cumulative impacts of past, present and reasonably foreseeable projects, both public and private. "NEPA requires that an agency explain in the EIS how it chose the geographic area in which it conducted the cumulative impacts analysis and . . . demonstrate that in making such choice it considered the relevant factors." *Habitat Educ. Ctr., Inc. v. Bosworth*, 363 F. Supp. 2d 1090, 1097 (E.D. Wis. 2005). The RUS's 2023 SEA and FONSI and FWS's 2024 FONSI do nothing to remedy this NEPA violation.

Both the 2023 RUS FONSI and the 2024 FWS FONSI rely on the Federal Defendants' legally flawed 2019 FEIS and 2020 ROD documents prepared to comply with NEPA. SPF at ¶¶ 95–104, 108. They each violate NEPA because of the inadequate and unlawful environmental review supporting the conclusion that there is no significant environmental impact. *See e.g.*, *American Wild Horse Preservation Campaign v. Perdue*, 873 F.3d 914, 932 (D.C. Cir 2017) (finding the Forest Service FONSI decision arbitrary and capricious because the Service "brushed aside critical facts about its past treatment of and official statements" about designated wild horse boundaries).

It remains the law in the Seventh Circuit that purpose and need statements in environmental review documents must incorporate the "general goal" of an action, not just the means by which a particular applicant can reach their own predetermined results. Otherwise, applicants can always evade NEPA's purposes by narrowing the purpose and need so that only what they are proposed gets evaluated leading to that intended outcome. *Simmons*, 120 F.3d at 669; *Van Abbema v. Fornell*, 807 F.2d 633, 638 (7th Cir. 1986). This Court should again conclude that the Federal Defendants' have violated NEPA's requirements, and reverse and remand for a legally-compliant environmental review under NEPA and the APA.

## IV.   The Federal Defendants Violated NEPA and the Refuge Act's Public Participation Requirements

The Federal Defendants failed to provide an adequate opportunity to comment on either the September 2023 Draft SEA or the February 23, 2024 decisional documents, and thereby violated NEPA, the Refuge Act and the APA. Their actions depriving Plaintiffs and the public of a reasonable opportunity to be heard. (Taken as a whole, that could also also raise constitutional due process concerns, which the Court need not reach because of the statutory violations). Plaintiffs' positions on the Federal Defendants' violations of law have been previously explained in Plaintiff Conservation Groups' Brief in Response to the Court's Questions About Notice and Comment Requirements submitted on April 8, 2024, which is incorporated herein for the Court's consideration. Doc. 77.

Defendant FWS's unduly truncated 14-day public (written) comment period without a public hearing and any opportunity for the public's oral comments in September 2023, SPF at ¶¶ 90–92, and FWS's complete failure to provide any opportunity at all for public comments, written or oral, on the FWS's Net Benefits Analysis and FONSI in February 2024 were contrary to law. SPF at ¶¶ 113–114. Plaintiffs and the public were deprived of any reasonable opportunity to inform

their public officials' decisions and were precluded from providing factual information to build out the Administrative Record. Federal Defendants' failure to provide a reasonable and sufficient opportunity for public comments provides additional support to Plaintiffs' motion to supplement the unlawfully constricted Administrative Record.

NEPA requires robust public participation to inform agency decision-making on actions that could significantly impact the environment. *Robertson*, 490 U.S. at 349–50; *see also Rocky Mountain Wild v. Dallas*, 2017 WL 6350384, at *18 (D. Colo. May 19, 2017) (finding violation of NEPA when the agency's process appeared to have "predictive bias" in trying to justify a decision as being in the public interest "even though that decision was made without benefit of an environmental impact statement or public participation"). "Informed public participation in reviewing environmental impacts is essential to the proper functioning of NEPA." *League of Wilderness Defenders v. Connaughton*, 752 F.3d 755, 761 (9th Cir. 2014). The U.S. Supreme Court has recognized that "the broad dissemination of information mandated by NEPA" is to "permit[] the public and other government agencies to react to the effects of a proposed action at a meaningful time," not "after it is too late to correct." *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 371 (1989).

CEQ's regulations implementing NEPA require that agencies "involve the public . . . to the extent practicable in preparing environmental assessments." 40 C.F.R. § 1501.5(e); *see also* 40 C.F.R. § 1506.6(a); 43 C.F.R. § 46.305(a). That duty includes requiring agencies to "[p]rovide public notice of . . . opportunities for public involvement, and the availability of environmental documents so as to inform those persons and agencies who may be interested or affected by their proposed actions," 40 C.F.R. § 1506.6(b), and "[h]old or sponsor public hearings, public meetings, or other opportunities" and "[s]olicit appropriate information from the public." *Id.* § 1506.6(c)-(d);

43 C.F.R. § 46.305(c). The requirement to provide the public with a meaningful opportunity to comment is "to insure that environmental information is available to public officials and citizens *before decisions are made and before actions are taken.*" 40 C.F.R. § 1500.1(b) (emphasis added).

The 1997 Refuge Act and associated regulations provide for public participation in future decisions made about the use and enjoyment of National Wildlife Refuge. Robert L. Fischman, *The National Refuge System and the Hallmarks of Modern Organic Legislation*, 29 ECOLOGY L.Q. 457, 551 (2002); 603 FW 2.11(I). FWS established a set of public participation requirements where compatibility determinations are involved, but they were not followed in this case because FWS improperly circumvented the necessary compatibility finding. FWS guidance includes three tiers of public participation for compatibility determinations depending on the environmental impact and expected public scrutiny related to the decision. 603 FW 2.12(A)(9).

The Federal Defendants have persistently failed to provide the public adequate notice or a reasonable opportunity to comment on the documents as required by NEPA. The Federal Defendants and Transmission Companies apparently made the decision to go ahead with the proposed land exchange twenty-nine months ago when they signed their "Statement of Proposed Land Exchange/Purpose" on October 29, 2021. SPF at ¶ 65. Then, they played "hide the ball" by failing to disclose it while the previous case was being litigated. SPF at ¶¶ 66, 67.

The Federal Defendants published their draft SEA on September 7, 2023, but only provided 14 days for the public to submit written comments, and did not provide any public hearing for oral comments to be submitted for consideration in the process. SPF at ¶¶ 90–92.

Then, Defendant FWS issued its three final "Net Benefits Analysis," FONSI, and land exchange decisional documents on February 23, 2024, without providing any public notice other than placement on RUS's (not FWS's) website. SPF at ¶¶ 113–114. The FWS did not provide *any*

opportunity for Plaintiffs or any other members of the public to be heard either through written comments on a draft of the Net Benefits Analysis or on a draft of the FONSI with the land exchange, or through oral comments at a public hearing. *Id.* They provided less than 30 days for any party to appeal these final agency actions and achieve effective judicial review. *Id.*

The Federal Defendants thus denied *any* opportunity for public comments and any reasonable opportunity at all for Plaintiffs and other members of the public to be heard. *Id.* Defendant FWS rushed its process so that the CHC transmission line's bulldozing and crossing through the protected Refuge would become a *fait accompli*, and that flawed process violates NEPA, the Refuge Act and the APA's procedural requirements.

The Federal Defendants and, specifically, Defendant FWS's failure to provide public notice and failure to provide for Plaintiffs and the public to have a reasonable opportunity to be heard, and failure to hold a public hearing before the final agency decisions violated NEPA, the Refuge Act and the APA.

## V.     The Transmission Companies' Construction Should Be Declared to Be Unlawful and Remedied.

The Transmission Companies have continued to build their CHC powerline on what should still be Refuge public lands as a matter of law. Despite the pendency of this lawsuit, and the possibility that the land exchange will be unwound, the Transmission Companies' continue to build along the Turkey River Bottoms – Oak Road Parcel. They are proceeding "at their own risk" as the Seventh Circuit and this Court have recognized. *Driftless Area Land Conservancy*, 74 F.4th at 495; Doc. 88 at 9. The Transmission Companies have submitted to this Court's jurisdiction. Therefore, the Court can declare the Land Exchange Agreement to be unlawful, unwind the exchange and require the Transmission Companies to restore the Turkey River Bottoms – Oak Road Parcel to its condition prior to the unlawful acts, and permanently enjoin construction.

70

Injunctions against private and non-federal entities to which agency permits were issued in violation of NEPA are commonplace, and remedial action against the Transmission Companies is appropriate as they voluntarily intervened as parties in this case. *See, e.g.*, *Save Greers Ferry Lake*, 255 F.3d at 501 (enjoining private use of docks where Corps permits were illegal; ordering removal within one year if Corps does not come into compliance); *Northern Alaska Env't Ctr.*, 803 F.2d at 471 (injunction against private mining operations); *Greater Yellowstone Coal.*, 209 F. Supp. 2d at 163 ("prohibiting any livestock grazing on the Horse Butte allotment until the NEPA process is completed"); *Ctr. for Food Safety*, 2010 WL 11484449, at *8 (enjoining private farmers to remove genetically modified seeds that had already been planted).

The Transmission Companies' unlawful construction is a public nuisance, which is "an unreasonable interference with a right common to the general public." Restatement (2d) of Torts § 821B; *Freeman v. Grain Processing Corp.*, 848 N.W.2d 58 (Iowa 2014); *see also Bad River Band of Lake Superior Tribe v. Enbridge Energy*, 626 F. Supp. 3d 1030, 1062 (W.D. Wis. 2022). There are three necessary elements to Plaintiffs' nuisance claim: "(1) unreasonable interference with public rights, health, safety or welfare; (2) if not presently occurring, interference must be imminent or certain to occur; and (3) the defendant must have caused the nuisance." *Bad River Band of Lake Superior Tribe*, 626 F. Supp. 3d at 1062 (citing *Michigan v. U.S. Army Corps of Eng'rs*, 758 F.3d 892, 900 (7th Cir. 2014). The right to have, use and enjoy public lands and waters dedicated to public purposes like the Upper Mississippi River National Wildlife and Fish Refuge is a right common to the general public. By constructing the CHC powerline through the protected Refuge, the Transmission Companies are "unreasonably interfering" with "a right common to the general public." This harm is underway, as of May 13, when the Transmission Companies began construction. Doc. 104. Plaintiffs also have a special interest in the Refuge as non-profit

organizations dedicated to the protection of National Wildlife Refuges across the country, and specifically to natural places in the Driftless region. SPF at ¶¶ 18–26. "Injunctive relief is typically an available remedy against someone found liable in tort for nuisance . . . ." *Bad River Band of Lake Superior Tribe*, 626 F. Supp. 3d at 1062.

Relatedly, to allow the Transmission Companies to profit off an *ultra vires* land exchange would constitute "unjust enrichment." Unjust enrichment occurs when a defendant "obtain[s] a benefit at [plaintiffs'] expense, or in violation of [plaintiffs'] legally protected rights." *Id.* at 1049–50 (citing Restatement (Third) Restitution and Unjust Enrichment § 1 (Restatement of Restitution)). Both Wisconsin and Iowa recognize claims for unjust enrichment. *See Puttkammer v. Minth*, 266 N.W.2d 361, 363 (Wis. 1978); *State of Iowa, Dep't of Human Servs. v. Unisys Corp.*, 637 N.W.2d 142, 154–55 (Iowa 2001) (footnotes omitted). In Iowa, to prevail on an unjust enrichment case, a Plaintiff must demonstrate that "(1) defendant was enriched by the receipt of a benefit; (2) the enrichment was at the expense of the plaintiff; and (3) it is unjust to allow the defendant to retain the benefit under the circumstances." *State of Iowa, Dep't of Human Servs.*, 637 N.W.2d at 154–55. To prevail on an unjust enrichment claim, Plaintiffs do not need to have been party to a contract. In fact, "[n]o contract is implied in an action for unjust enrichment." *Ramsey v. Ellis*, 484 N.W.2d 331, 333 (Wis. 1992); *see also State of Iowa, Dep't of Human Servs.*, 637 N.W.2d at 154 ("Although [unjust enrichment] is referred to as a quasi-contract theory, it is equitable in nature, not contractual"). The Transmission Companies are unjustly enriched as a result of the unlawful land exchange entered into with Defendant FWS to run their CHC high-voltage powerline and towers through the Refuge. This unjust enrichment is at the expense of Plaintiffs' use and enjoyment of the Refuge given the environmental damage that construction and the existence of the CHC high-voltage powerline and towers will cause to the ecosystem, wildlife

habitat, migratory birds, marine life and the scenic and visual quality of the Refuge. Finally, to allow the Transmission Companies to retain this benefit would be manifestly unjust.

## VI.    Plaintiffs Have Standing

In order to establish Article III standing, Plaintiffs must demonstrate (1) an injury-in-fact; (2) that is fairly traceable to the challenged conduct; and (3) seek a remedy that is likely to prevent or redress the injury. *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 797 (2021). An organization has standing to sue on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

Plaintiffs' members in this case would have standing to sue in their own right because they are suffering imminent, irreparable injury caused by the Cardinal-Hickory Creek transmission line's construction. SPF at ¶¶ 18–26; Docs. 8–13. The six declarations filed by members of the Plaintiff Conservation Groups demonstrate, Docs. 8–13, SPF ¶¶ 18–26, that the individual members use and enjoy the Refuge, and their enjoyment of those areas is being diminished by construction of the powerline. This diminished enjoyment constitutes an injury sufficient to establish standing. *See Indiana Forest All., Inc. v. U.S. Forest Serv.*, 325 F.3d 851, 855 n.4 (7th Cir. 2003) (finding that allegations that plaintiff's members used a National Forest "for hiking, camping and birding are sufficient to establish standing" to bring a suit under NEPA and the National Forest Management Act). The Supreme Court has "held that environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000) (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)). Plaintiffs' members also enjoy viewing native

animal and plant species that are being harmed by construction of the transmission line. SPF at ¶¶ 19, 21, 23; Doc 11 at 3; Doc. 12 at 2; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562–563 (1992) ("of course, the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purposes of standing").

Because the land exchange has closed and construction has commenced in the Refuge, these concrete and particularized harms are not speculative or imminent; rather, there are actual injuries in fact. Docs. 103, 104; *see also Friends of the Earth, Inc.*, 528 U.S. at 181–84; *Am. Bottom Conservancy v. U.S. Army Corps of Eng'rs*, 650 F.3d 652, 658 (7th Cir. 2011). These injuries in fact are fairly traceable to the Federal Defendants' approval of the land exchange and the Transmission Companies' acquisition of, and construction on, the Turkey River Bottoms – Oak Road Parcel

A favorable decision from this Court would redress Plaintiffs' members' injuries:

- If this Court finds that FWS's approval of the land exchange violated the Refuge Act, because it needed to make an affirmative lawful compatibility determination and/or because the Turkey River Bottoms – Oak Road Parcel is not lawfully "suitable for disposition," and/or because the FWS's actions do not comply with its own operative Comprehensive Conservation Plan for the Refuge, and/or that the Net Benefits Analysis is arbitrary and capricious, the transaction must be unwound and the Federal Defendants and Transmission Companies will have to restore the parcel or an alternative remedy must be achieved.

- If this Court finds that the 2019 EIS and the 2023 SEA violated NEPA, the Federal Defendants will have to redo the EIS process in compliance with NEPA. Caselaw is clear that remanding for an agency to redo a NEPA analysis in compliance with the law provides redress for injuries stemming from environmental harms because, even though there is no guarantee the agency would come to a different decision on the merits, an agency *could* decide differently after completing a NEPA analysis. *Defenders of Wildlife*, 504 U.S. at 572 n.7; *American Rivers v. Fed. Energy Reg. Comm'n*, 895 F.3d 32, 42 (D.C. Cir 2018) (finding the redressability prong of standing met because "[r]equiring the Commission to prepare an Environmental Impact Statement might cause the Commission to gather more information that could improve the conditions in the license and the conditions of the Coosa River").

- If this Court finds that the notice and comment provided by Federal Defendants was insufficient and did not comply with NEPA's requirements, the Federal Defendants must provide a reasonable opportunity for the public to comment on their NEPA environmental review documents.

- If this Court finds that the Transmission Companies construction is a nuisance, and that the benefit they have received from building their powerline on federal property was unjust, this Court can unwind the legal transaction and order them to restore the Turkey River Bottoms – Oak Road Parcel to its pre-exchange condition or an alternative remedy must be achieved.

Plaintiffs seek to protect interests that are germane to their organizational purposes. Germaneness requires only "mere pertinence between litigation subject and organizational purpose." *Humane Soc. of the U.S. v. Hodel*, 840 F.2d 45, 58-60 (D.C. Cir 1988) (organization granted standing to challenge increase in hunting in National Wildlife Refuges); *see also Gunpowder Riverkeeper v. FERC*, 807 F.3d 267, 272 (D.C. Cir 2015) (environmental organization's allegations of NEPA violations were germane to its purpose of preserving river watershed). Plaintiffs easily meet that legal test. Plaintiff National Wildlife Refuge Association is a not-for-profit organization focused exclusively on protecting and promoting the 850 million-acre National Wildlife Refuge System. SPF at ¶ 18. Plaintiff Driftless Area Land Conservancy is a land trust and conservation organization that seeks to protect scenic landscapes, historic properties, and natural resources in Wisconsin's Driftless Area. SPF at ¶ 20. Plaintiff Wisconsin Wildlife Federation is dedicated to protecting wildlife habitat, conservation lands and waters, and natural resources throughout the State of Wisconsin on behalf of the hunters, anglers, trappers, and other individuals who are its members. SPF at ¶ 22.

The relief requested by Plaintiffs will apply across the board, benefitting each individual member without requiring individual participation. *Hunt*, 432 U.S. at 343; *see also Warth v. Seldin*, 422 U.S. 490, 515 (1975).

The Plaintiffs have also suffered and continue to suffer their own procedural injury[12] because of the Federal Defendants' violation of NEPA. Courts have recognized that "the failure to comply with NEPA's requirement causes harm itself." *Sierra Club v. U.S. Army Corps of Eng'rs*, 645 F.3d 978, 995 (8th Cir. 2011); *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1037 (8th Cir. 2016). *See also United States v. Coal. for Buzzards Bay*, 644 F.3d 26, 31 (1st Cir. 2011) ("It follows inexorably that 'when a decision to which NEPA obligations attach is made without the informed environmental consideration that NEPA requires, the harm that NEPA intends to prevent has been suffered.'") (quoting *Massachusetts v. Watt*, 716 F.2d 946, 952 (1st Cir. 1983)).

Construction of the CHC powerline through the Refuge is causing injuries-in-fact both to the Plaintiff organizations directly and to their members. The Court vacating the federal approvals and unwinding the land exchange in this case will give Plaintiffs meaningful relief. All Article III standing requirements have been met.

## VII.   The Court Should Address Effective Remedies After Granting Summary Judgment to Plaintiffs on the Merits of Their Claims.

Plaintiffs propose that this Court split the liability and remedy portions of the briefing on summary judgment, as it did in the prior litigation. *Nat'l Wildlife Refuge Ass'n*, 580 F. Supp. 3d at 615. This Court should declare the land exchange unlawful and enjoin future construction. In so doing, the Court should also direct the parties to file additional briefs on the scope of the remedies, and then issue a remedial ruling as the Court previously did in its March 1, 2022 Order. PA 139.

---

[12] While some courts have described this as a "procedural" injury, others have instead acknowledged the same injury, but characterized it differently: "[T]he harm at stake is harm to the *environment*, but the harm consists of the added *risk* to the environment that takes place when governmental decisionmakers make up their minds without having before them an analysis (with prior public comment) of the likely effects of their decision upon the environment." *Sierra Club v. Marsh*, 872 F.2d 497, 500 (1st Cir. 1989).

The remedies can include a range of alternatives including, but not limited to: unwinding the *ultra vires* land exchange transaction; requiring the Transmission Companies to take down their transmission line and towers, and restore the Turkey River Bottoms – Oak Road Parcel to its prior state; and/or directing the parties to negotiate an equivalent alternative remedy that provides sufficient relief to the Plaintiff Conservation Groups in this case and disincentivizes the Transmission Companies' "orchestrated trainwreck" approach for the future so that building "at their own risk" has sufficient meaning and impacts; and potentially, appoint a mediator to assist the parties and the Court in achieving such a meaningful and effective equivalent alternative remedy. *See Nat'l Parks Conservation Ass'n*, 925 F.3d at 502 (in case involving a transmission line already built, "[the district] court is best positioned to order additional briefing, gather evidence, make factual findings, and determine the remedies necessary to protect the purpose and integrity of the EIS process . . . noting that district courts possess 'the ability to fashion an appropriate sanction for conduct which abuses the judicial process'") (citations omitted); *Nat'l Parks Conservation Ass'n*, 916 F.3d at 1083–1089.

This Court retains significant discretion in fashioning an appropriate remedial order, and it could issue an order that requires Defendants to come into legal compliance by a date certain. *See, e.g.*, *Environmental Defense*, 515 F. Supp. 2d at 88 ("The agency acted arbitrarily and capriciously in violation of the APA, the CWA, and NEPA . . . . Plaintiffs' motion for summary judgment will accordingly be granted, and defendant's 2002 RSEIS, 2006 RSEIS, and 2006 ROD will be set aside. The Corps will be enjoined from proceeding with the project, and it will be ordered to deconstruct that portion of the project which it has already built."); *Ocean Advocates*, 2005 WL 2035053, at *2 (ordering the Corps to "revoke the permit or . . . [otherwise take steps] necessary to ensure compliance with the law"); *Ocean Advocates*, 402 F.3d at 871–72 ("The fact that BP has

completed construction of the dock extension does not alter our conclusion, as we can fashion an appropriate remedy.").

The appropriate remedy for the Transmission Companies' and Federal Defendants' years-long creation of an "orchestrated trainwreck" leading to plowing the CHC powerline through the heart of the Upper Mississippi River National Wildlife and Fish Refuge is to unwind the transaction and order the Transmission Companies to restore the Turkey River Bottoms – Oak Road Parcel to its prior condition. The Transmission Companies have ignored repeated warnings at various points from this Court, the Seventh Circuit, FWS, the U.S. EPA and Plaintiffs. They constructed their powerline up to the edges of the Refuge without a valid route to cross the protected National Wildlife and Fish Refuge in order to create a *fait accompli*. This Court should not reward that cynical stratagem, should declare the land exchange unlawful, and should then determine proper, just and equitable remedies.[13]

Ultimately, Plaintiffs are entitled to summary judgment as a matter of law, and the transaction should be unwound. All parties were on notice of their legal violation for many years, and even the Seventh Circuit told the Transmission Companies' they continued at their own risk. *Driftless Area Land Conservancy*, 74 F.4th at 495. However, the Plaintiffs recognize that this Court may choose to consider a different appropriate remedy consistent with its judicial authority and equitable powers.

---

[13] Although the FAST ACT only mentions preliminary injunctions, in its May 2, 2023 order staying this Court's preliminary injunction, the Seventh Circuit stated that in considering a permanent injunction this Court must address the FAST Act factors. Doc. 93-1. Those factors are met given the tremendous environmental destruction associated with construction through the Refuge and the fact that the utilities could still employ its workforce building its powerline on routes outside the Refuge.

**CONCLUSION**

For the foregoing reasons, the Court should grant Plaintiffs motion for summary judgment and (1) declare that the Defendant FWS's decision to permit the CHC powerline without a compatibility determination violated the Refuge Act and was contrary to law, and, accordingly, vacate, reverse and remand the FWS's February 23, 2024 decisional documents; (2) declare that FWS's determination that the Turkey River Bottoms – Oak Road Parcel is "suitable for disposition" violated the Refuge Act and was contrary to law, and, accordingly, vacate, reverse and remand the FWS's February 23, 2024 decisional documents; (3) declare that the Defendant FWS's three February 23, 2024 decisional documents contradicted the FWS's operative Comprehensive Conservation Plan, thereby violating the Refuge Act and were contrary to law, and, accordingly, vacate, reverse and remand the FWS's decisional documents; (4) declare that the Defendant FWS's Net Benefits Analysis violated the Refuge Act and APA, was arbitrary and capricious, and unsupported by substantial evidence, and accordingly, invalidate, reverse and remand; (5) declare that the three Federal Defendants' 2019 FEIS, the 2023 SEA, the 2023 RUS FONSI, and the 2024 FWS FONSI all violate NEPA, are contrary to law, and, accordingly, invalidate, reverse and remand; (6) remand the Federal Defendants' 2019 FEIS, 2023 SEA, 2023 RUS FONSI and 2024 FONSI to the Federal Defendants to conduct a legally complaint NEPA review; (7) declare that the Defendant FWS's February 23, 2024 FONSI, Net Benefit Analysis and Land Exchange Agreement all violate NEPA and the Refuge Act's public participation requirements, are contrary to law, and, accordingly, reverse and remand; (8) direct the Federal Defendants provide for effective public participation and a reasonable opportunity for Plaintiffs and the public on the 2023 SEA and 2023 FONSI, and the Defendant FWS's February 23, 2024 FONSI, Net Benefit Analysis and Land Exchange Agreement; (9) direct the parties to file briefs on proper, just and equitable remedies for the Federal Defendants and the Transmission

Companies' violations of law within 30 days; (10) enjoin the Transmission Companies from conducting any further construction in the Refuge; (11) declare that the Transmission Companies' continued construction based on the unlawful exchange is both a nuisance and unjust enrichment; and (12) award Plaintiffs their reasonable attorney fees and costs under the Equal Access to Justice Act, 28 U.S.C. § 2412, and under other applicable laws; (13) grant such further relief the Court determines to be just and equitable.


Respectfully submitted this 20th day of June,


*/s/ Howard A. Learner*
Howard A. Learner
Daniel Abrams
Environmental Law & Policy Center
35 East Wacker Drive, Suite 1600
Chicago, IL 60601
T: (312) 673-6500
F: (312) 795-3730
HLearner@elpc.org
DAbrams@elpc.org

*Counsel for Plaintiffs National Wildlife Refuge Association, Driftless Area Land Conservancy, and Wisconsin Wildlife Federation*