# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

NATIONAL WILDLIFE REFUGE ASSOCIATION,
DRIFTLESS AREA LAND CONSERVANCY, and
WISCONSIN WILDLIFE FEDERATION,

    Plaintiffs,

    v.

RURAL UTILITIES SERVICE; ANDY BERKE, Administrator,
Rural Utilities Service; UNITED STATES FISH AND
WILDLIFE SERVICE; WILL MEEKS, Midwest Regional
Director; and SABRINA CHANDLER, Manager, Upper
Mississippi River National Wildlife and Fish Refuge; UNITED
STATES ARMY CORPS OF ENGINEERS; LIEUTENANT
GENERAL SCOTT A. SPELLMON, Chief of Engineers and
Commanding General, U.S. Army Corps of Engineers;
COLONEL AARON M. WILLIAMS, Commander and District
Engineer, Rock Island District, U.S. Army Corps of Engineers;
and COLONEL ERIC SWENSON, Commander and District
Engineer, St. Paul District, U.S. Army Corps of Engineers,

    Federal Defendants,

    and

DAIRYLAND POWER Cooperative and ITC MIDWEST LLC,

    Intervenor-Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. 3:24-cv-00139-wmc

---

## FEDERAL DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

STANDARD OF REVIEW ................................................................................ 3

STATUTORY BACKGROUND ........................................................................ 4

    A.    The Refuge Act ................................................................................... 4

    B.    The National Environmental Policy Act .................................................. 5

FACTUAL HISTORY ....................................................................................... 5

    A.    The CHC Project ................................................................................. 5

    B.    The CHC Project's Environmental Review Process.............................. 6

    C.    The Land Exchange ............................................................................ 10

    D.    The Stoneman Crossing and Existing Easements ................................. 13

PROCEDURAL HISTORY............................................................................... 14

ARGUMENT .................................................................................................... 16

    A.    The Claims Against RUS and the Corps Are Not Subject to Judicial Review. ................................................................................................ 16

           1.    Plaintiffs' Claims Against RUS Are Not Reviewable. ............................. 16

           2.    Plaintiffs' Claims Against the Corps Are Not Reviewable and Are Barred by Res Judicata and the Applicable Statute of Limitations. ......... 18

    B.    The Refuge Act's Compatibility Requirement is Inapplicable to Land Exchanges (Count I). ........................................................................... 21

    C.    FWS's Determination that the Oak Road Property Was Suitable for Disposition Is Unreviewable By this Court and Supported by the Record (Count II). ........................................................................................... 24

           1.    Plaintiffs' "Suitability" Claim Fails Because that Determination Is Not Reviewable under the APA................................................................... 24

                    a.    Decisions Committed to Agency Discretion Are Not Judicially Reviewable. ................................................................................... 25

                    b.    Plaintiffs' "Suitability" Claim Is Not Reviewable....................... 26

2.    FWS Rationally Concluded that the Oak Road Property Was Suitable for Disposition and Complied with the Refuge Act. .................. 27

D.    Plaintiffs' Net Benefit Claim Is Procedurally Improper and Ignores the Record (Count IV). ........................................................... 29

1.    Count IV Fails to State a Claim Based on FWS's Net Benefit Analysis................................................................................ 29

2.    FWS's Approval of the Land Exchange Was Rational and Based on Overwhelming Evidence of a Net Benefit to the Refuge. .................. 30

E.    FWS's Approval of the Land Exchange Is Consistent with the CCP (Count III) ...................................................................................... 35

F.    Plaintiffs and the Public Had Notice of, and Extensive Opportunities to Comment on, the Impacts to the Refuge (Count V). ............................. 37

1.    Federal Defendants Provided Extensive Notice and Comment Opportunities............................................................................. 38

2.    Plaintiffs Cannot Meet their Burden to Show A NEPA Violation. .......... 39

G.    Federal Defendants Complied with NEPA (Count VI). ........................................ 43

1.    The Scope of this Court's NEPA Review Is Limited to the Land Exchange.................................................................................... 43

2.    The Purpose and Need Statement Allowed for Consideration of Reasonable Alternatives to the Land Exchange......................................... 44

a.    Plaintiffs' NEPA Argument Fails Even if the Entire CHC Project is Reviewable.................................................... 47

3.    The EIS and Supplemental EA's Discussion of Climate Change Impacts Satisfies NEPA........................................................... 51

H.    The Court Should Order Separate Briefing on Remedies Should It Find A Violation. ....................................................................................... 53

CONCLUSION.......................................................................................................... 54

# TABLE OF AUTHORITIES

**Cases**

*Alaska Survival v. Surface Transp. Bd.*,
705 F.3d 1073 (9th Cir. 2013) ......................................................... 45, 46

*All Indian Pueblo Council v. United States*,
975 F.2d 1437 (10th Cir. 1992) ............................................................. 50

*Allen v. McCurry*,
449 U.S. 90 (1980) ................................................................................. 19

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,
988 F.2d 146 (D.C. Cir. 1993) ............................................................... 53

*Audubon Soc'y of Portland v. Haaland*,
40 F.4th 967 (9th Cir. 2022) .................................................................. 35

*Bagdonas v. Dep't of Treasury*,
93 F.3d 422 (7th Cir. 1996) ..................................................... 4, 28, 33

*Bennett v. Spear*,
520 U.S. 154 (1997) ............................................................................... 16

*Bos. Redevelopment Auth. v. Nat'l Park Serv.*,
838 F.3d 42 (1st Cir. 2016) ..................................................................... 4

*Car Carriers, Inc. v. Ford Motor Co.*,
789 F.2d 589 (7th Cir. 1986) ................................................................. 19

*Chessie Logistics Co. v. Krinos Holdings, Inc.*,
867 F.3d 852 (7th Cir. 2017) ................................................................. 18

*Citizens Against Burlington, Inc. v. Busey*,
938 F.2d 190 (D.C. Cir. 1991) ................................................... 45, 46, 48

*Commodity Futures Trading Comm'n v. Shor*,
478 U.S. 833 (1986) ............................................................................... 37

*Cronin v. USDA*,
919 F.2d 439 (7th Cir. 1990) ................................................................... 4

*Ctr. for Food Safety v. Vilsack*,
718 F.3d 829 (9th Cir. 2013) ................................................................. 47

*Daza v. Indiana*,
2 F.4th 681 (7th Cir. 2021) .................................................................... 19

*Dep't of Transp. v. Pub. Citizen*,
541 U.S. 752, (2004) .............................................................................. 44

*Driftless Area Land Conservancy v. Rural Utilities Service*,
74 F.4th 489 (7th Cir. 2023) ........................................................... passim

iii

*Env't Law & Pol'y Ctr. v. U.S. Nuclear Regul. Comm'n,*
470 F.3d 676 (7th Cir. 2006) ...................................................... passim

*Eustace v. Commissioner,*
312 F.3d 905 (7th Cir. 2002) ............................................................... 37

*Fl. Power & Light Co. v. Lorion,*
470 U.S. 729 (1985) ................................................................................ 3

*Forest Guardians v. U.S. Forest Serv.,*
329 F.3d 1089 (9th Cir. 2003) ............................................................ 35

*Habitat Educ. Ctr., Inc. v. U.S. Forest Serv.,*
673 F.3d 518 (7th Cir. 2012) ............................................................. 51

*Heckler v. Chaney,*
470 U.S. 821 (1985) ........................................................................... 25

*Highway J Citizens Grp. v. Mineta,*
349 F.3d 938 (7th Cir. 2003) ................................................... 3, 5, 51

*Highway J Citizens Grp. v. U.S. Dep't of Transp.,*
456 F.3d 734 (7th Cir. 2006) ............................................................. 19

*Hoosier Env't Council v. U.S. Army Corps of Eng'rs,*
722 F.3d 1053 (7th Cir. 2013) ..................................................... 46, 47

*Idaho Wool Growers Ass'n v. Vilsack,*
816 F.3d 1095 (9th Cir. 2016) ........................................................... 53

*Ill. Com. Comm'n v. Fed. Energy Regul. Comm'n,*
721 F.3d 764 (7th Cir. 2013) ............................................................... 6

*Ind. Forest All., Inc. v. U.S. Forest Serv.,*
325 F.3d 851 (7th Cir. 2003) ............................................................. 35

*Int'l Bhd. of Teamsters v. U.S. Dep't of Transp.,*
861 F.3d 944 (9th Cir. 2017) ............................................................. 29

*Kleppe v. Sierra Club,*
427 U.S. 390 (1976) ........................................................................... 51

*Laguna Greenbelt, Inc. v. U.S. Dep't of Transp.,*
42 F.3d 517 (9th Cir. 1994) ............................................................... 53

*Lands Council v. Martin,*
529 F.3d 1219 (9th Cir. 2008) ........................................................... 34

*Little Co. of Mary Hosp. v. Sebelius,*
587 F.3d 849 (7th Cir. 2009) ............................................................... 4

*Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc.,*
590 U.S. 405 (2020) ........................................................................... 19

*Maple Hill Apartment v. Pierce*,
    798 F.2d 1415 (6th Cir. 1986) ................................................................. 29

*Nat'l Wildlife Fed'n v U.S. Army Corps of Eng'rs*,
    75 F.4th 743 (7th Cir. 2023) ..................................................................... 45

*Nat'l Wildlife Refuge Ass'n v. Rural Utilities Serv.*,
    580 F. Supp. 3d 588 (W.D. Wis. 2022) ..................................................... 20

*Navab-Safavi v. Broad. Bd. of Governors*,
    650 F. Supp. 2d 40 (D.D.C. 2009) ............................................................. 29

*Navab-Safavi v. Glassman*,
    637 F.3d 311 (D.C. Cir. 2011) ................................................................... 29

*Nevada v. United States*,
    463 U.S. 110 (1983) ................................................................................... 19

*Nw. Motorcycle Ass'n v. USDA*,
    18 F.3d 1468 (9th Cir. 1994) ....................................................................... 4

*Or. Nat. Res. Council v. Thomas*,
    92 F.3d 792 (9th Cir. 1996) ....................................................................... 29

*Pozzie v. U.S. Dep't of Housing and Urban Dev.*,
    48 F.3d 1026 (7th Cir. 1995) ....................................................................... 3

*Pres. Endangered Areas of Cobb's Hist., Inc. v. U.S. Army Corps of Eng'rs*,
    87 F.3d 1242 (11th Cir. 1996) ................................................................... 34

*Protect Our Comtys. Found. v. Jewell*,
    825 F.3d 571 (9th Cir. 2016) ..................................................................... 49

*River Rd. All., Inc. v. Corps of Eng'rs of U.S. Army*,
    764 F.2d 445 (7th Cir. 1985) ..................................................................... 42

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989) ..................................................................................... 5

*Safe Skies Clean Water Wis., Inc. v. Nat'l Guard Bureau*,
    578 F. Supp. 3d 998 (W.D. Wis. 2022) ..................................................... 42

*Sierra Club v. Hickel*,
    467 F.2d 1048 (6th Cir. 1972) ................................................................... 26

*Sierra Club v. Marita*,
    46 F.3d 606 (7th Cir. 1995) ......................................................................... 3

*Sierra Club v. U.S. Army Corps of Eng'rs*,
    295 F.3d 1209 (11th Cir. 2002) ................................................................. 44

*Simmons v. U.S. Army Corps of Engineers*,
    120 F.3d 664 (7th Cir. 1997) ............................................................... 45, 49

*Singh v. Moyer*,
    867 F.2d 1035 (7th Cir. 1989) ................................................. 25

*Smith v. Off. of Civilian Health & Med. Program of Uniformed Servs.*,
    97 F.3d 950 (7th Cir. 1996) ..................................................... 3

*Theodore Roosevelt Conservation P'ship v. Salazar*,
    661 F.3d 66 (D.C. Cir. 2011) ................................................. 48

*Town of Superior v. U.S. Fish & Wildlife Serv.*,
    913 F. Supp. 2d 1087 (D. Colo. 2012) ................................... 23

*Univ., Ltd. v. U.S. Dep't of Hous. & Urb. Dev.*,
    No. 02-C-0579, 2003 WL 1145438 (E.D. Wis. Feb. 4, 2003) ......... 29

*Utahns for Better Transp. v. U.S. Dep't of Transp.*,
    305 F.3d 1152 (10th Cir. 2002) ............................................. 51

*Van Abbema v. Fornell*,
    807 F.2d 633 (7th Cir. 1986) ................................................. 47

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
    435 U.S. 519 (1978) ....................................................... 39, 49

*Warth v. Seldin*,
    422 U.S. 490 (1975) ............................................................. 41

*Webster v. Doe*,
    486 U.S. 592 (1988) ............................................................. 25

*Westlands Water Dist. v. U.S. Dep't of Interior*,
    376 F.3d 853 (9th Cir. 2004) ................................................... 5

*WildEarth Guardians v. U.S. Fish & Wildlife Serv.*,
    784 F.3d 667 (10th Cir. 2015) ........................................... 23, 51

**Statutes**

16 U.S.C. § 668dd(a) .................................................................. 44

16 U.S.C. § 668dd(a)(2) ............................................................... 4

16 U.S.C. § 668dd(b)(3) .............................................. 5, 21, 22, 27

16 U.S.C. § 668dd(b)(3)(B) ......................................................... 34

16 U.S.C. § 668dd(d)(1)(B) ......................................................... 22

16 U.S.C. § 668dd(e)(1)(B) ......................................................... 35

16 U.S.C. § 668ee ....................................................................... 27

16 U.S.C. §§ 668dd-668ee ...................................................... 1, 4

42 U.S.C. § 4336(a)(1) ............................................................... 16

42 U.S.C. § 4370m-6 ....................................................................... 17

42 U.S.C. § 4370m-6(a)(1) ........................................................ 17, 20

5 U.S.C. § 701(a)(2) ........................................................................ 25

5 U.S.C. § 704 ......................................................................... 16, 18

5 U.S.C. §§ 701-706 ................................................................... 3, 29

7 U.S.C. §§ 902, 904 ........................................................................ 7

7 U.S.C. § 902 ............................................................................... 48

7 U.S.C. § 904(a) .......................................................................... 48

Pub. L. 89-669 ................................................................................. 1

Pub. L. No. 105-57 .......................................................................... 1

**Regulations**

18 C.F.R. § 35.34(k)(7) ................................................................... 47

40 C.F.R. § 1501.5(e) ..................................................................... 41

40 C.F.R. § 1501.6(a)(1) ................................................................. 42

40 C.F.R. § 1502.14(a) .............................................................. 49, 50

40 C.F.R. § 1502.16 ....................................................................... 51

40 C.F.R. § 1506.6(c) ..................................................................... 42

40 C.F.R. § 1508.1(i) ..................................................................... 40

43 C.F.R. § 46.305(a) ..................................................................... 41

43 C.F.R. § 46.305(c) ..................................................................... 42

7 C.F.R. § 1970.102(b)(8) ............................................................... 42

7 C.F.R. § 1970.103 ....................................................................... 41

7 C.F.R. § 1970.8(b)(1) ................................................................... 43

**Rules**

85 Fed. Reg. 8554 .................................................................... 16, 17

## INTRODUCTION

Plaintiffs once again challenge the Cardinal-Hickory Creek 345-kilovolt (kV) Transmission Line Project ("CHC Project" or "Project") and assert that the minor roles of three federal agencies, the U.S. Fish and Wildlife Service ("FWS"), the Rural Utilities Service ("RUS") and the U.S. Army Corps of Engineers ("Corps" collectively, "Federal Defendants") resulted in violations of the Refuge Act[1] and the National Environmental Policy Act ("NEPA"). Plaintiffs' Amended Complaint disregards the law and the undisputed facts in the Administrative Record, and none of Plaintiffs' claims present a valid basis to grant the relief they seek.

As a threshold matter, Plaintiffs seemingly ignore that binding precedent from the Seventh Circuit has foreclosed any challenge to RUS's role in the Project as premature. They nevertheless have sued RUS even though it has not yet taken any final agency action. Plaintiffs likewise attempt to shoehorn the Corps into this case even though any challenges relating to the Corps' action are barred by res judicata because Plaintiffs raised or could have raised any claims relating to the Corps' actions in their prior lawsuit. Thus, before even turning to the merits, it is apparent that neither RUS nor the Corps are proper defendants in this action and those agencies are entitled to summary judgment on all claims.

Without viable claims against RUS and the Corps, the only relevant final agency action before this Court is FWS's decision to approve a land exchange ("Land Exchange") within the Upper Mississippi River National Wildlife and Fish Refuge ("Refuge"). Each of Plaintiffs'

---

[1] The National Wildlife Refuge System Improvement Act of 1997, Pub. L. No. 105-57, 111 Stat. 1253, amended the National Wildlife Refuge Administration Act of 1966, Pub. L. 89-669, 80 Stat. 926, which are codified at 16 U.S.C. §§ 668dd-668ee. Unless otherwise stated, Federal Defendants refer to 16 U.S.C. §§ 668dd-668ee as the "Refuge Act."

claims against FWS fail. First, the Refuge Act is clear that land exchanges are only subject to a

suitability determination, which is left to FWS's discretion. Plaintiffs ask this Court to impose a

"compatibility" requirement on land exchanges and ignore that the Seventh Circuit has already

explicitly ruled that the statute's use of suitability and compatibility are not equivalent. Plaintiffs'

unsupported reading of the statute is fatal to their claim and Federal Defendants are entitled to

summary judgment on Count I.

Second, Plaintiffs argue that, in any event, FWS's determination that property within the

Refuge was suitable for disposition is unsupported (Count II) and also violates the Refuge's

Comprehensive Conservation Plan ("CCP") (Count III). A review of the Administrative Record

reveals that FWS assessed the conservation value of the property within the Refuge, and based

on substantial evidence—including that the property is already fragmented by an existing road—

concluded that the property was suitable for disposition. Relatedly, consistent with the CCP, the

Land Exchange allowed FWS to acquire a high-priority parcel along the Mississippi River,

reclaim habitat previously held in perpetual easement by the Intervenor-Defendants ("Utilities"),

and reduce habitat fragmentation overall. Both Counts II and III ask the Court to substitute

Plaintiffs' judgment for that of FWS's expertise, but that is not this Court's role. Instead, the

Court should uphold FWS's reasoned decision.

Third, Plaintiffs' standalone "arbitrary and capricious" claim (Count IV) is both

impermissible as pleaded and misconstrues FWS's thorough Net Benefit Analysis that concluded

the Land Exchange had an overall positive impact on the Refuge.

Finally, Plaintiffs' NEPA claims fare no better. Their NEPA participation claim (Count

V) attempts to write requirements into the regulations that simply do not exist. Federal

Defendants provided ample opportunities for notice and comment on the CHC Project and fully

complied with NEPA. And Count VI incorrectly frames Plaintiffs' NEPA challenge as though this Court has jurisdiction to review the entire CHC Project rather than the narrow land exchange decision made by FWS. Once the appropriate scope of review is applied, it is clear that FWS considered the reasonable alternatives available to it and took a hard look at the environmental impacts of its decision.

In sum, this Court should grant summary judgment in favor of Federal Defendants on all counts.

## STANDARD OF REVIEW

The agency activities that Plaintiffs challenge are subject to judicial review, if at all, under the standards of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706. Under these standards, the agencies' actions are presumed valid, *Pozzie v. U.S. Dep't of Housing and Urban Dev.*, 48 F.3d 1026, 1029 (7th Cir. 1995), and Plaintiffs bear the burden to prove otherwise, *Sierra Club v. Marita*, 46 F.3d 606, 619 (7th Cir. 1995). To prevail, Plaintiffs must meet the "high standard" of showing that the agency's decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" *Marita*, 46 F.3d at 619 (quoting 5 U.S.C. § 706(2)(A)). Under this narrow standard of review, courts ask only "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Highway J Citizens Grp. v. Mineta*, 349 F.3d 938, 952-53 (7th Cir. 2003) (citation omitted). The APA standard is "highly deferential," and courts may not substitute their judgment for that of the agency. *Smith v. Off. of Civilian Health & Med. Program of Uniformed Servs.*, 97 F.3d 950, 955-57 (7th Cir. 1996); *Highway J Citizens Grp.*, 349 F.3d at 953.

Summary judgment is proper if the evidence "shows that there is no genuine [issue] as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under the APA, the Court's review is confined to the administrative record. *Fl. Power &*

*Light Co. v. Lorion,* 470 U.S. 729, 743-44 (1985); *Little Co. of Mary Hosp. v. Sebelius*, 587 F.3d 849, 856 (7th Cir. 2009). Thus, a motion for summary judgment in an APA case "is simply a vehicle to tee up a case for judicial review." *Bos. Redevelopment Auth. v. Nat'l Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016) (explaining that "an inquiring court must review an agency action not to determine whether a dispute of fact remains but, rather, to determine whether the agency action was arbitrary and capricious"). Because extra-record evidence and trials are inappropriate in APA cases, courts decide APA claims via summary judgment based on the administrative record the agency compiles. *Cronin v. USDA*, 919 F.2d 439, 445 (7th Cir. 1990) ("Because the plaintiffs are not entitled to present evidence in court to challenge the [decisionmaker's] decision . . . , there will never be an evidentiary hearing in court."); *Nw. Motorcycle Ass'n v. USDA*, 18 F.3d 1468, 1472 (9th Cir. 1994) ("[T]his case involves review of a final agency determination under the [APA]; therefore, resolution of this matter does not require fact finding on behalf of this court. Rather, the court's review is limited to the administrative record[.]"). The agency must provide a "satisfactory explanation for its action," but the court must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned[.]" *Bagdonas v. Dep't of Treasury*, 93 F.3d 422, 426 (7th Cir. 1996) (citation omitted).

## STATUTORY BACKGROUND

A.     **The Refuge Act**

The Department of the Interior delegates authority to FWS to manage refuges across the country (collectively, the "Refuge System") pursuant to the Refuge Act. 16 U.S.C. §§ 668dd-668ee. The mission of the Refuge System is "to administer a national network of lands and waters for the conservation, management, and where appropriate, restoration of the fish, wildlife, and plant resources and their habitats within the United States for the benefit of present and future generations of Americans." *Id.* § 668dd(a)(2). The Refuge Act authorizes FWS to

4

"[a]cquire lands or interests therein by exchange . . . for acquired lands or public lands, or for interests in acquired or public lands, under his jurisdiction which he finds to be suitable for disposition." 16 U.S.C. § 668dd(b)(3).

## B.     The National Environmental Policy Act

NEPA is a procedural statute that does not authorize agency action itself or "mandate particular results." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). Rather, it serves the twin aims of informing agency decisionmakers of the environmental effects of proposed federal actions and ensuring that relevant information is made available to the public. *Id.* at 349. As a result, a "court must avoid passing judgment on the substance of an agency's decision. Its focus must be on ensuring that agencies took a 'hard look' at the environmental consequences of their decisions." *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 865 (9th Cir. 2004) (citing *Robertson*, 490 U.S. at 350); *Highway J Citizens Grp.*, 349 F.3d at 960 ("Again, our review is not of the agency's substantive judgment, but . . . the sufficiency of the agency's consideration of the reasonable alternatives.").

## <u>FACTUAL HISTORY</u>

## A.     The CHC Project

The CHC Project is an almost-complete, roughly 100-mile transmission line that extends from Dubuque County, Iowa, to Dane County, Wisconsin. Federal Defendants' Statement of Facts ("SOF") ¶ 1. Most of the Project sits on non-federal land and only a roughly one-mile stretch connecting the Iowa and Wisconsin sides of the Project remains incomplete. SOF ¶ 5. The CHC Project emerged from multi-year transmission planning efforts and studies undertaken by the Midwest Independent System Operator, or "MISO," Midwestern states, transmission operators, and other stakeholders. SOF ¶ 2. It is the Intervenor-Defendants ("Utilities"), not

Federal Defendants, that are ultimately responsible for construction, operation, and maintenance of the Project.

Comparatively, Federal Defendants role in considering distinct aspects of the CHC Project is limited. Relevant to Plaintiffs' claims, one of the Utilities may at some point apply to RUS for financial assistance to support its minority (9%) ownership interest in the Project. SOF ¶ 9.  But as of today, no such application has been submitted. Further, a portion of the outstanding mile crosses what was Refuge land prior to the Land Exchange. *See* SOF ¶¶ 5, 115 (map of Refuge crossing). Finally, in September 2020, before Plaintiffs filed their complaint in the prior lawsuit challenging the CHC Project, the Corps granted the Utilities an easement to cross Corps land within the Refuge. SOF ¶ 55. For these reasons, Federal Defendants participated in an environmental review of the Project. But importantly, Federal Defendants in this case have no general statutory authority to plan, site, or regulate the CHC Project. Rather, that responsibility here belongs to MISO, the Public Service Commission of Wisconsin, and the Iowa Utilities Board. *See* SOF ¶ 4; *Ill. Com. Comm'n v. Fed. Energy Regul. Comm'n*, 721 F.3d 764, 770 (7th Cir. 2013) (explaining that the nation's electrical grid is controlled by regional transmission organizations, including MISO, which are "responsible for planning and directing expansions and upgrades").

## B.    The CHC Project's Environmental Review Process

Federal Defendants began their environmental review of the CHC Project in 2016. On October 18, 2016, RUS issued a notice of intent to complete an Environmental Impact Statement ("EIS") to assess the environmental impacts of the entire CHC Project. SOF ¶ 8. RUS served as the "lead agency" in the NEPA process, and the Corps, FWS, and the U.S. Environmental Protection Agency participated as "cooperating agencies." SOF ¶¶ 13, 16. The Utilities prepared three corridor-siting documents: the Alternatives Evaluation Study, the Alternative Crossings

Analysis, and the Macro-Corridor Study. SOF ¶ 18; 7 C.F.R. § 1970.5(b)(3)(iii) (requiring applicants to develop reasonable alternatives for meeting their purpose and need).

In December 2018, RUS published the draft EIS for the CHC Project. SOF ¶ 25. The Draft EIS analyzed environmental impacts of the entire Project. It also explicitly noted that the six action alternatives considered would cross the Refuge, and thoroughly analyzed the impacts to the Refuge. SOF ¶ 28. RUS published its four-volume Final EIS on October 23, 2019. SOF ¶ 30. RUS prepared the EIS to enable its future consideration of a potential application for financial assistance from one of the Utilities, Dairyland Power Cooperative ("Dairyland"), which will own about 9% of the CHC Project. *See* SOF ¶ 9. Pursuant to the Rural Electrification Act of 1936, 7 U.S.C. §§ 901–950cc-2, RUS administers programs to achieve infrastructure improvements in rural communities, including the RUS Electric Program, which provides loans or guaranteed loans to finance the construction or improvement of electric distribution, transmission, and generation facilities. SOF ¶ 14; *see* 7 U.S.C. §§ 902, 904.

Consistent with NEPA, the EIS sets out the purpose and need for the CHC Project, analyzes six alternatives in detail, and compares those alternatives to a "no action" alternative. SOF ¶¶ 33-34. It explains Federal Defendants' rationale for dismissing other types of alternatives, including "non-transmission" alternatives, from further consideration. SOF ¶¶ 36-39 The EIS also describes the affected environment and analyzes the potential impacts of the CHC Project and its alternatives on a broad range of environmental, socioeconomic, cultural, and historical resources, including the Refuge. SOF ¶ 40. Finally, the EIS identifies Federal Defendants' preferred alternative, which features 101 miles of transmission line (around 97 miles of which are co-located with existing rights-of-way for transmission lines, roadways, and railways). SOF ¶ 47. RUS signed its Record of Decision ("ROD") on January 16, 2020, adopting

7

the preferred alternative. SOF ¶ 48. In the Record of Decision, RUS "determined that the NEPA review is complete." SOF ¶ 50. If Dairyland applies for financial assistance, RUS will need to undertake additional financial, technical, and engineering reviews before making a final determination on any application. *Id.* FWS and the Corps signed the ROD as cooperating agencies. SOF ¶ 49.

Following approval of the ROD, in September 2020, FWS made a Compatibility Determination and granted a right-of-way to the Utilities to cross FWS fee-titled lands in the Refuge and the Corps granted an easement over Corps fee-titled lands within the Refuge. SOF ¶¶ 54-55. FWS revoked its right-of-way in August 2021 after discovering it had made a factual error in a determination that was a prerequisite to its issuance of that right-of-way. SOF ¶ 56. FWS discovered that it had reviewed and relied on incorrect documents. *Id.*

After the Compatibility Determination was rescinded, Federal Defendants and the Utilities notified the Court that FWS was considering a land exchange within the Refuge. *See* Notice of Withdrawal of USFWS's Compatibility Determination and Right-of-Way Permit Ex. A, *Nat'l Wildlife Refuge Ass'n v. Rural Utilities Serv.*, 21-cv-96-wmc, (W.D. Wisc. Aug. 27, 2021), ECF No. 69-1. To ensure all parties shared an understanding of the potential properties to be exchanged, the Utilities and FWS prepared a term sheet that outlined the proposed subject of the land exchange. SOF ¶ 58 ("This statement of the proposed land exchange/purchase is intended to assure that all parties are in agreement of the description of the realty transaction being proposed."). The term sheet informed the proposed Land Exchange analyzed in subsequent environmental reviews and appraisals but was not a final agreement to exchange land.

Between September 2020 and January 2022, the Utilities proposed nine route modifications for the CHC Project as well as a land exchange with FWS as an alternative to a

right-of-way permit to cross the Refuge. SOF ¶ 59. RUS published an Environmental Assessment ("EA") to analyze the significance of eight route modifications on June 24, 2021. SOF ¶ 60. One of those route modifications impacted the Refuge because it eliminated 9.9 acres of Refuge land from the transmission line's path. SOF ¶ 63. Accordingly, the EA considered the resources within the Refuge and analyzed the environmental consequences of the new route and the previously approved route within the Refuge. *Id.*

In September 2023, RUS published a Draft Supplemental EA that addressed all nine route modifications as well as the proposed Land Exchange. SOF ¶ 64. The purpose of the Supplemental EA process for FWS was simply to inform the agency's decision to approve or deny the proposed Land Exchange under the Refuge Act. SOF ¶ 69. Thus, the no action alternative with regard to the Land Exchange was that "[t]he USFWS would not grant the land exchange and/or any regulatory permits necessary for the CHC Project to cross the Refuge." SOF ¶ 70. The proposed action alternative considered for FWS was approval of the Land Exchange that would ultimately permit construction along Oak Road. SOF ¶ 72. Two other alternatives were considered but not analyzed in detail. The first was the Utilities crossing the Refuge and constructing transmission lines using their two pre-existing easements through the Refuge, roughly one mile from the land exchange property ("Stoneman Crossing"). SOF ¶ 73. This alternative was eliminated in part because it would result in greater negative impacts to the Refuge and migratory birds than the route along Oak Road. *Id.* Non-Refuge crossings were still not viable, as explained in the Alternative Crossings Analysis, so that alterative was also not considered in detail. SOF ¶ 74.

On October 6, 2023, RUS issued a Finding of No Significant Impact ("RUS FONSI") with respect to the eight route modifications outside the Refuge. SOF ¶ 77. On February 22,

2024, FWS signed its Finding of No Significant Impact ("FWS FONSI") with respect to the route modification through the Refuge and the proposed Land Exchange. SOF ¶ 78. The Net Benefit Analysis was published with the FWS FONSI. *Id.* All environmental reviews of the CHC Project identified the route along Oak Road in the Refuge as the preferred alternative ("Nelson-Dewey Crossing"). SOF ¶ 79. FWS signed the Land Exchange Agreement on February 23, 2024, SOF ¶ 80, and the transaction closed on May 9, 2024, SOF ¶ 81.

## C.     The Land Exchange

Pursuant to the Land Exchange Agreement, the Utilities conveyed to the United States 35.69 acres of wooded upland and wetland habitat ("Wagner Property") in exchange for 19.84 acres of scrub-shrub and wet meadow ("Oak Road Property"). SOF ¶ 83. The Utilities will use the Oak Road Property to complete the CHC Project. SOF ¶ 84. The Agreement also provides that the Utilities will relinquish their two existing perpetual easements through the Stoneman Crossing and will restore the land within those rights-of-way. SOF ¶ 118.

The Wagner Property consists of two unfragmented parcels of wooded upland on the Wisconsin side of the Mississippi River next to other Refuge land. SOF ¶ 85. FWS identified the Wagner Property as a priority acquisition parcel in the Refuge's 2006 CCP and has been attempting to acquire it for more than 15 years. SOF ¶ 86. FWS was never offered the Wagner Property before the Land Exchange and, because of limits of how much FWS can pay above the fair market value of land, FWS probably would not be able to acquire it otherwise. SOF ¶ 87. Acquisition of the Wagner Property allows FWS to protect high value, undeveloped habitat that directly fronts the Mississippi River. SOF ¶ 88. The following satellite image shows the boundaries of the Wagner Property.



Figure 12. Proposed USFWS land acquisition of the Wagner Tract (Source: Burns & McDonnell 2020).

SOF ¶ 92.

The Wagner Property contains mature floodplain forests that support many species and protect aquatic habitat quality for species including the endangered Higgins Eye pearlymussel. SOF ¶ 88. Prior to the exchange, the Utilities began restoring a small part of the Wagner Property that was open fields. *Id.* As of November 2022, the work was completed, had so far been successful, and was being monitored. *Id.* FWS also surveyed the Wagner Property and surrounding areas before the Land Exchange in an Environmental Site Assessment. SOF ¶ 94. FWS concluded that there was "no evidence of current, historical, or controlled regulated environmental concerns associated with" the Wagner Property. *Id.*

In contrast to the Wagner Property, the Oak Road Property contains less valuable habitat and tracks Oak Road, an existing gravel road through the Refuge that leads to a ferry landing to cross the Mississippi River. SOF ¶ 99 ("Oak Road is the unpaved access road within the Refuge used to connect Iowa County road C9Y (the Great River Road) with the Cassville Car Ferry landing on the Iowa bank of the Mississippi River."). The rest of the land area is primarily scrub-shrub and wet meadow, with trees less than 15-years old. SOF ¶ 98. The Oak Road Property is also located within the Turkey River Floodway and is regularly inundated by floodwaters. *Id.* It is overrun with invasive plants, including reed canary grass, and is within view of existing powerlines. SOF ¶¶ 98, 100-01.

The Oak Road Property does not extend to the Mississippi River. The Corps' previously granted easement crosses less than 10 acres of Corps fee-titled land within the Refuge and connects the Oak Road Property to the Mississippi River. SOF ¶¶ 55, 115. One 196-foot tower will be placed on the Corps easement, consistent with requirements for river crossings. SOF ¶ 109. No transmission line towers will be placed in the Mississippi River. SOF ¶ 110.

The following satellite image shows the location of the Wagner Property (orange), Oak Road Property (blue), Corps' easement (pink), and the Utilities' existing transmission lines in the Stoneman crossing.



SOF ¶ 115.

### D.    The Stoneman Crossing and Existing Easements

The Land Exchange provides additional benefits to the Refuge beyond acquisition of the Wagner Property. The Utilities have two preexisting perpetual, transmission line easements through the Refuge, called the Stoneman Crossing, and currently maintain two transmission lines and 30 transmission towers pursuant to that easement. SOF ¶ 116.

As part of the Land Exchange Agreement, on top of transferring ownership of the Wagner Property to FWS, the Utilities will release their existing transmission line easements along the Stoneman Crossing; will remove the existing transmission facilities in the Stoneman Crossing; and will restore the Stoneman Crossing habitat to FWS specifications. SOF ¶ 118. This will result in an addition of 28.1-acres of restored habitat within the Refuge. *Id.* The habitat

surrounding the Utilities' existing easements is superior to the Oak Road Property because it contains more sensitive wetland habitats. SOF ¶ 120.

The Utilities made clear that, should building through the Nelson-Dewey Crossing become infeasible, they intend to build the line through the Stoneman Crossing using their existing easements. SOF ¶ 122. Because of the width of the existing easements, the lower-profile 75-foot H-frame structures proposed for the Nelson-Dewey Crossing could not be used and construction could result in a greater impact to birds. SOF ¶ 123. FWS properly considered this risk when analyzing the net benefit of the Land Exchange. SOF ¶ 124; Div. of Nat. Res. and Conservation Planning, 603 FW § 2.10.B, USFWS, https://www.fws.gov/policy-library/603fw2 (Nov 17, 2000) ("Where reserved rights or legal mandates provide that we must allow certain activities, we should not prepare a compatibility determination."). FWS's approval of the Land Exchange eliminates this more harmful Refuge crossing possibility. SOF ¶ 124.

## PROCEDURAL HISTORY

On March 6, 2024, Plaintiffs filed their Complaint challenging the Land Exchange. Compl., ECF No. 1. Plaintiffs filed an initial motion for a preliminary injunction on March 13, 2024, which the Court granted on March 25, 2024. ECF Nos. 38, 62-63. The Court's Order enjoined Federal Defendants and the Utilities "from taking any action to close the land exchange agreement or begin construction on the stretch of the Cardinal-Hickory Creek Transmission Line Project running through and across the Upper Mississippi River National Wildlife and Fish Refuge." Prelim. Inj., ECF No. 63. The Utilities appealed that preliminary injunction order and asked the Seventh Circuit to stay the injunction. ITC Midwest LLC's & Dairyland's Notice of Appeal, ECF No. 67; Mot. to Stay Inj. Pending Appeal, *Nat'l Wildlife Refuge Ass'n v. ITC Midwest LLC*, No. 24-1492 (7th Cir. filed Mar. 29, 2024), ECF No. 9. On May 2, 2024, the

Seventh Circuit stayed the effectiveness of this Court's preliminary injunction. Order, ECF No. 95.

Consistent with the Seventh Circuit's stay decision, the Land Exchange closed on May 9, 2024, and the United States no longer owns the Oak Road Property. ECF No. 103. Federal Defendants provided Plaintiffs with notice of the closing on May 6, 2024. Mot. for Recons. and Renewed Mot. for Prelim. Inj. 1, ECF No. 101. On May 10, 2024, Intervenor-Defendants notified the Court that construction activities were scheduled to begin on May 13, 2024. Notice of Construction, ECF No. 104.

Plaintiffs filed their Amended Complaint on May 22, 2024, which brought seven claims challenging the CHC Project. ECF No. 118. Counts One and Two assert that Federal Defendants violated the Refuge Act's compatibility requirement and suitability for disposition requirement. Am. Compl. ¶¶ 239-63. Count Three argues that the Land Exchange conflicts with the CCP and therefore also violates the Refuge Act. *Id.* ¶¶ 264-82. Count Four brings a standalone "arbitrary and capricious" claim that challenges the Net Benefit Analysis. *Id.* ¶¶ 283-96. Counts Five and Six assert various claims under NEPA. *Id.* ¶¶ 297-350. Plaintiffs' final claim, Count Seven, asks the Court to stop the Utilities' construction and is not brought against Federal Defendants. *Id.* ¶¶ 351-366.[2]

---

[2] Count VII is inapplicable to Federal Defendants because it only challenges construction by the Utilities and does not implicate any action by Federal Defendants. Accordingly, Federal Defendants do not respond to Count VII.

# ARGUMENT

**A.     The Claims Against RUS and the Corps Are Not Subject to Judicial Review.**

   1.     Plaintiffs' Claims Against RUS Are Not Reviewable.

The Court should grant summary judgment in favor of Federal Defendants as to all claims against RUS. Plaintiffs have not identified an RUS final agency action that is reviewable by this Court. Section 704 of the APA limits judicial review to "final agency action[s]." 5 U.S.C. § 704.[3] For an agency action to be "final," it must (1) "mark the 'consummation' of the agency's decisionmaking process" *and* (2) "the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow[.]'" *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citations omitted).

RUS has not issued a final agency action with respect to the CHC Project. As the Seventh Circuit explained in *Driftless Area Land Conservancy v. Rural Utilities Service*, Dairyland has not yet applied to RUS for financing, and thus RUS has not issued a decision on that application. 74 F.4th 489, 495 (7th Cir. 2023); *see also* CHC 345-kV Transmission Line Project, 85 Fed. Reg. 8554, 8556 (Feb. 14, 2020) ("The ROD is not a decision on Dairyland's loan application . . . ."). Nothing has changed since the Seventh Circuit's decision, and Plaintiffs point to no new financing decision.

The Seventh Circuit also has already held that RUS's approval of the EIS is not a final agency action for purposes of judicial review under the APA. *Driftless Area Land Conservancy*, 74 F.4th at 495-96. As the Seventh Circuit explained,

---

[3] The Fiscal Responsibility Act of 2023, 42 U.S.C. § 4336(a)(1), recently amended NEPA to expressly provide that agencies are not required to prepare an environmental analysis for matters that do not constitute "final agency action" under the APA. 42 U.S.C. § 4336(a)(1) ("An agency is not required to prepare an environmental document with respect to a proposed agency action if—(1) the proposed agency action is not a final agency action within the meaning of such term in chapter 5 of title 5[.]").

[w]hen the agency adopted the environmental impact statement, that did not "consummat[e]" its decisionmaking process, but took just one preliminary step toward an eventual decision. And the agency's conclusion that the statement complies with the National Environmental Policy Act lacks legal consequences—any entitlements will flow from the ultimate funding decision.

*Id.* at 496 (second alteration in original) (internal citation omitted). The Seventh Circuit concluded that any NEPA claims against RUS were therefore premature. *Id.* at 495. To date, RUS has not issued a funding decision, nor has Dairyland applied to RUS for funding. As a result, Plaintiffs' claims against RUS remain premature.[4]

Even if RUS's approval of the EIS did constitute final agency action, contrary to the Seventh Circuit, Plaintiffs' claims would be time barred under the FAST-41 Act, 42 U.S.C. § 4370m-6. Pursuant to the FAST-41 Act, a claim seeking judicial review of any authorization by a federal agency for a covered project must be brought within two years. 42 U.S.C. § 4370m-6(a)(1). A "covered project" includes "any activity in the United States that requires authorization or environmental review by a Federal agency involving construction of infrastructure for . . . electricity transmission[.] . . ." that is subject to NEPA, requires more than $200 million total investment, and does not qualify for an abbreviated environmental review. *Id.* § 4370m. The Record demonstrates that the CHC Project constitutes a "covered project." SOF ¶ 6. The ROD was noticed in the Federal Register on February 14, 2020. CHC 345-kV Transmission Line Project, 85 Fed. Reg. 8554. And the record is clear that Plaintiffs brought this case more than two years after February 14, 2020. ECF No. 1. Thus, even if the ROD constituted

---

[4] Further, under the 2023 NEPA amendments, a major federal action does not include "loans, loan guarantees, or other forms of financial assistance where a Federal agency does not exercise sufficient control and responsibility over the subsequent use of such financial assistance or the effect of the action." 42 U.S.C. § 4336e(10)(B)(iii). Thus, under current law, RUS would not be required to complete NEPA review in response to an anticipated loan application.

final agency action under the APA, Plaintiffs' claims against RUS would be barred by the FAST-41 statute of limitations.

In sum, Plaintiffs have not brought a claim against RUS that is reviewable by this Court under the APA, and even if Plaintiffs' claims against RUS were reviewable, they would be barred by the applicable statute of limitations. The Court should find for Federal Defendants on all claims against RUS.

2.    <u>Plaintiffs' Claims Against the Corps Are Not Reviewable and Are Barred by Res Judicata and the Applicable Statute of Limitations.</u>

Likewise, any claims against the Corps are also barred. Plaintiffs have not identified a Corps final agency action that is subject to judicial review under the APA. 5 U.S.C. § 704. At most, Plaintiffs allege that the Corps' approval of the EIS is a final agency action, Am. Compl. Requested Relief ¶ 5, but, as discussed above, the Seventh Circuit has stated an "agency's conclusion that the statement complies with the National Environmental Policy Act lacks legal consequences." *Driftless Area Land Conservancy*, 74 F.4th at 496. The Corps' approval of the EIS is not a final agency action for the same reason that RUS's approval is not a final agency action. *Id.* Nor have Plaintiffs pled sufficient facts in their Amended Complaint to challenge the Corps' 2020 grant of an easement across Corps-managed Refuge land. Plaintiffs cannot assert this new claim for the first time in summary judgment.[5] Regardless, such claims are barred by res judicata and the FAST-41 statute of limitations.

Any claims against the Corps for its September 2020 easement are barred by the doctrine of res judicata for the simple reason that Plaintiffs could have brought them in the prior litigation but did not. Res judicata (or claim preclusion) "prevents parties from raising issues that could

---

[5] *See Chessie Logistics Co. v. Krinos Holdings, Inc.*, 867 F.3d 852, 860 (7th Cir. 2017) (affirming district court's decision that plaintiff forfeited new argument raised in summary judgment where plaintiff did not allege sufficient facts supporting the claim in the complaint).

have been raised and decided in a prior action—even if they were not actually litigated." *Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc.*, 590 U.S. 405, 412 (2020); *Highway J Citizens Grp. v. U.S. Dep't of Transp.*, 456 F.3d 734, 741 (7th Cir. 2006) ("[A] final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action.") (quoting *Allen v. McCurry*, 449 U.S. 90, 94 (1980)). Res judicata applies "not only" to matters that were previously litigated, but also "*to any other admissible matter which might have been offered*" in the prior case. *Id.* (emphasis added) (quoting *Nevada v. United States*, 463 U.S. 110, 129-30 (1983)). The doctrine "rests on the pragmatic insight that one fair opportunity to litigate a claim is normally enough." *Daza v. Indiana*, 2 F.4th 681, 683 (7th Cir. 2021). Given the "great latitude" that the Federal Rules give plaintiffs to amend their complaints, "it is appropriate that *res judicata* be defined with sufficient breadth to encourage parties to present all their related claims at one time." *Car Carriers, Inc. v. Ford Motor Co.*, 789 F.2d 589, 593-94 (7th Cir. 1986).

In determining whether res judicata applies, courts consider whether the claims arise from the same transaction or "'involve a common nucleus of operative facts.' Anything falling within that common nucleus, whether or not actually raised, falls within the scope of the claim and is thus subject to claim preclusion in a later case." *Daza*, 2 F.4th at 684 (quoting *Lucky Brands*, 590 U.S. at 412). In *Highway J Citizens Group*, the Seventh Circuit concluded that claims that "stem from the same factual transaction as the legal claims addressed in that prior litigation," where plaintiffs had a fair opportunity to raise the new claims, were barred under res judicata. 456 F.3d at 744.

Plaintiffs previously sued Federal Defendants over various Federal approvals related to the CHC Project, including a separate action challenging the Corps' grant of Clean Water Act

permits, (21-cv-306), and an action challenging FWS's September 2020 grant of a right-of-way permit (21-cv-96), and these cases were consolidated. Am. Compl. ¶ 4; *see also* 3:21-cv-306, ECF No. 21; *Nat'l Wildlife Refuge Ass'n v. Rural Utilities Serv.*, 580 F. Supp. 3d 588, 596 (W.D. Wis. 2022). Plaintiffs acknowledge in their Amended Complaint in this case that the Corps issued its easement around the same time as the FWS right-of-way permit, in September 2020, well before that last lawsuit. Am. Compl. ¶ 150 ("Defendants FWS and Corps formally granted the right-of-way easements in September 2020."). The ROD challenged in the prior litigation explicitly referenced the Corps easement. SOF ¶ 53 ("The USACE has either issued or will issue . . . [a] right-of-way authorization to issue an easement across USACE-managed/owned lands (to be issued within 270 days of issuance of this ROD)."); *see also* Am. Compl. ¶ 142 ("As part of the ROD, Defendants Corps and FWS would grant right-of-way ('ROW') easements and special permits . . . ."). The environmental impacts of both the withdrawn FWS right-of-way permit and the Corps easement were considered in the EIS, which was documented in the ROD, and thus they share common operative facts. Plaintiffs were aware of the Corps easement at the time of the prior suit and could have brought any claims challenging the Corps easement in the prior litigation. Plaintiffs are thus barred from challenging the Corps' September 2020 easement in this case.

Finally, even if Plaintiffs could identify a final agency action by the Corps in their Amended Complaint *and* that action could not have been challenged in the prior lawsuit, any claims against that final agency action would be barred by the FAST-41 two-year statute of limitations. 42 U.S.C. § 4370m-6(a)(1). *See* Argument, Section A.1 *supra*.

Plaintiffs have alleged no claims against RUS or the Corps that are reviewable by this Court under the APA and not otherwise barred. The Court should find in favor of Federal Defendants as to all claims against RUS and the Corps.

**B. The Refuge Act's Compatibility Requirement is Inapplicable to Land Exchanges (Count I).**

The Refuge Act sets forth FWS's authority to carry out land exchanges at Section 668dd(b). Under a completely separate section, § 668dd(d), FWS is given discretion to approve new uses within a refuge, so long as those new uses are compatible with the refuge's purpose. Plaintiffs assert that this distinct subsection usurps the clearly delegated land exchange authority and imposes a compatibility requirement on every land exchange. Am. Compl. ¶¶ 239-57. There is no support for such an interpretation. Accordingly, this Court should grant summary judgment in Federal Defendants' favor for Count I.

Neither the Refuge Act nor FWS guidance require a compatibility analysis for a land exchange. 16 U.S.C. § 668dd(b)(3); Div. of Realty, 342 FW § 5.7.B, USFWS (June 21, 1994), https://www.fws.gov/policy-library/342fw5. The language and structure of the statute undeniably demonstrate that approval of a use of a refuge and approval of a land exchange are subject to different requirements. Section (b)(3) governs land exchanges and states that:

> **(b) ADMINISTRATION; PUBLIC ACCOMMODATIONS CONTRACTS; ACCEPTANCE AND USE OF FUNDS; EXCHANGE OF PROPERTIES; CASH EQUALIZATION PAYMENTS**
> In administering the System, the Secretary is authorized to take the following actions:
> . . .
> **(3)** Acquire lands or interests therein by exchange (A) for acquired lands or public lands, or for interests in acquired or public lands, under his jurisdiction which he finds to be suitable for disposition, or (B) for the right to remove, in accordance with such terms and conditions as he may prescribe, products from the acquired or public lands within the System. The values of the properties so exchanged either shall be approximately equal, or if they are not approximately equal the values shall be equalized by the payment of cash to the grantor or to the Secretary as the circumstances require.

Then, following section (c), which addresses prohibited activities within a refuge, section (d)(1)(B) addresses uses within a refuge and states:

> **(d) USE OF AREAS; ADMINISTRATION OF MIGRATORY BIRD SANCTUARIES AS GAME TAKING AREAS; RIGHTS OF WAY, EASEMENTS, AND RESERVATIONS; PAYMENT OF FAIR MARKET VALUE**
> **(1)** The Secretary is authorized, under such regulations as he may prescribe, to—
>
> . . .
>
> **(B)** permit the use of, or grant easements in, over, across, upon, through, or under any areas within the System for purposes such as but not necessarily limited to, powerlines, telephone lines, canals, ditches, pipelines, and roads, including the construction, operation, and maintenance thereof, whenever he determines that such uses are compatible with the purposes for which these areas are established.

The words "compatibility" or "compatible" are not used anywhere section (b) of the Refuge Act. Nor does it incorporate any provision in section (d). Instead, compatibility is only required for "use of a refuge," not for off-site uses of private land following an exchange. *Compare* 16 U.S.C. § 668dd(d)(1)(B) *with* 16 U.S.C. § 668dd(b)(3). Congress could have required compatibility for land exchanges when it passed the National Wildlife Refuge System Improvement Act of 1997, but it did not. Rather, it preserved the Secretary's discretion to exercise the land exchange authority to benefit the Refuge System.

This interpretation of the statute is not just Federal Defendants' view, but is consistent with the view of the Seventh Circuit, which noted that it "[did] not share the district court's certainty that the statutory requirements for a land exchange and right-of-way permit are identical." *Driftless Area Land Conservancy*, 74 F.4th at 495. The Seventh Circuit reasoned that the Refuge Act uses different language in the land exchange provision than the right-of-way provisions. *Id.* Specifically,

> [a]n inquiry into whether a land exchange is 'suitable' under 16 U.S.C. § 668dd(b)(3) may differ from the compatibility analysis for a right-of-way permit under 16 U.S.C. § 668ee(1), if only because a land exchange entails an increase in the Refuge's extent, which must be offset against a loss elsewhere.

*Id.*

Prior to FWS's decision approving the Land Exchange, the Department of the Interior confirmed that land exchanges do not require a compatibility analysis. FWS-AR0003778 (Solicitor's M-Opinion). The Department of the Interior reached this conclusion after finding that "[t]here is no statutory reference to any interplay between compatibility determinations and land exchanges." FWS-AR0003781; FWS-AR0003782 ("[T]he Administration and Improvement Acts do not require FWS to conduct a compatibility determination for any land exchange."); FWS-AR0003787 ("Given the text, structure, and legislative history of the Administration and Improvement Acts, and FWS's longstanding practice, I have concluded that compatibility determinations need not be undertaken for land exchanges.").

The case law addressing FWS's land exchange decisions further establishes that a compatibility analysis is not required. *Town of Superior v. U.S. Fish & Wildlife Serv.*, 913 F. Supp. 2d 1087, 1111 (D. Colo. 2012) ("The plain language of the Refuge Act supports the conclusion that a compatibility determination is not required for the acquisition of land."), *aff'd on other grounds, WildEarth Guardians v. U.S. Fish & Wildlife Serv.*, 784 F.3d 677 (10th Cir. 2015); *id.* ("[T]he Refuge Act's provision authorizing the FWS to enter into land exchanges is separate from the provision requiring a compatibility determination. *Compare* 16 U.S.C. § 668dd(b)(3) *with* § 668dd(d)."); *id.* at 1112 ("Since the land exchange does not fall within the meaning of 'use' under the Refuge Act, the FWS was not required to conduct a compatibility determination."). Plaintiffs cite no contrary precedent.

This interpretation makes sense because it recognizes that the two actions have different implications for the Refuge. As is evident from this case, under a land exchange FWS disposes of some land, but also receives additional land that can benefit the refuge overall. Once land is

exchanged, it belongs to a third party and is no longer part of the refuge. Thus, any use on the exchanged property is no longer a use within the refuge and is not controlled by the Refuge Act's requirements.

In sum, Plaintiffs' view relies on an untenable interpretation of the Refuge Act that contradicts Seventh Circuit precedent, case law from other courts, and the interpretation of the agency tasked with implementing the statute. This Court should decline Plaintiffs' invitation to read language into the statute where it simply does not exist and find in favor of Federal Defendants on Count I.

**C.     FWS's Determination that the Oak Road Property Was Suitable for Disposition Is Unreviewable By this Court and Supported by the Record (Count II).**

There is no dispute that Congress authorized FWS to exchange land within the Refuge System. The agency's authority is in the text of the Refuge Act and affords FWS significant discretion. FWS acted pursuant to that authority and discretion when it made its reasoned decision to dispose of the Oak Road Property in exchange for the Wagner Property. Though Plaintiffs argue that FWS's finding that the Oak Road Property was "suitable for disposition" violates the Refuge Act, Am. Compl. ¶¶ 260-263, their claim fails. First, whether a parcel is "suitable" for disposition is committed to agency discretion and is unreviewable by this Court. Second, if it is reviewable, the Record demonstrates that FWS based its suitability determination on sound evidence and a thorough analysis that accurately assessed the status of the Oak Road Property and the impact its disposition would have on the Refuge.

1.     Plaintiffs' "Suitability" Claim Fails Because that Determination Is Not Reviewable under the APA.

As a threshold matter, Plaintiffs cannot succeed on Count II because whether a parcel is "suitable" for disposition is committed to agency discretion and is unreviewable by this Court.

a. *Decisions Committed to Agency Discretion Are Not Judicially Reviewable.*

The judicial review provisions of the APA are not applicable when "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). The Supreme Court addressed Section 701(a)(2) in *Heckler v. Chaney*, explaining that "where Congress has not affirmatively precluded review [under Section 701(a)(1)], review is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." 470 U.S. 821, 830 (1985). In such a case, the statute "can be taken to have 'committed' the decisionmaking to the agency's judgment absolutely." *Id.* (citation omitted).

Following *Chaney*, the Supreme Court revisited this doctrine in *Webster v. Doe*, 486 U.S. 592 (1988). In *Webster*, the Supreme Court held that under the National Security Act the CIA Director's decision to terminate an employee was committed to his discretion and therefore unreviewable under the APA. *Id.* at 600-01. In reaching this determination, the *Webster* Court found particularly compelling that the Act "allows termination of an Agency employee whenever the Director 'shall *deem* such termination necessary or advisable in the interests of the United States'. . . , not simply when the dismissal *is* necessary or advisable to those interests." *Id.* at 600 (citation omitted). The Court stated that "[t]his standard fairly exudes deference to the Director, and appears to us to foreclose the application of any meaningful judicial standard of review." *Id.*

In *Singh v. Moyer*, 867 F.2d 1035, 1039 (7th Cir. 1989), the Seventh Circuit considered whether a United States Information Agency's decision not to waive a two-year residency requirement was reviewable under the APA. The statute, 8 U.S.C. § 1182(e), stated "that upon the favorable recommendation of the Director of the United States Information Agency, pursuant to the request of . . . the Commissioner of [INS]. . . , the Attorney General may waive the [two-year residency] requirement ." 867 F.2d. at 1038-39 (ellipses and first alteration in original). The Seventh Circuit held that, based on the plain language, the statute "is void of criteria in which to

judge how the Director determines the content of his inquiry or the nature of his recommendation[,]" and thus the Agency's decision was not reviewable under the APA. *Id.* at 1039. The Seventh Circuit also looked to the statute's structure and history and determined those elements confirmed the discretion in the statute's plain language. *Id.* at 1039.

        *b.*      *Plaintiffs' "Suitability" Claim Is Not Reviewable.*

*Chaney*, *Webster*, and *Singh* dictate that Plaintiffs' "suitability" claim fails because that determination is soundly rooted in FWS's discretion and is unreviewable.

The text of the Refuge Act makes clear that the decision to engage in a land exchange is committed to the discretion of FWS, through delegation by the Secretary of the Interior. Under the Refuge Act, "the Secretary is authorized to. . . [a]cquire lands or interests therein by exchange … for acquired lands or public lands, or for interests in acquired or public lands, under his jurisdiction which *he finds* to be suitable for disposition." 16 U.S.C. § 668dd (b)(3)(A) (emphasis added). As in *Webster,* where the Supreme Court determined that "deem" was language that "exudes discretion to the Secretary," so too is the language in the Refuge Act, which does not state that the lands must be objectively suitable for disposition, but the Secretary must simply "find" that the lands are suitable for disposition. Thus, by the plain language of the statute, the decision to engage in a land exchange and a determination that a parcel is suitable for disposition is committed to the discretion of FWS.

Consistent with the plain language of the statute and with the subsequent Supreme Court rulings in *Chaney* and *Webster*, the Sixth Circuit analyzed whether a land exchange under the Refuge Act is reviewable and explicitly held it was not. *Sierra Club v. Hickel*, 467 F.2d 1048, 1051 (6th Cir. 1972). The Sixth Circuit found that 16 U.S.C. § 668dd (b)(3) "confers broad discretion on the Secretary in the exchange of lands." *Id.* And because the decision was

committed to the Secretary's discretion, the action "is not reviewable by the Courts" under 5 U.S.C. § 701(a)(2). *Id.*

Pursuant to section 701(a)(2) of the APA, there is no meaningful standard in the Refuge Act against which to judge the agency's exercise of discretion regarding whether land is suitable for disposition, and thus Plaintiffs' "suitability" claim is not reviewable under the APA.

2.    <u>FWS Rationally Concluded that the Oak Road Property Was Suitable for Disposition and Complied with the Refuge Act.</u>

Under the plain language of the Refuge Act, FWS may acquire lands by exchange where (1) the agency finds the exchanged property is suitable for disposition and (2) where the values of the properties for exchange are of approximately equal value or equalized by cash payment. 16 U.S.C § 668dd(b)(3). Suitability is not defined in the statute and thus is left to FWS's discretion. *See* 16 U.S.C. § 668ee.

In its Net Benefit Analysis, FWS assessed the conservation value of the Oak Road Property and identified several reasons why it was suitable for disposition under 16 U.S.C. § 668dd(b)(3). The Oak Road Property is fragmented by Oak Road, an active gravel road that cuts through the Refuge to reach the ferry landing on the Mississippi River. SOF ¶¶ 98-99. In fact, the Oak Road right-of-way occupies about 24% of the total land area of the parcel. SOF ¶ 129. Beyond the gravel road, the Oak Road Property mainly consists of "scrub-shrub and wet meadow habitats intermixed with young willow and cottonwood stands" and provides "little to no wildlife or habitat value." SOF ¶ 98. The area surrounding the Oak Road Property is "routinely inundated" by flash floodwaters that "deposit debris from Turkey River." *Id*. Due to the routine flooding, restoration of the parcel's floodplain forests has been unsuccessful. *Id.* Instead, the land surrounding Oak Road is overrun with reed canary grass, an invasive plant that FWS has been unable to successfully control. *Id.*; SOF ¶ 100.

Further, the viewshed from the Oak Road Property is not uninterrupted natural habitat. Instead, the gravel Oak Road and the Utilities' two existing powerlines can be seen from the parcel. SOF ¶ 101.

Prior to completing the Land Exchange Agreement, FWS reviewed surveys of the Oak Road Property to determine the impact to bat and raptor (eagle) habitats. SOF ¶ 102. Bat habitat surveys in October 2023 confirmed that there was no suitable bat habitat within the divested tract. SOF ¶ 103. A raptor nest survey in December 2023 confirmed there were no raptor nests within 660 feet of the Oak Road Property. SOF ¶ 104. FWS considered these findings when assessing the Land Exchange's impact to the Refuge. SOF ¶ 105.

Finally, the Oak Road Property will continue to further the Refuge's purposes through protective land use restrictions contained in the deed. SOF ¶¶ 111-12. In particular, the Land Exchange Agreement requires the Utilities to follow an FWS-approved vegetation management plan that requires invasive species control, limitations on soil disturbance, and identification of desirable plant species. SOF ¶ 111. These deed restrictions ensure that the Oak Road Property will be managed according to FWS specifications in the long term.

In sum, FWS considered all of the relevant information, and in its discretion, rationally concluded the parcel was suitable for disposition, consistent with the condition of the Oak Road Property. Though Plaintiffs may disagree with that analysis, the agency was not required to do anything more, and Plaintiffs' disagreement does not amount to a Refuge Act violation. FWS provided a "satisfactory explanation for its action," and the Court should uphold that decision. *Bagdonas*, 93 F.3d at 426 (citation omitted).

**D.** **Plaintiffs' Net Benefit Claim Is Procedurally Improper and Ignores the Record (Count IV).**

Plaintiffs assert that FWS's determination that the Land Exchange provided a net conservation benefit to the Refuge was arbitrary and capricious. Am. Compl. ¶¶ 283-96. This claim likewise fails for two reasons: (1) the APA does not create a cause of action for a standalone "arbitrary and capricious" claim and (2) the Record demonstrates FWS considered all relevant information when assessing the net benefit of the Land Exchange.

1. Count IV Fails to State a Claim Based on FWS's Net Benefit Analysis.

The APA provides a limited waiver of sovereign immunity and a standard of review for claims challenging final agency action. 5 U.S.C. §§ 701-706. But it does not provide the substantive law for a court to apply in deciding whether a decision is arbitrary and capricious; that must come from another statute. *Or. Nat. Res. Council v. Thomas*, 92 F.3d 792, 798 (9th Cir. 1996); *Maple Hill Apartment v. Pierce*, 798 F.2d 1415 (6th Cir. 1986) (per curiam) ("[T]he APA does not create a substantive right in itself."). "The APA is merely a procedural vehicle for review of agency action, . . . in that its provisions merely provide a vehicle for enforcing rights which are declared elsewhere." *Navab-Safavi v. Broad. Bd. of Governors*, 650 F. Supp. 2d 40, 71 (D.D.C. 2009) (citations and quotation marks omitted), *aff'd sub nom. Navab-Safavi v. Glassman*, 637 F.3d 311 (D.C. Cir. 2011).

Accordingly, a standalone APA claim is not cognizable because a court may not review an agency action or find that agency action is arbitrary and capricious "in the absence of a statutory benchmark against which to measure an agency's exercise of discretion." *Int'l Bhd. of Teamsters v. U.S. Dep't of Transp.*, 861 F.3d 944, 955 (9th Cir. 2017); *see also Univ., Ltd. v. U.S. Dep't of Hous. & Urb. Dev.*, No. 02-C-0579, 2003 WL 1145438, at *6 (E.D. Wis. Feb. 4,

2003) (finding failure to state a cognizable APA claim where plaintiffs argued that government violated an internal guideline and provided no separate statutory basis for the claim).

Plaintiffs' Amended Complaint reveals that they are asserting a standalone "arbitrary and capricious" APA claim. Count IV argues that the "Net Benefit Analysis supporting the land exchange was arbitrary and capricious and contrary to law," but does not cite any independent, underlying statutory authority for that claim. Am. Compl. ¶¶ 283-96. Because Plaintiffs have not identified any statutory criteria against which this Court could review the challenged Net Benefit Analysis, their "net conservation benefit" claim fails.

> 2. <u>FWS's Approval of the Land Exchange Was Rational and Based on Overwhelming Evidence of a Net Benefit to the Refuge.</u>

Even if FWS's determination of the Land Exchange's "net conservation benefit" is subject to judicial review, Plaintiffs cannot show that FWS's analysis and conclusion were arbitrary and capricious because FWS rationally concluded that the Land Exchange would result in a net conservation benefit to the Refuge. Prior to approving the Land Exchange, FWS assessed the benefits to the Refuge of acquiring the Wagner Property and the consequences of disposing the Oak Road Property. This analysis is seen throughout the Record and is comprehensively set forth in the agency's Net Benefit Analysis.

On one side of the equation, FWS assessed the Wagner Property. Almost two-decades ago, FWS identified the Wagner Property as a high-priority acquisition target in the Refuge's CCP because of its "[h]igh value fish and wildlife habitat which is unique and irreplaceable on a national basis or in the ecoregion." SOF ¶ 86. FWS, an expert in habitat assessment and conservation, determined the Wagner Property "has a mosaic of habitats, including mature floodplain forest, that provide benefits to wildlife species, and it fronts the Mississippi River." SOF ¶ 88. This would benefit "the endangered Higgins Eye pearlymussel and other sensitive

aquatic species" because "[a]cquiring and preserving the shoreline protects these sensitive areas from development." *Id.* Unlike the Oak Road Property, the Wagner Property does not have any roads fragmenting the habitat, and acquisition of the Wagner Property will increase habitat connectivity in the Refuge by eliminating private inholdings and connecting disjunct portions of the Refuge. *Id.*; SOF ¶¶ 92-93 (showing Wagner Property among existing Refuge lands). It will also provide additional recreational opportunities such as hunting, fishing, and wildlife observation. SOF ¶ 89. Further, now that it has been acquired, there will be no construction activity on the Wagner Property. SOF ¶ 90.

On the other side of the equation, FWS compared these benefits to the Oak Road Property that would be divested. On a per acre basis alone, the benefit is apparent. SOF ¶ 91. The Refuge will gain 15.85 acres through the exchange. *Id.* As described in Argument, Section C.2 *supra*, the Oak Road Property has a lower conservation value given the existing fragmentation because of the gravel road; the rampant, uncontrollable, invasive species; and the ineffective restoration efforts. The Land Exchange will also reduce fragmentation in the Refuge as a whole because the Utilities will abandon their existing perpetual easements in the Refuge and will restore around 28 acres of habitat within the Refuge. SOF ¶¶ 114, 118, 121. Disposal of the Oak Road Property allows for the co-location of utility transmission lines along a corridor that is already cleared and fragmented by Oak Road. SOF ¶ 113. Co-locating transmission lines and the road into a single corridor will reduce habitat fragmentation overall within the Refuge and allow for the restoration of higher quality habitat. SOF ¶ 114.

FWS did not put on blinders and shy away from the fact the Oak Road Property will be used to construct the transmission line. It was an explicit factor considered in the analysis. SOF ¶ 106 ("The potential harms of building the CHC Project on the divested parcel must be

considered in the context of all the terms of the land exchange and the existing transmission line fragmentation in this unit of the Refuge."). Further, the FONSI, which incorporates the Net Benefit Analysis, recognized the extent of expected construction on the Oak Road Property, including that it would house transmission lines of up to 75-feet high. SOF ¶ 107. The Record also details how future transmission line construction will be carried out on the Oak Road Property. It will not be a free-for-all as Plaintiffs contend. Chiefly, no clear cutting can take place on the exchanged parcel; instead, only minor tree clearing will occur. SOF ¶ 106. The towers on the Oak Road Property will be limited to 75-feet in height, and at 75 feet the towers will be the same height as the tree canopy and will reduce potential bird collisions. SOF ¶ 108.

Ignoring FWS's thorough analysis, Plaintiffs allege that FWS's determination that the Land Exchange will result in a net benefit is flawed because it overstates the value of the Wagner Property. Am. Compl. ¶¶ 284-96. Plaintiffs primarily focus on land nearby, but not on, the Wagner Property as evidence that FWS improperly analyzed the Land Exchange's benefits. *Id.* Plaintiffs highlight a nearby campground (including its manmade lake and tiki bar), sand pit, and airport, and a railroad that borders but does not cross through the property. *Id.* ¶¶ 285-90. Plaintiffs claim that because these buildings and infrastructure are not explicitly mentioned in the Net Benefit Analysis, FWS's determination is arbitrary and capricious. But FWS did not ignore these surrounding conditions. FWS conducted a site inspection of the Wagner Property that examined the parcels for evidence of environmental hazards. SOF ¶ 94. This analyzed nearby properties that could diminish the Wagner Property. FWS noted that there was a "sterile or modified water" body nearby, and that the Wagner Property is near a campground. SOF ¶ 95. FWS also observed that Bard Sand and Gravel maintained a gravel pit to the north of the Property but noted that it was separated from the property by a railroad berm, thereby reducing

impacts. SOF ¶ 96. FWS also did not ignore that a railroad was nearby, as it was mentioned throughout the Site Inspection document and labeled on a map. SOF ¶ 97. Prior to the Land Exchange, FWS examined the Property and surrounding area, explicitly noted many items Plaintiffs claim were ignored, and used its expertise to determine that the off-site development did not have negative environmental impacts on the Property.

Plaintiffs fail to explain how developed areas somehow undercut the conservation value of the Wagner Property itself. Instead, they simply note the existence of developed areas outside of the Wagner Property and, without any evidence in the Record, invite the Court to assume that a negative impact to the Wagner Property would result. Because of the thin, linear nature of the Refuge, the Wagner Property is no different than many other portions of the Refuge, which abut non-Refuge property and are bordered by railroads. FWS considered the surrounding area and determined that the Wager Property acquisition would result in a net benefit to the Refuge. FWS's path to its decision can be readily discerned and, because the role of the Court is not to substitute its judgment for that of the agency, that decision should be upheld. *Bagdonas*, 93 F.3d at 426.

Plaintiffs' second attack relies on the appraised market value of the Wagner Property. Am. Compl. ¶¶ 291-94. Plaintiffs imply that because the Wagner Property "only" has a market value of $79,000, this is evidence that the property has a low conservation value and is not a valuable acquisition for the Refuge. *Id.* This argument misses the point of the appraisal and the relevant criteria for the Land Exchange. The appraisal estimates the market value of the property. SOF ¶ 126 ("The appraisal calls for the valuation of the Fee Simple market value of the subject property."). It does not estimate a parcel's conservation benefit. The reason appraisals are performed in land exchanges is to confirm that either the two properties are of equal market

value or that an equalization payment to offset any difference in market value is necessary. SOF ¶ 130 (explaining difference in appraised values of the properties and the estimated equalization payment); 16 U.S.C. § 668dd(b)(3)(B). In contrast, the Net Benefit Analysis, not the appraisal, is the document that explains the conservation benefits of the Land Exchange. *E.g.*, SOF ¶¶ 88, 98.

Relatedly, Plaintiffs assert that, because the Wagner Property was valued at $79,000, FWS could have easily bought the property outside the exchange. Am. Compl. ¶¶ 291-94. There is no support for this statement, and it disregards FWS's policies. Under the FWS Manual, there are narrow circumstances (which do not apply here) when the agency may pay above fair market appraised value for an acquired property. Div. of Realty, 342 FW § 3.8, USFWS (June 17, 2001), https://www.fws.gov/policy-library/342fw3. Based on the price paid by the Utilities, the Wagner Property's prior owner sought more than double the market value of the tract. FWS lacks authority to pay a price so far above market value. The limitations on FWS's authority were set forth in the Net Benefit Analysis. SOF ¶ 87 (stating that "the Refuge would likely be unable to acquire the tract outside of this proposed exchange due to limits of how much the Service can pay per acre based on fair market value"). This argument also ignores that there is no evidence of any prior owner being willing to sell the Wagner Property for $79,000. *Id.* ("The tract has never been offered to the Refuge for acquisition . . . .").

In sum, Plaintiffs attempt to poke holes in the Net Benefit Analysis by saying what FWS should have done instead. But Plaintiffs' disagreement with FWS's conclusion is not evidence of an arbitrary and capricious analysis. *Pres. Endangered Areas of Cobb's Hist., Inc. v. U.S. Army Corps of Eng'rs*, 87 F.3d 1242, 1248 (11th Cir. 1996) ("Although the plaintiffs disagree with the conclusion of the Corps, they can point to nothing that would make the Corps decision arbitrary and capricious."); *Lands Council v. Martin*, 529 F.3d 1219, 1228 (9th Cir. 2008) ("We therefore

reject Plaintiffs' challenge to the Forest Supervisor's conclusion that the amendment is not significant, to the extent that Plaintiffs simply disagree with the Forest Supervisor's conclusion."). The Administrative Record demonstrates that FWS analyzed the relative conservation values of the two properties, exercised its permitted discretion, and documented its decision in the Net Benefit Analysis. The Court should grant summary judgment for Federal Defendants on Count IV.

### E.  FWS's Approval of the Land Exchange Is Consistent with the CCP (Count III)

In Count III, Plaintiffs contend that the Land Exchange conflicts with the Refuge's CCP because it increases fragmentation and trades away "floodplain" land. Am. Compl. ¶¶ 264-76. This challenge fails because it misconstrues the undisputed facts and ignores that FWS specifically identified the Wagner Property as a target acquisition in 2006.

The Refuge Act directs FWS to create a comprehensive conservation plan for each refuge within the Refuge System. 16 U.S.C. § 668dd(e)(1)(B). FWS must "manage the refuge. . . in a manner consistent with the plan." *Id.* § 668dd(e)(1)(E); *see also Audubon Soc'y of Portland v. Haaland*, 40 F.4th 967, 979 (9th Cir. 2022). FWS's interpretation and application of its CCP is entitled to deference. *See Ind. Forest All., Inc. v. U.S. Forest Serv.*, 325 F.3d 851, 859, 861 (7th Cir. 2003) (noting decisions implicating agency expertise are entitled to deference); *Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1099 (9th Cir. 2003) (holding agency interpretation of its own management plan entitled to "substantial deference"). Against this deference, Plaintiffs cannot show that FWS acted arbitrarily and capriciously when it approved the exchange of the low-conservation value Oak Road Property for the Wagner Property.

The CCP identifies land acquisition as a "critical component of fish and wildlife conservation." SOF ¶ 86. In 2006, well before the Land Exchange was ever proposed, the CCP identified the Wagner Property as an acquisition priority because of its "[h]igh value fish and

wildlife habitat which is unique and irreplaceable on a national basis or in the ecoregion." *Id.*

Thus, FWS's decision to acquire the Wagner Property is undoubtedly consistent with the CCP's

goals, which explicitly identified it as a target for acquisition.

FWS's decision to exchange the Oak Road Property is also consistent with the CCP.

Plaintiffs focus on the CCP's use of "floodplain" and attempt to equate the fragmented, Oak

Road Property with pristine wetlands. Am. Compl. ¶¶ 266, 273. But not all land within the

Turkey River Bottoms area is created equal. FWS, relying on its expertise and discretion,

thoroughly analyzed the Oak Road Property and determined it was suitable for disposition given

the presence of the gravel road, invasive species, and unsuccessful restoration efforts. *See*

Argument, Section C.2 *supra*. Nor can Plaintiffs point to any part of the CCP that explicitly

identifies the Oak Road Property (rather than the general floodplain area) as a high-quality

habitat. And Plaintiffs also fail to acknowledge that, through the Land Exchange, the Refuge will

gain additional improved floodplain habitat within the Turkey River Bottoms because the

Utilities will give up and restore their two existing perpetual easements through the Stoneman

Crossing. SOF ¶ 117 (describing restoration project in "floodplain wetlands").

Finally, Plaintiffs' argument that the Land Exchange increases fragmentation willfully

ignores the undisputed facts. Without the Land Exchange, (1) the two transmission lines running

through the Stoneman Crossing would remain and continue to fragment sensitive wetland

habitat, (2) the gravel Oak Road to the ferry would continue to operate through the Oak Road

Property, and (3) the Wagner Property would remain under private ownership and two private,

inholdings would continue to fragment Refuge land along the Wisconsin side of the Mississippi

River. With the Land Exchange, the Stoneman Crossing is removed and restored, the

transmission line will run alongside the existing Oak Road, and the Wagner Property transforms

from a private tract subject to potential future development to a continuous block of protected, high-quality habitat within the Refuge. Thus, three fragmenting effects are reduced to one. SOF ¶ 114 ("The restoration and abandonment of these existing perpetual rights-of-way will remove fragmentation from more sensitive wetland habitats along the entire existing right-of-way through the Refuge on this tract and co-locate transmission line fragmentation with the existing gravel road, creating an overall reduction in habitat fragmentation in that area of the Refuge.").[6]

Accordingly, FWS's conclusion that the Land Exchange fulfills the purpose of the Refuge's CCP was not arbitrary or capricious and did not violate the Refuge Act. The Court should enter judgment in favor of Federal Defendants on Count III.

## F. Plaintiffs and the Public Had Notice of, and Extensive Opportunities to Comment on, the Impacts to the Refuge (Count V).

In Count V, Plaintiffs assert that Federal Defendants violated NEPA's public participation requirements by failing to provide adequate notice and an opportunity to comment on the Supplemental EA, Net Benefit Analysis, FWS FONSI, RUS FONSI, and Land Exchange Agreement. Am. Compl. ¶¶ 297-322. Contrary to Plaintiffs' claims, they were provided multiple opportunities to comment on the potential impacts of the proposed major federal actions associated with the CHC Project. And Plaintiffs took advantage of those opportunities beginning in 2016. Federal Defendants complied with NEPA and all applicable regulations and this Court should not accept Plaintiffs' overreaching and unsupported reading of the law.

---

[6] Plaintiffs cite a FWS proposed rule on ecological integrity to support their fragmentation argument, Am. Compl. ¶¶ 268-69; however, proposed regulations are not binding on the agency unless finalized. *See Commodity Futures Trading Comm'n v. Shor*, 478 U.S. 833, 845 (1986) ("It goes without saying that a proposed regulation does not represent an agency's considered interpretation of its statute and that an agency is entitled to consider alternative interpretations before settling on the view it considers most sound."); *Eustace v. Commissioner*, 312 F.3d 905, 908 (7th Cir. 2002) ("proposed regulations have no legal effect"). Even if the proposed regulations were in effect, however, the Land Exchange minimizes habitat fragmentation in the Refuge as a whole.

1. <u>Federal Defendants Provided Extensive Notice and Comment Opportunities.</u>

Since the environmental review for the CHC Project began, Federal Defendants have provided multiple opportunities for written comment and held several public meetings. Plaintiffs have invoked those opportunities and were able to provide their opinions to Federal Defendants before any decisions were made.

On October 18, 2016, RUS issued a notice of intent to complete an EIS. SOF ¶ 8. As part of the EIS scoping process, RUS held four open-house meetings, one in Iowa and three in Wisconsin, to solicit public comments. SOF ¶ 10. The purpose of the public meetings was to provide notice of the NEPA process and to solicit feedback on the CHC Project that would be used to prepare the EIS. SOF ¶ 11.

Next, a draft EIS was published on December 7, 2018, and was initially available for a 60-day public comment period. SOF ¶¶ 25-26. The comment period was extended until April 1, 2019. SOF ¶ 26. RUS held six public meetings on the draft EIS during the comment period. SOF ¶ 27. RUS published the Final EIS in October 2019, and accepted public comments on the EIS for 30 days. SOF ¶¶ 30-31. RUS signed a Record of Decision in January 2020. SOF ¶ 48. Then, in response to proposed route changes from the Utilities, RUS published an EA to analyze the significance of the route modifications on June 24, 2021, which was subject to a 30-day comment period. SOF ¶¶ 59-61. Following the revocation of the Compatibility Determination and Right-of- Way permit, on September 8, 2023, RUS published a Draft Supplemental EA that addressed all nine route modifications as well as the proposed Land Exchange. SOF ¶ 64. The Draft Supplemental EA was subject to an additional 14-day public comment period. SOF ¶ 65. Appendix B of the Final Supplemental EA summarizes all public comments received during that comment period and agency responses. SOF ¶ 68. On October 6, 2023, RUS issued a FONSI with respect to the eight route modifications outside the Refuge. SOF ¶ 77. On February 22,

2024, FWS signed the FWS FONSI with respect to the route modification through the Refuge and the proposed Land Exchange. SOF ¶ 78. The FWS FONSI was published on RUS's website, which serves as a repository for all NEPA documents for the CHC Project. *See* Rural Utilities Service, *CHC Transmission Line Project- Iowa & Wisconsin*, https://www.rd.usda.gov/resources/environmental-studies/impact-statement/cardinal-hickory-creek-transmission-line-project-iowa-wisconsin (last visited June 20, 2024).

Plaintiffs' participation in the NEPA process began in 2016 and continued throughout the various comment opportunities after that. Plaintiffs submitted comments during the scoping process for the EIS. SOF ¶ 12. Once the draft EIS was published, Plaintiffs submitted a 77-page comment, SOF ¶ 29, and then submitted a comment on the final EIS, SOF ¶ 32. Plaintiffs also submitted comments on the EA, SOF ¶ 62, and a 40-page comment during the public comment period for the draft Supplemental EA, SOF ¶ 66. Plaintiffs acknowledge they were emailed copies of the February 2024 documents on February 23, 2024, the same day they were completed. Pls.' Br. on Notice and Comment Requirements 9, ECF No. 77.

2. <u>Plaintiffs Cannot Meet their Burden to Show A NEPA Violation.</u>

Given the clear text of the applicable regulations, Plaintiffs cannot show that Federal Defendants failed to provide adequate notice-and-comment opportunities. Neither the Land Exchange Agreement nor the Net Benefit Analysis are covered by NEPA's public participation requirements, and Federal Defendants provided the required notice-and-comment for the Supplemental EA and FONSIs. Acceding to Plaintiffs' demands and imposing new procedural requirements on the agency beyond those required in the statute or agency regulations would go against binding Supreme Court precedent. *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 524 (1978) ("Agencies are free to grant additional procedural rights in the exercise of their discretion, but reviewing courts are generally not free to impose them if

the agencies have not chosen to grant them."). This Court should decline to do so and should grant summary judgment in Federal Defendants' favor on Count V.

First, NEPA does not require FWS to provide notice or an opportunity to comment on the Net Benefit Analysis or Land Exchange Agreement, in either draft or final forms. NEPA's notice-and-comment regulations apply only to "environmental documents," a defined term that is limited to "environmental assessment, environmental impact statement, finding of no significant impact, or notice of intent." 40 C.F.R. § 1508.1(i). The Net Benefit Analysis is FWS's internal metric to determine whether the proposed exchange provides a net benefit to the Refuge and complies with the Refuge Act. It is not an "environmental document" under NEPA. Similarly, the Land Exchange Agreement also is not an "environmental document" because it merely finalizes the real estate transaction approved by the Net Benefit Analysis. And as described below, even if either document were an "environmental document," nothing in the regulations require draft versions be made available for public comment. Thus, because these documents are not covered by NEPA's public participation requirements, Federal Defendants could not possibly have failed to provide adequate notice-and-comment.

Second, for those environmental documents covered by NEPA's public participation requirement, including the FWS FONSI, RUS FONSI, and Supplemental EA, Federal Defendants gave all required notice and public participation required under the law. Plaintiffs argue that the notice for these documents was inadequate, the comment period was too short, and the agency should have held hearings. This argument fails because RUS and FWS complied with all applicable regulations. Nor could Plaintiffs have been injured by these purported notice-and-comment defects because Plaintiffs submitted detailed comments on the Draft Supplemental EA and admit that they received sufficient notice of the FONSIs.

RUS published the initial EA addressing route modifications for the CHC Project on June 24, 2021, and it was available for comment for 30 days. SOF ¶ 61. This is the upper limit of what RUS's regulations require. 7 C.F.R. § 1970.102(b)(6)(ii) ("A 14- to 30-day public review and comment period, as determined by the Agency, will be provided for all Agency EAs."). FWS's regulations only require public notification of and involvement with an EA "to the extent practicable." 43 C.F.R. § 46.305(a); 40 C.F.R. § 1501.5(e). In accordance with those regulations, the public was notified of the EA and given a month to comment on it.

On September 8, 2023, RUS published the Draft Supplemental EA. SOF ¶ 64. RUS regulations do not require another comment period for supplemental EAs. 7 C.F.R. § 1970.103. Nevertheless, RUS noticed the Draft Supplemental EA for an additional comment period of 14 days. SOF ¶ 65. Plaintiffs then submitted a detailed 40-page comment listing their many concerns with the agency's analysis. *See* SOF ¶ 66. Whether Plaintiffs agree with the conclusions the agencies reached (i.e., publishing a FONSI rather than completing an EIS) is irrelevant to whether the public participation requirements were met. The 30- and 14-day comment periods more than satisfied the public participation requirements for the EA and Supplemental EA. Plaintiffs also fail to address how any purported deficiency in this comment period could have harmed them, given that they submitted forty pages of comments on the Draft Supplemental EA within the time permitted. *Id*. Without any such harm, they appear to merely assert a generalized interest in a longer comment period on behalf of the public, which cannot by itself maintain standing on these claims. *See Warth v. Seldin*, 422 U.S. 490, 499 (1975) (noting that prudential standing requires a plaintiff to assert "his own legal rights" not just "generalized grievances" shared by the public).

After comments were received in October 2023, RUS issued a final Supplemental EA. SOF ¶ 67. RUS published a FONSI on October 6, 2023 and FWS published a FONSI on February 22, 2024. Plaintiffs argue that a FONSI must be published in draft form and subject to comment. Am. Compl. ¶ 309-11, 318-19. But a FONSI is not subject to public comment. 43 C.F.R. § 46.305(c) ("Comments on a finding of no significant impact do not need to be solicited . . ."). The agency must merely notice its availability once complete. *Id.* (requiring only public notice that a FONSI has been issued); 7 C.F.R. § 1970.102(b)(8) (requiring only public notice that a FONSI has been issued); 40 C.F.R. § 1501.6(a)(1) (requiring only public notice that a FONSI has been issued). Consistent with 43 C.F.R. § 46.305(c), 7 C.F.R. § 1970.102(b)(8), and 40 C.F.R. § 1501.6(a)(1), the FONSIs were published online and were also sent directly to Plaintiffs.

Plaintiffs also suggest Federal Defendants had to hold public hearings to solicit comment on the FONSIs and Supplemental EA, as well as the Net Benefit Analysis and Land Exchange Agreement. Am. Compl. ¶¶ 310, 315, 319. Contrary to Plaintiffs' unsupported view, the applicable regulation leaves it to the agency's discretion to hold public hearings or meetings "whenever appropriate," 40 C.F.R. § 1506.6(c), and to "solicit appropriate information" from the public, *id.* § 1506.6(d). And in exercising this discretion, an agency need not "hold a public hearing before preparing an environmental assessment." *River Rd. All., Inc. v. Corps of Eng'rs of U.S. Army*, 764 F.2d 445, 451 (7th Cir. 1985) (citing 40 C.F.R. § 1506.6(c)), much less before preparing non-NEPA documents such as the Net Benefit Analysis and Land Exchange Agreement. *See also Safe Skies Clean Water Wis., Inc. v. Nat'l Guard Bureau*, 578 F. Supp. 3d 998, 1010 (W.D. Wis. 2022) (discussing 40 C.F.R. § 1506.6 and stating "there is no legal obligation to hold a public hearing as opposed to soliciting written comments").

In sum, that Plaintiffs misrepresent what is required under NEPA does not mean that Federal Defendants failed to involve the public. Federal Defendants are entitled to summary judgment on Count V.

**G.      Federal Defendants Complied with NEPA (Count VI).**

Plaintiffs' NEPA claim raises alleged defects with the October 2019 EIS's purpose and need statement, range of alternatives, and analysis of environmental impacts. Am. Compl. ¶¶ 333-43. Plaintiffs disregard that the only reviewable federal action before the Court is FWS's Land Exchange and attempt to challenge the environmental review for the entire CHC Project. Federal Defendants are entitled to summary judgment on Count VI because the purpose and need for the Project allowed FWS to consider reasonable alternatives (including no crossing of the Refuge); FWS did consider available alternatives to a land exchange; and FWS considered the climate impacts of the Land Exchange.

1.      <u>The Scope of this Court's NEPA Review Is Limited to the Land Exchange.</u>

Plaintiffs' NEPA claim ignores that the environmental review for the entire CHC Project is not before this Court. Instead, because neither action by the Corps nor RUS are reviewable, the only ripe and reviewable federal action is FWS's Land Exchange. *See* Argument, Section A *supra.* Thus, Plaintiffs' challenges to the EIS's purpose and need statement, the alternatives considered, and the analysis of greenhouse gases must be evaluated only with respect to FWS.

Plaintiffs try to attribute responsibility for the entire environmental review to FWS because it signed the EIS. Am. Compl. ¶ 348. Such an argument should be rejected. RUS is the lead agency for NEPA preparation because the environmental review was triggered by a potential future funding application by Dairyland. SOF ¶¶ 9, 13; 7 C.F.R. § 1970.8(b)(1) (environmental review applies to "[p]roviding financial assistance"). "RUS, through the Electric Program, makes loans and loan guarantees for rural electrification and the furnishing of electric

service to persons in rural areas." *Id.* § 1700.28. FWS, on the other hand, has no expertise in rural electrification projects. Instead, FWS has expertise in administering the nation's refuges. 16 U.S.C. § 668dd(a). For this reason, FWS served only as a cooperating agency, and its purpose in the NEPA review at the initial stages was to "evaluate the Utilities' request for a right-of-way (ROW) easement and a Special Use Permit to cross the Refuge." SOF ¶ 17. Once the right-of-way permit was withdrawn, FWS's role shifted to reviewing the proposed Land Exchange. SOF ¶ 69. The cooperating agency principle allows agencies to avoid "duplicat[ing] the work done by another federal agency which also has jurisdiction over a project" and "NEPA regulations encourage agencies to coordinate on such efforts." *Sierra Club v. U.S. Army Corps of Eng'rs*, 295 F.3d 1209, 1215 (11th Cir. 2002). But NEPA does not expand FWS's authority or expertise and Plaintiffs fail to point to any authority to support the proposition that FWS's signature on the EIS makes it responsible for the entire environmental review of aspects outside the agency's scope of responsibility or expertise and control. Accordingly, FWS' obligations under NEPA were commensurate to the action it was proposing— approving a land exchange within the Refuge—and the portion of the Project that was under FWS's authority and control. *See Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 768-70, (2004) (finding no NEPA violation when agency did not prepare an EIS to consider the environmental impact of an action it had no control over).

2.  The Purpose and Need Statement Allowed for Consideration of Reasonable Alternatives to the Land Exchange.

Plaintiffs argue that one part of the final EIS's six-part purpose and need statement violates NEPA because it is too narrowly drafted and did not allow Federal Defendants to consider Plaintiffs' preferred alternatives. Am. Compl. ¶¶ 333-40 (challenging only the purpose and need statement of "increase[ing] the transfer capability of the electrical system between Iowa and Wisconsin"). In developing an EIS, an agency must confront three questions: the purpose of

the proposed project, reasonable alternatives to the project in light of that purpose, and the extent to explore each reasonable alternative. *Simmons v. U.S. Army Corps of Engineers*, 120 F.3d 664, 668-69 (7th Cir. 1997). The Seventh Circuit has cautioned that those questions must be left to "an agency . . . to resolve in the first instance. We owe and accord deference to the [agency] on whether the [agency] resolved those three questions in a permissible way." *Id*. at 669. Deference is particularly appropriate because the "purpose" of a project "is a slippery concept, susceptible of no hard-and-fast definition." *Id*. at 666. An agency may not "contrive a purpose so slender as to define competing 'reasonable alternatives' out of consideration[.]" *Id*. But the purpose and need statement must just be "broad enough to permit consideration" of alternatives. *See Env't Law & Pol'y Ctr. v. U.S. Nuclear Regul. Comm'n*, 470 F.3d 676, 84 (7th Cir. 2006) (analyzing the application of *Simmons* to early site plan for nuclear power plant). And an EIS does not flout these guidelines simply because its definition of a project's purpose precludes a particular interest group's preferred alternative. *See id.* at 683-84. In reviewing an agency's stated purpose and need for the project, the reviewing court grants agencies "considerable discretion." *Nat'l Wildlife Fed'n v U.S. Army Corps of Eng'rs*, 75 F.4th 743, 754 (7th Cir. 2023) (quoting *Alaska Survival v. Surface Transp. Bd.*, 705 F.3d 1073, 1084 (9th Cir. 2013)). Ultimately, the Court should not substitute its judgment for that of the agency. *Nat'l Wildlife Fed'n*, 75 F.4th at 749.

Plaintiffs' purpose and need argument, like their entire NEPA claim, disregards the scope of the federal action at issue. "In commanding agencies to discuss 'alternatives to the proposed action,' however, NEPA plainly refers to alternatives to the 'major *Federal* actions significantly affecting the quality of the human environment,' and not alternatives to the applicant's proposal." *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 199 (D.C. Cir. 1991). "An agency cannot redefine the goals of the proposal that arouses the call for action; it must evaluate

alternative ways of achieving *its* goals, shaped by the application at issue and by the function that the agency plays in the decisional process." *Id.* In other words, FWS was not free to "redefine the goals of the proposal" or alter siting beyond the boundaries of the Refuge. *Id.*; *see also Hoosier Env't Council v. U.S. Army Corps of Eng'rs*, 722 F.3d 1053, 1061 (7th Cir. 2013) (holding that the Corps assuming responsibility for Federal Highway Administration's alternatives analysis "would usurp" federal and state law). Wisconsin and Iowa state utility regulators approved transmission line routing. SOF ¶ 4. FWS could only evaluate "alternative ways of achieving *its* goals[.]" *Citizens Against Burlington, Inc.*, 938 F.2d at 199.

Here, the purpose and need statement is only relevant to the extent that it allowed FWS to consider a reasonable range of alternatives to its proposed action. Thus, FWS was tasked with considering, and did consider, reasonable alternatives to the proposed Land Exchange to further its conservation mission. In the Supplemental EA, along with considering the Land Exchange, FWS considered the no-action alternative of "not grant[ing] the land exchange and/or *any regulatory permits necessary for the C-HC Project to cross the Refuge*." SOF ¶ 70 (emphasis added). This no-action alternative also necessarily entailed the consideration that the "existing [Stoneman Crossing] would remain in place with full operational capacity." SOF ¶ 71. FWS ultimately approved the Land Exchange because it results in a net conservation benefit to the Refuge by providing for acquisition of high-quality habitat; decreasing overall fragmentation in the Refuge; and consolidating roads and utilities in this area of the Refuge to a single corridor with little to no wildlife value. Given the scope of its action, Plaintiffs' preferred alternatives— an alternative route around the Refuge or a non-specified package of non-wire alternatives—are not reasonable because they would not have been feasible for FWS to implement, other than to adopt the "no action" alternative that was under the agency's consideration. *See Alaska Survival*

*v. Surface Transp. Bd.*, 705 F.3d 1073, 1088 (9th Cir. 2013) (court "cannot say that failure to consider [an] alternative is improper without evidence showing the feasibility of the alternative"); *Ctr. for Food Safety v. Vilsack*, 718 F.3d 829, 842 (9th Cir. 2013) (NEPA did not require agency to evaluate alternative of partial deregulation when the agency had no statutory authority to regulate the commodity in question at all). Accordingly, Plaintiffs' argument that FWS should have considered non-wire or non-Refuge crossings is nothing more than semantics and their disagreement with FWS's conclusions. Such disagreement does not amount to a NEPA violation.

a.    *Plaintiffs' NEPA Argument Fails Even if the Entire CHC Project is Reviewable.*

Even if the environmental review of the entire CHC Project were before this Court, Plaintiffs' purpose and need argument still fails. First, the Project's purpose of "increasing the transfer capability of the electrical system between Iowa and Wisconsin" falls well within the range of "general" goal statements that courts have upheld. *See Env't Law & Pol'y Ctr.*, 470 F.3d at 683-84 (upholding goal of "baseload energy generation"); *Van Abbema v. Fornell*, 807 F.2d 633, 638 (7th Cir. 1986) (identifying the "general goal" as "deliver[ing] coal from mine to utility").

Second, the purpose of increasing transfer capability between Iowa and Wisconsin emerged from a multi-year regional transmission planning process, making it particularly worthy of judicial deference. *See, e.g.*, *Hoosier Env't Council*, 722 F.3d at 1059 (warning that an agency's analysis of project alternatives should not "usurp the responsibility" assigned to other federal and state authorities in the planning process). Under federal law, regional transmission organizations such as MISO, in coordination with state authorities and other stakeholders, are responsible for transmission planning and expansion within the regions they serve. *See* 18 C.F.R. § 35.34(k)(7). Here, MISO followed a federally authorized planning process in analyzing,

proposing, and approving the Multi-Value Project portfolio, which included the CHC Project. SOF ¶ 3.

Finally, the EIS's statement of purpose and need does not violate NEPA simply because it led to the dismissal of non-transmission alternatives from further consideration. *See* Am. Compl. ¶¶ 333, 338-40. So long as "the agency's objectives are reasonable," courts "will uphold the agency's selection of alternatives that are reasonable in light of those objectives." *Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 73 (D.C. Cir. 2011) (citations omitted). The purpose and need for the CHC Project also aligns with RUS's statutory purpose of granting loans for furnishing and improving rural electrification, including distribution, transmission, and generation facilities. 7 U.S.C. § 902; *Id.* § 904(a); SOF ¶ 15; *see Citizens Against Burlington, Inc.*, 938 F.2d at 196 ("Perhaps more importantly [than an applicant's goals], an agency should always consider the views of Congress . . . in the agency's statutory authorization . . .). In *Environmental Law and Policy Center v. U.S. Nuclear Regulatory Commission*, the plaintiffs claimed that the Nuclear Regulatory Commission's Atomic Safety Licensing Board's failure to consider energy efficiency alternatives to the proposed nuclear plant violated NEPA. 470 F.3d at 682. The Seventh Circuit, however, held that the purpose and need was broad enough to consider other energy generating alternatives, and that it was "reasonable" to exclude alternatives the project proponent "was in no position to implement." *Id.* at 684. The Court rejected plaintiffs' contention that the Board should have independently analyzed energy efficiency alternatives. *Id.* ("Because the [project sponsor] was a private company engaged in generating energy for the wholesale market, the Board's adoption of baseload energy generation as the purpose . . . was not arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." (citation omitted)).

Having specified the purpose and need for the CHC Project, the EIS then identified and analyzed a number of different alternatives to the Project. An EIS should evaluate reasonable alternatives, and for those alternatives eliminated from detailed study, the agency need only "briefly discuss" why they were eliminated. 40 C.F.R. § 1502.14(a). At the same time, because analyzing alternatives consumes significant amounts of time and money, "[i]t is axiomatic that the [agency] need not examine every conceivable alternative[.]" *Simmons*, 120 F.3d at 669. The Supreme Court has cautioned that "[t]o make an impact statement something more than an exercise in frivolous boilerplate[,] the concept of alternatives must be bounded by some notion of feasibility." *Vt. Yankee,* 435 U.S. at 551.

Plaintiffs critique the EIS's treatment of non-transmission alternatives and alternative routes that would not cross the Refuge. *See* Am. Compl. ¶¶ 338-40. But the EIS and the preliminary studies that preceded it—the 110-page Alternatives Evaluation Study, SOF ¶ 19, the 318-page Macro-Corridor Study, SOF ¶ 20, and the 408-page Alternative Crossings Analysis SOF ¶ 21—sufficiently explored both non-transmission alternatives and alternative locations for the CHC transmission line.

First, the EIS considered several non-transmission alternatives to the CHC Project: regional and local renewable electricity generation, energy storage, energy efficiency, and demand response. SOF ¶ 39. After discussing the potential benefits of these options, the EIS concluded that they were not yet technically or economically feasible at the required scale and would not fulfill the purpose and need. SOF ¶ 39. These conclusions are entitled to deference. *See Protect Our Comtys. Found. v. Jewell*, 825 F.3d 571, 581 (9th Cir. 2016) (upholding dismissal of distributed generation as infeasible and inconsistent with the agency's goals). Thus, the EIS's consideration and subsequent dismissal of non-transmission alternatives satisfies

NEPA's requirement to "briefly discuss the reasons" they were eliminated from detailed study. 40 C.F.R. § 1502.14(a); *see All Indian Pueblo Council v. United States*, 975 F.2d 1437, 1444–46 (10th Cir. 1992) (holding that similar discussion in EIS complied with 40 C.F.R. § 1502.14(a)).

Second, the EIS's analysis of alternative routes for the transmission line also satisfies NEPA. First, in compliance with 40 C.F.R. § 1502.14(a), the EIS provided a reasoned basis for dismissing from detailed consideration routes that would not cross the Refuge. Beginning in 2012, Refuge staff worked with the Utilities to analyze options for avoiding the Refuge, which covers about 240,000 acres and 260 river miles along the Mississippi River. SOF ¶¶ 24, 82, The Alternative Crossings Analysis explored seven alternative river crossings in detail, analyzing engineering and regulatory opportunities and constraints; environmental, land use, and social impacts; and feasibility. SOF ¶¶ 21-23. Drawing on that report, the EIS briefly considered non-Refuge crossings of the Mississippi River and explained why each was infeasible from an engineering, safety, or regulatory standpoint or presented unacceptable environmental, cultural, or historical impacts. SOF ¶¶ 36-38. It also explained that the non-Refuge crossings would pose greater overall environmental and social impacts. *Id.*; *see also* SOF ¶ 21. NEPA requires nothing more, *see* 40 C.F.R. § 1502.14(a), and Federal Defendants' conclusions on this subject are entitled to deference. *See, e.g.*, *Env't Law & Pol'y Ctr.*, 470 F.3d at 682.

In sum, the EIS's alternatives analysis was not arbitrary or capricious because it appropriately considered and dismissed non-feasible alternatives and because Federal Defendants did not have to analyze alternatives that could not meet the Project's purpose and need.

3.     <u>The EIS and Supplemental EA's Discussion of Climate Change Impacts Satisfies NEPA.</u>

Plaintiffs' final NEPA challenge asserts that Federal Defendants did not adequately analyze climate change impacts or greenhouse gas emissions from the CHC Project. Am. Compl. ¶¶ 343-44. NEPA requires agencies to discuss the environmental impacts of the reasonable alternatives. 40 C.F.R. § 1502.16. In examining the adequacy of an EIS's impacts analysis, a court's "only role is to ensure that the agency has taken a hard look at environmental consequences." *Env't Law & Pol'y Ctr.*, 470 F.3d at 682. "[A]rbitrary and capricious review prohibits a court from substituting its judgment for that of the agency as to the environmental consequences of its actions." *Highway J Citizens Grp.*, 349 F.3d at 953 (internal quotation marks and alterations omitted) (citing *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)). In conducting this review, courts must "take care to distinguish between claimed deficiencies in an EIS that are 'merely flyspecks' and those that are 'significant enough to defeat the goals of informed decisionmaking and informed public comment.'" *Habitat Educ. Ctr., Inc. v. U.S. Forest Serv.*, 673 F.3d 518, 528 (7th Cir. 2012) (quoting *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1163 (10th Cir. 2002), *as modified on reh'g*, 319 F.3d 1207 (10th Cir. 2003)).

Because the relevant federal action is a land exchange that will accommodate a short segment of the transmission line, the only environmental impacts relevant to this litigation are those stemming from the Land Exchange, not construction and operation of the entire transmission line. Completion and operation of the transmission line is merely a "*consequence* of the action under attack, which is—understood in its most reasonable terms—only the land exchange." *WildEarth Guardians v. U.S. Fish & Wildlife Serv.*, 784 F.3d 667, 694-95 (10th Cir.

2015) (holding FWS not responsible for assessing and enforcing environmental regulations applicable to entire parkway).

FWS determined that the Land Exchange would have "no new impact" on climate change and that any overall impacts would be minor. SOF ¶ 75 (Supplemental EA stating that "[n]either the proposed route modifications nor the proposed land exchange would result in changes to the minor, long-term increase in [greenhouse gas] emissions over the approved C-HC Project."). If anything, incorporation of the Wagner Property into the Refuge will "result in very minor beneficial impacts to air quality and climate change resulting from carbon sequestration resulting from the acquired parcel being managed for resource conservation." SOF ¶ 76. Thus, Federal Defendants took a hard look at the effects on climate change related to the Land Exchange.

Because Plaintiffs improperly focus on the EIS for the entire CHC Project, they do not raise any claims related to the climate change analysis for the Land Exchange. Instead, they argue that the EIS did not adequately account for the climate change impacts attributable to the operation of the entire transmission line, including any fossil fuel sources. Am. Compl. ¶ 343. Just as with the purpose and need statement, even if the entire CHC Project were properly before the Court—which it is not—the Record demonstrates that Federal Defendants took a hard look at climate change and greenhouse gas emissions. The EIS explicitly analyzed the climate impacts of operating the entire transmission line, which included estimated tons of emissions from maintenance activities and operation of new gas-insulated circuit breakers. SOF ¶¶ 41-43. The EIS concluded that such operations would result in a relatively minor long-term increase in greenhouse gases over the life of the project. SOF ¶ 43. The EIS also considered impacts from electricity generators that may use the CHC Project. RUS estimated emissions based on two different generation sources: wind and coal. SOF ¶¶ 44-45. RUS analyzed a scenario where the

CHC Project would service only coal-powered generators. *Id.* Even in that unlikely scenario (because the CHC Project is slated to service many renewable energy projects), RUS concluded that the CHC Project results in a minor increase in carbon emissions. SOF ¶¶ 7, 46. Thus, Federal Defendants took a hard look at potential climate change impacts and satisfied NEPA's requirements.

Accordingly, because Federal Defendants complied with NEPA's requirements, they are entitled to summary judgment on Count VI.

## H. The Court Should Order Separate Briefing on Remedies Should It Find A Violation.

Federal Defendants are entitled to summary judgment on all claims but, should the Court find some violation under the APA, Federal Defendants request that it order separate briefing on remedy. In deciding whether to vacate an agency action in APA cases, courts balance the seriousness of the deficiencies in the administrative action and the disruptive consequences of vacating an agency decision. *See, e.g.*, *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993). The APA also requires courts "to take 'due account of the rule of prejudicial error.'" *Idaho Wool Growers Ass'n v. Vilsack*, 816 F.3d 1095, 1104 (9th Cir. 2016) (ellipses omitted) (quoting 5 U.S.C. § 706). For example, "even where there is a violation of NEPA's procedural requirements, relief will not be granted if the decision-maker was otherwise fully informed as to the environmental consequences and NEPA's goals were met." *Laguna Greenbelt, Inc. v. U.S. Dep't of Transp.*, 42 F.3d 517, 527 (9th Cir. 1994). Because these considerations are difficult to apply in the abstract, and given the breadth of legal issues in this case, the Court should order separate briefing on remedy if it finds a violation. This procedure would allow the parties to brief the seriousness of the deficiencies, the disruptive consequences, and, as applicable, harmless error, in the context of any specific violations the Court finds.

## **CONCLUSION**

For the reasons set forth above, this Court should grant Federal Defendants' motion for

summary judgment on all counts.

Respectfully submitted June 20, 2024,

> TODD KIM
> ASSISTANT ATTORNEY GENERAL
> United States Department of Justice
> Environment & Natural Resources Division
>
> */s/ Kimberly A. Cullen*
> KIMBERLY A. CULLEN
> READE E. WILSON
> Trial Attorneys
> Natural Resources Section
> P.O. Box 7611
> Washington, D.C. 20044-7611
> 202-305-0503 (office)
> 202-305-0275 (fax)
> kimberly.cullen@usdoj.gov
>
> ATTORNEYS FOR FEDERAL
> DEFENDANTS