**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WISCONSIN**

| | | |
|---|---|---|
| NATIONAL WILDLIFE REFUGE ASSOCIATION, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| RURAL UTILITIES SERVICE, et al., | ) | |
| | ) | Case No. 24-cv-139-wmc |
| Federal Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| ITC MIDWEST LLC, and DAIRYLAND POWER COOPERATIVE, | ) | |
| | ) | |
| Intervenor-Defendants. | ) | |
| | ) | |
| | ) | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF CONTINUING JURISDICTION AND DESIRABLE AND FEASIBLE RELIEF FOR DEFENDANTS' UNLAWFUL CONDUCT**

**Table of Contents**

I.   INTRODUCTION AND OVERVIEW ................................................................. 1

II.  ALTERNATIVE FORMS OF DESIRABLE AND FEASIBLE RELIEF ............................ 8

   A.   Summary of Alternative Relief ........................................................ 8

   B.   Four Categories of Alternative Equitable Relief .............................. 11

      1.   Funding for Additional Land Acquisitions and/or Conservation Easements ............ 11

      2.   Funding for Restoration Projects ............................................... 13

      3.   Funding for Remediation Projects .............................................. 15

      4.   Creating a "Upper Mississippi River – Driftless Area Trust Fund": A Mechanism for Effectuating Alternative Relief with Financial Compensation to Avoid Unjust Enrichment to the Transmission Companies and Preclude Them from Profiting from their Ultra Vires Actions. ................................................. 16

III. ARGUMENT ................................................................................ 17

   A.   Standard of Review ................................................................... 17

   B.   Plaintiffs' Refuge Act Claims (Counts 1, 2, 3 & 4) Remain Viable Because the Court Can Still Grant Effectual Relief ......................................... 18

      1.   Plaintiffs' Compatibility Claim (Count One) Continues to Present a Live Controversy For Which Relief Is Possible ................................. 18

      2.   Plaintiffs' Claim Under the Refuge Act's "Suitable for Disposition" Provision (Count Two) Presents a Live Controversy For Which Relief Is Possible. ............................................. 22

      3.   Plaintiffs Claim Alleging Violation of the Refuge's Comprehensive Conservation Plan (Count Three) Presents a Live Controversy For Which Relief Is Possible ........ 24

      4.   Plaintiffs' Claim Alleging That FWS's Net Benefit Analysis Is Arbitrary and Capricious (Count Four) Presents a Live Controversy For Which Relief Is Possible 25

   C.   Plaintiffs' Claim Alleging a Failure to Provide Adequate NEPA Notice and Comment (Count Five) Presents a Live Controversy For Which Relief Is Possible ..................... 26

   D.   Plaintiffs' Claim Challenging the 2019 FEIS, 2023 SEA and 2024 FONSI As Violating NEPA (Count Six) Presents a Live Controversy For Which Relief Is Possible ........... 28

   E.   Plaintiffs Claim Alleging Unjust Enrichment and Nuisance Against The Transmission Companies' (Count Seven) Presents a Live Controversy For Which Relief Is Possible 31

IV.  CONCLUSION ............................................................................. 32

i

## I.    INTRODUCTION AND OVERVIEW

None of the claims in Plaintiffs' Amended Complaint are moot, but relief can be most fully accomplished for Counts 1, 2, 3, 4, and 7. We separately address the particularities of Plaintiffs' NEPA Counts 5 and 6. The remedies of removing the high-voltage powerline and tower in the Upper Mississippi River National Wildlife and Fish Refuge and voiding the land exchange *are* legally justified and proper and make this case not moot. As directed by the Court and recognizing the current circumstances, however, Plaintiffs are also proposing alternative practical, "desirable and feasible" remedies. These remedies provide accountability for the Defendants' violations of federal laws, which this Court should find on the merits for Plaintiffs as fully briefed on the cross-motions for summary judgment. The extent of the remedies is warranted by the extent of the Defendants' violations of the National Wildlife Refuge Act, NEPA, and the APA, and the Transmission Companies' stratagem of continuing to bulldoze and build. They continued this construction at their own risk after the Seventh Circuit warned them. *Driftless Area Land Conservancy v. Rural Utils. Serv.*, 74 F.4th 489, 495 (7th Cir. 2023); *see also* 4/26/24 Order Denying TC Mot. for Stay (Doc. 88) at 9.

Plaintiffs recognize that the Court expressed some skepticism at the November 13, 2024 status conference as to whether there are remedies for some of Plaintiffs' claims. The Court's November 13 Text Order (Doc. 190) provides for this briefing in which the Plaintiffs respectfully seek to persuade this Court that under the applicable law as applied to the facts, their claims are not moot, and that there are "desirable and feasible" remedies. The Seventh Circuit stated "[w]e can imagine the possibility of relief such as an order to tear down the transmission line and restore the environment, or to swap additional (or different) land as part of an exchange" as providing "effectual relief" as explained below. *National Wildlife Refuge Ass'n v. Rural Utilities Serv., et al.*, Case No. 24-1492, Doc. 62 at 3, 4 ("11/6/24 7th Cir. Opinion and Order").

For the reasons explained in Plaintiffs' summary judgment briefs, the Court should rule in the Plaintiffs' favor on the merits of their claims. For the reasons explained below, Plaintiffs' claims are not moot, and the Court can grant effectual relief that is "desirable and feasible." The Court's task at this juncture is not to "rule now on the propriety of particular kinds of equitable relief that might or might not be granted in the future; it is sufficient to conclude that some form of effective relief is still available." *Northwest Envt'l Defense Center v. Gordon*, 849 F.2d 1241, 1245 n.6 (9th Cir. 1988). Plaintiffs stand ready to work with the Court and with the Defendants on "desirable and feasible" alternative equitable remedies if the Court is unwilling to order that the powerline and towers be taken down.

This Court retains continuing jurisdiction over this case because Defendants' unlawful conduct continues unabated and many avenues for effectual relief remain possible. Despite the timely and consistent efforts of Plaintiffs to preserve the status quo before damage was done (and this Court's March 21, 22, 25, and April 26, 2024 Orders granting such relief), Defendants plowed forward, leaving this Court to assess relief in a different context. Justice delayed should not be justice denied to the Plaintiffs who have properly and assiduously pursued their claims to be heard and determined on the merits in this case and in the previous related case.

Harm to Plaintiffs is ongoing because the land exchange and powerline construction are now complete. As this Court is well aware, the Federal Defendants engineered the release of their final actions and the closing of the land exchange, and the Transmission Companies plowed forward with construction itself to create this unfortunate ordering of events. The fact remains, however, that this Court never completed judicial review of whether this massive powerline could legally run through and across the middle of the protected Upper Mississippi River National Wildlife and Fish Refuge with the resulting harms to the Refuge itself and to Plaintiffs' interests.

The Transmission Companies and the Federal Defendants "manufactured" "urgency," as this Court recognized. 3/7/24 Hrg. Tr. (Doc. 37) at 11. They argued that the Transmission Companies should be allowed to continue construction while judicial review proceeded. As the Transmission Companies stated: "Work to complete the Project could proceed while the parties brief summary judgment motions and any further appeals." TC Mot. for Stay Mem. (Doc. 72) at 1. The Defendants never argued that this build first, judicial review later approach should mean that there would be mootness, and *no* judicial review and *no* remedies. The Seventh Circuit's July 19, 2023 Opinion in *Driftless Area Land Conservancy v. Rural Utils. Serv.*, 74 F.4th 489 (7th Cir. 2023) plainly contemplated effective judicial review after the final agency action and specifically stated that "[t]he cost of construction is one the utility companies have opted to incur and bear the risk of…." *Id.* at 495.

In addition to the detrimental practical and policy implications if Defendants' unlawful conduct remains unremedied simply because the specter of undoing it may seem onerous, the Court possesses a sound legal basis to: (1) find this case is not moot; (2) continue to the merits and conclude that the Defendants' conduct is unlawful in several respects; (3) grant summary judgment in Plaintiffs' favor; and (4) grant Plaintiffs the meaningful "desirable and feasible" relief that is warranted here.

The legal requirements for mootness are not present here. As the Ninth Circuit has explained, "*completion of activity is not the hallmark of mootness*. Rather, a case is moot only when no effective relief for the alleged violation can be given." *Oregon Natural Desert Ass'n v. U.S. Forest Serv.*, 975 F.3d 1024, 1032 (9th Cir. 2020) (internal quotes omitted; emphasis added).

The Seventh Circuit acknowledged that a case "becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." 11/6/24 7th Cir. Opinion

and Order at 4 (quoting *Knox v. Service Employees*, 567 U.S. 298, 307 (2012)). To the contrary, effectual relief remains possible for each and every count asserted in Plaintiffs' Amended Complaint, as explained below.

For most of the counts in Plaintiffs' Amended Complaint, an appropriate and proper remedy "is to unwind the transaction and order the Transmission Companies to restore the Turkey River Bottoms – Oak Road Parcel to its prior condition." Pls. SJ Opening Mem. (Doc. 146) at 83–84. Indeed, the Seventh Circuit itself identified "an order to tear down the transmission line and restore the environment," as one "possibility of relief" that they could imagine here. 11/6/24 7th Cir. Opinion and Order at 3.

Other courts likewise recognize that undoing an unlawful action is a possible form of relief in analogous circumstances involving a pipeline, a powerline, a highway and a dam, and that overcomes mootness concerns. *See, e.g.*, *Indigenous Environmental Network v. Trump*, 541 F. Supp. 3d 1152, 1157 (D. Mont. 2021) (where the court found a challenge to the Keystone XL pipeline not moot because "the Court can provide relief to Plaintiffs by ordering the removal of the constructed border segment" of the pipeline); *West v. Sec'y of Dep't of Transp.*, 206 F.3d 920, 925 (9th Cir. 2000) (finding a controversy not moot, despite completion of a new highway interchange, because the court could "conceivably, order[] the interchange closed or taken down."); *Columbia Basin Land Protection Ass'n v. Schlesinger*, 643 F.2d 585, 591 (9th Cir. 1981) (holding a dispute over a completed powerline not moot because "ultimately [the utility] could be required to remove the line" and further because, "[i]f the fact that the towers are built and operating were enough to make the case nonjusticiable…then the [agency] could merely ignore the requirement of NEPA, build its structures before a case gets to court, and then hide behind the mootness doctrine."); *Envt'l Defense v. U.S. Army Corps of Eng'rs*, 515 F. Supp. 2d 69, 88 (D.D.C.

4

2007) (ordering the Corps to "deconstruct that portion of the [flood control] project which it has already built" based on violations of the APA, CWA, and NEPA). As the Ninth Circuit explained in *Columbia Basin Land Protection v. Schlesinger*, which involved a transmission line:

> In the case at hand, were this Court to find the EIS inadequate, or the decision to build along Route D-1 arbitrary and capricious, the agency would have to correct the decision-making process, and ultimately could be required to remove the line from this route. Clearly, therefore, this case presents a live controversy with concrete facts, and parties with adverse interests. The building of the towers has not made the case hypothetical or abstract — the towers still cross the fields of the Landowners, continually obstructing their irrigation systems — and this Court has the power to decide if they may stay or if they may have to be removed.

643 F.2d at 582 n1.

However, as Plaintiffs stated previously, "this Court may choose to consider a different appropriate remedy consistent with its judicial and equitable powers." Pls. SJ Opening Mem. (Doc. 146) at 83–84. Likewise, when asked by the Seventh Circuit what relief is possible, Plaintiffs' counsel responded, albeit not with the alacrity Judge Easterbrook was seeking, "first the court could require the transmission lines and towers be taken out," or "the district court can order an alternative remedy that, in effect, acts sometimes in wetlands cases where there are offsets made and there is a compensatory action that is done by the federal defendants and the transmission companies as a, if you will, next best to what the first best would have been." *See* https://media.ca7.uscourts.gov/sound/external/ch.24-1492.24-1492_11_05_2024.mp3 at 18:36, 21:01.

Alternative relief that Plaintiffs regard as "desirable and feasible in this case," 11/13/24 Text Order (Doc. 190), are grouped into four categories: (1) ordering additional land be purchased and donated by the Transmission Companies (or that funding for such purchase be provided by the Transmission Companies)—a fully compensatory offset—if they are permitted to continue to own the Turkey River Bottoms – Oak Road Parcel and operate their transmission line through the

Refuge; (2) ordering the Transmission Companies to fund restoration projects; (3) requiring the Transmission Companies to fund additional remediation of the environmental damage they have caused in the Refuge and the Southwest Wisconsin Driftless area; and (4) ordering the Transmission Companies to fund a newly created "Upper Mississippi River – Driftless Area Trust Fund" that would make grants to support land acquisition, restoration projects and remedial projects designed to offset the significant damage already done to the Upper Mississippi River National Wildlife and Fish Refuge and the Southwestern Wisconsin Driftless Area.[1] This new Fund could be based on the models of the current Fund for Land Michigan (https://fundforlakemichigan.org/history/) and the Great Lakes Fishery Trust (https://www.glft.org/about/). Restatement (Third) of Restitution and Unjust Enrichment § 51(4) (2011) ("[T]he unjust enrichment of a conscious wrongdoer … is the net profit attributable to the underlying wrong.").

In a current case involving a proposed land exchange to allow a new road to run through the Izembek National Wildlife Refuge in Alaska, Defendant FWS recently proposed a land exchange divesting 490 acres of Refuge land for the new road and, in return, acquiring 31,198 acres of private land to be added to the Refuge and for a new Wilderness Area.[2] This exchange, while in a different context, certainly better captures the value inherent in National Wildlife Refuge System land, and the high bar necessary for constructing through a protected Refuge.

The Seventh Circuit specifically stated that a district court order "to swap additional (or different) lands as part of an exchange" is a "possibility of relief" for this case. 11/6/24 7th Cir.

---

[1] Plaintiffs may also seek attorneys' fees and costs under the Equal Access to Justice Act, 28 U.S.C. § 2412, within 30 days of a final judgment.

[2] *See* https://www.fws.gov/press-release/2024-11/us-fish-and-wildlife-service-opens-public-comment-period-draft-supplemental, Nov. 13, 2024 ("conservation and subsistence are enhanced through this exchange: the refuge system will increase by 30,000 acres and over 1,700 of those acres will come into Wilderness status."); https://www.regulations.gov/document/FWS-R7-NWRS-2023-0072-7707 (Executive Summary at ES-4).

Opinion and Order at 3. Of course, the extent of the relief to be awarded in this case will depend upon the extent of the violations of laws that this Court finds. Both the Federal Defendants and Intervenor-Defendants acknowledged as much in their summary judgment briefs. According to the Transmission Companies, "[i]n deciding whether to vacate an unlawful agency action, the Court should consider the seriousness of the deficiencies in the agency's decision and the disruptive consequences of vacatur." TC SJ Opening Mem. (Doc. 143) at 76. And according to Federal Defendants, courts engage in "balancing the seriousness of the deficiencies in the administrative action and the disruptive consequences of vacating an agency decision," in remedy briefing after they have ruled on the merits. Fed. Def. SJ Resp. Mem. (Doc. 165) at 36; Fed. Def. SJ Opening Mem. (Doc. 149) at 53.

The Court should consider the breadth and degree of unlawful action and the Defendants' intentionality in creating the orchestrated trainwreck and their proceeding at their own risk when considering the remedies. As discussed below, the extent of the Refuge Act violations requires adding more valuable land to the Refuge as an offset for the harms done. Under NEPA, because the original analysis covered the entire 102-mile transmission line, the Court can still grant an effectual remedy that also covers the Driftless Area in southwest Wisconsin, including an offset of land to compensate for the environmental destruction of this unique area. Finally, under both NEPA and the Refuge Act, the Court can order the Federal Defendants to create a stronger set of environmental protection, restoration, and remediation measures for both the Turkey River Bottoms – Oak Road Parcel, the Wagner Parcel, and the non-Refuge lands that the high-voltage transmission line and towers impaired in the Driftless Area. That action would better ensure that these unique ecosystems continue to thrive despite the intrusion of the powerline and high towers.

## II.      ALTERNATIVE FORMS OF DESIRABLE AND FEASIBLE RELIEF

### A.      Summary of Alternative Relief

In this Part II, Plaintiffs provide additional detail regarding four different categories of alternative forms of relief, all of which are desirable and feasible. In the Part III Argument below, Plaintiffs will then explain how each claim supports some or all of the proposed relief. The extent and amount of the alternative forms of relief and remedies explained below, individually and in combination of these alternatives, should bear a relationship to the extent of harms resulting from the legal violations.

The harms done by Defendants' actions is extensive. The devastation to the beauty of the Refuge from the high-voltage powerline and the massive towers can be grasped from the bucolic images of the Turkey River Bottoms – Oak Road Parcel and the immense size of the new towers that were already installed along the Mississippi River directly across from Turkey River Landing at the time videographer William Ward captured his images in May 2024. Ward Initial Decl. (Doc. 109) at ¶¶ 5–10; Ward Supp. Decl. (Doc. 152) at ¶¶ 9–14. Beyond the Refuge itself, the Cardinal-Hickory Creek transmission line traverses the northern boundaries of three Conservation Opportunity Areas, which are geographies identified in Wisconsin's Wildlife Action Plan that contain ecological features, natural communities or habitat for Species of Greatest Conservation Need or significant habitat of global, continental or Upper Midwest perspectives. Jennifer Filipiak Decl. at ¶ 5.[3] As the Federal Defendants acknowledge, the construction of the transmission line through the Driftless Area caused "irreversible" impacts, including "destruction of wetland and floodplains," "destruction of terrestrial and aquatic vegetation and wildlife habitat, including

---

[3] Plaintiffs will file the Declaration of Jennifer Filipiak, Executive Director of Plaintiff Driftless Area Land Conservancy ("DALC"), concurrently with this memorandum.

forested areas and bluffs," and "alteration to the viewshed." Pls. Prop. SOF for Preliminary Injunction (Doc. 39) at ¶ 114; *see also id.* at ¶¶ 115–131.

The Driftless Area in Southwestern Wisconsin is recognized as a Ramsar Wetlands of International Importance. https://dnr.wisconsin.gov/topic/lands/RamsarWetlands. From the outset of the proposed Cardinal-Hickory Creek transmission line project, the Federal Defendants took the position that the environmental impacts analysis should include the entirety of the 102-mile path of the powerline through the iconic Southwestern Wisconsin Driftless Area, not just the shorter segment running through the National Wildlife Refuge. So, it is appropriate for the remedies to cover the broader Driftless Area.[4]

The gross disparity in value between the Turkey River Bottom – Oak Road Parcel ("TRB-OR Parcel") as compared to the Wagner Parcel ("WP") is described by Senior Ecologist Steven Apfelbaum. He concludes "the findings overwhelmingly indicate that the TRB-OR Parcel's ecological significance has been inappropriately undervalued and that its proposed trade for the WP would constitute an unacceptable compromise of one of the refuge's rarest and most ecologically important resource areas." Apfelbaum Decl. (Doc. 153) at ¶ 10c.

Based on analysis of the ecological features of the parcels, his review of pertinent documents and visit to the parcels, Mr. Apfelbaum finds that "the TRB-OR Parcel represents an exceptionally rare alluvial deltaic environment whose dynamic processes directly sustain the refuge's biodiversity and federal/state-listed species, particularly the freshwater mussel beds of utmost conservation significance" whereas "[i]n stark contrast, the non-contiguous parcels

---

[4] The Federal Defendants' draft EIS, final EIS, and ROD all state: "Regardless of the potential financial assistance from RUS to fund Dairyland's ownership interest in the C-HC Project, *a NEPA environmental review would still be required as part of the permitting actions by USACE, USFWS, and potentially other Federal agencies*." ROD003053; ROD004976; ROD007606 (emphasis added). In this case, all of the agencies' permitting was based on the entire 102-mile high-voltage transmission line running through the Driftless Area, not just on the two-mile segment running through the protected National Wildlife Refuge, and on the Corps' permits for impacts on jurisdictional wetlands and waterways.

comprising the WP typify common disturbed upper floodplain/floodway margin habitat" such that the "disparity between the TRB-OR Parcel and WP renders any comparison not just fundamentally flawed but patently indefensible." *Id*. at ¶¶ 10a, 10g.

The scale and magnitude of damage to biodiversity in the Upper Mississippi River National Wildlife and Fish Refuge and the Driftless Area caused by the unlawful land exchange and huge high-voltage powerline and towers construction warrants relief and offsetting compensation much greater than the Wagner Parcel and removing the older, smaller transmission line. The Wagner Parcel was appraised at a market value of only $79,000, FWS-AR-0005964, and it is adjacent to a recreational vehicle park with its tiki bar, and to the Cassville municipal airport, and to the heavily-used doublewide freight railroad tracks. Ward Initial Decl. (Doc. 109) at ¶¶ 12–13; Ward Supp. Decl. (Doc. 152) at ¶¶ 15–19.

As Plaintiffs endure the continuing damage to the Refuge and Driftless Area, the Transmission Companies will receive a rate of return of between 10% and 12% on their capital investments on the Cardinal-Hickory Creek powerline. Pls. Suppl. Prop. SOF (Doc. 164) at ¶ 265. The Transmission Companies estimate that the final CHC construction costs will be $707 million. Pls. Prop. SOF (Doc. 147) at ¶ 16. The Cardinal-Hickory Creek transmission line is expected to cost electricity ratepayers approximately $2.2 billion over the life of the project. Case No. 21-cv-00096; Pls. Prop. SOF (Doc. 99) ¶ 210; Doc. 104-09.

If the Court finds Defendants' conduct unlawful and elects not to unwind the land exchange and construction, pursuant to Paragraph 17 of Section VI of Plaintiffs' Amended Complaint (Doc. 118), the Court should "[g]rant such further relief as may be appropriate," which here, is relief in the alternative forms described in the four categories explained below. *See Hecht Co. v. Bowles*,

321 U.S. 321, 329 (1944) ("The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case.").

**B.      Four Categories of Alternative Equitable Relief**

*1.      Funding for Additional Land Acquisitions and/or Conservation Easements*

There are many land acquisition and easement options that could provide desirable and feasible alternative relief if the Court decides to not unwind the land exchange and Refuge construction, but concludes that Defendants acted unlawfully on the merits.

First, an agreement could be reached with the Plaintiffs by which the Transmission Companies would purchase and donate land to the Refuge already identified by Defendant U.S. Fish and Wildlife Service ("FWS") as "Desired Future Habitat" to be added to the Refuge in their 2006 Comprehensive Conservation Plan ("CCP"). If the Court requires the Transmission Companies to fund further land acquisition or contribute monetarily as offsetting relief ordered in this case to compensate unlawful actions, the Companies must not be allowed to pass along and charge those costs to ratepayers.

The CCP's Appendix G includes a map identifying such "Desired Future Habitat" land by Pool. CCP at Appendix G, "Potential Land Protection Areas, Pool, 11." Doc. 42-2 at 557. This map includes nine properties (in addition to the Wagner Parcel) totaling over 1,000 acres of desired land in and around Cassville, Wisconsin and Pool 11. Defendant FWS provides further context for these desired habitat areas in a related table within the CCP that outlines "Environmental Pool Plan Actions Needed to Achieve Desired Future Habitat" in Pool 11 and identifies property along the Turkey River as a site for "land acquisition" in Pool 11. *Id.* at 204. Upper Mississippi River National Wildlife and Fish Refuge Manager Sabrina Chandler recently explained the importance of acquiring more Refuge lands in an interview celebrating the Refuge's 100th birthday: she is "focused on acquiring more privately-owned land for the refuge." There is every reason to believe

11

that such parcels are obtainable over time because Ms. Chandler disclosed that "[i]n the last 10 years, close to 8,000 acres have been donated, or acquired, by the refuge."[5]

Second, the Transmission Companies could purchase and donate conservation easements or land in or near to three Conservation Opportunity Areas ("COAs") that the Cardinal-Hickory Creek transmission line traverses. A map prepared by Plaintiff Driftless Area Land Conservancy ("DALC") identifies these COAs, and DALC's Executive Director, Jennifer Filipiak, describes them. Filipiak Decl. at ¶¶ 6–11 & Ex. 1 to Filipiak Decl. DALC's service area includes portions of the COAs that the Cardinal-Hickory Creek powerline traverses; other portions of those COAs fall within the service area of the Mississippi Valley Conservancy ("MVC"); and, for some portions of the COAs the DALC and MVC service areas overlap. *Id.* at ¶¶ 10–13.

DALC is one of only 450 accredited non-profit land trusts in the country, has "permanently protected over 8,400 acres of private land in southwest Wisconsin" with conservation easements. DALC "owns or helps manage six publicly accessible nature preserves totaling nearly 800 acres in the Driftless Area." *Id.* at ¶ 2; https://www.driftlessconservancy.org. MVC, like DALC, is an accredited nonprofit land trust, whose mission is to conserve native habitats and farmlands for the health and well-being of the Driftless Area. *Id.* at ¶ 11; s*ee* https://www.mississippivalleyconservancy.org.

If such lands or easements fall within DALC's and MVC's service areas, and if they receive funding, then DALC and MVC can purchase the land and/or conservation easements subject to their Board of Directors' approvals. *Id.* at ¶¶ 13–14; Church Decl. at ¶ 4.[6] For example, within the

---

[5] Heim, Madeline, *For a century, this upper Mississippi River refuge has been an ecological oasis. What comes next?*, Milwaukee Journal Sentinel, June 6, 2024, https://www.minnpost.com/other-nonprofit-media/2024/06/upper-mississippi-river-refuge-has-been-an-ecological-oasis-what-comes-next/;https://www.minnpost.com/other-nonprofit-media/2024/06/upper-mississippi-river-refuge-has-been-an-ecological-oasis-what-comes-next/.

[6] Plaintiffs will file the Declaration of Abbie Church, Conservation Director of the Mississippi Valley Conservancy, concurrently with this memorandum.

Mississippi Bluffs & Floodplain Conservation Opportunity Area, MVC has specifically identified two "priority areas": Cassville Bluffs State Natural Area and Devil's Backbone State Natural Area, which are discussed below. *Id.* at ¶¶ 5–8. [7]

2. *Funding for Restoration Projects*

Another way to provide relief for Defendants' unlawful conduct is to order the Transmission Companies to fund specific restoration projects identified by the Plaintiffs.

For example, the Cassville Bluffs State Natural Area and Devil's Backbone State Natural Area are located in Grant County, Wisconsin, which are adjacent to the Refuge. MVC is seeking a dedicated funding source to be able to pro-actively implement management practices to improve the health and resilience of the natural communities in these preserves. *See* Church Decl. at ¶¶ 5–8. Both of these nature preserves are included among MVC's priority areas and are in the Wisconsin Wildlife Action Plan, and the Mississippi Bluffs and Floodplain Conservation Opportunity Area, which is of continental ecological significance. *Id.* at ¶ 5. Both of these properties are comprised of disturbance-dependent ecosystems that require carefully planned habitat management to ensure the natural communities and rare species thrive into the future and populations have an opportunity to expand. *Id.* at ¶ 6. The annual habitat management requirements for both sites include diligent invasive species control year-round, prescribed burning, and monitoring as part of an adaptive management strategy. *Id.*

- The Cassville Bluffs State Natural Area, south of Cassville, WI, includes 190 acres owned by MVC and 53 acres owned by the Wisconsin Department of Natural Resources. Cassville Bluffs features a rare expanse of undeveloped bluff and sand terrace overlooking the Mississippi River that supports linear strips of dry prairie and rare chinquapin oak savanna. Extremely important and unique to this high-quality natural area are the uplands, which remain connected to the river bottoms below and are not separated by any roads or highways. Currently, Wisconsin has only one mile of protected riverfront property that has no highway between the bluffs and the Mississippi River. One of the rarest savanna types in Wisconsin, the chinquapin

---

[7] As discussed above, any order which directs the Transmission Companies to fund relief, should also include a provision that the Transmission Companies cannot pass those remedial costs onto ratepayers.

oak savanna is dominated by chinquapin oak with some bur oak, and it contains a diverse, intact ground layer. The oak savanna natural community is designated by the Wisconsin Natural Heritage Inventory as critically imperiled on a global scale. The site is home to numerous species of greatest conservation need including the state-designated threatened Kentucky warbler, as well as the species of special concern including red-headed woodpecker, and yellow-billed cuckoo, and several listed reptiles and plants. *Id*. at ¶ 7.

- Devil's Backbone State Natural Area is a 165-acre nature preserve just north of Glen Haven, WI, and it contains the only permanently protected algific talus slope in Wisconsin in addition to critically imperiled oak savanna, and high quality mesic forests which support a wide array of species of greatest conservation need identified by the Wisconsin DNR including Three birds orchid, Snowy campion, Tall nut-rush, Chinquapin oak, Great waterleaf, Kentucky coffee tree, Purple milkweed, great Indian plantain, and Federally threatened Northern monkshood. In addition to the rare plants, state threatened Acadian Flycatchers and Kentucky warblers nest in the mesic forest community, and the steep slopes host populations of the state threatened cherrystone drop snail and Midwest Pleistocene vertigo, two species that are relics from the last ice age. *Id*. at ¶ 8.

The Court may also order relief directed at preserving the unique freshwater mussel population in and around Cassville, Wisconsin as an additional restoration opportunity. The mussel beds are located in the Mississippi River near the Turkey River Landing. Given the danger and harms caused by the land exchange and construction of the CHC powerline and towers on the Turkey River Bottoms – Oak Road Parcel, the Transmission Companies could be ordered to fund restoration projects to seed new mussels within the Mississippi River as part of desirable and feasible relief.

Senior Ecologist Steven Apfelbaum explains that the Transmission Companies' ownership and their operation of the CHC powerline on the TRB-OR Parcel means there will be "continued disruption to the deltaic building and maintenance process, especially rear delta areas, of the Turkey River," which will be rerouted. That risks wiping out the endangered mussel population living in the Mississippi River near Turkey River Landing. Apfelbaum Decl. (Doc. 153) at ¶¶ 10c, 10h. This rerouting of the Turkey River flow will deprive the mussels of the coarse sediments that the Turkey River delivers to the mussel beds near the Landing. Those sediments are vital nutrients

for those mussels. Apfelbaum Decl. (Doc. 153) at ¶¶ 10c, 10h. For example, the Transmission Companies could donate funds to a third-party foundation, such as the potential not-for-profit Upper Mississippi River – Driftless Area Trust Fund described below, for support of Defendant FWS's Genoa National Fish Hatchery, "which is home to one of the largest mussel culture recovery projects in North America." https://www.fws.gov/fish-hatchery/genoa/species. The dedicated funds would be used for restoration and reintroduction of threatened and endangered freshwater mussels within the Upper Mississippi River pool and tributaries.

### 3.   Funding for Remediation Projects

The land exchange provisions do not sufficiently provide for environmental remediation of either the Turkey River Bottoms – Oak Road Parcel or the Wagner Parcel. Nor is there sufficient provision for environmental remediation of lands and waters damaged by the Cardinal-Hickory Creek transmission line where it is running through the southwest Wisconsin Driftless Area. If the land exchange and transmission line construction are to remain in place, the Transmission Companies should be ordered to fund and conduct additional remediation.

Senior Ecologist Steven Apfelbaum explains that additional "extensive restoration improvements" are needed in order to "align the condition" on each of the two non-contiguous portions of the Wagner Parcel "with the refuge management plan guidelines in the FWS CCP." Apfelbaum Decl. (Doc. 153) at ¶ 10a. He explains that restoration plans for the Wagner Parcel set forth in the land exchange "are far short of a normal restoration commitment for mitigation projects." *Id*. at ¶ 10d. Apfelbaum recommends additional remediation beginning with "herbaceous smother crop planting for several years followed by high density transitional short-lived tree cover crop, followed by underplanting into the dense shade with native floodplain sedges, grasses, forbes, and seeded and plugged floodplain trees." *Id.*

Likewise, the land management provisions for the Turkey River Bottoms – Oak Road Parcel, which anticipate continued operation of Oak Road and levees, contribute to a "foreclosed opportunity for continuous restoration and maintenance of ecological systems across the deltaic system landscape" necessary for the ecosystem that includes the Turkey River Bottoms – Oak Road Parcel. *Id.* at ¶ 10c. Provision should be made to require cessation of activities on the Turkey River Bottoms – Oak Road Parcel that cause continued disruption to the deltaic building and maintenance process of the Turkey River, especially rear delta areas.

4.     *Creating a "Upper Mississippi River – Driftless Area Trust Fund": A Mechanism for Effectuating Alternative Relief with Financial Compensation to Avoid Unjust Enrichment to the Transmission Companies and Preclude Them from Profiting from their Ultra Vires Actions.*

Pursuant to Count Seven of Plaintiffs' Amended Complaint regarding unjust enrichment, and to effectuate the relief discussed above, the Court may also consider ordering the Transmission Companies to fund the creation of a new not-for-profit foundation: the "Upper Mississippi River – Driftless Area Trust Fund." This relief would prevent the Transmission Companies from unduly profiting from their unlawful action. The Trust Fund would be a funding vehicle to effectuate the land acquisition, restoration projects, and remediation projects discussed above.

There is substantial Midwest precedent for creating such a trust fund or foundation in in the context of settlements of other litigated environmental claims. For example, the Great Lakes Fishery Trust was created from a litigation settlement involving a challenge to the construction and continued operation of the Ludington pumped storage project in Michigan. https://www.glft.org/about/. Similarly, the Fund for Lake Michigan was created in the wake of litigation challenging the Oak Creek and Elm Road coal plants on the Lake Michigan shoreline about 20 miles south of Milwaukee. https://fundforlakemichigan.org/history/. Both of these not-for-profit Trust Funds, or foundations, were established to administer and make grants from funds

deposited by the defendants to settle environmental lawsuits. The leadership of these funds is a mix of non-profit, industry and governmental organizations. For example, the Board of Trustees of the Great Lakes Fishery Trust has members of environmental and conservation not-for-profit organizations, indigenous tribes, the Michigan Department of Natural Resources, the U.S. Fish & Wildlife Service, and the local utility. The Great Lakes Fishery Trust also has a Scientific Advisory Team comprised of ecologists, conservationists and other natural resources scientists. https://www.glft.org/about/. The Fund for Lake Michigan has a Board of Trustees including members of environmental not-for-profit organizations, utilities and the Wisconsin Department of Natural Resources. https://fundforlakemichigan.org/staff-trustees/.

The potential Upper Mississippi River – Driftless Area Trust Fund would be created with funding from the Transmission Companies, and ordered by the Court as a consequence of the Companies' intentional actions to continue construction through the National Wildlife Refuge and the Driftless Area despite bearing the risk, as stated by the Seventh Circuit and as alleged in Plaintiffs' Count Seven. This Trust Fund could effectuate the other three types of alternative relief discussed above. Board members of this fund could potentially include Plaintiffs DALC, National Wildlife Refuge Association, and Wisconsin Wildlife Federation, as well as MVC, and representatives from Defendant FWS, the Wisconsin Department of Natural Resources and the Iowa Department of Natural Resources, and a representative from one of the Transmission Companies.

### III.   ARGUMENT

#### A.   Standard of Review

In order for a court to dismiss an entire case as moot, "a case must really be dead." *New York State Rifle & Pistol Assoc., Inc. v. City of New York, New York*, 590 U.S. 336, 351 (2020).

The Supreme Court describes the bar to demonstrating mootness as a "demanding standard." *Mission Product Holdings, Inc. v. Tempnology, LLC*, 587 U.S. 370, 377 (2019). As explained above, and count-by-count below, this case is very much alive, and the standard for declaring this case moot is not met. This Court has continuing jurisdiction over this case to rule on the merits of each count in Plaintiffs' Amended Complaint and to grant relief requested in Plaintiffs' Amended Complaint and as elaborated upon herein.

**B.     Plaintiffs' Refuge Act Claims (Counts 1, 2, 3 & 4) Remain Viable Because the Court Can Still Grant Effectual Relief**

> *1.     Plaintiffs' Compatibility Claim (Count One) Continues to Present a Live Controversy For Which Relief Is Possible*

Plaintiffs' first count alleges that Federal Defendants violated the 1997 Refuge Act requirement that all "powerlines" authorized through a national wildlife refuge must be "compatible with the purposes for which these areas are established." Am. Compl. (Doc. 118) at ¶ 243 (quoting 16 U.S.C. § 668dd(d)(1)(B)). More specifically, Plaintiffs have explained that the specific reference to "powerlines" in the compatibility sections of the Refuge Act indicates Congress's intention that powerlines must be "compatible" in order to cross the Refuge, regardless of whether the project is approved as a right-of-way or through a land exchange. *Id.* at ¶¶ 243–257. Plaintiffs have fully made the case in their summary judgment briefs why the Defendants' attempted end-run and evasion of the statutory compatibility requirements is legally impermissible, violates the Refuge Act provisions enacted by Congress, and is contrary to law under the APA. Just as the Court did in its March 1, 2022 Judgment Order in the previous case, the Court should: "DECLARE[] that the compatibility determination precludes the CHC transmission line as currently proposed from crossing the refuge by right of way or land transfer." Case No. 21-cv-00096; 3/1/11 Judgment Order (Doc. 195) at 2 ¶ 2.

18

The Transmission Companies argued that construction could go forward first with judicial review and appeals later (TC Mot. for Stay Mem. (Doc. 72) at 1), and the Federal Defendants supported that position. Based on the law and the record in this case, the Court should find as a matter of law that a compatibility determination was required and that this massive CHC transmission line is not compatible with the purposes of the Upper Mississippi National Wildlife and Fish Refuge and the larger National Wildlife Refuge System. *See* Pls. SJ Opening Mem. (Doc. 146) at 37–46; Pls. SJ Reply Mem. (Doc. 174) at 4–12. Because non-compatible uses are prohibited from running through the Refuge pursuant to the 1997 Refuge Act, *see* 16 U.S.C. § 668dd(d)(3)(A)(i), an appropriate and proper remedy for Defendants' unlawful conduct is to unwind the land exchange and order the towers taken out. *See supra* at 4–5 (discussing *Indigenous Environmental Network*, 541 F. Supp. 3d at 1157; *West*, 206 F.3d at 925; *Columbia Basin Land Protection Ass'n*, 643 F.2d at 592 n.1 and *Envt'l Defense*, 515 F. Supp. 2d at 88).

However, in the event that the Court determines that such a remedy is not "feasible," 11/13/24 Text Order (Doc. 190), the Court should exercise its equitable powers to order a "next best" (or *cy pres*-type) remedy. *See, e.g.*, *Pearson v. NBTY, Inc.*, 772 F.3d 778, 784 (7th Cir. 2014) (defining *cy pres* as an "Anglo-French term meaning 'as near as possible'" which "permits a benefit to be given other than…for the intended purpose because changed circumstances make it impossible….").[8]

As discussed at the recent November 13, 2024 hearing, in addition to the litigated cases leading to the Great Lakes Fishery Trust and Fund for Lake Michigan, there is also precedent for such equivalent remedies involving offsets and compensation in Clean Water Act cases involving

---

[8] Plaintiffs recognize that the application of "*cy pres*" remedies is typically confined to class action suits or disputes involving charitable trusts. Plaintiffs simply intend to analogize to "*cy pres*," for the purpose of identifying a "desirable and feasible" remedy given the Court's reluctance to order removal of the transmission line.

destruction of wetlands whether deliberate and illegal, or inadvertent. *See* 11/13/24 Hrg. Tr. (Doc. 191) at 5. The extent of the wetlands mitigation remedy, or offsets with acreage multipliers, are to replace the destroyed wetlands, and depends on the degree of illegality and intentionality, and the quality of the destroyed wetlands. *See Norman v. U.S.*, 429 F.3d 1081, 1087 (Fed. Cir. 2020) (affirming the Army Corps' regular practice of allowing wetland fill on the condition it is offset by the "creat[ion] or restor[ation]" of a larger amount of wetlands area); *Bering Strait Citizens for Responsible Resource Development v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 944, 950-51 (9th Cir. 2008) (affirming Army Corps' mitigation plan to reclaim "106 acres of previously-disturbed wetlands and [] creat[e] 70 acres of new wetlands" as part of Clean Water Act permit approval for mining project). Plaintiffs propose that the "as near as possible" remedy in this case would be for the Court to order relief from a combination of four categories of alternative equitable remedies discussed above, *supra* at 8–17.

If the Court is unwilling to void the *ultra vires* land exchange and require that the transmission line and towers be removed from the Refuge as a result of the Defendants' statutory violations and unlawful actions, then *the Court should not default to zero* in terms of an equitable remedy for the Plaintiffs. The Court may still declare that Defendants violated the statutory compatibility requirement, which then informs the Court's use of its equitable powers in light of the particular facts and circumstances of this case. *See Hecht*, 321 U.S. at 329; *see also U.S. v. Oakland Cannabis Buyers' Co-op*, 532 U.S. 483, 496 (2001) ("when district courts are properly acting as courts of equity, they have discretion unless a statute clearly provides otherwise."). Here, it certainly is *not* "impossible for a court to grant any effectual relief whatever to the prevailing party." 11/6/24 7th Cir. Opinion and Order at 4 (quoting *Knox*, 567 U.S. at 307).

The Federal Defendants and the Transmission Companies have known for years that "powerlines" must be compatible to be approved through the Refuge. The U.S. EPA submitted detailed formal, written comments to the Federal Defendant agencies at the beginning of the EIS process in 2017 making clear that the proposed Cardinal-Hickory Creek high-voltage transmission line could not legally run across and through the protected Upper Mississippi River National Wildlife and Fish Refuge. Doc. 1-30; Pls. Prop. SOF (Doc. 147) at ¶ 42; ROD002215.

Nonetheless, the Federal Defendants and Transmission Companies continued down that route even though it became clear in 2019 that they could not credibly determine that this massive high-voltage powerline project was compatible with the purposes of the Refuge and the Refuge System. This Court has labeled the opposing parties' maneuvering as an "end-around of the [Refuge] Act's compatibility provisions." 4/26/24 Order Denying TC Mot. for Stay (Doc. 88) at 7.

This Court can still craft "desirable and feasible" relief for Plaintiffs by: (1) Determining that the Refuge Act's compatibility requirements apply and "[d]eclaring that the compatibility determination precludes the CHC transmission line as currently proposed from crossing the refuge by right of way or land transfer" (*see* Case No. 21-cv-00096; 3/1/11 Judgment Order (Doc. 195) at 2 ¶ 2); (2) Finding that the Federal Defendants have never determined the CHC powerline to be compatible; (3) Concluding that, on its face, the huge CHC high-voltage powerline running through the middle of the Refuge is not compatible with the Upper Mississippi National Wildlife and Fish Refuge and its wildlife protection purposes as set forth in the Refuge Act and in the applicable CCP; and (4) Ordering the Defendants to provide additional land and funding for the Refuge as a next-best *cy pres*-type remedy. Plaintiffs have identified four categories of effective alternative relief in Part II above. *See supra* 8-17.

21

2.      *Plaintiffs' Claim Under the Refuge Act's "Suitable for Disposition" Provision (Count Two) Presents a Live Controversy For Which Relief Is Possible.*

Plaintiffs' second count alleges that "[t]he Turkey River Bottoms – Oak Road Parcel is not 'suitable for disposition,'" so Federal Defendants violated the land exchange provision of the Refuge Act, 16 U.S.C. § 668dd(b)(3), by their approving and closing the land exchange. Am. Compl. (Doc. 118) at ¶ 261. Plaintiffs also allege that "FWS systematically undervalued the conservation value of the Turkey River Bottoms – Oak Road parcel in the Net Benefit Analysis." *Id.* at ¶ 262. The land exchange provision of the Refuge Act requires two things—first, that the to-be-divested land must be "suitable for disposition," and second, that "[t]he values of the properties so exchanged…shall be approximately equal." 16 U.S.C. § 668dd(B)(3).

The Court should conclude based on the applicable law and the record in the case that: (1) the Turkey River Bottoms – Oak Road Parcel is not "suitable for disposition" and, (2) relatedly, because Defendant FWS so drastically misidentified the value of the parcel, that the exchange was not of "approximately equal" value. 16 U.S.C. § 668dd(b)(3); Pls. SJ Mem. (Doc. 146) at 46–56; Pls. SJ Resp. Mem. (Doc. 163) at 32–43; Pls. SJ Reply Mem. (Doc. 174) at 13–20. In a similar case, the Ninth Circuit held that the court retained jurisdiction and the controversy was not moot where a land exchange had already been completed. *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 816 (9th Cir. 1999). The Court held that "[c]onveyance of property to another does not moot a case." *Id*. And, the fact that one of the defendants "may have 'destroyed' a portion of the land does not alter the ability of the government to accept a reassignment of the property, if required." *Id.*; *see also Tinoqui-Chaloya Council of Kitanemuk and Yolumne Tejon Indians v. Dep't of Energy*, 232 F.3d 1300, 1304–05 (9th Cir. 2000) (reversing the district court's finding of mootness and concluding that, under the APA, the court has "authority to order rescission of the

sale if we determine that [defendants] acted in excess of statutory authority or without observance of the procedures required by law.").

If the Court finds that the Turkey River Bottoms – Oak Road Parcel is not "suitable for disposition," it would be proper and appropriate for the Court to unwind the transaction, as discussed above. *See Muckleshoot Indian Tribe*, 177 F.3d at 816; *Tinoqui-Chaloya Council*, 232 F.3d at 1305. In this scenario, ownership of the Turkey River Bottoms – Oak Road Parcel would return to FWS, and the parties could work towards a more suitable transaction that does not divest valuable land from the Refuge. If the Court is nonetheless unwilling to unwind the *ultra vires* land exchange at this time, then the Court should instead order a more appropriately balanced and equal land exchange using alternative equitable remedies through the four categories explained above, including land acquisition, restoration, and remediation projects, and the Trust Fund, and/or direct the parties to negotiate an alternative equitable remedy that includes adding more land to be included in the exchange.

As discussed in Part II above, FWS maintains a list of "Desired Future Habitat" properties in Pool 11 and elsewhere that it hopes to add to the Refuge by acquisition or donation, which could serve as the starting point for this negotiation. *See* CCP (Doc. 42-2) at 557. Plaintiffs have also identified land in and around the Refuge, in the declarations of Plaintiff DALC's Executive Director, Jennifer Filipiak, and MVC's Conservation Director, Abbie Church, which could contribute to a more appropriate and balanced land exchange. *See* Filipiak Decl., Church Decl.

The Turkey River Bottom – Oak Road Parcel is not and was not suitable for disposition, nor is this exchange of "approximately equal" value. In the related case involving a proposed land exchange through the Izembek National Wildlife Refuge, FWS recently proposed a land exchange

divesting 490 acres and acquiring 31,198 acres of private land.[9] This exchange, while in a different location (Alaska) and under a different but related statute, certainly better captures the value inherent in Refuge system land, and the high bar necessary to divest that land. Plaintiffs "suitability" claim is not moot, and the Court can still grant effectual relief by unwinding the transaction and returning it to the parties for a more suitable transaction.

> 3. *Plaintiffs Claim Alleging Violation of the Refuge's Comprehensive Conservation Plan (Count Three) Presents a Live Controversy For Which Relief Is Possible*

Plaintiffs' third count alleges that FWS's decision to approve the land exchange and authorize the CHC transmission line through the Refuge violated the Refuge Act by "failing to manage the Refuge in a manner consistent with the CCP." Am. Compl. (Doc. 118) at ¶ 279 (citing 16 U.S.C. § 668dd(e)(1)(E)). Plaintiffs specifically pointed to the CCP's stated objective to *acquire* land along the Turkey River and various discussions of reducing habitat fragmentation, the need to protect freshwater mussels, and protect the area from industrial development as evidence of the incongruence between the transmission line approval and the CCP. Pls. SJ Opening Mem. (Doc. 146) at 55.

If the Court were to rule in Plaintiffs' favor on this Count, it would be proper to vacate the agency action (the land exchange), and order the agency to pursue a course consistent with its official strategic plan as outlined in the CCP. Throughout this case, the parties have consistently analogized the CCP to the more commonly-litigated Forest Plans required under the National Forest Management Act. *See, e.g.*, TC SJ Opening Mem. (Doc. 141) at 35; Fed Def. SJ Opening Mem. (Doc. 149) at 35; Pls. SJ Resp. Mem. (Doc. 163) at 45. When courts find violations of Forest

---

[9] https://www.fws.gov/press-release/2024-11/us-fish-and-wildlife-service-opens-public-comment-period-draft-supplemental; https://www.regulations.gov/document/FWS-R7-NWRS-2023-0072-7707 (Executive Summary at ES-4).

Plans they often remand back to the agency for proceedings that are consistent with their forest plan. *See Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1382 (9th Cir. 1998) (remanding a timber sale to the Forest Service because it was inconsistent with the established Forest Plan); *Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1070–71 (9th Cir. 1998) (same); *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 965 (9th Cir. 2005) (same).

On its face, the land exchange contradicts the CCP by divesting land, which the CCP identifies as a priority for acquisition. If the Court rules in Plaintiffs' favor, but is unwilling to require that the powerline and its towers be taken out of the Refuge, this Court can provide relief to the Plaintiffs under this Count III by adopting alternative equitable remedies as explained above, which would modify and better balance the land exchange.

    4.  *Plaintiffs' Claim Alleging That FWS's Net Benefit Analysis Is Arbitrary and Capricious (Count Four) Presents a Live Controversy For Which Relief Is Possible*

Plaintiffs' Fourth Count alleges that FWS's justification for the land exchange, the "Net Benefit Analysis," was arbitrary and capricious because it systematically downplays the value of the Turkey River Bottoms – Oak Road Parcel and oversells the value of the Wagner Parcel. Am. Compl. (Doc. 118) at ¶ 294 ("Defendant FWS's 'Net Benefit Analysis' ignores and omits key pieces of evidence from the Administrative Record calling into question the habitat and conservation value of the Wagner Parcel in comparison with the Turkey River Bottoms – Oak Road parcel."). Accordingly, Plaintiffs request that the Net Benefit Analysis "be set aside and invalidated under the APA." *Id.* at ¶ 296.

If the Court rules in Plaintiffs' favor on this claim but is unwilling to require that the powerline and its towers be taken out of the Refuge, it can adopt alternative equitable remedies that would better balance the two sides of the land exchange transaction. In many ways, Count

Four tracks with the relief requested in Count Two under suitability. Put simply, if the agency's rationale for the land exchange is arbitrary and capricious, then the land exchange itself is arbitrary and capricious.

As discussed above and throughout Plaintiffs' summary judgment briefs, the Federal Defendants systematically downplayed the value of the Turkey River Bottoms – Oak Road Parcel and ignored potential issues related to the Wagner Parcel. Pls. SJ Opening Mem. (Doc. 146) at 56–62; Pls. SJ Resp. Mem. (Doc. 163) at 46–53; Pls. SJ Reply Mem. (Doc. 174) at 21–24. As Senior Ecologist Steven Apfelbaum explained, FWS misidentified the value of the Turkey River Bottoms – Oak Road Parcel, which led to their erroneous conclusion that this exchange benefitted the Refuge. Apfelbaum Decl. (Doc. 153) at ¶¶ 10a, 10b, 10c, 10f, 10g, 10h. The Court can still provide Plaintiffs with effectual relief. Under these circumstances, the Court can and should invalidate the land exchange, *see Muckleshoot Indian Tribe*, 177 F.3d at 816, and order a more equitable and appropriately balanced land exchange reflecting the four categories of alternative equitable relief explained in Part II above.

### C.    Plaintiffs' Claim Alleging a Failure to Provide Adequate NEPA Notice and Comment (Count Five) Presents a Live Controversy For Which Relief Is Possible

Plaintiffs' fifth count alleges that the Federal Defendants failed to provide adequate notice and comment on the Draft Supplemental Environmental Assessment in September 2023, and then did not provide any public notice and or any opportunity at all for public comments on the key February 23, 2024, decisional documents. Am. Compl. (Doc. 118) at ¶¶ 301–304, 309–311, 318–319. Plaintiffs acknowledge the frustrating remedial situation here. But, Plaintiffs should not be penalized in these circumstances caused by the Federal Defendants' and Transmission Companies' maneuvering and "manufactured" "urgency" to avoid their NEPA obligations for public participation, especially with regard to the Defendant FWS's Net Benefits Analysis and FONSI

documents issued in final form on February 23, 2024, without any opportunity for the Plaintiffs and other members of the public to submit written or oral comments. 3/7/24 Hrg. Tr. (Doc. 37) at 11. There were no draft versions issued at all, and public participation, which is a core principle of NEPA, was entirely precluded as Plaintiffs have extensively briefed to this Court. *See* Pls. Mem. on Notice and Comment (Doc. 77); Pls. SJ Opening Mem. (Doc. 146) at 67–70; Pls. SJ Resp. Mem. (Doc. 163) at 53–56; Pls. SJ Reply Mem. (Doc. 174) at 24–26.

That all said, Plaintiffs recognize the practical difficulty at this time of the relief that would otherwise be required: Defendant FWS would be ordered to reissue these decisional documents in draft form for public comment followed by what is intended under NEPA to be fair consideration and review by the agency.

Plaintiffs' notice and comment claim is not moot, however, and an effectual remedy can be provided that ties directly to Plaintiffs' motion to supplement the record with the declarations and exhibits of Senior Ecologist Steven Apfelbaum and videographer William Ward. Docs. 109, 151–53. The legally impermissible comment process provided by Federal Defendants frustrated Plaintiffs' and the public's opportunity to introduce evidence into the record, which would contest the proposed land exchange. Plaintiffs ultimately submitted such evidence through the declarations and exhibits of Apfelbaum and Ward. If the Court concludes that it would not be practical to reverse and remand on the Count Five grounds for the Federal Defendants to provide a reasonable opportunity for public comments, then the Court should order the record supplemented with the declarations and exhibits of Apfelbaum and Ward to compensate for the undue and unlawful preclusion of a reasonable opportunity for public comments and participation. That is "desirable and feasible" relief in this situation. Moreover, this NEPA violation provides more support for greater alternative equitable remedies in the four categories explained above.

27

**D.**    **Plaintiffs' Claim Challenging the 2019 FEIS, 2023 SEA and 2024 FONSI As Violating NEPA (Count Six) Presents a Live Controversy For Which Relief Is Possible**

Plaintiffs' Sixth Count alleges that the Federal Defendants violated NEPA by: (1) adopting the Transmission Companies' unduly constrained purpose and need statement which restricted the range of alternatives analyzed to only transmission lines running between Iowa and Wisconsin, *Simmons v. U.S. Army Corps of Engineers*, 120 F.3d 664, 666 (7th Cir. 1997) ("One obvious way for an agency to slip past the strictures of NEPA is to contrive a purpose so slender as to define competing "reasonable alternatives" out of consideration (and even out of existence). The federal courts cannot condone an agency's frustration of Congressional will. If the agency constricts the definition of the project's purpose and thereby excludes what truly are reasonable alternatives, the EIS cannot fulfill its role."); (2) failing to study non-Refuge route alternatives and non-wires technological alternatives; (3) failing to properly assess climate impacts; (4) failing to address the lawfulness of the proposed land exchange; and (5) failing to provide for adequate description of mitigation measures in the FONSI. Am. Compl. (Doc. 118) at ¶¶ 338–347.

The Federal Defendants' October 2023 SEA and RUS FONSI and February 23, 2024, FWS FONSI were based entirely on the legally flawed foundation of their 2019 Final Environmental Impact Statement and 2020 Record of Decision as explained in Plaintiffs' summary judgment briefs. *See* Pls. SJ Opening Mem. (Doc. 146) at 62–67 Pls. SJ Resp. Mem. (Doc. 163) at 56–70; Pls. SJ Reply Mem. (Doc. 174) at 26–32. The Court should conclude that the Federal Defendants violated NEPA and acted contrary to law, and arbitrarily and capriciously, and set aside and vacate all the approvals predicated on the legally flawed NEPA analysis. Violating NEPA is a procedural harm that can be remedied by a remand. *See Sierra Club v. Marsh*, 872 F.2d 497, 500 (1st Cir. 1989).

28

Once again, Plaintiffs acknowledge the frustrating remedial situation here. But, Plaintiffs should not be penalized in these circumstances caused by the Federal Defendants' and Transmission Companies' NEPA violations for which effective relief would otherwise require the Defendants to redo their fundamentally flawed EIS, SEIS, and FONSIs. The Ninth Circuit rejected mootness in analogous circumstances in *Columbia Basin Land Protection Ass'n v. Schlesinger*, 643 F.2d 585, 591–92 (9th Cir. 1981). That Court held that in litigation over a completed powerline: "This case is not moot …. That the towers have been erected and the power line has been in operation since 1978, does not moot the claim that it *should not be* operating in its present location." *Id*. at 591, n.1. The court explained:

> Were this Court to find the EIS inadequate, or the decision to build along Route D-1 arbitrary and capricious, the agency would have to correct the decision-making process, and ultimately could be required to remove the line from this route. Clearly, therefore, this case presents a live controversy with concrete facts, and parties with adverse interests. The building of the towers has not made the case hypothetical or abstract — the towers still cross the fields of the Landowners, continually obstructing their irrigation systems — and this Court has the power to decide if they may stay or if they may have to be removed.

*Id*. The Ninth Circuit concluded: "If the fact that the towers are built and operating were enough to make the case nonjusticiable…then the [agency] could merely ignore the requirement of NEPA, build its structures before a case gets to court, and then hide behind the mootness doctrine. That is not acceptable." *Id.*

If the Court nonetheless concludes that remanding the NEPA analysis to the three Federal Defendants to study alternatives would be impractical at this point, the Plaintiffs have proposed alternative equitable remedies in the four categories explained above that can provide for effective relief that is "desirable and feasible." 11/13/24 Text Order (Doc. 190). For example, as discussed above, Senior Ecologist Steven Apfelbaum detailed the need to allow the Turkey River to flood

properly and also several ways to improve the remediation plan on the Wagner Parcel. Apfelbaum Decl. (Doc. 153) at ¶ 10. Courts have found such relief possible, staving off mootness, where an updated NEPA analysis can bear on future environmental impacts. *See Delaware Riverkeeper Network v. Sec'y Pennsylvania Dep't of Envt'l Protection*, 833 F.3d 360, 374–75 (3d Cir. 2016) (controversy over completed gas pipeline not moot because the state agency "may monitor mitigation outcomes following completion of mitigation); *RB Jai Alai, LLC v. Secretary of Florida Dept. of Transp*, 112 F. Supp. 3d 1301 (M.D. Fla. 2015) (where Court remanded a NEPA analysis to the agency despite the roadway project being completed in order to study "measures to mitigate environmental damage caused by the project); *Nat'l Parks Conservation Ass'n v. Semonite*, 925 F.3d 500, 502 (D.C. Cir 2019) (where the D.C. Circuit remanded a case involving a completed transmission line to the district court to consider the appropriate remedy for a NEPA violation); *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 2005 WL 2035053, at *2 (W.D. Wash. Aug. 22, 2025) (ordering the Corps to "revoke the permit or. . .[otherwise] take steps necessary to ensure compliance with the law" through the NEPA process).

If the Court finds for the Plaintiffs on the merits of the NEPA violations in Count Six, it should grant alternative equitable relief covering the entire 102-mile length of the Cardinal-Hickory Creek powerline and towers. That includes *both* in the Upper Mississippi River National Wildlife and Fish Refuge and the broader Driftless Area in Southwest Wisconsin where unlawful environmental destruction has been wrought. Because the Federal Defendants conducted their EIS over the entire project area, the Court's relief can do the same. The Federal Defendants' draft EIS, final EIS, and ROD all state: "Regardless of the potential financial assistance from RUS to fund Dairyland's ownership interest in the C-HC Project, *a NEPA environmental review would still be required as part of the permitting actions by USACE, USFWS, and potentially other Federal*

*agencies.*" ROD003053; ROD004976; ROD007606 (emphasis added). All of the agencies' permitting was based on the entire 102-mile high-voltage transmission line, not just on the two-mile segment running through the protected National Wildlife Refuge.

Federal Defendants' flagrant NEPA violations are redressable by this Court. The Court can order the Federal Defendants to provide "desirable and feasible" alternative equitable relief to offset the environmental damage wrought by their approval of the Cardinal-Hickory Creek transmission line without a legally-compliant NEPA review and analysis. 11/13/24 Text Order (Doc. 190).

### E.   Plaintiffs Claim Alleging Unjust Enrichment and Nuisance Against The Transmission Companies' (Count Seven) Presents a Live Controversy For Which Relief Is Possible

Plaintiffs' Seventh Count focused on the Transmission Companies' decision to continue construction without approval when they had long been on notice of the potential illegality of their chosen route. Their decision, without the benefit of a court's approval, unjustly enriched the Companies and created a public nuisance. Am. Compl. (Doc. 118) at ¶¶ 351–366. As both this Court and the Seventh Circuit pointed out, the Transmission Companies "have opted to incur and bear the risk of" their construction. *Driftless Area Land Conservancy v. Rural Util. Serv.*, 74 F.4th 489, 495 (7th Cir. 2023); 4/26/24 Order Denying TC Mot. for Stay (Doc. 88) at 9.

If the Court grants summary judgment in Plaintiffs' favor on Count Seven for the reasons described in our briefs, Pls. SJ Opening Mem. (Doc. 146) at 70–73; Pls. SJ Resp. Mem. (Doc. 163) at 70–80; Pls. SJ Reply Mem. (Doc. 174) at 32–33, then the Court should order disgorgement of the Transmission Companies' unjust profit or order damages under the theory of nuisance. The Court must ensure that the amount of monetary damages corresponds to the Transmission Companies' profits related to illegally proceeding through the Refuge. These monetary damages could be put toward additional conservation land acquisitions in the Refuge and in the impacted

Driftless Area in Southwest Wisconsin and for the offsetting alternative equitable remedies in the four categories explained in Part II above, especially the potential Upper Mississippi River – Driftless Area Trust Fund.

From the outset of the initial lawsuit, the Transmission Companies have been on notice of the potential illegality of their proposed and completed Refuge crossing. This Count Seven is directed at the Transmission Companies' decision to blow through all warnings and continue building in an attempt to frustrate this court's effective judicial review. If the Court concludes that the Federal Defendants and Transmission Companies orchestrated a trainwreck and violated the Refuge Act, NEPA, and the APA, the Court can order the Transmission Companies to pay damages for alternative equitable remedies, which can be used to offset that environmental damage. The equitable factors associated with "effectual relief" in this complicated case make it all the more important that the Court's monetary award adequately serves the goals of restitution where the Transmission Companies will make hundreds of millions of dollars in profits over the proposed 40-years during of the CHC powerline. Restatement (Third) of Restitution and Unjust Enrichment § 51(4) (2011) ("[T]he unjust enrichment of a conscious wrongdoer … is the net profit attributable to the underlying wrong.").

## IV.   CONCLUSION

This Court should find that each of Plaintiffs' Counts One through Seven are not moot because the Court can grant "effectual relief" to Plaintiffs. 11/6/24 7th Cir. Opinion and Order at 4 (quoting *Knox*, 567 U.S. at 307). While effectual relief to which Plaintiffs are entitled would involve voiding the land exchange and removing the powerline, Plaintiffs have identified alternative equitable relief that are "desirable and feasible in this case" for the reasons explained above and in direct response to this Court's November 13, 2024 text order (Doc. 190).

Respectfully submitted,

*/s/ Howard A. Learner*
Howard A. Learner
Daniel Abrams
Environmental Law & Policy Center
35 East Wacker Drive, Suite 1600
Chicago, IL 60601
T: (312) 673-6500
F: (312) 795-3730
HLearner@elpc.org
DAbrams@elpc.org

*Counsel for Plaintiffs National Wildlife*
*Refuge Association, Driftless Area*
*Land Conservancy, and Wisconsin*
*Wildlife Federation*

Dated: November 27, 2024