IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

NATIONAL WILDLIFE REFUGE ASSOCIATION,
DRIFTLESS AREA LAND CONSERVANCY, and
WISCONSIN WILDLIFE FEDERATION,

                 Plaintiffs,                     OPINION AND ORDER

    v.

                                                24-139-wmc

RURAL UTILITIES SERVICE,
ANDY BERKE, Administrator, Rural Utilities Service,
UNITED STATES FISH AND WILDLIFE SERVICE,
WILL MEEKS, Midwest Regional Director, and
SABRINA CHANDLER, Manager, Upper Mississippi River
National Wildlife and Fish Refuge,
UNITED STATES ARMY CORPS OF ENGINEERS,
LIEUTENANT GENERAL SCOTT A. SPELLMON, Chief of
Engineers and Commanding General, U.S. Army Corps of
Engineers, COLONEL STEVEN SATTINGER, Commander
and District Engineer, Rock Island District, U.S. Army Corps of
Engineers, and COLONEL KARL JANSEN, Commander and
District Engineer, St. Paul District, U.S. Army Corps of Engineers,

                 Defendants,

                 and

DAIRYLAND POWER COOPERATIVE and
ITC MIDWEST LLC,

                 Intervenor-Defendants.

Plaintiffs National Wildlife Refuge Association, Driftless Area Land Conservancy and Wisconsin Wildlife Federation have been engaged for some time in an administrative and legal battle to ensure that completion of the 101-mile high-voltage Cardinal-Hickory Creek ("CHC") Transmission Line Project running from Dubuque, Iowa to Madison, Wisconsin, did not go through the Upper Mississippi River National Wildlife and Fish Refuge ("Refuge"). Most recently, in this lawsuit, plaintiffs challenge a land exchange

agreement that defendant United States Fish and Wildlife Service ("FWS") entered into with intervening defendants Dairyland Power Cooperative and ITC Midwest LLC (collectively, the "Utilities"), granting the latter fee ownership over land within the Refuge itself in order for the Utilities to complete the CHC Line.  More specifically, plaintiffs contend that this land exchange violated the National Wildlife Refuge System Improvement Act of 1997, 16 U.S.C. §§ 668dd-ee ("Refuge Act"); the Refuge's Comprehensive Conservation Plan; and the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332(C).

After plaintiffs were ultimately unsuccessful in obtaining a preliminary injunction, the CHC Project was completed through the Refuge during the summer of 2024, with the transmission line placed into service in September 2024.  Nonetheless, plaintiffs continue to pursue their claims, seeking (among other relief) a court order compelling the removal of that portion of the CHC transmission line that now runs through the Refuge.  As discussed below, having concluded that plaintiffs' claims remain justiciable, the court must resolve the numerous motions still pending before the court.

First, plaintiffs filed a motion to supplement the administrative record with declarations from: (1) forensic photographer and videographer William Ward, who visited the two exchanged parcels and the overall area; (2) appraisal expert Scott McWilliams; and (3) ecologist Stephen Apfelbaum, who also visited the two exchanged parcels and knows the overall area well.  Defendants object to plaintiffs' supplements as "extra-record" evidence that does not fall within an exception for admission.  Specifically, as defendants note, "the focal point for judicial review [of an agency action] should be the administrative record already in existence, not some new record made initially in the reviewing court."

2

*Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985). However, consideration of extra-record materials is appropriate "if necessary to determine whether the agency has considered all relevant factors and has explained its decision." *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 450 F.3d 930, 943 (9th Cir. 2006); *see also USA Grp. Loan Servs., Inc. v. Riley*, 82 F.3d 708, 715 (7th Cir. 1996). Such is the case here. Plaintiffs allege that defendants failed to consider significant information that was absent from the administrative record, so the court is permitted to consider extra-record materials offered by plaintiffs as evidence that the agency failed to consider all relevant factors and adequately explained its decision. For much the same reason, the court likewise now considers additional evidence offered by the Utilities in response to plaintiffs' supplemental evidence. Thus, the court will grant plaintiffs' motion to supplement the record (dkt. #151) and deny the Utilities' motions to strike (dkt. #131, dkt. #132 and dkt. #169) and plaintiffs' motion to strike (dkt. #179).

Second, the parties filed cross motions for summary judgment on all of plaintiffs' claims. While the court is sympathetic to plaintiffs' arguments that the Utilities and Federal Defendants[1] have found a loophole in the Refuge Act that allowed completion of the CHC Project without FWS determining that the project was compatible with the Refuge and without more rigorous environmental review, plaintiffs have failed to show that the Utilities or Federal Defendants violated any laws. Therefore, the court will grant the Utilities' and Federal Defendants' motions for summary judgment (dkt. #142 and dkt. #148) and deny plaintiffs' motion for summary judgment (dkt. #145).

---

[1] The parties have adopted "Federal Defendants" in referring to the originally named defendants, including the FWS, as does the court.

3

Third, and finally, in light of the above rulings, the court will deny the parties' remaining motions as moot, including plaintiffs' motion for reconsideration and renewed motion for preliminary injunction (dkt. #101) and the Utilities' motion to dismiss Count Seven of the Amended Complaint (dkt. #136).

FINDINGS OF FACT[2]

## A. Upper Mississippi River National Wildlife and Fish Refuge

Congress established the Refuge in 1924 as a place of refuge and breeding for birds, wildlife, fish and plants. The Refuge extends for 261 miles along the Mississippi River in Minnesota, Wisconsin and Illinois. At approximately 240,000 acres, it is one of the longest linear refuges in the United States. More than 290 species of birds migrate throughout the Refuge every year, including more than 300 pairs of bald eagles. The Refuge also attracts more than 3.7 million, annual human visitors for hunting, fishing, wildlife observations and other recreation. The Refuge is managed according to the Refuge Act, FWS rules and a Refuge-specific Comprehensive Conservation Plan, which identifies as a goal enhancing ecological connectivity and avoiding habitat fragmentation.

---

[2] The court makes the following findings of fact based on the administrative record filed electronically with the court and the supplemental evidence filed by the parties. Citations are to the docket or the administrative record. ("ROD" citations are to the administrative record filed by Rural Utilities Service, and "FWS" citations are to the administrative record filed by Fish and Wildlife Service.)

### B. Cardinal-Hickory Creek Project

The CHC Project involved the construction of a 345-kilovolt, 101-mile transmission line that carries electricity from the Hickory Creek Substation in Dubuque, Iowa, across the Mississippi River and through southwest Wisconsin, to the Cardinal Substation in Dane County, Wisconsin. The owners of the $700 million project are American Transmission Company, ITC and Dairyland Power Cooperative.[3] The CHC Project was constructed almost entirely on private and non-federal land, with an approximately 1.1 mile-long segment on former-FWS land (0.6 miles) and U.S. Army Corps of Engineers-administered land (0.5 miles), all within the Refuge's boundaries. At the time this lawsuit was filed, the CHC Project had been approved by Wisconsin and Iowa state utility regulators and construction was nearly complete, with the exception of the 1.1 mile-long segment through the Refuge. The 0.6-miles of FWS land was conveyed to the Utilities on May 9, 2024, under the land exchange agreement between FWS and the Utilities that plaintiffs challenge in this action.

### 1. Initial Project Proposal

The Midwest Independent System Operation ("MISO") is the regional transmission organization charged by the Federal Energy Regulatory Commission with responsibility for planning, directing or arranging for transmission "expansions, additions, and upgrades" in the area that includes Iowa and Wisconsin.[4] In 2011, MISO proposed the CHC Project

---

[3] ATC is not a party to this particular lawsuit.

[4] *See* 18 C.F.R. § 35.34(k)(7) ("[t]he Regional Transmission Organization must be responsible for planning, and for directing or arranging, necessary transmission expansions, additions, and upgrades

as part of a portfolio of projects intended to improve the power grid in the region, as well as enable utilities to transmit energy generated by multiple renewable energy projects. After approving the project, MISO turned over siting and environmental review of the CHC Project to the Utilities and relevant state and federal entities.

For the next several years, the Utilities worked with federal, state and local entities to vet alternatives and identify routes for the CHC Project. Because crossing the Mississippi River was the most significant routing constraint for the Project, the routing analysis began with determining the best location for that crossing. In April 2012, the Utilities began meeting with FWS, which instructed the Utilities that they would have to demonstrate that *non-Refuge* crossings were infeasible before FWS would consider a Refuge crossing. FWS also warned the Utilities about the challenge of the transmission line being "compatible" under the Refuge Act, confirming that "the use of existing rights-of- way or avoidance of the Refuge" were "the only compatible alternatives for crossing the Refuge." (Dkt. #18.) FWS also noted that: "Transmission lines which pass through habitats result in habitat fragmentation, whereby a large contiguous habitat is divided." (Dkt. #1-29, at 26.)

The Utilities considered several Mississippi River crossing locations, but by 2018, had determined that the best options would be either: (1) the "Nelson-Dewey" crossing; or (2) the "Stoneman" crossing. The first option, which was ultimately chosen, was referred to as the "Nelson-Dewey" route in reference to a former coal power plant substation located on the opposite side of the river from the point where the line would

_____

that will enable it to provide efficient, reliable and non-discriminatory transmission service and coordinate such efforts with the appropriate state authorities").

exit the Refuge.  The Nelson-Dewey route parallels Oak Road, a gravel road used to access the car ferry between Millville, Iowa and Cassville, Wisconsin, connecting the two National Scenic Byways -- the Great River Road and the Iowa Great River Road.  The Nelson-Dewey crossing had the benefit of existing infrastructure (the road) and requiring fewer acres in the Refuge than the Stoneman crossing.  The second option was called the "Stoneman" crossing because the transmission lines on the easement connected to the Stoneman substation, formerly in service of a now-defunct coal plant.  The Utilities already had two preexisting, perpetual transmission line easements at the Stoneman crossing through the Refuge, over which the Utilities maintained two transmission lines (161 kV and 69 kV) and 30 transmission towers.  However, the Cassville airport and private residences would put constraints on the proposed CHC Project at that location.

### 2.  Environmental Review of the CHC Project

The Rural Utilities Service ("RUS") reviewed the CHC Project in anticipation of a possible future request for federal funding by Dairyland.[5]  In October 2016, RUS issued a notice of intent to complete an Environmental Impact Statement ("EIS"), studying potential impacts of the CHC Project.  (ROD000001.)  The Federal Register notice started an 81-day formal "scoping" period for public and agency comments on the extent of the EIS analysis.  RUS held scoping meetings in 2016–2017.

---

[5] RUS makes "loans and loan guarantees for rural electrification and the furnishing of electric service to persons in rural areas."  7 C.F.R. § 1700.28.  Environmental review is triggered when there is a potential funding requests for a rural electrification project.  *Id.* § 1970.8(b)(1).

7

RUS released a Draft EIS for a public comment period of approximately four months.  (ROD000006.)  Six public meetings were held in March 2019.  The Draft EIS identified the segment ultimately constructed and challenged by plaintiffs here as the "preferred route" for the CHC Project to cross the Mississippi River, despite the U.S. Environmental Protection Agency ("EPA") recommending in 2017 that the Utilities consider non-refuge crossing alternatives "in order to compare and contrast impacts that would occur within and outside of the Refuge." (Dkt. #1-30.)

RUS made revisions in the Final EIS to address comments, and it coordinated the development of the Final EIS with FWS and the U.S. Army Corps of Engineers as cooperating agencies.  Each subsequent stage of environmental analysis continued to identify Nelson-Dewey as those agencies' preferred crossing.  RUS published the more than 1,200-page Final EIS in October 2019, establishing a 30-day, public review period. (ROD000015; ROD004931-6171.)  Plaintiffs submitted comments throughout this entire process.

During the EIS process, the Utilities prepared three documents purporting to analyze alternatives to the CHC Project and proposed route: (1) the Alternatives Evaluation Study; (2) the Alternative Crossing Analysis (requested by FWS); and (3) the Macro-Corridor Study, which RUS reviewed.[6]  (ROD005005.)  The first study analyzed system alternatives (i.e., alternatives other than a new, high-voltage transmission line to meet the Project's purpose and need), while the other two studies analyzed routing

---

[6] *See* 7 C.F.R. § 1970.5(b)(3)(iii) (requiring applicants to develop reasonable alternatives for meeting their purpose and need).

alternatives. The information provided in those studies is discussed and incorporated by reference in Chapter 2 of the Final EIS.

The agencies' environmental review culminated in a "Record of Decision," which was published in December 2019, and signed by RUS, FWS and the Corps in January 2020. (ROD007652; ROD007622-23.) Also in December 2019, FWS issued a "compatibility determination," concluding that the CHC Project was compatible with the Refuge. (FWS-AR-0006546.) As part of the compatibility determination, FWS considered the Utilities' agreement to restore habitat along the existing transmission lines, which would be removed.

Between May and September 2020, state utility regulators and the applicable agencies, including the Iowa Utilities Board, Public Service Commission of Wisconsin, Iowa's and Wisconsin's Departments of Natural Resources, all approved the CHC Project crossing the Refuge at the Utilities' proposed spot. The federal agencies then began issuing relevant permits. For example, in September 2020, FWS granted a right-of-way permit to the Utilities for the crossing of FWS lands in the Refuge. That same month, the Corps granted a right-of-way over its fee-titled lands within the Refuge.[7] In August 2021, however, FWS discovered that it had relied on "incorrect easement documents" in its compatibility determination, revoked its right-of-way permit, and rescinded its compatibility determination. (FWS-AR-0002951.) The Federal Defendants also notified this court that FWS had withdrawn its right-of-way permit, attaching a letter that FWS had sent to ITC, which explained that those agencies and the Utilities were now exploring

---

[7] The right-of-way granted by the Corps is not in dispute in this case.

a potential land exchange to enable the CHC Project to cross the Mississippi River at the

Nelson-Dewey location:

> [A]s stated in Refuge Manager Sabrina Chandler's letter of
> August 3, 2021, USFWS is committed to working with you
> toward timely review of the land exchange you have proposed
> in lieu of your March 2021 application for an amended right-
> of-way permit. To date, we have worked with you to ensure
> you have identified a qualified appraiser, and we are in the
> process of developing a statement of work for the appraisal and
> defining specific terms of the proposed land exchange. USFWS
> concurs that a land exchange is a potentially favorable
> alternative to a right-of-way permit.

(*Id*.)

Between September 2020 and January 2022, the Utilities proposed nine route

modifications for the CHC Project, one of which was a route modification to avoid cultural

resources adjacent to the Refuge.  RUS then developed an Environmental Assessment

("EA") to study these proposed route modifications, with FWS participating in

development of the EA as a "cooperating agency."  (RUS-AR-000889, 97.)  In June 2021,

RUS published the EA.  As compared to the alternative routes studied in the Final EIS, the

revised Nelson-Dewey route analyzed in the EA (and in a subsequent supplemental EA)

was shorter and used 9.9 fewer acres of land for a route within the Refuge.  The Draft EA

also identified the revised Nelson-Dewey route as the new "preferred alternative" for that

portion of the Project.  The EA was subject to a 30-day comment period as well, during

which plaintiffs submitted 21 pages of comments, including discussion of the route

modifications and potential impacts.

On September 8, 2023, RUS published a "Draft Supplemental EA" that again

addressed the proposed route modifications, advising that FWS was no longer considering

10

a "right-of-way permit," but rather a proposed land exchange agreement that would allow the CHC Project to cross the Mississippi River at the Nelson-Dewey route.  (RUS-AR-001609-10; FWS-AR-0006510-11.)   Just as the EA had done, this Supplemental EA compared these project modifications to the project as studied in the Final EIS.  RUS then published the Supplemental EA for a shorter, 14-day public comment period to which plaintiffs timely submitted a 40-page comment.   (Plts.' Comments (dkt. #1-37)).   Appendix C of the Final Supplemental EA summarized all public comments received and agency responses. (Supplemental EA (dkt. #1-21)).

Ultimately RUS determined that the proposed route *modifications* analyzed in the Supplemental EA, including changing the Nelson-Dewey route from a right-of-way grant to a land exchange, would result in no new, significant impacts when compared with the impacts already analyzed in the Final EIS.  Thus, on October 6, 2023, RUS issued the Final Supplemental EA and a Finding of No Significant Impact ("FONSI") with respect to the route modifications outside the Refuge.  (RUS FONSI (dkt. #1-38)).  Like the Final EIS, the Supplemental EA also concludes that non-Refuge crossings of the Mississippi River were not reasonable alternatives as compared to the Project's proposed Nelson-Dewey crossing.   Likewise, the Supplemental EA again analyzed and rejected the Stoneman Crossing as an alternative through the Refuge because it would require taller transmission structures (with greater avian impacts), have greater impacts on the Village of Cassville, would be located near the Cassville Municipal Airport, and would be proximate to a "sensitive cultural resource." (*Id.* at 17.)  Thus, the final RUS FONSI explained RUS's decision regarding the proposed route modification, finding that:

> The land exchange would comply with 16 U.S.C. § 668dd(b)(3) as well as the Refuge's 2006 Comprehensive Conservation Plan, which highlights the desirability of land exchanges as a tool to adjust land ownership in and around the Refuge for the benefit of the Refuge (USFWS 2006:13). The land exchange would also require a net benefit analysis as confirmed in the recently issued M-Opinion on this topic (U.S. Department of Interior 2023:2).

(*Id.* at 16.)

### 3. Land Exchange

On July 29, 2021, the Utilities further made a proposal to FWS for "expedited consideration" of a land exchange to accommodate the CHC Project as an alternative to the pending proposal for an amended right-of-way.  As noted above, FWS agreed that a land exchange was a "potentially favorable alternative" to the right-of-way permit and committed to "timely review" of the Utilities' proposal.  Specifically, the proposed land exchange would convey to the Utilities a 19-acre corridor along Oak Road, an existing gravel road through the Refuge that leads to a ferry landing to cross the Mississippi River ("Oak Road property").  The Oak Road property, which had been appraised at $58,000, was primarily vacant land bordered by federally owned lands, with railroad tracks on the southern boundary and privately owned land in the northeast corner.  Subject to existing road and railroad easements, the Oak Road property is entirely in the floodway of the Turkey and Mississippi Rivers.

By exchanging the Oak Road property, the Utilities could build the CHC Project on FWS's preferred route through the Refuge (i.e., the Nelson-Dewey route), instead of using their existing easements with the Refuge at the Stoneman Crossing.  The Nelson-

12

Dewey route also would align with the Corps right-of-way through the Refuge.  The following satellite image shows the boundaries of the Oak Road Property.



Figure 11. Proposed route modification B-IA3.

(Dkt. #1-21 (Supplemental EA) at 43.)

In exchange, the Utilities would transfer 35.69 acres (the "Wagner Property") in Grant County, Wisconsin, to FWS.  The Utilities had purportedly purchased the Wagner Property for $287,200 in 2021, although its appraised value in June 2023 was $79,000.  The Wagner Property consists of two parcels of wooded upland on the Wisconsin side of the Mississippi River: a western parcel that is approximately 28.5 acres and an eastern parcel measuring approximately 7.5 acres.  These parcels are adjacent to Refuge land, and one of the parcels is abutted by an RV campground and trailer park, a sand quarry and a railroad line.  The following satellite image shows the boundaries of the Wagner Property.



Figure 12. Proposed USFWS land acquisition of the Wagner Tract (Source: Burns & McDonnell 2020).

(Dkt. #1-21 (Supplemental EA) at 44.)

In addition to the transferring the Wagner Parcel, the Utilities proposed restoring approximately 28 acres within the Refuge then occupied by their existing transmission lines. Specifically, the Utilities proposed removing the existing towers and other infrastructure, restoring the Stoneman right-of-way consistent with the surrounding Refuge habitat, releasing any associated easements, and implementing a vegetation management plan.

The following satellite image shows the location of the Wagner Property (orange), Oak Road Property (blue), Corps right-of-way (pink), and the Utilities' existing transmission lines in the Stoneman crossing:

14



(Dkt. #1-21 (Supplemental EA) at 19.)

In October 2021, the Utilities and FWS next executed a "Statement of Proposed Land Exchange," outlining the terms that the parties intended to include in a final land exchange agreement. (FWS-AR-0006666.) This Statement was signed by Refuge Manager Sabrina Chandler for FWS.[8] The proposed land exchange was described and analyzed in RUS's Supplemental EA, and the Statement of Proposed Land Exchange was attached as "Appendix A" to the Supplemental EA when it was released for public comment. On February 23, 2024, FWS entered into the Land Exchange Agreement with the Utilities. (Land Exchange Agreement (dkt. #1-18) 10.) At the same time, FWS issued a FONSI, which concluded (as RUS already had) that the changes analyzed in the Supplemental EA

---

[8] The Utilities supplemented their original proposal on July 25, 2023.

were not significant and did not require a supplemental EIS.  (FWS FONSI (dkt. #1-17) 19.)

In particular, the FWS found the restoration of the rights-of-way would reduce habitat fragmentation in the Refuge and result in a net reduction of 19 structures.  FWS also found a "high risk" that if it did not approve the Exchange, the "transmission line would still be built through the Refuge but on a more environmentally harmful route" (i.e., the Stoneman route) that would result in "towers twice as tall" as those to be used for the Nelson-Dewey route, negatively affecting migratory birds and resident wildlife, including threatened and endangered species.  (*Id.* at 11.)  According to the FWS, this result would further "increase[] habitat fragmentation," negatively affecting both wildlife-dependent recreation and "the Refuge's environmental health."  (*Id.*)  In contrast, the FWS found the Project's design for the Nelson-Dewey route would minimize environmental impacts by using industry-leading features to reduce bird impacts (e.g., a design height of 75 feet to match existing tree cover and reduce the potential for collisions and the use of low-profile structures and avian-friendly flight diverters) in the Refuge.  This FONSI was also signed by:  the Refuge Manager, Upper Mississippi River National Wildlife and Fish Refuge; the Acting Assistant Regional Director, National Wildlife Refuge System; and the Midwest Regional Director, FWS.

Finally, FWS issued a "Net Benefits Analysis" for the proposed land exchange. (Dkt. #30-3.)  FWS stated that it had relied on the FWS-requested, Alternative Crossing Analysis completed in April 2016, the Final EIS completed in September 2019, and the Supplemental EA completed in 2023.  In addition, further environmental analysis had been completed, including northern long-eared bat habitat surveys, raptor nest (including

16

eagle nest) surveys, and an environmental screening of the Wagner Parcel.  (*Id.* at 4.)  FWS concluded that the proposed exchange would provide a net benefit to the Refuge because it involved "exchanging lower quality habitat for higher quality habitat, increasing the total protected acreage in the Refuge, reducing habitat fragmentation in the long term, and allowing the Refuge to acquire a high-priority tract that would not otherwise be available." (*Id.* at 3.)  In light of its location fronting the Mississippi River, the Net Benefits Analysis also emphasized that "[a]cquiring and preserving the shoreline protects these sensitive areas from development and reduces the potential for erosion that could impact the endangered Higgins Eye pearlymussel and other sensitive aquatic species."  (*Id.* at 4.)

### C.  Plaintiffs' Past Challenges to the CHC Project

In past, consolidated cases before this court, plaintiffs had claimed that:  RUS's original EIS violated NEPA, 42 U.S.C. §§ 4321–4347; FWS violated the Refuge Act by issuing a (later-withdrawn) right-of-way permit; and certain permitting decisions by the Corps violated the Clean Water Act, NEPA, and the Endangered Species Act.  *Nat'l Wildlife Refuge Ass'n v. Rural Utilities Serv.*, 580 F. Supp. 3d 588, 590–95 (W.D. Wis. 2022).  In January 2022, this court issued a final judgment, which held:  (1) the Corps' permitting complied with NEPA; (2) FWS's compatibility analysis for the rescinded right-of-way was deficient to support either a right-of-way or land exchange proposal; and (3) RUS's EIS was also insufficient because the stated purpose and need was too narrow.  *Id.* at 608–11, 613.

The Utilities then appealed these holdings on the grounds that:  the court's review of the land exchange was premature; plaintiffs lacked standing to challenge the EIS; the

court erred by holding that a land exchange is subject to the Refuge Act's compatibility requirement; and the EIS's analysis complied with NEPA. The Federal Defendants appealed on similar grounds, as well as that the court's order invalidating the EIS was not proper under the APA. Plaintiffs also cross-appealed the court's decision not to award injunctive relief against the construction of the line outside the Refuge.[9]

On appeal, the Seventh Circuit vacated this court's decision, holding that plaintiffs' challenge to a proposed land exchange was premature in the absence of a final agency action. *Driftless Area Land Conservancy v. Rural Utilities Service*, 74 F.4th 489, 494 (7th Cir. 2023) ("The Fish and Wildlife Service has not issued a final decision that could harm plaintiffs."); *id*. at 495 ("Plaintiffs' request for relief against the Rural Utilities Service under the National Environmental Policy Act is likewise premature."). Accordingly, the Seventh Circuit remanded plaintiffs' claims, instructing the court to dismiss them. *Id.* at 496.

### D. Present Litigation

Early in this case, this court preliminarily enjoined defendants from closing on the land exchange and beginning construction on the CHC Project through the Refuge. (Mar. 25, 2024 Order (dkt. #62).) However, defendants appealed, and the Seventh Circuit stayed the preliminary injunction on the ground that this court had not determined whether plaintiffs had a likelihood of success on the merits. (May 3, 2024 USCA Order (dkt. #95).) After construction was completed and the CHC line was placed into service,

---

[9] Plaintiffs did not appeal the court's award of summary judgment on the claims against the Corps.

the Seventh Circuit further dismissed that appeal as moot. *Nat'l Wildlife Refuge Ass'n v. Rural Utilities Serv.*, No. 24-1492, 2024 WL 4692027, at *2 (7th Cir. Nov. 6, 2024). Still, the court of appeals remanded the case for consideration of plaintiffs' request for a permanent injunction.

Plaintiffs now challenge the CHC Project, and the final land exchange specifically, on several grounds: (1) FWS failed to make a compatibility assessment as required by the Refuge Act; (2) FWS's suitability determination violated the Refuge Act; (3) FWS's approval of the land exchange violated the Refuge's Comprehensive Conservation Plan; and (4) the Federal Defendants violated NEPA.

OPINION

## I. Mootness

Now that the CHC Project is complete, the court must consider whether plaintiffs' claims remain justiciable. In its decision dismissing the preliminary injunction motion as moot, the Seventh Circuit questioned whether plaintiffs' request for a permanent injunction was also moot. Specifically, the court of appeals cautioned this court against issuing any advisory opinion, stating that it was "tempted to declare that the entire case is moot and order the complaint dismissed for lack of a case or controversy." *Id.* at *2. In accordance with the Seventh Circuit's order, the court asked the parties to brief the question of mootness, including in particular, what relief remained desirable and feasible in this case and which of plaintiffs' claims might justify that relief. (Dkt. #190.)

All parties have now responded, and none argue that this case is moot under the Constitution's "case and controversy" standard. *See* Fed. Dfts.' Br. (dkt. #195) 5 (arguing

19

Case: 3:24-cv-00139-wmc    Document #: 201    Filed: 09/24/25    Page 20 of 51

this court "need not wade into the issue of whether the case is moot as a constitutional matter under Article III" since "certain remedies remain theoretically possible and could save this case from constitutional mootness[.]"); Intervenor Dfts.' Br. (dkt. #196) (urging the court to "resolve the summary judgment motions on the merits.")[10]  The court agrees. The bar to demonstrating mootness is a "demanding standard," *Mission Product Holdings, Inc. v. Tempnology, LLC*, 587 U.S. 370, 377 (2019), and "completion of activity is not the hallmark of mootness.  Rather, a case is moot only where no effective relief for the alleged violation can be given." *Oregon Nat. Desert Ass'n v. United States Forest Serv.*, 957 F.3d 1024, 1032 (9th Cir. 2020) (citation omitted).  In short, before dismissing an entire case as moot, "a case must really be dead." *New York State Rifle & Pistol Assoc., Inc. v. City of New York, New York*, 590 U.S. 336, 351 (2020).

Here, plaintiffs request that the court unwind the land exchange and require defendants to restore the Refuge to its prior condition by removing the new powerline and towers.  In addition, they request that FWS be required to conduct a new environmental analysis of the land exchange, including new compatibility, suitability and net benefits analyses.  Although extreme, such a remedy would technically be possible and legally permissible. *See Knox v. Service Employees*, 567 U.S. 298, 307 (2012) (a case "becomes moot

---

[10] The Federal and Intervenor Defendants do argue that the case is "prudentially moot" because plaintiffs have failed to request any meaningful and feasible relief.  However, "prudential" considerations are not jurisdictional, and defendants cite no case in which the Seventh Circuit dismissed a case as moot solely based on so-called prudential considerations.  Instead, the only Seventh Circuit case either cite was dismissed only in part for prudential considerations and involved questions of statutory interpretation in an "outdated legal landscape" over which the parties' "lack[ed] [a] personal stake in the outcome." *EEOC v. Flambeau, Inc.*, 846 F.3d 941, 950 (7th Cir. 2017).  In this case, there are *no* new statutory provisions that supersede those raised in plaintiffs' amended complaint and all parties continue to have a stake in the outcome of this case.

only when it is *impossible* for a court to grant any effectual relief whatever to the prevailing party") (emphasis added); *Hoosier Env't Council v. U.S. Army Corps of Engineers*, 722 F.3d 1053, 1058 (7th Cir. 2013) (finding that the court could order that a constructed highway be ripped up in a Clean Water Act case with a distinct remedy regime, even though it "would be an extreme measure, unlikely to be ordered," and "the fact that relief is unlikely does not render a case moot").  Finally, although the Seventh Circuit panel understandably questioned whether the case was moot, it conceded "the possibility of relief such as an order to tear down the transmission line and restore the environment, or to swap additional (or different) land as part of an exchange[.]"  *Nat'l Wildlife Refuge Ass'n.*, 2024 WL 4692027, at *2.  Since plaintiffs have now expressly requested that relief, the case is not moot under Article III of the Constitution and the court will consider the merits of plaintiffs' claims under the Refuge Act and NEPA.

## II. Merits Review

The Administrative Procedure Act governs this court's review of plaintiffs' claims under the Refuge Act and NEPA.  Under the APA, a court reviewing an agency's compliance with a statute owes no deference to agency interpretations of the law, except under limited circumstances.  *See Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado*, 145 S. Ct. 1497, 1511 (2025)  ("[W]hen an agency interprets a statute, judicial review of the agency's interpretation is de novo."); 5 U.S.C. § 706 ("To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning and applicability of the terms of an agency action.").  However, judicial review of agency decisions is generally

conducted under the APA's deferential arbitrary-and-capricious standard. *Seven Cnty. Infrastructure Coal.*, 145 S. Ct. at 1511.[11]

"Under that standard, a court asks not whether it agrees with the agency decision, but rather only whether the agency action was reasonable and reasonably explained." *Id.; see also Highway J Citizens Grp. v. Mineta*, 349 F.3d 938, 952–53 (7th Cir. 2003) (court reviewing agency decision under APA asks only "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment"). Still, a decision may be overturned as "arbitrary and capricious" when an agency fails to consider "the relevant data" or fails to put forth "a rational connection between that data and its decision." *WildEarth Guardians v. U.S. Fish & Wildlife Serv.*, 784 F.3d 677, 682–83 (10th Cir. 2015) (citation omitted). This arbitrary and capricious standard is also met when the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the

---

[11] Plaintiffs argue in their summary judgment briefing that the Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) "eliminates deference to the Federal Defendant agencies' decision-making." (Plts.' Br. (dkt. #163) 8.) However, in overturning the holding in *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council*, 467 U.S. 837 (1984), the *Loper* Court actually held that courts should no longer defer to agency interpretations of ambiguous statutory language in certain circumstances. 603 U.S. at 412. Since neither party has asserted that the statutory provisions of the Refuge Act are ambiguous, nor that Federal Defendants are entitled to deference under *Chevron*, *Loper* is inapplicable to the inquiry before this Court. Moreover, *Loper* leaves undisturbed agency deference in policymaking and factfinding applicable under the APA. *Loper*, 603 U.S. at 392 ("Section 706 *does* mandate that judicial review of agency policymaking and factfinding be deferential.") (emphasis in original). Finally, the Supreme Court in *Loper* reiterated that: "courts may—as they have from the start—seek aid from the interpretations of those responsible for implementing particular statutes. Such interpretations constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance consistent with the APA." *Id.* at 394 (citation and quotation marks omitted).

product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

That said, the court may not "substitute [its] own policy judgment for that of the agency," *Nat'l Wildlife Fed'n v. U.S. Army Corps of Engineers*, 75 F.4th 743, 749 (7th Cir. 2023), and must not "substitute its judgment for that of the agency as to the environmental consequences of its actions." *Highway J. Citizens Grp.*, 349 F.3d at 953 (citations omitted). Rather, the reviewing court "simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *Nat'l Wildlife Fed.*, 75 F.4th at 749; *see also Gripum, LLC v. U.S. Food and Drug Admin.*, 47 F.4th 553, 558 (7th Cir. 2022) (noting that agency must merely articulate a "rational connection between the facts found and the choice made" to survive an APA challenge) (citations omitted). In addition, the court's "deference to the agency is more substantial when the challenged decision involves technical or scientific matters within the agency's area of expertise." *WildEarth Guardians*, 784 F.3d at 683. Applying this guidance, the court first turns to plaintiffs' claim that FWS violated the Refuge Act by approving a land exchange that was arbitrary, capricious or a violation of law, then considers plaintiffs' NEPA claims.

### A. Refuge Act Claim

The Refuge Act establishes the National Wildlife Refuge System, a "national network of lands and waters for the conservation, management, and where appropriate, restoration of the fish, wildlife, and plant resources and their habitats . . . for the benefit of present and future generations of Americans," to be administered by the Secretary of

the Interior through FWS.  16 U.S.C. §§ 668dd(a)(1)–(2).  The Act further states that each refuge "shall be managed to fulfill the mission of the System," which includes, among other things: providing for the conservation of fish, wildlife, plants and their habitats; ensuring the biological integrity, diversity and environmental health of the system; plan and direct the continued growth of the system; and facilitating compatible wildlife-dependent recreational uses.  *Id.* § 668dd(a)(4).  With some exceptions, therefore, FWS may "permit the use of any area within the System for any purpose," so long as these "uses are compatible with the major purposes for which such areas were established[.]"  *Id.* § 668dd(d)1)(A).

A "compatible" use means a wildlife-dependent recreational use or any other use of a refuge that will "not materially interfere with or detract from the fulfillment of the mission of the System or the purposes of the refuge."  *Id.* § 668ee(1).  In determining whether a use is compatible, FWS is to use "sound professional judgment," which consists of "principles of sound fish and wildlife management and administration, available science and resources, and adherence to the requirements of this Act and other applicable laws." *Id.* § 668ee(3).  More specifically, the Refuge Act states that FWS may "permit the use of, or grant easements" across, any area of a refuge for purposes such as "powerlines, telephone lines, canals, ditches, pipelines, and roads . . . whenever [it] determines that such uses are compatible with the purposes for which these areas are established."  *Id.* § 668dd(d)(1)(B). Thus, when a new use, such as a powerline, is proposed within a refuge, FWS must make a determination "that the use is a compatible use and that the use is not inconsistent with public safety." *Id.* § 668dd(d)(3)(A)(i).

24

As discussed in the undisputed fact section above, FWS initially considered the CHC Project to be proposing a "new use" in the Refuge that required a compatibility determination under § 668dd(d)(3)(A)(i), and FWS issued such a determination, though it was later rescinded. However, after the Utilities proposed a land exchange instead, FWS determined that a compatibility determination was no longer required. Specifically, under the Act, FWS determines acquisition of "lands or interests … by exchange ... for acquired lands or public lands, or for interests in acquired or public lands" to expand the territory of the Refuge provided the Refuge land being exchanged is "suitable for disposition" and "approximately equal" in value (or equalized by cash payment) to the land for which it is being exchanged. 16 U.S.C. § 668dd(b)(3).

Nevertheless, by authorizing the land exchange, plaintiffs claim that the Federal Defendants violated the Refuge Act in three ways. First, even though a land exchange was being proposed rather than an easement, they contend that the Federal Defendants were required but failed to determine whether running a high-voltage powerline through the Refuge would be "compatible" with the purpose of the Refuge. Second, they separately contend that FWS failed to determine whether the Oak Road Property *was* "suitable for disposition" as expressly required by § 668dd(b)(3). And third, plaintiffs contend that the land exchange violates the Refuge's Comprehensive Conservation Plan, which FWS itself had developed as required by the Refuge Act. The court addresses each of these three claims and defendants' responses below.

### 1. Compatibility Determination

25

The FWS concedes that it made no compatibility determination before authorizing the land exchange that allowed the CHC Project to be completed.  Plaintiffs argue that FWS acted contrary to law by failing to determine whether the land exchange and installation of a high-voltage powerline was compatible with the express purposes of the Refuge -- wildlife-dependent recreation, wildlife protection and conservation.  16 U.S.C. § 668dd(d)(3)(A)(i).  As plaintiffs point out, Congress specifically mentioned "powerlines" in the context of discussing compatible uses, stating that FWS must determine whether a powerline would be compatible with the Refuge before permitting such a use.  *Id.* § 668dd(d)(1)(B).

In response, the Federal Defendants and Utilities contend that the compatibility requirement does not apply to land exchanges.  In light of the Seventh Circuit's earlier rulings in this case, the court must agree with defendants for at least three reasons.[12]  First, when interpreting a statute, "[t]he 'cardinal canon' of statutory interpretation is that we look first to the text of the statute."  *United States v. All Funds on Deposit with R.J. O'Brien & Assocs.*, 783 F.3d 607, 622 (7th Cir. 2015).  Here, as the Seventh Circuit has already pointed out, the "Refuge Act uses different words to describe the standard the different potential actions [i.e., right-of-way permits and land exchanges] must meet."  *Driftless*, 74 F.4th at 495.  While subsection 668dd(d), which governs "uses" of the Refuge, including easements and rights-of-way, requires a "compatibility" analysis, subsection 668dd(b)(3), governing "land exchanges," only requires FWS to determine whether a land exchange is "suitable."  The words "compatibility" or "compatible" are not used anywhere in the land

---

[12] As explained previously, this is a question of statutory interpretation, not a review of an agency decision, and thus is a question of law that the court resolves de novo.  *Sloan*, 436 U.S. at 118.

exchange section, nor is a land exchange ever referred to as a "use," which may bring it under the umbrella of § 668dd(d) as plaintiffs argue.

Second, "where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Ambassador Animal Hosp., Ltd. v. Elanco Animal Health Inc.*, 74 F.4th 829, 831 (7th Cir. 2023) (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983).) While Congress used the word "compatible" and defined "compatible use" in various sections of the Act, it did not use the term in the section governing land exchanges. Under general principles of statutory construction, the court must assume that Congress acted intentionally in setting different standards for "uses" and "land exchanges." Congress's decision to treat land exchanges and uses differently also makes some sense, because the two decisions have different implications for the Refuge. Again, as the Seventh Circuit has already pointed out, a different analysis may be required because "a land exchange entails an increase in the Refuge's extent, which must be offset against a loss elsewhere." *Driftless*, 74 F.4th at 495. Thus, by issuing an easement or permit, FWS maintains fee ownership of the underlying land; and by approving a land exchange, FWS disposes of its fee interest and the divested parcel is no longer part of the refuge, while FWS gains additional land that must be managed.

Third, although there is little legal authority discussing the standards governing land exchanges, persuasive authority exists supporting the defendants' interpretation of the Refuge Act. Most persuasive, as already discussed, although the Seventh Circuit did not resolve the question on the merits, it expressed skepticism that the "compatibility" analysis would apply to land exchanges. *Id.* In addition, the only other court to consider the

27

question under the Refuge Act concluded that FWS is not required to conduct a compatibility determination for land exchanges.

> The plain language of the Refuge Act supports the conclusion that a compatibility determination is not required for the acquisition of land. First, the list of example uses does not include the acquisition or sale of refuge land, but instead references only activities carried out by third parties on existing refuge land, such as hunting, fishing, or placing lines for utilities. *See* 16 U.S.C. § 668dd(d)(1)(A)-(B). Second, the Refuge Act's provision authorizing the FWS to enter into land exchanges is separate from the provision requiring a compatibility determination. *Compare* 16 U.S.C. § 668dd(b)(3) *with* § 668dd(d). Moreover, § 668dd(b)(3) does not impose any requirements on the Secretary's decision to exchange land, other than the requirement that the "values of the properties so exchanged either shall be approximately equal, or if they are not approximately equal the values shall be equalized by the payment of cash to the grantor or to the Secretary." 16 U.S.C. § 668dd(b)(3). Congress is presumed to know how to condition an agency's exercise of authority on the completion of an analysis and did not do so in this instance.

*Town of Superior v. U.S. Fish & Wildlife Serv.*, 913 F. Supp. 2d 1087, 1111 (D. Colo. 2012), *aff'd sub nom. WildEarth Guardians v. U.S. Fish & Wildlife Serv.*, 784 F.3d 677 (10th Cir. 2015).

Further, FWS's own practice has been to apply different standards to land exchanges and easements/rights-of-way. Specifically, although not controlling authority,[13] the FWS Manual both provides context for FWS's actions here: "Exchange is a valuable method to acquire land or interests in land for Service programs." *U.S. Fish and Wildlife*

---

[13] FWS's Manual is internal guidance only and does not have the force of law or regulation. *See Chrysler Corp. v. Brown*, 441 U.S. 281, 301 (1979) (noting interpretive rules, policy statements, and rules of agency procedure and practice do not have the "force and effect of law").

*Service, Fish and Wildlife Service Manual*, 342 FW 5.7.A.[14]  The Manual goes on to explain that all land exchanges must satisfy the following criteria: (1) the land divested must be suitable for disposition; (2) the exchange must benefit the United States; and (3) the value of the lands to be exchanged must be approximately equal or the values may be equalized by a cash payment.  *Id.* 5.7.B(1).  In addition, Refuge managers must "use their expert judgment to assess and prepare a written record that clearly demonstrates how the exchange would" (1) further the purposes for which the refuge was established; (2) fulfill the National Wildlife Refuge System's conservation mission as defined in the National Wildlife Refuge System Administration Act of 1966, as amended (16 U.S.C. 668dd(a)(2)); and (3) provide a net conservation benefit to the refuge, and in particular, weigh the conservation value of the land to be acquired against the conservation value of the land to be divested, with consideration of any available information about planned uses of the land to be divested and the impacts of those uses on the refuge." *Id.* 5.7(b)(2).[15]

Plaintiffs' remaining arguments in support of the need for a compatibility study are unpersuasive.  For example, plaintiffs contend that the "land exchange" provision at § 668dd(b)(3) cannot be read in isolation and must be harmonized with the "compatibility"

---

[14] Available at https://www.fws.gov/policy-library/342fw5.

[15] Also persuasive is an M-Opinion issued by the Solicitor to the Secretary of the Interior on May 31, 2023, addressing land exchanges.  https://www.doi.gov/sites/doi.gov/files/m-37078-national-wildlife-refuge-land-exchanges-5.31.23-508-compliant.pdf.  As in the FWS Manual, the Solicitor opined that Refuge managers, when considering any land exchange, should first determine whether the divested tract is "suitable for disposition" and, second, whether the exchange, as a whole, would "fulfill the conservation mission of the Refuge System and the purpose of the individual [r]efuge." The Solicitor also found that refuge land exchanges are not new "uses" of refuge system lands that require FWS to make a compatibility determination under the Improvement Act.  M-opinions are generally binding on agencies, but this opinion, along with all other M-opinions issued by the previous administration, is currently "Under Suspension Review" by the Trump administration.  (M-Opinion Suspension Notice (dkt. #199-1).)

provisions in subsection (d) of § 668dd, as well as the provision requiring "compatibility" for the placement of powerlines through the Refuge.  Even plaintiffs concede that not *all* land exchange must comply with the Act's compatibility provisions, but rather only the types that "Congress specifically identified in the compatibility provision—"powerlines, telephone lines, canals, ditches, pipelines, and roads," § 668dd(d)(1)(B).  (Plts.' Br. (dkt. #146) 39.)  However, a plain reading of § 668dd(d)(1)(B) directs that this subsection is simply a non-exhaustive list of various potential *uses*, not a list of types of land exchanges that require compatibility analyses.  Specifically, the subsection states that FWS is authorized to "permit the use of, or grant easements in, over, across, upon, through, or under any areas within the System for purposes such as but not necessarily limited to, powerlines, telephone lines, canals, ditches, pipelines, and roads . . ." *Id.* § 668dd(d)(1)(B). Critically, nothing in that provision or anywhere else in the Act suggests a land exchange is a type of *use* in the Refuge.

Plaintiffs also argue that the legislative history of the Refuge Act amendments support their reading, because Congress wanted to curb incursions like powerlines when it passed the National Wildlife Refuge System Improvement Act of 1997, which amended the National Wildlife Refuge Administration Act of 1966.  Given the clarity of the statutory language, however, the court need not resort to interpreting legislative history. Moreover, even if the court considered the history, it would not help plaintiffs.  The land exchange provision was not even amended by the 1997 Act, and none of plaintiffs' cited legislative history refers to land exchanges at all or remotely suggests that the land exchange authority was under discussion.  Thus, nothing in the Act's legislative history supports plaintiffs' interpretation of the land exchange provision.  *See Encino Motorcars, LLC v.*

30

*Navarro*, 584 U.S. 79, 90 (2018) ("If the text is clear, it needs no repetition in the legislative history; and if the text is ambiguous, silence in the legislative history cannot lend any clarity.")

Finally, in what is their most sympathetic argument, plaintiffs argue that defendants' interpretation of the Refuge Act allows for a large and obvious loophole for those seeking to exploit refuge land. Specifically, under defendants' (and this court's) interpretation, FWS can grant an easement or a permit for a right-of-way project *only* if it finds the use is compatible with the Refuge's primary purpose, while FWS can actually convey fee simple title without making a compatibility determination despite plainly conferring a greater property right for an identical purpose. Accordingly, plaintiffs argue that legitimizing this apparent loophole will empower other refuge managers to give away public land for incompatible uses, effectively circumventing the underlying mission of the refuge system. While the court shares plaintiffs' concerns, as already discussed, the Refuge Act imposes requirements on land exchanges as well under § 668dd(b). Specifically, refuge managers cannot exchange land without determining whether the divested land is "suitable for disposition" *and* the exchange as a whole would provide a net benefit for the refuge. Although the analysis may not be as strict as plaintiffs would prefer, land exchanges still require a thorough evaluation of the appropriateness of the exchanges.

Regardless, the Refuge Act does not appear to require FWS to conduct a compatibility determination for land exchanges. Thus, the material question for the court is whether FWS properly conducted the analysis that was required.

31

## 2. Suitability and Net Benefits Analysis

As also discussed, the Refuge Act expressly requires that before approving a land exchange, FWS must find that the "public land[s]" currently in the Refuge are "suitable for disposition." 16 U.S.C. § 668dd(b)(3)(A). All parties agree that this provision refers to the property that will be divested -- here, the Oak Road Property. However, the parties disagree as to whether FWS actually conducted this analysis. FWS contends its suitability analysis was sufficient, while plaintiffs argue it obviously was not because the Oak Road Property was too valuable to exchange away for the property that the Refuge received.

The initial question for the court is what standard of review applies. Plaintiffs argue that the review should be de novo under the APA since it involves questions of law. More specifically, plaintiffs argue that the court should hold as a matter of law that FWS did not conduct a proper suitability determination. In contrast, the Federal and Intervenor defendants argue that FWS's decision is *unreviewable* since whether a parcel is "suitable" for disposition is committed to agency discretion. In particular, defendants invoke the APA exception to judicial review found at 5 U.S.C. § 701(a)(2), which states that judicial review is unavailable when the challenged "agency action is committed to agency discretion by law."

The Supreme Court has held that § 701's limitation on judicial review is "a very narrow exception," to be invoked only when there is "no law to apply." *Menominee Indian Tribe of Wisconsin v. Env't Prot. Agency*, 947 F.3d 1065, 1072 (7th Cir. 2020) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971)). When deciding whether a decision is committed to agency discretion, the court must review the applicable statutes and regulations to determine whether they contain "judicially manageable

standards ... for judging how and when an agency should exercise its discretion." *Menominee Indian Tribe*, 947 F.3d at 1072 (citations omitted); see also *Miami Nation of Indians of Ind. v. Dept. of Interior*, 255 F.3d 342, 348–49 (7th Cir. 2001) (examining regulations governing the tribal recognition process to determine if they contain criteria that "courts are capable of applying"). The Federal Defendants argue that there are no regulations governing FWS's analysis of whether a parcel is "suitable" for disposition or, relatedly, how a court should review FWS's "net benefit analysis." However, this frames the question of the scope of judicial review too narrowly.

While the court agrees with defendants that it lacks authority to determine de novo whether the Oak Road Property was suitable for disposition, the relevant question is whether the court can review FWS's decision to consider and approve a land exchange. The answer to this question is "yes." As already discussed, the plain language of the Act allows FWS to acquire lands by exchange where: (1) the agency finds the exchanged property is suitable for disposition; and (2) the values of the properties for exchange are of approximately equal value or equalized by cash payment. 16 U.S.C § 668dd(b)(3). The requirements that FWS must consider suitability and the properties' relative values are not permissive or discretionary; FWS cannot make a judgment call about whether to conduct a suitability analysis or require an exchange of equally valuable property. Thus, under the APA's arbitrary and capricious standard, the court is able to review whether FWS engaged in a suitability analysis and whether the ultimate decision to engage in the land exchange, based on that analysis and the net benefits analysis, was arbitrary and capricious, or contrary to law. 5 U.S.C. § 706(2)(A). Indeed, courts are regularly required to conduct similar reviews in a variety of settings.

33

### a. Suitability

With respect to suitability, FWS identified several reasons in its Net Benefits Analysis that make the Oak Road Property suitable for disposition under 16 U.S.C. § 668dd(b)(3).  To begin, FWS noted that this property is fragmented by Oak Road, an active, gravel road that cuts through the Refuge to reach a ferry landing on the Wisconsin side of the Mississippi River.  (Net Benefit Analysis (dkt. #1-19) 1, 3.)  Beyond this gravel road, the FWS found the Oak Road Property consists primarily of "scrub-shrub and wet meadow habitats intermixed with young willow and cottonwood stands" and provides "little to no wildlife or habitat value."  (*Id.* at 3.)  The area surrounding Oak Road is "routinely inundated" by flash floodwaters that "deposit debris from Turkey River."  (*Id.* at 1, 3.)  Due to the routine flooding, restoration of the Property's floodplain forests had been unsuccessful.  Instead, the land surrounding Oak Road is overrun with reed canary grass, an invasive plant that FWS has been unable to eradicate or control.  FWS further noted that exchanging the Oak Road Property would not harm northern long-eared bats, as a bat habitat survey in October 2023 confirmed that there was no suitable bat habitat within the divested tract.  Ultimately, the FWS found that the disposal of the Oak Road Property would allow for the colocation of utility transmission lines along a corridor that was already cleared and fragmented by Oak Road, resulting in a single corridor used for transmission lines, reducing overall habitat fragmentation within the Refuge and restoration of higher quality habitat.

Moreover, the FWS separately determined that even after an exchange, the Oak Road Property would continue to further the Refuge's purposes through protective land

use restrictions contained in the deed.  In particular, the Land Exchange Agreement would require the Utilities to follow an FWS-approved vegetation management plan that requires invasive species control, limitations on soil disturbance, and identification of desirable plant species.  Even in the long term, FWS noted that the deed restrictions would ensure that the Oak Road Property was managed according to FWS specifications.  (*Id.* at 5.)

Plaintiffs nevertheless critique FWS's suitability determination on several fronts. Specifically, they argue that the suitability determination: (1) was not based on FWS's expertise, but on the Utilities' suspect assessments; (2) disregarded the high conservation value of the Oak Road Property which, as described by plaintiffs' expert, Steven Apfelbaum, is high-quality wetland habitat; (3) disrupts a long-term restoration effort for the Turkey River portion of the Refuge by the Corps and FWS; (4) allows construction on a parcel that would severely diminish the scenic quality of the area; and (5) contradicts FWS's own Comprehensive Conservation Plan and FEIS, exacerbating habitat fragmentation in the Refuge while creating a new, private "inholding."[16]

Unfortunately for plaintiffs, none of these criticisms, even taken together, establish that FWS acted arbitrarily or capriciously in light of evidence that Sabrina Chandler, the Refuge Manager, authored the Net Benefit Analysis and made the determination to approve the Land Exchange based on her expertise in refuge management and extensive knowledge of the Refuge, including the properties to be exchanged.  (Chandler Decl. (dkt. #167).)  Moreover, Chandler's and FWS's analysis readily acknowledge:  that the Oak Road Property is located within the Turkey River Bottoms floodplain; restoration efforts

---

[16] An inholding is a piece of privately owned land located within the boundaries of a larger, publicly owned area.

have been attempted; and the transmission lines would be visually disruptive. However, when weighed against other factors, these criticisms did not alter FWS's ultimate decision.

That plaintiffs' expert disagrees with FWS's assessment of the Oak Road Property's conservation value or habitat fragmentation analysis is *not* sufficient to show that FWS's assessment was arbitrary and capricious. Rather, the court must give deference under the APA to FWS's factual and expert determinations. *See Loper*, 603 U.S. at 392 (APA "mandate[s] that judicial review of agency policymaking and factfinding be deferential."); *Marsh v. Ore. Nat. Res. Council*, 490 U.S. 360, 378 (1989) ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive."); *Ind. Forest All., Inc. v. U.S. Forest Serv.*, 325 F.3d 851, 859, 861 (7th Cir. 2003) (noting decisions implicating agency expertise are entitled to deference); *see also Sauk Prairie Conservation All. v. U.S. Dep't of the Interior*, 944 F.3d 664, 678 (7th Cir. 2019) (finding National Park Service's "application of expertise" entitled to deference); *Animal Lovers Volunteer Ass'n, Inc. v. Cheney*, 795 F. Supp. 994, 1000 (C.D. Cal. 1992) ("The [APA] and [Refuge Act] do not give the Court the authority to evaluate whether the agency's decision was the wisest decision.").

### b. Net Benefit Analysis

This leaves the court to examine FWS's net benefit analysis of the land exchange under the same arbitrary and capricious standard, whether as an abuse of discretion or by otherwise being unlawful. In deciding whether the land exchange would result in a net conservation benefit to the Refuge, FWS assessed both the net benefits to the Refuge of

36

acquiring the Wagner Property and of disposing of the Oak Road Property.  In particular, FWS noted that the agency had identified the Wagner Property in its 2006 Comprehensive Conservation Plan as a high-priority acquisition target because of its high value fish and wildlife habitat.  (Dkt. #1-19, at 4.)  FWS further noted that protection of that habitat would benefit "the endangered Higgins Eye pearlymussel and other sensitive aquatic species," because "[a]cquiring and preserving the shoreline protects these sensitive areas from development."  (*Id.*)  Unlike the Oak Road Property, FWS further found that the Wagner Property has no roads fragmenting the habitat, and acquisition of the Wagner Property would increase habitat connectivity by eliminating private inholdings and connecting disjunct portions of the Refuge, as well as provide recreational opportunities such as hunting, fishing, and wildlife observation.  (*Id.*)

FWS also compared the benefits of the Wagner Property to the Oak Road Property that would be divested.  FWS considered "[t]he potential harms of building the CHC Project on the divested parcel . . . in the context of all the terms of the land exchange and the existing transmission line fragmentation in this unit of the Refuge."  (*Id.* at 4.)  The FWS's Net Benefit Analysis also incorporated the EIS, Supplemental EA and FONSI, which provide a thorough discussion of the expected construction on the Oak Road Property, including that it would house transmission lines of up to 75-feet high. Nonetheless, FWS concluded that the land exchange would provide an overall net conservation benefit to the Refuge.

Again, plaintiffs criticizes FWS's net benefit analysis as flawed for several reasons. Predictably, again relying on their expert, plaintiffs contend that FWS understated the value of the Oak Road Property and overstated the value of the Wagner Property.  Much

37

of the support for this contention focuses on land and structure adjacent to, or near the Wagner Property, including:  a nearby campground that includes its own manmade lake and tiki bar; an adjacent sand pit; a nearby airport; and railroad bordering that property. Plaintiffs particularly criticize the FWS's failure to acknowledge these buildings and infrastructure in its net benefits analysis.  However, plaintiffs fail to explain how those developed areas undercut the conservation value of the Wagner Property itself.  Moreover, FWS's record shows that it considered these conditions, conducting a site inspection of the Wagner Property for evidence of environmental hazards and noting the presence of a manmade lake, campground and gravel pit, as well as a railroad berm.  (FWS-AR-0005898.)  FWS also did not ignore that a railroad line itself was nearby, as it was mentioned throughout the Site Inspection document and labeled on a map.  (*Id.*)  Before the land exchange, FWS also examined the property and surrounding area, explicitly noting many items plaintiffs contend were ignored.

Similarly, plaintiffs argue that the Wagner Property has a low conservation value with a market value of only $79,000.  Plaintiffs further suggest that because the Wagner Property was only $79,000, FWS could have easily bought the property rather than proceed with a land exchange.  However, plaintiffs cite no evidentiary support for this assertion, such as evidence that any prior owner was willing to sell the Wagner Property for $79,000; nor do they explain how the parcel's value to the general marketplace correlates to its conservation value to the Refuge.  As the Federal Defendants explain, the reason appraisals are performed in land exchanges is not to determine conservation value, but to confirm that the two properties are of roughly equal market value or arrive at an

equalization payment to offset any difference in market value. *See* 16 U.S.C. § 668dd(b)(3)(B).

Plaintiffs next argue that FWS's approval of the land exchange was inconsistent with the Refuge's Comprehensive Conservation Plan ("CCP"), which in turn violates the Act, 16 U.S.C. § 668dd(e)(1)(e), by requiring the Refuge be managed "in a manner consistent with the plan."[17]  Plaintiffs argue that the land exchange contradicts several commitments, goals and planning objectives that are established in the CCP, including: (1) protecting, restoring, and enhancing wetlands and associated habitat; (2) acquiring land in the Turkey River Bottoms; and (3) staving off development pressures.  (*See* Dkt. #1-27; ROD028194–95.)  Instead of working toward these goals, plaintiffs contend that the land exchange, including subsequent construction, has resulted in destruction of wetlands, fragmentation of wildlife habitat, and divesting of a parcel in the Turkey River Bottoms that the CCP had identified for protection.

As defendants respond, however, the CCP encourages "land acquisition" as a means to "restor[e] habitat connectivity needed for the health of many species" and to "restore flood plains."  (*Id.*)  Importantly, the CCP itself *identifies* the Wagner Property as an acquisition priority because of its "[h]igh value fish and wildlife habitat which is unique and irreplaceable on a national basis or in the ecoregion."  (*Id.*)  Thus, the Utilities and Federal Defendants argue that the FWS's decision to acquire the Wagner Property is consistent with the CCP's goals.

---

[17] As part of their challenge to FWS's net benefit analysis (Count IV of the Amended Complaint) *and* as a standalone claim under the Refuge Act (Count III), plaintiffs make arguments under the CCP.  Because their arguments overlap, the court addresses both here.

In fairness, the CCP does not discuss land exchanges *or* disposition of Refuge land as a means to achieve the Refuge's goals. But it also does not identify the Oak Road Property as a high-quality habitat that should be preserved, as opposed to the need to preserve the general floodplain area. Nor does the CCP expressly preclude the use of land exchanges; rather, it appears to give discretion to FWS in determining whether a land exchange would be an appropriate way to achieve the Refuge's goals. At the very least, the CCP is ambiguous about whether the proposed land exchange would be an appropriate means to restore habitat, reduce fragmentation and obtain new wetlands. As a result, the court must defer to FWS's interpretation of the CCP as well. *See Cascadia Wildlands v. United States Bureau of Land Mgmt.*, No. 24-4542, 2025 WL 2460946, at *16 (9th Cir. Aug. 27, 2025) (court must defer to agency interpretation of its own management plan where "susceptible to more than one reasonable reading") (citing *Kisor v. Wilkie*, 588 U.S. 558 (2019) (court defers to agency's interpretation of its own regulation where regulation is "genuinely ambiguous" regulation, at least where the interpretation is "reasonable" or is "entitled to controlling weight," such as where interpretation is based on special agency expertise)).

Accordingly, whether the court agrees with FWS's decision or not, plaintiffs have identified no basis for the court to second guess it as arbitrary and capricious under the APA. *See Pres. Endangered Areas of Cobb's Hist., Inc. v. U.S. Army Corps of Eng'rs*, 87 F.3d 1242, 1248 (11th Cir. 1996) ("Although the plaintiffs disagree with the conclusion of the Corps, they can point to nothing that would make the Corps' decision arbitrary and capricious."). To the contrary, the FWS's Net Benefit Analysis is sufficiently well documented to confirm that the FWS considered relevant information and, in its

discretion, rationally concluded that the parcel was suitable for disposition, consistent with its evaluation of the Oak Roak Property.

Specifically, without the land exchange: the two transmission lines running through the Stoneman Crossing would remain; the gravel road to the ferry would continue to operate through the Oak Road Property; and the Wagner Property would remain under private ownership.  With the land exchange, the Refuge gains 15.85 acres of high value habitat at least from a conservation perspective, with the Wagner Property transforming from a private tract subject to potential future development to a contiguous block of protected land within the Refuge; the Stoneman Crossing is removed, restoring 28 acres of high-quality habitat; and the transmission line runs alongside the existing Oak Road already in use.  Thus, through the land exchange, three fragmenting effects (Stoneman Crossing transmission lines, Wagner Property inholdings, and Oak Road) are reduced to one (Oak Road).  Under the APA, because FWS "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action, including [drawing] a rational connection between the facts found and the choice made," the court must uphold that decision.  *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.  Against all of this is plaintiffs' argument that the acquired land would probably have stayed unused whether FWS took control of it or not, which, given that some of the Wagner Property is wetlands, is not unreasonable.  Still, this counter argument does not begin to establish that the FWS acted unreasonably or arbitrarily.

B. **NEPA Claims**

"NEPA has twin aims." *Ctr. for Biological Diversity v. BLM*, 141 F.4th 976, 993 (9th Cir. 2025) (citation omitted). First, requiring federal agencies to include in "every recommendation or report on . . . major Federal actions significantly affecting the quality of the human environment, a detailed" description of the proposed action's environmental impact. 42 U.S.C. § 4332(C). Second, ensuring "that the agency will 'inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Ctr. for Biological Diversity*, 141 F.4th at 993. As the Supreme Court recently explained, therefore, "[p]roperly applied, NEPA helps agencies to make better decisions and to ensure good project management." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. ——, 145 S. Ct. 1497, 1510 (2025). However, the Supreme Court also emphasized NEPA "is a purely procedural statute" that "imposes no substantive environmental obligations or restrictions." *Id.* at 1507.

Said differently, although NEPA requires that agencies analyze environmental impacts and make that analyses available for public inspection, "NEPA does not require the agency to weigh environmental consequences in any particular way." *Id.* "Rather, an agency may weigh environmental consequences as the agency reasonably sees fit under its governing statute and any relevant substantive environmental laws." *Id.* At bottom, then, NEPA does not require the agency to prioritize environmental concerns over other concerns in determining whether to proceed with a project within the Refuge; instead, NEPA requires that the agency consider and disclose environmental impacts, "no more." *Id.* at 1511.

42

The limited scope of NEPA necessarily circumscribes the scope of judicial review as well. "[T]he central principle of judicial review in NEPA cases is deference." *Id.* As a result, the "role of a court in reviewing the sufficiency of an agency's consideration of environmental factors is a limited one." *Id.* at 1514–15 (citation omitted). More specifically, courts cannot substitute their judgment for that of the agency. *Id.* at 1514 ("NEPA's procedural mandate helps to insure a fully informed and well-considered decision, not necessarily a decision" that judges "would have reached had they been members of the decision-making unit of the agency.") (citation and quotation marks omitted).

Plaintiffs argue that the Federal Defendants violated both aspects of NEPA by failing to: (1) engage in a thorough environmental assessment; and (2) provide adequate public participation. As an initial matter, the court agrees with the Federal Defendants that plaintiffs cannot sustain NEPA claims against RUS or the Corps. As the Seventh Circuit explained in plaintiffs' previous action, an EIS, EA or FONSI is not subject to judicial review unless and until those statements are incorporated into an agency decision. *Driftless Area Land Conservancy*, 74 F.4th at 495 ("But an EIS differs from a decision to approve any given action… It is the decision incorporating the statement into a recommendation or report that is a reviewable agency action.") Because RUS had not made any final agency decision incorporating the challenged EIS, the court found plaintiffs' NEPA claim was "premature." *Id.* In this action, plaintiffs have again failed to identify any final agency action by RUS that would sustain a NEPA claim. Indeed, the undisputed record shows that RUS has taken no action because Dairyland has not requested funding from the agency.

43

As for the Corps, plaintiffs did not appeal this court's previous holding that its permit was "compliant with the requirements of NEPA," *Nat'l Wildlife Refuge As"n*, 580 F. Supp. 3d at 615, and plaintiffs do not claim that the Corps issued any new final agency action that might support revisiting the court's earlier holding. Therefore, plaintiffs' NEPA claim is limited to the only final agency decision that remains judicially reviewable: FWS's decision to proceed with the land exchange at issue here. Accordingly, the court reviews plaintiffs' challenges to FWS's reliance on the EIS and fulfillment of that public participation requirement in making its final land exchange decision.

### 1. Environmental Impact Statement

As discussed, NEPA requires any agency undertaking a "major Federal action[] significantly affecting the quality of the human environment" to prepare an Environmental Impact Statement. 42 U.S.C. § 4332(C). To determine whether an EIS is required, an agency may first prepare an Environmental Assessment ("EA"). After preparing an EA, if an agency determines that the action "will not have a significant effect on the human environment," then the agency may make a Finding of No Significant Impact ("FONSI") and need not prepare an EIS. 40 C.F.R. § 1508.13 (1978).

As in their previous lawsuit, plaintiffs once again challenge the October 2019 EIS's purpose and need statement, range of alternatives, and analysis of environmental impacts, including greenhouse gases and climate impacts. *See id.* at 610–13. Plaintiffs also claim that the October 2023 Final Supplemental EA and FWS's FONSI violate NEPA by relying

("tiering") on the original inadequate EIS with no meaningful changes to address its flaws.[18] The court reviews this claim under the APA's deferential "arbitrary and capricious" standard. *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 623 F.3d 633, 641 (9th Cir. 2010) (quoting 5 U.S.C. § 706(2)(A)). Similarly, in "determining whether a document "complied with NEPA, a court should afford substantial deference to the agency," *Seven County Infrastructure Coalition*, 605 U.S. —, 145 S. Ct. at 1512–13, including deferring to the agency regarding: what level of detail is required; what alternatives are feasible; and the scope of the environmental effects that the NEPA document will address. *Id.* at 1512–13. Thus, "[w]hen assessing significant environmental effects and feasible alternatives for purposes of NEPA, an agency will invariably make a series of fact-dependent, context-specific, and policy-laden choices about the depth and breadth of its inquiry—and also about the length, content, and level of detail of the resulting" NEPA documents, and "Courts should afford substantial deference and should not micromanage those agency choices so long as they fall within a broad zone of reasonableness." *Id.* at 1513. Accordingly, the role that the judicial branch plays in policing NEPA compliance is also "a limited one." *Id.* at 1515 (quotation omitted).

With this guidance, the court has little trouble finding that FWS did *not* act arbitrary or capriciously in signing the EIS and EA or in preparing the FONSI for the land exchange. If anything, plaintiffs' NEPA arguments appear to be based on the erroneous assumption that the environmental review for the entire CHC Project is before this court.

---

[18] For the sake of efficiency, a later EA can "tier" to an existing EIS in the right circumstances. Cascadia Wildlands, —F.4th—, 2025 WL 2460946, at *4. "Tiering" refers to reliance on another document that includes the "required discussion." *Id.* (citation omitted). Here, RUS's Supplemental EA and FWS's FONSI both purported to rely on the original EIS.

As just explained, however, the only reviewable federal action is FWS's land exchange. Thus, the purpose of the Supplemental EA process was solely to help inform the FWS's decision to approve or deny the proposed land exchange under the Refuge Act. (FWS-AR-0006553 ("The USFWS would need to decide whether or not to enter into a land exchange with the Utilities, which would exchange lower quality fragmented habitat (divested lands) for higher quality, more desirable habitat (acquired lands).") In particular, FWS neither had regulatory jurisdiction or expertise regarding utilities or transmission lines, nor was it required under NEPA to consider the environmental impacts or reasonable alternatives to the entire CHC Project. *See Seven County Infrastructure Coalition*, 605 U.S. —, 145 S. Ct. at 1516 ("[A]gencies are not required to analyze the effects of projects over which they do not exercise regulatory authority.") The EIS's purposes and need statement, the possible impacts of the project, and the reasonable alternatives, may only be evaluated with respect to the project over which FWS did have jurisdiction -- the siting of the transmission line through the Refuge.

With respect to that specific project, FWS's environmental analysis complied with NEPA. Specifically, FWS considered (1) the possible environmental impacts of the project, including climate consequences and (2) a reasonable range of alternatives to its proposed action. For example, the no action alternative with regard to the land exchange was that "USFWS would not grant the land exchange and/or any regulatory permits necessary for the CHC Project to cross the Refuge." (FWS-AR-0006565.) FWS also considered an alternative where the Utilities crossed the Refuge and constructed transmission lines using their two, pre-existing easements at the Stoneman Crossing. (FWS-AR-0006593; ROD007569 ("The existing transmission lines would be moved approximately 1,800 feet

46

on the western side and 6,000 feet on the eastern side of the existing right-of-way to a location which would follow alongside Oak Road.").)    However, this alternative was eliminated at least in part because it would result in greater negative impacts to the Refuge and migratory birds than the route along Oak Road.  (FWS-AR-0006593.)  Moreover, non-Refuge crossings were still considered nonviable by the applicable regulatory authorities, so that alterative was also not considered in detail in the Supplemental EA.  (FWS-AR-0006593.)  Again, whether the "best alternative" was correctly selected by FWS is not before the court; only whether FWS acted arbitrarily is and the evidence suggests that, right or wrong, FWS's decision was a considered one.

Finally, the Supplemental EA also examined climate change impacts, noting that "[n]either the proposed route modifications nor the proposed land exchange would result in changes to the minor, long-term increase in [greenhouse gas] emissions over the approved CHC Project," while acknowledging that "incorporation of the Wagner Property into the Refuge will "result in very minor beneficial impacts to air quality and climate change resulting from carbon sequestration resulting from the acquired parcel being managed for resource conservation."  (FWS-AR-0006611; FWS-AR-0006522.)  In sum, FWS conducted an appropriate environmental review as required by NEPA for the aspect of the CHC Project over which it had authority.  Particularly in light of the Supreme Court's guidance in *Seven County Infrastructure Coalition*, the court may not disturb its conclusions so long as the agency considered the relevant information and based its conclusion on such information. Accordingly, plaintiffs' challenge to FWS's NEPA assessment fails.

## 2. Public Participation

Plaintiffs' final claim is that the Federal Defendants violated NEPA's public participation requirements by failing to provide adequate notice and an opportunity to comment on the September 2023 Draft Supplemental EA or the February 23, 2024, decisional documents.  Specifically, plaintiffs complain that they had inadequate time to consider and comment on the proposed land exchange.

As defendants point out, however, neither the Land Exchange Agreement nor the Net Benefit Analysis are covered by NEPA's public participation requirements.  Rather, NEPA's notice-and-comment regulations apply only to "environmental documents," which is a defined term limited to "environmental assessment, environmental impact statement, finding of no significant impact, or notice of intent."  40 C.F.R. § 1508.1(i).  In contrast, the Net Benefit Analysis is FWS's internal metric to determine whether the proposed exchange provides a net benefit to the Refuge and complies with the Refuge Act, but is not an "environmental document" under NEPA. Similarly, the Land Exchange Agreement is not an "environmental document," but merely finalizes the real estate transaction approved by the Net Benefit Analysis.  While the court agrees with plaintiffs that additional public participation may have been beneficial, it lacks any legal authority to impose requirements exceeding those in the statute or agency regulations.  *See Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 524 (1978) ("Agencies are free to grant additional procedural rights in the exercise of their discretion, but reviewing courts are generally not free to impose them if the agencies have not chosen to grant them.").

48

This leaves the Supplemental EA and FWS's FONSI.  As they must, plaintiffs also concede the Federal Defendants provided notice and opportunities for public participation with respect to those documents, but argue that the notice for the documents was inadequate, the comment period was too short, and the agency should have held public hearings.  Turning first to the Supplemental EA, which was drafted by RUS, the regulations only require a "14- to 30-day public review and comment period … for all Agency EAs."  7 C.F.R. § 1970.102(b)(6)(ii).  And FWS's regulations require public notification of and involvement with an EA "to the extent practicable."  43 C.F.R. § 46.305(a); 40 C.F.R. § 1501.5(e).  Here, RUS published the initial EA addressing route modifications for the CHC Project on June 24, 2021, and made it available for comment for 30 days.  On September 8, 2023, RUS published the Draft Supplemental EA.  Although RUS's regulations do not require another comment period for supplemental EAs, 7 C.F.R. § 1970.103, RUS nevertheless gave notice of an additional comment period of 14 days for the Draft Supplemental EA.  Plaintiffs then submitted a timely, 40-page comment addressing their many concerns with the agency's analysis.

After comments were received in October 2023, RUS issued a final Supplemental EA.  Ultimately, RUS published a FONSI on October 6, 2023, and FWS published a FONSI on February 22, 2024.  FONSIs are not required to be open to public comment; nor must they be presented at public hearings.  40 C.F.R. § 1506.6(c); 43 C.F.R. § 46.305(c) ("Comments on a finding of no significant impact do not need to be solicited . . . .").)  The agency must merely notice its availability once complete.  *Id.* (requiring only public notice that a FONSI has been issued); 7 C.F.R. § 1970.102(b)(8) (same); 40 C.F.R. § 1501.6(a)(1) (same).  Consistent with 43 C.F.R. § 46.305(c), 7 C.F.R. § 1970.102(b)(8),

and 40 C.F.R. § 1501.6(a)(1), therefore, the agencies' FONSIs were published online and were also sent directly to plaintiffs. Accordingly, plaintiffs have identified no statute or regulation that required the Federal Defendants to provide more opportunities for public participation than were already provided.

Finally, the court notes that based on the administrative record, plaintiffs had multiple opportunities to comment on the land exchange and the environmental impacts of the CHC Project on the Refuge. Although they imply that the final details of the land exchange were a surprise, they also assert throughout their briefing that the environmental impact of the land exchange is substantially the same as the EAs for the originally proposed right-of-way over the Oak Road Property considered back in 2018 when the Draft EIS was released. Regardless, the evidence shows that plaintiffs were afforded and took the opportunity to provide comments throughout the review process on potential impacts: even commenting with respect to the EA that the land exchange resulted in a "net benefit" to the Refuge. (RUS-AR-001089–090.) Accordingly, plaintiffs have failed to prove that the Federal Defendants violated NEPA by depriving them of the ability to participate in the environmental review of the CHC Project, and defendants are entitled to summary judgment on all plaintiffs' claims.

## ORDER

IT IS ORDERED that

1. Plaintiffs' motion for reconsideration and renewed motion for preliminary injunction (dkt. #101) is DENIED.

2. Intervenor-defendants' motions to strike (dkt. ##131, 132, 169) are DENIED.

3.  Intervenor-defendants' motion to dismiss count 7 of the amended complaint (dkt. #136) is DENIED as moot.

4.  Intervenor-defendants' motion for summary judgment (dkt. #142) is GRANTED.

5.  Plaintiffs' motion for summary judgment (dkt. #145) is DENIED.

6.  Federal defendants' motion for summary judgment (dkt. #148) is GRANTED.

7.  Plaintiffs' motion to supplement the administrative record (dkt. #151) is GRANTED.

8.  The parties' joint motion regarding oral argument (dkt. #177) is DENIED as moot.

9.  Plaintiffs' motion to strike declaration (dkt. #179) is DENIED.

10. Intervenor-defendants' motion for leave to file a reply brief in support of motion to strike (dkt. #182) is GRANTED.

11. The clerk of court is directed to enter final judgment for defendants and close this case.

Entered this 24th day of September, 2025.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge

51